FILED

2021 Mar-19  AM 11:52
U.S. DISTRICT COURT
N.D. OF ALABAMA

# UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF ALABAMA
## MIDDLE DIVISION

| | |
|---|---|
| AUNDRA DEBREL BOYKINS, )<br><br>    Plaintiff, )<br><br>v. )<br><br>JEFFERSON DUNN, COMMISSIONER; )<br>GUY NOE, WARDEN III; DEWAYNE; )<br>ESTES, WARDEN III, MARC WALKER, )<br>CORRECTIONS OFFICER; JOHN DOE 1, )<br>UNKNOWN SHIFT COMMANDER; and )<br>JOHN DOE 2, UNKNOWN SECURITY )<br>CAPTAIN; in their individual and official )<br>capacities, )<br><br>    Defendants. ) | Case No. 4:19-cv-01934-ACA |

## PLAINTIFF'S FOURTH AMENDED COMPLAINT

1.     Plaintiff Aundra Boykins ("Plaintiff") by and through his undersigned counsel respectfully submits this Fourth Amended Complaint in the above-captioned matter.

## PRELIMINARY STATEMENT

2.     Plaintiff is presently confined in the custody of the Alabama Department of Corrections ("ADOC") at St. Clair Correctional Facility ("St. Clair"), where chronic mismanagement, overcrowding, and inadequate staffing and security,

among other factors, have fostered a culture where prisoner-on-prisoner violence is both expected and accepted.  Although those in positions of authority within ADOC and at St. Clair have long been aware of these conditions, they have failed to remedy them.  As a result of Defendants' failure to uphold their duty to protect those in their custody, Plaintiff Aundra Boykins has been subjected to and severely injured by conditions of confinement violating the Eighth and Fourteenth Amendments to the United States Constitution.

3.      In late 2017, Mr. Boykins suffered an unprovoked attack by another inmate who entered Mr. Boykins's restricted-access dormitory while the lone correctional officer on duty slept at his post.  While attempting to rob Mr. Boykins of his belongings, the inmate stabbed Mr. Boykins approximately a dozen times. The correctional officer slept through most of the altercation; and even when he did wake, the officer did nothing to intervene or stop the assault.  Due to the severity of his injuries, Mr. Boykins was rushed to the University of Alabama at Birmingham Hospital, where he underwent emergency life-saving treatment.

4.      Mr. Boykins brings this action pursuant to 42 U.S.C. § 1983 to redress the devastating injuries he sustained due to Defendants' gross misconduct.  Mr. Boykins seeks injunctive and declaratory relief as well as actual and punitive damages for the violation of his rights as an inmate at St. Clair.  Specifically, Mr. Boykins seeks actual and punitive damages for Defendants' failure to take

reasonable measures to ensure his safety—including by properly staffing the prison, training and supervising corrections officers, and developing and implementing policies to minimize access to dangerous contraband—and to protect him from harm at the hands of an inmate known to be violent.  These failures constitute cruel and unusual punishment under the Eighth Amendment, made applicable to the states through the Fourteenth Amendment.

## JURISDICTION AND VENUE

5.      This Court has jurisdiction over the subject matter of this action pursuant to 28 U.S.C. §§ 1331 and 1343(a)(3).  The claims herein arise under the Constitution, laws, or treaties of the United States.

6.      Venue is proper in the Northern District of Alabama pursuant to 28 U.S.C. § 1391(b).  The claims alleged herein arise from an incident at St. Clair, an adult correctional facility located in Springville, Alabama that is part of ADOC. Because the events and omissions giving rise to Plaintiff's claims occurred in the Northern District of Alabama, venue is proper here.

## PARTIES

7.      Plaintiff Aundra Boykins (AIS #303786) is an inmate in the custody of ADOC.  At all times relevant to this action, Mr. Boykins was, and still is, an inmate at St. Clair.

8.     Defendant Commissioner Jefferson Dunn was at all times relevant hereto, and upon information and belief still is, the Commissioner of ADOC and acting under the color of Alabama state law.   As Commissioner of ADOC, Defendant Dunn is responsible for the management, staffing, and the safety and security of all inmates incarcerated within ADOC.  He is the highest ranking official in ADOC.  Defendant Dunn is sued in his individual and official capacities.

9.     At the time of the assault on Mr. Boykins, Defendant DeWayne Estes was employed by ADOC as the Warden of St. Clair, acting under the color of Alabama state law.  As Warden, Defendant Estes was responsible for the day-to-day operations at St. Clair, including overseeing the management, staffing, and supervision of all subordinate employees as well as the safety and security of all inmates.  Upon information and belief, Defendant Estes became the Warden of St. Clair in March 2015.  Defendant Estes is sued in his individual capacity.

10.     Defendant Guy Noe[1] is a current Warden of St. Clair, acting under the color of Alabama state law.  As Warden, Defendant Noe is responsible for the day-to-day operations at St. Clair, including overseeing the management, staffing, and

---

[1] Guy Noe is being substituted for DeWayne Estes as the Warden of St. Clair pursuant to Rule 25(d) of the Federal Rules of Civil Procedure, which states that "[a]n action does not abate when a public officer who is a party in an official capacity dies, resigns, or otherwise ceases to hold office while the action is pending.  The officer's successor is automatically substituted as a party."  Because former Warden Estes has been sued not only in his official capacity but also in his personal capacity, he nonetheless remains a party to this action.

supervision of all subordinate employees as well as the safety and security of all inmates.  Defendant Noe is sued in his official capacity.

11.     Defendant Correctional Officer Marc Walker was at all times relevant hereto, and upon information and belief still is, assigned as a correctional officer and acting under the color of Alabama state law.  Defendant Walker was the sole correctional officer on duty in Mr. Boykins's dormitory at the time that Mr. Boykins was assaulted by another inmate.  Defendant Walker failed to stop the inmate-assailant from attempting to rob Mr. Boykins and subsequently failed to prevent the inmate from stabbing Mr. Boykins.  Defendant Walker is sued in his individual and official capacities.

12.     Defendant John Doe 1 is the shift commander who was the direct supervisor of Defendant Walker on December 2, 2017 at the time of the attack on Mr. Boykins.  Upon information and belief, Defendant Doe 1 failed to properly train and supervise Defendant Walker, who was sleeping while on duty in the H-Dorm when Mr. Boykins was assaulted.

13.     Defendant John Doe 2 is the Captain of Security who was the supervisor of the correctional staff at St. Clair on December 2, 2017.  Upon information and belief, Defendant Doe 2 failed to properly train and supervise Defendant Walker, who was sleeping while on duty in the H-Dorm when Mr. Boykins was assaulted.

## FACTUAL ALLEGATIONS

### *The Unprovoked Attack on Mr. Boykins*

14.     On December 2, 2017, Plaintiff was serving a sentence of incarceration in the custody of ADOC and housed in the residential drug treatment program, the "New Outlook Therapeutic Community Program" ("TC Program"), at H-Dorm within St. Clair.

15.     H-Dorm is a housing unit that is dedicated to the prison's residential substance abuse treatment program.  H-Dorm is physically separated from the other housing units at St. Clair by fences and a lengthy tunnel.  At the time of the attack on Mr. Boykins, formal prison policy mandated that only those inmates participating in the TC Program or its aftercare programs were permitted to enter H-Dorm. However, unofficially, the Defendants followed a policy of non-enforcement, whereby basic safety rules including those governing the movement of inmates around the prison were routinely abandoned.

16.     As a result of this unwritten policy of non-enforcement, inmates from St. Clair's "general population" who were not authorized to enter H-Dorm frequently did so unimpeded due to inattentive and/or careless correctional officers who failed to enforce the official policy or properly monitor the ingress and egress of H-Dorm. Efforts by members of the general population to enter H-Dorm were further enabled

by a lack of adequate security measures in the form of functioning locks, barriers, and doors throughout the prison.

17.     At approximately 4:30 p.m. on December 2, 2017, Mr. Boykins was in the television room at H-Dorm when inmate Cortez Whittington (AIS #305423) ("Whittington") entered the H-Dorm building.

18.     Whittington was assigned to St. Clair's general population and was not authorized to access the H-Dorm building because he was neither an H-Dorm resident nor a member of the TC Program.

19.     On information and belief, Whittington had a history of violence, of which Defendants were warned and aware.

20.     Whittington entered the H-Dorm building without being identified or checked for dangerous contraband because, on information and belief, Defendant Walker was asleep at his post.  That Defendant Walker was asleep was not a rare occurrence, as Defendant Walker was known throughout the dormitory for frequently sleeping during his shifts.

21.     Defendant Walker was the sole correctional officer on duty in H-Dorm at the time that Whittington entered H-Dorm.

22.     Upon entering the H-Dorm building, Whittington started talking loudly and threatening the inmates present in the television room.  Whittington then focused his attention on Mr. Boykins and tried to extort Mr. Boykins for money and property.

When Mr. Boykins refused to surrender his belongings, Whittington brandished two prison-made weapons resembling knives and began repeatedly stabbing Mr. Boykins.

23.     On information and belief, Defendant Walker remained asleep as the attack unfolded, despite being in an open bay in the dormitory and not behind any door or window that could have muffled the noise.

24.     When the attack spilled into the main area of H-Dorm where Defendant Walker was stationed, Defendant Walker did not attempt to intervene or subdue Whittington or otherwise de-escalate the situation.   Other inmates eventually separated Whittington from Mr. Boykins, but not in time to prevent Mr. Boykins from being severely injured.

25.     Mr. Boykins suffered at least a dozen stab wounds to various parts of his body, including his abdomen, chest, back, shoulder, arm, leg, and hands, as well as pulmonary lacerations. Mr. Boykins required emergency treatment and hospitalization at the University of Alabama at Birmingham Hospital.  His injuries have resulted in severe, permanent scarring and disfigurement.  Years after the attack, Mr. Boykins continues to suffer bouts of sudden pain in the locations where he was stabbed, along with continued emotional and mental distress, pain, and suffering.

26.     Because of the extensive injuries he suffered, Mr. Boykins was unable to complete his participation in the 18-month TC Program, the completion of which could have materially affected his eligibility for parole.  That program is no longer offered at St. Clair.

27.     Plaintiff is unaware of Whittington being subject to any disciplinary action for the unprovoked attack.  Plaintiff is similarly unaware of Defendant Walker being subject to any disciplinary action for sleeping at his post.

### The Culture of Violence at St. Clair

28.     At the time of Whittington's vicious attack on Mr. Boykins and still at present, St. Clair was and is reputed to be one of the most dangerous prisons in the nation.  Mr. Boykins's experience is thus neither singular nor extraordinary.  Rather, it is emblematic of the widespread abuse permeating the institution and ADOC.

29.     Long before and including at the time of the incident, St. Clair was, by unwritten policy, underfunded, overcrowded, and short-staffed, leading to the many issues that stem from the inadequate supervision and monitoring of inmates and thereby engendering conditions posing an unreasonable risk of serious harm to inmates.

30.     Defendants have known about the deprivation of inmates' rights at St. Clair since at least October 13, 2014, when a class action was first filed against former ADOC Commissioner Kim Thomas ("Commissioner Thomas") and other St.

Clair officials in relation to the conditions at St. Clair.  *See* Complaint, *Duke v. Dunn*, No. 4:14-cv-01952-VEH-JHE (N.D. Ala. Oct. 13, 2014), ECF No. 1.  Defendant Dunn and Defendant Estes were substituted into the case when they assumed their positions as ADOC Commissioner and Warden of St. Clair, respectively, in 2015.

31.     The named plaintiffs in the class action alleged that "mismanagement, poor leadership, overcrowding, inadequate security, and unsafe conditions . . . ha[d] led to an extraordinarily high homicide rate, weekly stabbings and assaults, and a culture where violence is tolerated," which created conditions of confinement violating the Eighth and Fourteenth Amendments.  Second Amended Complaint at 2, *Duke v. Dunn*, No. 4:14-cv-01952-VEH-JHE (N.D. Ala. Aug. 28, 2015), ECF No. 53.  The plaintiffs further contended that ADOC and St. Clair officials had failed to promulgate, implement, and enforce the policies, procedures, and practices necessary to (a) adequately supervise and monitor the housing units and common areas and (b) maintain the safety and security of St. Clair inmates.  And with respect to the formal policies and procedures that *were* in place, St. Clair correctional staff failed to appropriately follow them, with impunity.  As part of their claims, the plaintiffs pointedly noted that prisoners were at risk of violence due to the defendants' failure to adequately enforce housing assignments and monitor inmate movement times—the same issue that led to Mr. Boykins's injury here, more than three years after Defendants were undeniably put on notice of these issues.

32.    To corroborate their claims, the named plaintiffs in the class action supplied statistics revealing the atypically high rate of stabbings and serious assaults at St. Clair.  For example, the rate of fights and assaults at St. Clair was 4,321 per 100,000 prisoners from January to May 2014.  This number, however, then nearly doubled to 7,680 per 100,000 prisoners from June 2014 to March 2015.  The plaintiffs also identified a series of incidents involving prisoner-on-prisoner abuse at St. Clair, including: four stabbings, one rape, one sexual assault, and one assault in January 2015; two stabbings, one assault, and one rape in February 2015; four stabbings and one assault in March 2015; two rapes and one stabbing in April 2015; one robbery and one assault in May 2015; one stabbing in May or June 2015; and two stabbings in July 2015.  The plaintiffs then listed 23 other incidents occurring between 2011 and 2014, including stabbings, rapes, assaults, and murders.  As the dates make clear, all of these attacks occurred before Mr. Boykins was attacked in 2017.

33.    Counsel for the named plaintiffs in the class action also sent a letter to then-Commissioner Thomas in April 2014 to flag the alarming rise in violence at St. Clair, and later met with Commissioner Thomas to underscore these concerns. Second Amended Complaint at 8, *Duke v. Dunn*, No. 4:14-cv-01952-VEH-JHE (N.D. Ala. Aug. 28, 2015), ECF No. 53.  But only around a month and a half later, plaintiffs' counsel was prompted to send a second letter to Commissioner Thomas

following yet another murder of a St. Clair inmate.  In this letter, plaintiffs' counsel again documented and recounted the unusually high rate of violence and number of homicides at St. Clair in the preceding 30 months.  Counsel for the plaintiffs further detailed the mismanagement and violent conditions at St. Clair and called for immediate reform and change in leadership.  *Id.*

34.    In 2017, the parties in the class action reached a settlement in which ADOC promised to implement multiple reforms, such as installing video cameras for security monitoring.   But ADOC did not follow through on its promise, forcing the parties to return to mediation in 2018.  Then, on July 31, 2020, the parties submitted a joint request to stay the action in order to continue negotiating a (second) resolution.  Joint Motion to Stay/Extend Stay, *Duke v. Dunn*, No. 4:14-cv-01952-VEH-JHE (N.D. Ala. July 31, 2020), ECF No. 194.   Thus, Defendants here, including Defendant Dunn and Defendant Estes—both named defendants in the *Duke* class action—were aware of the ongoing security issues for several *years* prior to the attack on Mr. Boykins.

35.    In addition to the above class action, an investigation initiated by the federal government similarly prompted Defendants to confront the deplorable conditions of ADOC prisons, including St. Clair.  The Department of Justice's Civil Rights Division (the "Department") opened an investigation into the level of violence at ADOC prisons in October 2016, just over a year before Mr. Boykins was

viciously stabbed.  In its report, published in 2019, the Department and the U.S. Attorney's Offices for the Northern, Middle, and Southern Districts of Alabama examined the conditions within ADOC prisons that were exposing inmates to unchecked abuse.  The government concluded that there was reasonable cause to believe that the conditions in Alabama's prisons for men, including St. Clair, violate the Eighth Amendment.  U.S. DEP'T OF JUSTICE CIVIL RIGHTS DIVISION & U.S. ATTORNEY'S OFFICES FOR THE NORTHERN, MIDDLE, AND SOUTHERN DISTRICTS OF ALA., INVESTIGATION OF ALABAMA'S STATE PRISONS FOR MEN 1 (2019), https://www.justice.gov/crt/case-document/file/1149971/download ("DOJ Report").

36.    The government characterized such violations as severe and systemic and exacerbated by serious deficiencies in: staffing and supervision, overcrowding, ineffective housing and classification protocols, inability to control the flow of contraband into and within the prison (including illegal drugs and weapons), ineffective prison management and training, and a high level of violence that is too common, cruel, of an unusual nature, and pervasive.  The Department's own experts found that, based on their experience, the amount of prisoner-on-prisoner violence in Alabama's prisons was much higher than in other similar systems.  The Department further noted that ADOC authorities had known about these issues at least several years prior to the start of the investigation, referencing the pleas made to ADOC in 2014 by plaintiffs' counsel in the *Duke* class action.

37.     The DOJ Report explained that ADOC's attempts to separate potential predators from victims through classification and housing policies are undermined by deficient supervision, which enables prisoners to roam between different housing units without staff intervention.   A review of incident reports from 2017, for example, found over 1,100 incidents of prisoners being in an unauthorized location.

38.     In addition, dangerous contraband is rampant at St. Clair.   The Department's review of incident reports revealed that in hundreds of these reports, weapons of some kind were used.   Interviews with staff and inmates also made clear that weapons were ubiquitous within ADOC institutions, thus contributing to frequent stabbings and other violent attacks, such as:

> a.   In May 2016, a St. Clair inmate was strangled to death.  Less than two weeks before his death, this inmate had been assaulted over a debt.
>
> b.   In March 2017, a St. Clair inmate was stabbed by two other inmates. When an officer yelled at the assailants to stop, one of the assailants ran away while the other continued to stab the victim.
>
> c.   In July 2017, a St. Clair inmate was stabbed.  In September 2018, that same inmate was stabbed to death while still incarcerated at St. Clair.
>
> d.   Also in July 2017, a St. Clair inmate was found tied up and strangled to death.

e.  In September 2017, a St. Clair inmate was stabbed while being escorted by two officers to the health care unit.

f.  Also in September 2017, a St. Clair inmate was beaten by two prisoners with a sock filled with metal locks.  Due to the severity of his injuries, the inmate was transported to an outside hospital for emergency treatment.

g.  In October 2017, St. Clair staff discovered an inmate in the prison yard wearing only a blanket and socks.  The inmate had been assaulted and severely beaten.  He was bound and taped around his hands, ankles, mouth, and head and had fresh burn marks on his face.

h.  In February 2018, a St. Clair inmate was killed in a knife fight by another prisoner with an extensive history of being disciplined for possessing contraband weapons.

i.  Also in February 2018, an officer found a St. Clair inmate running down the hallway with an eight-inch, metal homemade knife embedded in the back of the inmate's head.

j.  Also in February 2018, a St. Clair inmate was repeatedly physically and sexually assaulted by his cellmate over the course of several days.[2]

---

[2] DOJ Report at 13-24 (listing numerous examples of inmate-on-inmate abuse).

39.     The Department further expressed that it had reasonable cause to believe that ADOC was not recording all violent events in incident reports, meaning that it was possible, and perhaps likely, that the violence and harm to inmates was greater than what was being reported.  But even with this suspected gap in records, the Department found that the available incident reports demonstrated a strong pattern of evidence of deficient supervision and a systemic failure across ADOC institutions to provide humane conditions and confinement and take reasonable measures to guarantee inmate safety.  DOJ Report at 18.  Although the DOJ Report was released after Mr. Boykins's assault, ADOC and St. Clair officials, including Defendants, were aware of the events captured in the DOJ Report via official prison records.

40.     The Department therefore concluded that the totality of these conditions pose a substantial risk of serious harm to prisoners (as well as to ADOC's own correctional officers), even when that harm has not yet occurred.  The Department additionally found that the State of Alabama is deliberately indifferent to that harm or serious risk of harm and has failed to correct known systemic deficiencies that contribute to this culture of violence.

41.     In another more recent report, published in July 2020, the Department explained that the severe and pervasive overcrowding in Alabama prisons increases

tensions and escalates episodes of violence between prisoners.[3]  The Department found: "In an adequately staffed prison, officers can use a show of force and command presence to discourage fighting among prisoners or to quickly end fighting through sheer force of their numbers.  But because Alabama's prisons are severely overcrowded and operate substantially below the necessary staffing level, officers often find themselves near instances of prisoner violence."[4]  This report additionally noted that since the issuance of the April 2019 DOJ Report, the overcrowding within Alabama's prisons had increased even more.[5]

42.    A news article from June 2012 shows that these problems had been compounding since before 2012, with violence described as "commonplace" in Alabama's prisons.[6]  At that time, former Commissioner Thomas acknowledged that violence was an "ongoing challenge" that was rendered all the more difficult by "having too many inmates and two few officers."  In March of 2012, Commissioner Thomas led news reporters on a tour through St. Clair to highlight the dangerous conditions resulting from overcapacity and understaffed prisons.

---

[3] U.S. DEP'T OF JUSTICE CIVIL RIGHTS DIVISION & U.S. ATTORNEY'S OFFICES FOR THE NORTHERN, MIDDLE, AND SOUTHERN DISTRICTS OF ALA., INVESTIGATION OF ALABAMA'S STATE PRISONS FOR MEN 2 (2020), https://www.justice.gov/crt/case-document/file/1297031/download?utm_medium=email&utm_source=govdelivery.

[4] Id.

[5] Id. at 21.

[6] Robin DeMonia, *Alabama prison violence rising in overcrowded system*, THE BIRMINGHAM NEWS (June 3, 2012), https://www.al.com/spotnews/2012/06/post_760.html.

43.     Further, in a December 2015 interview filmed before the start of the federal government's investigation, Defendant Dunn remarked that St. Clair "stood out" due to its violence and that it remained an "ongoing concern."[7] Defendant Dunn explained that the severity of the  understaffing—with St. Clair only having 57% of the staff it needed at the time—created a situation in which correctional officers were expected to perform beyond the scope of their training.

44.     In addition, a news article published several months later in April 2016 featured an interview with a St. Clair correctional officer who discussed the level of danger present at the prison on condition of anonymity.[8]   When asked about a specific October 2015 event in which a package containing two handguns, drugs, and cell phones was thrown over a fence at St. Clair, the officer attributed the incident to Defendant Estes's decision to cease staffing a certain security tower.  In response, an ADOC spokesperson said that the low staffing level at St. Clair required the Warden to close two outside posts.

45.     During his interview, the St. Clair officer also explained that for any given shift, only three to ten correctional officers actively patrolled the prison.  And

---

[7] Lauren Walsh, *ADOC Commissioner: Overcrowding, understaffing breeding violence at St. Clair Prison*, ABC 33/40 (Dec. 10, 2015), https://abc3340.com/news/local/adoc-commissioner-overcrowding-understaffing-breeding-violence-at-st-clair-prison.

[8] Clare Huddleston, *EXCLUSIVE: St. Clair Correctional Officer talks to WBRC about prison issues*, WBRC FOX6 News (Apr. 7, 2016), https://www.wbrc.com/story/31672139/exclusive-st-clair-correctional-officer-talks-to-wbrc-about-prison-issues/.

because all of the other officers were required to stay at their posts, only these three to ten "roving" officers could respond to various incidents around the prison, such as a stabbing.

46.    Further, a *New York Times* article from March 2017—around eight months before Plaintiff's injury—detailed the "grim regularity" of attacks at St. Clair, saying that even by the standards of ADOC, "one of the nation's most dysfunctional prison systems," St. Clair stood out for its violence.[9]  One corrections expert said that the frequency of assaults resulting in life-threatening injuries was among the highest he had observed in his 43-year career in corrections.  Specifically, in the fiscal year ending in September 2016, there were 249 reported assaults at St. Clair, which amounted to a more than tenfold increase from the same point six years prior.   During that same period, however, the number of correctional officers *decreased* by nearly half.  And with respect to the issue of dangerous contraband, the article stated that estimates of how many St. Clair inmates were armed ran from "well over half to just about everyone."  The article further included a prescient quote from Defendant Dunn characterizing ADOC prisons as already the most overcrowded but that it would not "be long until we're **the most understaffed and most violent**."[10]

---

[9] Campbell Robertson, *An Alabama Prison's Unrelenting Descent Into Violence*, N.Y. TIMES (Mar. 28, 2017), https://www.nytimes.com/2017/03/28/us/alabama-prison-violence.html.

[10] *Id.* (emphasis added).

47. Given all of the above, it is apparent that Defendants knew about the ongoing problem with inmate-on-inmate abuse at St. Clair for *years* prior to the date of Mr. Boykins's injury. Yet Defendants did not take any reasonable steps to remedy prison conditions or put an end to the unwritten policy of non-enforcement permitting these inhumane conditions to persist, even when required to do so pursuant to at least one settlement agreement. The systemic failures and lack of oversight perpetuated by Defendants directly led to the life-threatening injuries that Mr. Boykins, and many others like him, suffered while in the custody of ADOC. Consequently, prisoner-on-prisoner violence was, is, and will continue to be a regular and accepted occurrence at St. Clair so long as these issues go unaddressed.

### *Rampant Overtime in the Face of Severe Understaffing Leads to Exhausted Officers*

48. Along with the epidemic of prisoner-on-prisoner violence left unchecked throughout ADOC, another deleterious norm at St. Clair is the culture of "voluntary mandatory overtime," designed to combat the perpetual staff shortage.

49. A 2016 interview with a St. Clair correctional officer reported that officers were regularly required to add at least four hours to their 12-hour shifts whenever shifts were understaffed.[11] This practice then evolved into the voluntary mandatory overtime program, where officers were mandated to pick up extra shifts,

---

[11] Huddleston, *supra* note 8.

but could "choose" the day of the week on which to serve this overtime.  Indeed, Defendant Estes admitted during his December 2015 deposition in the *Duke* class action that officers at St. Clair are required to work a total of 24 hours of overtime each month.[12]  Thus, as the prison became more and more dangerous, staffing issues increased and already under-resourced officers were forced to work extra hours to pick up the slack.

50.    Given that officers could double or even triple their yearly salaries with overtime, officers were incentivized to take on more shifts than they could safely handle.  A May 2018 news article—fewer than six months after Mr. Boykins's attack and while both Defendants Dunn and Estes were still overseeing operations at St. Clair—reported that although St. Clair's policy prohibited correctional officers from working more than 80 hours per week, this policy historically was not enforced.[13] In fact, the DOJ Report notes that "[i]n fiscal year 2017, a correctional officer at St. Clair with a base pay of $38,426.60, earned almost $80,000 in overtime. Extrapolating that amount in overtime pay, the officer averaged 90-95 hours per week."  DOJ Report at 11.

---

[12] *See* Deposition of D. Estes at 42:17-20 (taken on December 16, 2014), *Duke v. Dunn*, No. 4:14-cv-01952-VEH-JHE. ("Q: Okay. So that's a total of 24 hours mandatory overtime each month?  A: Yes, ma'am.").

[13] Brian Pia, *Alabama corrections officer makes almost as much as the governor*, ABC 33/40 (May 2, 2018), https://abc3340.com/news/local/state-overtime-investigation-its-your-money.

51.     This pattern and practice of correctional officers working excessive overtime posed and continues to pose a significant threat to the safety of inmates as well as other officers.   While the ratio of officers to prisoners was already endangering vulnerable inmates, the fact that many of the officers are working while severely exhausted only exacerbates the issue.   Indeed, even after the aforementioned officer—who earned more than double his base salary by working overtime in 2017—was disciplined for falling asleep in a prisoner's cell, he was permitted to work these extreme overtime hours for several consecutive years.   The Department similarly notes in its report that it found numerous ADOC incident reports where correctional officers were caught sleeping in cubicles, hospitals, and perimeter security vehicles.   DOJ Report at 49.   The Department also received accounts from prisoners who had seen officers asleep on duty.   *Id.* at 11.

52.     It is no surprise, then, that on December 2, 2017, when Defendant Walker was tasked with supervising H-Dorm alone, he was asleep at his post. Although only those inmates residing in H-Dorm or participating in the TC Program were permitted to enter H-Dorm, Defendant Walker followed the unwritten policy of non-enforcement, failing to monitor who was entering the building and turn away those who were not authorized to enter.   Defendant Walker further failed to inspect the persons entering H-Dorm to ensure they were not bringing contraband, such as homemade knives, into the dormitory.   Because of these failures, Whittington was

able to enter H-Dorm unimpeded with two contraband weapons, which he used to severely wound Mr. Boykins.

53.     It was the responsibility of those in positions of authority, from Defendants Does 1 and 2 through Estes and Dunn, to control the operations of the prison through proper staffing and by enforcing the hour limitations that correctional officers can work in a week.   Defendants' repeated disregard of ADOC policies allowed for the dangerous combination of inmate-on-inmate violence and unreasonable overtime to flourish.   Defendants failed to perform their duties to protect the wellbeing of those in their custody, jeopardizing the safety of Mr. Boykins and all others incarcerated at St. Clair.

## CAUSE OF ACTION

### Violation of Eighth Amendment Pursuant to 42 U.S.C. § 1983

54.     Plaintiff adopts and incorporates by reference the allegations set forth in the preceding paragraphs as though fully set forth herein.

55.     Plaintiff brings this claim against Defendants, jointly and severally, for cruel and unusual punishment in violation of the Eighth Amendment, which is a constitutional tort cognizable by and through 42 U.S.C. § 1983.

56.     The Eighth Amendment imposes on prison officials the duty to provide humane conditions of confinement, which includes taking reasonable measures to guarantee the safety of inmates and protecting them from violence at the hands of

other prisoners.  Conditions of confinement that inflict unnecessary pain or suffering upon a prisoner are found where there is an unjustified constant and unreasonable exposure to violence.  Being repeatedly stabbed with crude weaponry is not—and in no civilized society can be—a part of the penalty paid by prisoners for their offenses.

57.     Defendants were aware of the longstanding problem of inmate-on-inmate abuse within the Alabama prison system, particularly at St. Clair.  Defendants knew that such violence was occurring on a regular basis due to the ubiquity of contraband among inmates and inadequate supervision and monitoring by correctional officers, related to issues of improper training and understaffing.

58.     Defendants, while acting under the color of state law, recklessly, willfully, and/or intentionally deprived Plaintiff of his rights under the Eighth Amendment by failing to take reasonable measures to guarantee his safety—including by properly staffing the prison, training and supervising correctional officers, and developing and implementing policies to minimize inmates' access to dangerous contraband—and to protect Plaintiff from violence at the hands of other inmates at St. Clair.

59.     That Defendant Walker was the only officer assigned to monitor a dorm housing around 200 men is itself patently unreasonable.  Defendants John Doe 1 and John Doe 2, Defendant Walker's shift coordinator and Security Captain, respectively, at the time of the incident, are likewise culpable for allowing such

inadequate understaffing, and for further failing to stop Defendant Walker from sleeping on the job.

60.     In addition, issues of overcrowding, understaffing, the failure to identify and segregate violent inmates, the failure to limit contraband, the ready availability of knives and other weaponry, and the failure to control prisoner movement collectively posed a substantial risk of serious harm to Plaintiff.  These circumstances, alongside the fact that H-Dorm had and continues to have no cameras, no grievance process for abused inmates, and no functioning disciplinary process for misbehaving officers, led to the full-fledged denial of Plaintiff's constitutional rights.

61.     In engaging in this unlawful conduct, Defendants were not acting within their discretionary authority, and their conduct violated clearly established rights, including Plaintiff's constitutional right to be free from physical assault by other inmates.

62.     By failing to address the known problems that cause prisoner-on-prisoner abuse—including inadequate supervision and monitoring, failure to identify and segregate violent inmates like Whittington, and failure to suppress contraband—Defendants, through their policies, practices, acts and omissions, exhibited and continue to exhibit deliberate indifference to the substantial risk of serious physical harm to Plaintiff, in violation of Plaintiff's rights to be free from cruel and unusual

punishment under the Eighth and Fourteenth Amendments.  It is unreasonable for Defendants to do nothing when confronted with prison conditions posing a risk of serious physical harm to inmates.

63.    As a direct and proximate result of Defendants' conduct, Plaintiff was repeatedly stabbed by an inmate who was known to be violent and not authorized to be in the H-Dorm building, and suffered far more than minimal injuries.  Plaintiff consequently suffered, and continues to suffer, from physical pain along with lasting psychological trauma.

## JURY DEMAND

64.    Plaintiff hereby demands a jury trial.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff respectfully requests that this Court grant judgment in his favor, and upon final hearing, grant the following relief:

1. Declare that Defendants' acts and omissions, described herein, violated the Eighth and Fourteenth Amendments to the United States Constitution;

2. Order Defendants to comply with the Constitution and enter an injunction prohibiting Defendants from engaging in further violations of the Eighth and Fourteenth Amendments to the United States Constitution;

3.  Enter a judgment in Plaintiff's favor and against all Defendants;

4.  An order awarding actual damages in an amount no less than $100,000, to be proven at trial for violations of federally protected rights that have been clearly established;

5.  Award Plaintiff compensatory damages against Defendants, jointly and severally, in an amount to be determined at trial;

6.  Award Plaintiff punitive damages against Defendants, jointly and severally;

7.  Award Plaintiff's reasonable attorneys' fees, litigation expenses and costs pursuant to 42 U.S.C. § 1988 and any other applicable law; and

8.  Order such other relief as the Court deems just and proper.


Respectfully submitted,

Date: March 19, 2021


/s/ *Susan K. Leader*
J.S. "Chris" Christie, Jr. (ASB-3162-H07J)
R.   Terrell   Blakesleay   (ASB-5910-B00U)
SIROTE & PERMUTT, P.C.
2311 Highland Avenue South
Post Office Box 55727
Birmingham, AL 35255-5727
Tel:   (205) 930-5100
Fax:   (205) 930-5101

cchristie@sirote.com
tblakesleay@sirote.com

Susan K. Leader
Molly E. Whitman
*Admitted pro hac vice*
Akin Gump Strauss Hauer & Feld LLP
1999 Avenue of the Stars, #600
Los Angeles, CA 90067

Attorneys for Plaintiff


## CERTIFICATE OF SERVICE

I hereby certify that on March 19, 2021, I electronically filed the foregoing, which will send notification of such filing to the following:

| | |
|---|---|
| Neva C. Conway<br>Assistant Attorney General<br>General Civil Division<br>Office of the Attorney General<br>State of Alabama<br>501 Washington Avenue<br>P.O. Box 300152<br>Montgomery, AL 36130<br>334-242-7374 (Office)<br>334-549-3967 (cell)<br>Neva.conway@alabamaag.gov<br>**Attorney for Marc Walker** | William R. Lunsford<br>Stephen C. Rogers<br>MAYNARD, COOPER & GALE, P.C.<br>655 Gallatin Street<br>Huntsville, Alabama 35801<br>Telephone: (256) 551-0171<br>Facsimile: (256) 512-0119<br>blunsford@maynardcooper.com<br>srogers@maynardcooper.com<br>**Attorneys for Defendant Jefferson**<br>**Dunn** |

/s/ J.S. "Chris" Christie, Jr.
One of the Attorneys for Plaintiff