FILED
2023 Feb-20  PM 12:54
U.S. DISTRICT COURT
N.D. OF ALABAMA

# IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF ALABAMA
## MIDDLE DIVISION

|  |  |  |
|---|---|---|
| **AUNDRA DEBREL BOYKINS,** | ) | |
| **Plaintiff,** | ) | |
| | ) | |
| | ) | **Case No. 4:19-CV-1934-ACA** |
| **v.** | ) | |
| | ) | |
| **JEFFERSON DUNN**, *et al.*, | ) | |
| **Defendants.** | ) | |

## THE CORRECTIONAL OFFICIALS' MEMORANDUM OF LAW IN SUPPORT OF MOTION FOR SUMMARY JUDGMENT

# **TABLE OF CONTENTS**

Table of Contents ................................................................................. i

Table of Authorities ........................................................................... iii

Introduction ......................................................................................... 1

Legal Standard .................................................................................... 2

Narrative Statement of Undisputed Facts ........................................... 3

    A.    Procedural History ................................................................ 3

    B.    The Incident ......................................................................... 4

            Post-Incident Medical Treatment ................................. 10

            ADOC's Investigation of the Incident ......................... 11

            Disciplinary Sanctions ................................................. 12

            Plaintiff's Incarceration Following the Incident ......... 13

    C.    The Correctional Officials and Their Authority ................. 14

            Former Commissioner Jefferson Dunn ....................... 14

            Commissioner John Hamm ......................................... 16

            Warden Dewayne Estes ............................................... 20

            Warden Guy Noe ......................................................... 21

Expert Testimony .............................................................................. 23

    I.    The Parties' Experts ........................................................... 23

    II.    Opinions Regarding Plaintiff's Claim That Estes Should Have Prevented the Incident ........................................................ 24

    III.    Opinions Regarding Ongoing Efforts at St. Clair ............. 27

Argument ........................................................................................... 31

i

I.      Plaintiff's Individual-Capacity Claim Against Estes Fails as a Matter
        of Law ................................................................................................31

        A.      Estes' Supervisory Role Precludes Any Individual Liability...32

        B.      Plaintiff Failed to Establish a Substantial Risk of Serious
                Harm...........................................................................................33

        C.      Plaintiff Failed to Establish That Estes Acted With Deliberate
                Indifference ...............................................................................36

II.     Estes is Entitled to Qualified Immunity from Plaintiff's
        Individual-Capacity Claim.................................................................39

        A.      Estes Acted Within His Discretionary Authority ......................40

        B.      Plaintiff Cannot Establish Estes Violated Clearly Established
                Law.............................................................................................41

III.    Plaintiff Failed to Establish an Official-Capacity Claim Against
        Commissioner Hamm or Warden Noe ................................................43

        A.      The Eleventh Amendment Bars Plaintiff's Official-Capacity
                Claim...........................................................................................43

        B.      Plaintiff Failed to Establish Deliberate Indifference .................45

Conclusion .........................................................................................................48

Certificate of Service ........................................................................................50

# TABLE OF AUTHORITIES

Cases

*Anderson v. Creighton*
  483 U.S. 635 (1987) ............................................................39

*Anderson v. Liberty Lobby, Inc.*,
  477 U.S. 242 (1986) ...........................................................2

*Ashcroft v. Iqbal*
  556 U.S. 662 (2009) .................................................... 32, 40

*Beck v. Hamblen Cnty., Tenn.*
  969 F.3d 595 (6th Cir. 2020) ...............................................42

*Celotex Corp. v. Catrett*,
  477 U.S. 317 (1986) ...........................................................2

*Chandler v. Crosby*
  379 F.3d 1278 (11th Cir. 2004) ............................... 45, 46, 47

*Cox v. Nobles*
  15 F.4th 1350 (11th Cir. 2021) .............................................36

*Ex parte Young*,
  209 U.S. 123 (1908) .................................................... 43, 44

*Farmer v. Brennan*
  511 U.S. 825 (1994) ...........................................................46

*Green v. Mansour*
  474 U.S. 64 (1985) ............................................................43

*Harrison v. Culliver*
  746 F.3d 1288 (11th Cir. 2014) .................................... 32, 34

*Harrison v. Culliver*,
  746 F.3d 1288 (11th Cir. 2014) ...........................................42

*Hoffer v. Sec'y. Fla. Dep't of Corrs.*
  973 F.3d 1263 (11th Cir. 2020) ...........................................47

*Holloman ex rel. Holloman v. Harland*
  370 F.3d 1252 (11th Cir. 2004) ...........................................40

*Jones v. Fransen*
  857 F.3d 843 (11th Cir. 2017) .............................................41

*Kentucky v. Graham*
    473 U.S. 159 (1985) ..................................................................43

*Lee v. Ferraro*
    284 F.3d 1188 (11th Cir. 2002) ........................................ 39, 40

*Marbury v. Warden*
    936 F.3d 1227 (11th Cir. 2019) .................................... passim

*McCullough v. Antolini*
    559 F.3d 1201 (11th Cir. 2009) ...............................................41

*Mosley v. Zachary*
    966 F.3d 1265 (11th Cir. 2020) ...............................................37

*Nicholl v. Atty. Gen. of Ga.*
    769 F. App'x 813 (11th Cir. 2019) ........................................44

*Pearson v. Callahan*
    555 U.S. 223 (2009) .................................................. 40, 41

*Pinto v. Nettleship*
    737 F.2d 130 (1st Cir. 1984) ....................................................38

*Riva-Villegas v. Cortesluna*
    142 S. Ct. 4 (2021) ....................................................................41

*Summit Med. Assocs, P.C. v. Pryor,*
    180 F.3d 1326 (11ᵗʰ Cir. 1999) ...............................................44

*Swain v. Junior*
    961 F.3d 1276 (11th Cir. 2020) ................................... passim

*Valentine v. Collier*
    956 F.3d 797 (5th Cir. 2020) ...................................................48

*Williams v. Bennett*
    689 F.2d 1370 (11th Cir. 1982) ....................................... 38, 42, 43

**Statutes**

42 U.S.C. § 1983 .............................................................................3

**Rules**

Fed. R. Civ. P. 56(a) .......................................................................2

Fed. R. Civ. P. 25 ...........................................................................3

iv

Fed. R. Civ. P. 25(d) ...............................................................................16

Defendants Commissioner John Hamm ("Commissioner Hamm"), Guy Noe ("Warden Noe"), and Dewayne Estes ("Estes" and, together with Commissioner Hamm and Warden Noe, the "Correctional Officials") submit this Memorandum in support of their Motion for Summary Judgment. (Doc. 132, the "Motion").

## INTRODUCTION

Plaintiff – an inmate in the custody of the Alabama Department of Corrections ("ADOC") – filed this action blaming various ADOC officials for an altercation allegedly instigated by another inmate at St. Clair Correctional Facility ("St. Clair") on December 2, 2017 (the "Incident"). Plaintiff seeks to hold certain ADOC officials individually liable for this Incident, while purportedly seeking broad injunctive relief against current ADOC leaders. In pursuing these claims, Plaintiff does not claim anyone received actual notice of any specific threat to Plaintiff. Rather, Plaintiff proceeds under a novel theory of a generalized risk allegedly common to every inmate incarcerated at St. Clair. As discussed herein, no evidentiary or legal basis supports this theory.

Plaintiff's claims fail as a matter of law for the following three (3) reasons:

(1)    Plaintiff failed to establish an individual-capacity claim against Estes;

(2)    Plaintiff cannot overcome Estes's entitlement to qualified immunity from Plaintiff's individual-capacity claim; and

(3)    Plaintiff cannot establish an official-capacity claim against Commissioner Hamm or Warden Noe.

1

For these reasons, the Correctional Officials respectfully request that the Court enter judgment as a matter of law in their favor as to all claims asserted against them.

## LEGAL STANDARD

Rule 56 of the <u>Federal Rules of Civil Procedure</u> provides that "[t]he court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a); <u>Anderson v. Liberty Lobby, Inc.</u>, 477 U.S. 242, 248 (1986). "[T]he plain language of Rule 56(c) mandates the entry of summary judgment . . . against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." <u>Celotex Corp. v. Catrett</u>, 477 U.S. 317, 322-24 (1986).

A plaintiff cannot defeat a motion for summary judgment without an affirmative presentation of facts showing a genuine issue and may not merely rely on the general allegations of the pleadings. <u>Anderson</u>, 477 U.S. at 248. A plaintiff must "go beyond the pleadings and by [his] own affidavits, or by the 'depositions, answers to interrogatories, and admissions on file,' designate 'specific facts showing that there is a genuine issue for trial.'" <u>Celotex</u>, 477 U.S. at 324 (quoting former Fed. R. Civ. P. 56(e)). Because Plaintiff cannot produce any, much less substantial, evidence supporting his claims, the Correctional Officials are entitled to summary judgment.

## NARRATIVE STATEMENT OF UNDISPUTED FACTS

**A.    PROCEDURAL HISTORY**

1.    Plaintiff - an inmate currently incarcerated in the ADOC system - is serving a life sentence for the murder of a 2-year-old child and attempted murder of another female victim.  (Doc. 141-10, 5, 16 (Ex. J., 16:11-12; 123:11-18).

2.    Plaintiff instituted this action based upon the December 2, 2017, Incident at St. Clair involving an altercation between Plaintiff and another St. Clair inmate.  (Doc. 65, ¶ 3).

3.    Plaintiff asserts a single cause of action for "violation of Eighth Amendment pursuant to 42 U.S.C. § 1983" against Commissioner Hamm, Warden Noe, and Estes.  (Id., ¶¶ 54-63).[1]

4.    Plaintiff names Estes "in his individual capacity" and Commissioner Hamm and Warden Noe in their "official capacit[ies]."  (Id., ¶¶ 8-10).

5.    The Parties participated in extensive discovery, including the production of approximately 24,500 pages of documents, thirteen (13) depositions, and two (2) expert site visits.  (Doc. 123).

---

[1] Plaintiff originally named former Commissioner Jefferson Dunn "in his individual and official capacities" (doc. no. 65, ¶ 8), but, on November 14, 2022, the Court dismissed the individual-capacity claim against Dunn *with prejudice*.  (Doc. No. 120)  Under Rule 25 of the Federal Rules of Civil Procedure, Commissioner Hamm replaced Dunn on the official-capacity claim upon taking office on January 1, 2022.

**B.    THE INCIDENT**

6.     Plaintiff entered ADOC custody on April 26, 2016.  (Doc. 141-5, 75 (Ex. E-5)).

7.     In September 2016, Plaintiff requested and applied to participate in a "therapeutic community" drug treatment program (the "TC Program") offered at St. Clair.  (Doc. 141-10, 6, 7 (Ex. J, 61:12-62:11)).

8.     St. Clair is a security-level V close-custody prison that "houses Close, Medium and Minimum Custody inmates."  (Doc. 141-9, 8-15 (Ex. I-2)).

9.     ADOC designates its facilities as security levels I, II, IV, and V, with security level V constituting the most secure and restrictive environment in the ADOC system. (Doc. 141-2, 3 (Ex. B, ¶ 4)).

10.     While St. Clair houses inmates at various security levels, its inmates include some of "the most violent and highest classified offenders in ADOC custody."  (Id.).

11.     ADOC separately classifies inmates by custody level such as "Close" and "Medium." (Id., ¶ 5).

12.     Inmates designated as "Close" custody require "the most restrictive custody level within ADOC[,]" and may "include ADOC inmates with prior escape attempts, inmates exhibiting violent behavior, and inmates who demonstrate an inability to follow institutional regulations." (Id.).

13.    ADOC houses Inmates designated as "Medium" custody in less restrictive housing than Close custody inmates, and such housing often offers "institutional programming and [utilizes] dormitory living or [] double occupancy cells."  (Id., 4, ¶ 5).

14.    After Plaintiff's admission to the TC Program, ADOC transferred him to St. Clair for this purpose.  (Doc. 141-10, 6-7, 9 (Ex. J., 61:24-62:11; 71:14-16)).

15.    Plaintiff received no warnings about St. Clair, and he believed it to be "[n]o different from any other prison" in terms of violence.  (Id., 8, (Ex. J, 69:13-25).

16.    Upon Plaintiff's arrival at St. Clair, ADOC assigned him to H-Dorm, which, at that time, housed all inmates enrolled in the TC Program.  (Id., 4, 13:16-21).

17.    H-Dorm and the other St. Clair housing units utilized the same chow hall and, because of the facility's layout, inmates from various housing units regularly interacted during pill call or sick call.  (Id., 9, 11, (Ex. J, 72:16-75:17; 78:3-13; 79:3-11)).

18.    Nearly one (1) year into Plaintiff's incarceration at St. Clair, ADOC transferred another inmate, Cortez Whittington ("Whittington") to St. Clair, and assigned him to P/Q-Dorm.  (Doc. 141-17, 5 (Ex. Q, 75:6-9)).

19.    Plaintiff and Whittington did not know each other prior to their

incarceration at St. Clair.  (Doc. 141-10, 19 (Ex. J., 168:6-10)).

20.    At this point in the chronology of events, the accounts of Plaintiff and Whittington diverge. (Id., 19, 20, 21 (Ex. J. 168:6-10; 170:22-171:20; 177:16-22); Doc. 141-4, 3-4 (Ex. D, ¶¶ 7-12)).[2]

21.    Whittington claims that, on December 1, 2017, the day before the Incident, Plaintiff—███████████████████—entered Whittington's dorm (without authorization), held Whittington at knifepoint, and demanded Whittington hand over his contraband cellphone to Plaintiff.  (Doc. 141-17, 7, 8 (Ex. Q, 167:17-23; 174:1-8; 176:1-15); 141-4, 3 (Ex. D, ¶ 5)).

22.    Whittington claims the formulated plans to retrieve his contraband cellphone from Plaintiff the next day.  (Doc. 141-4, 4 (Ex. D, ¶ 9); 141-17, 16 (Ex. Q, 236:18-23)).

23.    Around 4:36 p.m. on December 2, ADOC staff released Whittington and the other inmates assigned to P/Q-Dorm for dinner served in St. Clair's chow hall.  (Doc. 141-9, 5 (Ex. I-1); 141-17, 9-11 (Ex. Q, 202:4-14; 209:16-210:2)).

24.    Whittington knew this dinner movement schedule involved inmates from P/Q-Dorm entering the chow hall around the same time that the inmates in H-

---

[2] The Correctional Officials recognize the obligation of the Court at this stage of the proceedings to rely upon the undisputed facts to evaluate their entitlement to summary judgment, but maintain that the "dispute" over the course of events leading up to the Incident constitutes a material undisputed fact relevant to the reasonableness of the actions taken by the Correctional Officials prior to and subsequent to the Incident.

Dorm – Plaintiff's housing unit - exited the chow hall and returned to H-Dorm. (Doc. 141-4, 3 (Ex. D, ¶ 7); 141-17, 9 (Ex. Q, 202:19-22)).

25.    Rather than entering the chow hall on the afternoon of December 2, 2017, Whittington proceeded to H-Dorm via a tunnel adjacent to the chow hall.[3] (Doc. 141-17, 9, 10, 11, 21 (Ex. Q, 202:4-14; 209:16-210:2; 281:17-20)).

26.    Traveling with other H-Dorm inmates returning from the chow hall, Whittington disguised himself with a "skull cap," put on two (2) jackets, and placed a "towel" around his neck to protect himself.  (Id., 11, 12 (Ex. Q, 210:4-7; 216:11-217:8); 141-3 (Ex. C, ¶ 7)).

27.    Whittington chose this exact time to enter H-Dorm because he knew that the scheduled movement, his disguise, and his newness to St. Clair allowed him to travel to H-Dorm unrecognized by correctional staff. (Doc. 141-17, 6, 12 (Ex. Q, 92:9-11; 216:11-217:8)).

28.    Upon entering H-Dorm, Whittington passed Officer Walker, the assigned rover on-duty at H-Dorm, and observed him awake at his post.  (Id., 12, 13 (Ex. Q, 217:17-20; 221:10).

29.    At the time of the Incident, H-Dorm housed an enclosed TV room which Officer Walker's post could monitor through several large glass windows.

---

[3] This tunnel serves to control inmate movement in and out of H-Dorm.  (Doc. 141-14, 40-41 (Ex. N, 138:20-139:18); 141-13, 12-13 (Ex. M, 353:13-354:18)).

(Doc. 141-16, 11 (Ex. P, 225:4-10); 141-13, 9 (Ex. M, 77:2-6)).

30.    Upon entering H-Dorm, Whittington saw Plaintiff in H-Dorm's TV room with his back to Whittington and Officer Walker.  (Doc. 141-17, 15 (Ex. Q, 231:10-18)).

31.    Plaintiff claims he saw Walker asleep at his desk when Plaintiff entered the TV room, "[m]aybe  five minutes" before the Incident occurred.  (Doc. 141-10, 21, 24 (Ex. J., 175:18-176:2; 188:7-25)).

32.    However, Plaintiff did not see Whittington enter the H-Dorm TV room or see what Officer Walker was doing at the time Whittington entered H-Dorm's TV room.  (Id., 21 (Ex. J., 175:18-176:25); see also 141-19, 8 (Ex. S)).

33.    Once Whittington entered H-Dorm TV room, Whittington and Plaintiff began to fight.  (Doc. 141-17, 17 (Ex. Q., 241:8-21); 141-10, 20 (Ex. J, 170:17-171:20)).

34.    The fight "surprised" Plaintiff, who had no warning of Whittington's actions and never warned anyone of a possible altercation with Whittington.  (Id., 21 (Ex. J, 176:22-177:22)).

35.    Observing the altercation between Plaintiff and Whittington in H-Dorm's TV room, Officer Walker immediately used his radio to summon other officers for assistance.  (Doc. 141-16, 10 (Ex. P., 224:5-14); 141-17, 18 (Ex. Q., 243:11-20); 141-19 (Ex. S)).

36.    During the fight, Plaintiff claims he saw Officer Walker sitting at his desk, and "I think he was grabbing his radio." (Doc. 141-10, 25-26 (Ex. J, 201:14-202:14)).

37.    St. Clair policy provides for security staff, such as Officer Walker, to ████████████████████████████████████████████ ██████████ (Doc. 141-18, 26 (Ex. R-1)).

38.    The fight between Whittington and Plaintiff spilled out of H-Dorm's TV room into the open dormitory. (Doc. 141-17, 18 (Ex. Q, 244:8-13); 141-10, 23 (Ex. J, 182:22-24)).

39.    Within minutes, four (4) correctional officers responded to Officer Walker's call for backup and escorted Plaintiff and ██████████ to the infirmary for medical evaluations. (Doc. 141-16, 10 (Ex. P, 224:6-17); 141-17, 19 (Ex. Q, 255:18-256:9); 141-16, 17 (Ex. P-2); 141-6, 6 (Ex. F-2); 141-7, 4 (Ex. G-1); 141-19, 8 (Ex. S)).

40.    Plaintiff does not know how long it took officers to respond or how many officers responded. (Doc. 141-10, 26 (Ex. J, 203:7-204:7)).

41.    Shortly after the Incident, correctional staff conducted two security checks in the H-Dorm and noted "all was secure." (Doc. 141-9, 6 (Ex. I-1)).

42.    Consistent with ADOC policy, Officer Walker logged the Incident and the subsequent security checks in the duty post log. (Doc. 141-5, 65 (Ex. E-3); 141-

9, 6 (Ex. I-1)).

43.    Neither Dunn nor Estes received any advance notice or warning of the Incident or any potential altercation between Plaintiff and Whittington.  (Doc. 141-19, 12-13 (Ex. S)).

44.    No evidence suggests that Commissioner Hamm or Warden Noe (both of whom assumed their current positions after the Incident) received any notice of this particular Incident other than through this lawsuit.

### Post-Incident Medical Treatment

45.    Pursuant to Dr. Walter Wilson's orders, ADOC staff called an ambulance to transport Plaintiff to UAB Hospital after the Incident.  (Doc. 141-16, 17 (Ex. P-2)).

46.    Plaintiff claimed he spent a week in the hospital, but UAB's medical records indicate ██████████████████.  (Doc. 141-10, 27 (Ex. J, 206:11-21); 141-8, 4-7 (Ex. H-1)).

47.    Although Plaintiff claims Whittington stabbed him "[a]t least 30 times," the medical records indicate that Plaintiff experienced ████████████ ████████████████████████.  (Doc. 141-10, 22 (Ex. J, 180:4-8); 141-8, 4-15 (Ex. H-1)).

48.    None of Plaintiff's ████████████████████ ████████ (Id.).

10

## **ADOC's Investigation of the Incident**

49.    ADOC's Law Enforcement Services Division ("LESD"), previously known as Intelligence and Investigations ("I&I"), opened an investigation into the Incident.  (Doc. 141-3, 5 (Ex. C, ¶ 11)).

50.    LESD possesses the responsibility to "investigat[e] . . . incident[s] of inmate-on-inmate violence . . .  to determine whether to refer the incident[s] to the District Attorney with jurisdiction."  (Id., 3 ¶ 7).

51.    LESD lacks the authority to prosecute criminal cases—"the authority to prosecute an individual for criminal conduct lies solely with the District Attorney with jurisdiction."  (Id., 3-4, ¶ 7).

52.    On March 19, 2018, Agent Brian Casey ("Agent Casey") of LESD interviewed Plaintiff regarding the Incident. (Id., 5 (Ex. E-7, ¶ 11)).

53.    Plaintiff informed Agent Casey he did not wish to prosecute Whittington.  (Doc. 141-5, 84 (Ex. E-7)).

54.    Pursuant to ADOC policy, Agent Casey explained to Plaintiff his rights and presented him with a waiver of prosecution, which Plaintiff voluntarily executed, declining to prosecute Whittington or testify before the St. Clair County Grand Jury concerning the Incident.  (Id.; Doc. 141-10, 28 (Ex. J, 211:14-15); 141-19, 10-11 (Ex. S)).

55.    As a result of Plaintiff's failure to cooperate as a witness, Agent Casey,

in accordance with ADOC policy, closed the investigation.  (Doc. 141-3, 5 (Ex. C, ¶ 12)).

## Disciplinary Sanctions

56.    On December 5, 2017, ADOC charged ██████████ with a violation of ADOC Rule "910 - [f]ighting with a weapon," and Plaintiff with a violation of ADOC Rule "501 - [f]ighting without a weapon."  (Doc. 141-17, 20 (Ex. Q, 271:8-12); 141-5, 79 (Ex. E-6); 141-5, 68 (Ex. E-4)).

57.    At the December 29, 2017, disciplinary hearing regarding the Incident, the hearing officer found Plaintiff not guilty.  (Doc. 141-5, 69 (Ex. E-4)).

58.    At the same hearing, the hearing officer found ██████████ ████████████████████████████████████████████ ████████████████████████████████████████████ ██████████████████████████ (Doc. 141-17, 20 (Ex. Q, 271:13-20); 141-5, 80 (Ex. E-6); 141-19, 10 (Ex. S)).

59.    Pursuant to St. Clair policy, on December 13, 2017, ADOC's Institutional Enemies Validation Committee declared Whittington and Plaintiff enemies.  (Doc. 141-16, 18 (Ex. P-2); 141-19, 10 (Ex. S)).

60.    On January 11, 2018, the reclassification committee ██████████ ████████████████████████████████████████████. (Doc. 141-17, 20 (Ex. Q, 271:13-15)).

## Plaintiff's Incarceration Following the Incident

61.    Plaintiff remained at St. Clair for approximately three-and-a-half years after the Incident.  (Doc. 141-10, 12 (Ex. J, 98:12-14)).  During that time, he never reported any other issues with any another inmate; never received threats from another inmate; and never told any correctional officer that he feared for his safety or needed protection from anyone.  (Id., 12 (Ex. J, 98:15-99:14)).

62.    Plaintiff acknowledged that St. Clair installed cameras and fencing and "started using metal detectors around 2020, 2019," and he believed these measures reduced inmate violence at St. Clair.  (Id., 13, 14 (Ex. J, 104:1-22; 107:1-22)).

63.    Plaintiff pleaded guilty to two (2) disciplinary charges for possessing contraband cellphones at St. Clair.  (Id., 18 (Ex. J, 134:2-135:4); 141-10, 37 (Ex. J-2), 45 (Ex. J-3)).

64.    On March 4, 2022, ADOC transferred Plaintiff to Fountain Correctional Facility, a security-level four (4) facility designated to "house [] inmates who demonstrate less severe behavioral problems than those assigned to" a facility like St. Clair.  (Doc. 141-5, 73 (Ex. E-5); 141-2, 3 (Ex. B, ¶ 4)).

65.    Plaintiff agreed that St. Clair was safer when he left than when he arrived, and "[w]hen I was leaving, they was doing a lot more to make it secure." (Doc. 141-10, 33 (Ex. J, 249:8-17)).

66.    Plaintiff does not know of any changes at St. Clair since he left St. Clair

13

or anything about the current conditions at St. Clair. (Id., 15 (Ex. J, 114:11-115:11)).

67.    No one informed Plaintiff he might return to St. Clair, and he has no concerns that he may return to St. Clair. (Id., 31 (Ex. J, 238:19-24)).

68.    Plaintiff never filed any grievances during his incarceration with ADOC. (Id., 17 (Ex. J, 130:16-18)).

## C.    THE CORRECTIONAL OFFICIALS AND THEIR AUTHORITY

### Former Commissioner Jefferson Dunn

69.    Jefferson Dunn ("Dunn") served as ADOC Commissioner from April 1, 2015 to December 31, 2021. (Doc. 141-11, 4, 8, 11 (Ex. K, 18:11-12; 41:10; 67:5-6)).

70.    As Commissioner, Dunn possessed "the responsibility to provide leadership, vision, direction, guidance" to ADOC staff; "to advocate for resources . . . , primarily advocating through the governor's office with the legislature; to delegate responsibility for policies "to the appropriate individuals; "to ensure that our financial house was in order;" and "to maintain and develop to the extent that I could relationships with various partners that contributed to the correctional mission." (Id., 5-6 (Ex. K, 25:21-26:19)).

71.    Dunn faced significant limitations on his authority as Commissioner. For example, approximately two-thirds of ADOC's budget goes to pay staff. (Doc. 141-11, 18 (Ex. K, 160:14-16)). The remainder of the budget provides ADOC's

medical contract; food, clothing, and bedding for inmates; and facilities maintenance. (Id., 18, (Ex. K, 160:16-161:1)). To the extent "there were any other incentives that [Dunn] wanted to pursue," he had to request the funds and obtain approval from the governor and state finance director. (Id.). Some "initiatives were approved fully," some "partially," and some not "at all." (Id.).

72. Under Dunn's direction as Commissioner, ADOC implemented a variety of measures to combat inmate violence at St. Clair, including the following:

- Worked with Warren Averett to improve staffing and recruiting (Doc. 141-14, 20 (Ex. N, 39:14-23));

- Approved the installation of concave mirrors inside H-Dorm to minimize blind spots (Doc. 141-16, 8-9 (Ex. P, 189:8-190:12));

- Published a "Strategic Plan" to address various issues facing ADOC (Doc. 141-11, 6-7, 15 (Ex. K, 29:14-30:14; 142:9-15; 143:16-144:1); 141-5, 5-19 (Ex. E-1));

- Required deputy commissioners to inform the Commissioner of areas of concern within their authority (Doc. 141-11, 9 (Ex. K, 43:3-9));

- Increased television and radio advertisements for staff recruiting purposes (Doc. 141-14, 20 (Ex. N, 39:14-23));

- Created the Alabama Prison Transformation Initiative, which included detailed analysis and an analytical basis to obtain legislative support to construct two new prisons (Doc. 141-11, 16 (Ex. K, 148:2-11); 141-5, 20-62 (Ex. E-2));

- Hired six (6) lieutenants, and at or near thirty (30) part-time and/or retired officers who bring in experience, knowledge, and training, including three (3) additional part-time captains (Doc. 141-14, 15, 17, 18, 24 (Ex. N, 21:6-9; 26:15-17; 37:14-18; 50:18-20));

15

- Provided St. Clair correctional officers with digital radios, stab vests, a radar system, cameras, body scanners, and other types of metal detectors to improve overall safety (Doc. 141-11, 17-19 (Ex. K, 158:3-9; 155:19-22; 156:1-21; 203:9-12));

- Implemented an inmate "tip line" in which an inmate could call LESD anonymously via a "1-800 number . . . to identify any issues" (Id., 19 (Ex. K, 204:6-9));

- Led an initiative, although ultimately not approved by the Alabama Legislature, to allow correctional officers previously assigned to a Childersburg, Alabama, facility to be reallocated to St. Clair (Id., (Ex. K, 204:21-23; 205:1-4); and

- Led an initiative in which outside law enforcement agencies, including the "local sheriff and district attorneys," assisted in a facility-wide search for contraband at St. Clair.  (Id., 12 (Ex. K, 71:23-72:10)).

### Commissioner John Hamm

73.    Following Dunn's retirement, Commissioner Hamm began his tenure as ADOC's Commissioner on January 1, 2022, more than four (4) years after the Incident.  (Doc. 141-2, 2 (Ex. B, ¶ 2).

74.    Under Federal Rule of Civil Procedure 25(d), Hamm was "automatically substituted as a party" on the official-capacity claim against the ADOC Commissioner on January 1, 2022.  (Supra n. 1).

75.    Plaintiff never requested Hamm's deposition.  (Doc. 141-1, 3 (Ex. A, ¶ 5)).

76.    Hamm possesses general responsibility for overseeing "twenty-six (26) facilities across the state of Alabama . . ., including St. Clair." (Doc. 141-2, 2 (Ex.

B, ¶ 3)).

77.    Hamm does not directly oversee the day-to-day activities at any particular ADOC facility, including St. Clair.  (Id.).

78.    Hamm possesses general responsibility for advocating on behalf of ADOC to the Alabama Legislature for funding.  (Id., 4 ¶ 7).

79.    ADOC is not self-funded, and Hamm lacks the authority to establish the annual funding levels for ADOC and St. Clair, which are dictated by the Alabama Legislature.  (Id., ¶ 6).

80.    Accordingly, Hamm lacks the authority to increase ADOC's funding, alter the rate of pay or change the benefits for ADOC correctional officers, or directly contract for goods or services exceeding $15,000.00 in value. (Id.).

81.    "[A]ll major purchase requests and contracts for services must first go through a multi-step approval process and/or bidding process."  (Id.).

82.    As Commissioner, Hamm must lobby the Legislature and other agencies for changes in operations or facilities within ADOC.  (Id., ¶ 7).

83.    Hamm submits a request for funding to the State of Alabama Executive Budget Office ("EBO") for alterations and consideration.  The EBO then prepares a budget proposal for review and approval by multiple levels within the Alabama Legislature.  (Id.).

84.    Over the course of his first year as Commissioner, Hamm devoted

"substantial time and resources" to continuing improvement of safety and security practices at ADOC facilities, including St. Clair.  (Id., 5 ¶ 9).

85.    Under Commissioner Hamm, ADOC continues to evaluate all available resources as well as the implementation of new policies and procedures to reduce levels of violence and contraband, improve overall safety and security operations and increase correctional staffing levels.  During his first year in office, building on the measures implemented by Dunn, Commissioner Hamm and ADOC leadership achieved the following:

- Worked to reduce the hiring process from six (6) to three (3) weeks (id., 6 ¶ 12);

- Implemented an in-house recruitment team consisting of an ADOC captain and four (4) lieutenants (id.);

- Lobbied for increased compensation for all ADOC employees (id., ¶ 11);

- Lobbied the legislature to improve ADOC employee retirement benefits (id., 7 ¶ 13);

- Rebranded the previously titled "Basic Correctional Officers" to "Corrections Security Officer ('CSO')," to "fill any security post that does not require a firearm certification" to attract more CSOs (id.);

- Sought approval from State Personnel to approve "differential pay" of five (5) to ten (10) percent "for the CSOs at Level IV and V facilities, including St. Clair" (id.);

- Established an internal staffing agency (id., 6 ¶ 12);

- Ensured the completion of an updated staffing analysis of all facilities consistent with guidelines published by the National Institute of Corrections (id., 5 ¶ 9);

- Utilized outside state agencies like the State Personnel Department ("SPD") and the Alabama Peace Officers' Standards and Training Commission ("APOSTC") to provide assistance in recruiting and retaining ADOC employees (id., 5-6 ¶ 10);

- Worked with "a private security firm to determine the feasibility of hiring private security guards to fill . . . ADOC security posts that require no contact with inmates" (id., 7-8 ¶ 14);

- Implemented a program to permit and train over "150 ADOC support personnel to complete the required training to work overtime in non-contact posts" (id.);

- Personally visited facilities to directly interact with staff, understand their needs and challenges and encourage their efforts (id., 2 ¶ 3);

- Requested and received approval from the SPD to "hire fourteen (14) Special Investigators to serve as Hearing Officers at inmate disciplinary proceedings" (id., 8 ¶ 15);

- Retained outside consultants in the areas of work force development, employee wellness, recruitment and retention in order to improve ADOC's staffing efforts (id., 5 ¶ 9);

- Requested and received approval from the SPD to promote and provide a salary increase to "all eligible ADOC Social Services Case Workers." (id., 8 ¶ 16).

- Directed all ADOC facilities, including St. Clair, "to utilize body scanners at the facility entrance" (id., 8-9 ¶ 17);

- Oversaw revisions to ADOC's inmate transfer procedures to ensure that Central Classification coordinates all inmate transfers between ADOC facilities," including St. Clair (id., 9 ¶ 19);

19

- Re-purposed LSD agents to conduct vehicle checks and patrol the exterior of St. Clair at night to prevent contraband (id., ¶ 18); and

- Created the "Restrictive Housing Committee," and remains committed to implementing its recommendation for a "protective custody dorm" at St. Clair (id., 10 ¶ 21).

### Warden Dewayne Estes

86.    Estes served as the Warden III at St. Clair from March 1, 2015, to May 2018.  (Doc. 141-12, 8 (Ex. L, 20:1-4)).

87.    A Warden III lacks the authority to implement policy changes, enter into contracts, approve major purchases, or hire employees.  (Doc. 141-11, 13 (Ex. K,  81:13-15); 141-2, 13 (Ex. B ¶ 27)).

88.    Estes was not present at St. Clair and did not serve as St. Clair's on-call official on Saturday, December 2, 2017, the date of the Incident.  (Doc. 141-19, 12 (Ex. S); 141-12, 18 (Ex. L, 247:6-8)).

89.    Estes oversaw various measures implemented to improve the safety and security of inmates and staff at St. Clair, including the following:

- The installation of additional cameras and internal fencing to address inmate movement, contraband weapons, and inmate-on-inmate violence (Doc. 141-12, 14-15 (Ex. L, 88:10-16; 100:14-15); 141-11, 17 (Ex. K,  154:2-5)), both of which Plaintiff admits improved security and restricted inmate movement at St. Clair (Doc. 141-10, 14 (Ex. J, 107:1-23); 141-19, 14 (Ex. S));

- St. Clair's total lock replacement project, during which St. Clair replaced "every lock on every cell door" and the cell doors in the population and segregation units (Doc. 141-12, 9-10 (Ex. L, 55:22-56:4));

20

- Actively recruited correctional officers through presentations to college students enrolled in criminal justice courses (Doc. 141-12, 11 (Ex. L, 58:15-19)); and

- Requested "nets" to be placed around the fence of the facility to prevent contraband from being thrown over perimeter fencing (Doc. 141-12, 14 (Ex. L, 88:17-21)).

90.    Plaintiff admitted during his deposition that, other than installation of additional fencing and cameras and the use of metal detectors, there are no other actions he intends to ask the Court to direct ADOC to complete.  (Doc. 141-10, 32 (Ex. J, 244:8-12)).

## **Warden Guy Noe**

91.    Warden Noe began his employment with ADOC more than twenty-four (24) years ago.  (Doc. 141-14, 14 (Ex. N, 19:14-15)).

92.    In February 2021, ADOC promoted Warden Noe to Warden III and transferred him to St. Clair, where he continues to serve as Warden III. (Id.).

93.    Warden Noe never worked at St. Clair prior to February 2021 and was not present at St. Clair on December 2, 2017, the date of the Incident. (Id., 12-14 (Ex. N, 17:16-19:10); 141-19, 13 (Ex. S)).

94.    As Warden III, Warden Noe "oversees the Warden [II] and Warden [I]" and the general day-to-day operations of St. Clair.  (Doc. 141-14, 16 (Ex. N, 22:18-20)).

95.    Warden Noe took and continues to take various actions within his

authority to address inmate violence at St. Clair, including the following:

- Improved the use of camera systems, metal detectors, and handheld metal detectors to address inmate movement and possession of contraband (Id., 27, (Ex. N, 71:2-8));

- Improved search procedures on population yard, including more frequent pat down searches, strip searches after incidents, and increased utilization of metal detection devices (Id., 31-32 (Ex. N, 81:8-82:11));

- Implemented nightly bed check counts to combat unauthorized inmate movement (Id., 37 (Ex. N, 125:16-20));

- Utilizes various ADOC resources such as the LESD K9 team and the Correctional Emergency Reponses Team ("CERT") to increase searches and assist with security (Id., 28 (Ex. N, 72:14-73:11; 76:8-13));

- Utilizes the Internal Classification Review Board to help ensure appropriate classification and placement of inmates, including identification of gangs and hotspots (Id., 18, 35 (Ex. N, 93:11-19; 37:1-2));

- Implemented and now utilizes an on-the-job training program, geared towards training and retaining officers, in which a field training officer oversees a newly graduated correctional officer for up to ninety (90) days (Id., 18, 19 (Ex. N, 37:21-38:11));

- Improved the mandated over-time policy to add three (3) to four (4) shifts a day (Id., 25, 26 (Ex. N, 54:17-55:4));

- Utilizes correctional officers assigned to Birmingham Work Release, Childersburg Work Release, Decatur Work Release Center, Hamilton Aged and Infirmed, and Hamilton Work Release who assist St. Clair (Id., 24 (Ex. N, 50:8-14)); and

- Continues to engage in recruiting efforts, including placing a "now hiring" sign outside St. Clair and the distribution of informational business cards at recruiting events (Id., 21, 22 (Ex. N, 46:22-47:7)).

96.    Plaintiff does not know what he wants from Warden Noe in this action. (Doc. 141-10, 29 (Ex. J, 222:14-17)).

## EXPERT TESTIMONY

## I.    THE PARTIES' EXPERTS.

97.    Plaintiff retained Joseph Rion ("Rion"), a former Kentucky Department of Corrections warden, as his purported expert to offer opinions in this matter. ("Rion's Report").  (Doc. 141-15 (Ex. O-1)).

98.    Rion lacks any experience as a commissioner, secretary, or director of a correctional department and has never managed more than one prison at a time. (Doc. 141-15, 10, 11 (Ex. O, 191:10-14; 208:7-12)).

99.    Rion never spoke to or met with Plaintiff.  (Id., 6, (Ex. O, 103:8-10)).

100.    Rion did not independently develop his opinions, but merely copied the opinions outlined for him by Plaintiff's counsel in the initial retention letter dated September 21, 2022.  (Id., 19, 21 (Ex. O, 358:13-22; 367:15-369:21)).

101.    The Correctional Officials retained two (2) experts, Mark Inch ("Inch") and Brian Zawilinski ("Zawilinski" and, together with Inch, the "Correctional Experts") to provide their opinions in this matter.

102.    Inch possesses experience in a variety of leadership roles similar to the Correctional Officials within state and federal correctional systems.  (Doc. 143-1, 36-42 (Ex. T-1, 36-42)).

103.    While in the military, Inch served as the Commandant (i.e., warden) of the United States Department of Defense's maximum-security prison and the Provost Marshal General of the Army Corrections System.  (Id.; 141-13, 5 (Ex. M, 26:4-27:20)).

104.    Inch also served as the Director of the Federal Bureau of Prisons, overseeing "122 major facilities, 39,000 staff members, and 186,000 incarcerated persons."  (Doc. 143-1, 36-42 (Ex. T-1, 36-42); 141-13, 6 (Ex. M, 36:3-22)).

105.    Most recently, Inch served as the Secretary (i.e., the commissioner) of the Florida Department of Corrections, the "third largest state corrections agency" in the United States.  (Doc. 143-1, 36-42 (Ex. T-1, 36-42); 141-13, (Ex. M, 47:11-14)).

106.    Zawilinski served the Connecticut Department of Corrections for twenty-seven (27) years in various positions, including as a correctional officer, captain, and lead investigator.  (Doc. 141-18, 12 (Ex. R-1); 141-18, 5 (Ex. R, 37:9-19)).

107.    On December 5, 2022, the Correctional Experts participated in a tour of St. Clair.  (Doc. 141-13, 8 (Ex. M, 72:23-82:8); 143-1, 9 (Ex. T-1, 5); 141-18, 16 (Ex. R-1, 6)).

## II.    OPINIONS REGARDING PLAINTIFF'S CLAIM THAT ESTES SHOULD HAVE PREVENTED THE INCIDENT.

108.    Rion opined about "the prevalence of contraband weapons before and

after the incident, steps that could have been taken to prevent the proliferation of contraband weapons, the problem of uncontrolled inmate movement at St. Clair before and after the incident, and steps that could have been taken to address this problem, the problem of inmate-to-inmate violence before and after the incident, and steps that could have been taken to address this problem." (Doc. 141-15, 41 (Ex. O-1, 14)).

109. However, Rion failed to identify a single step that Estes personally could or should have taken to prevent the Incident, and never opined that any act or omission by Estes actually caused the Incident or harmed Plaintiff. (See generally Doc. 141-15 (Ex. O-1)).

110. Indeed, Rion admitted that he "can't say" whether his general recommendations of "steps that could have been taken" "would have prevented" the Incident, "[b]ecause inmates will always find creative ways to try to fashion weapons and try to analyze the current system and find ways of getting around the current system." (Doc. 141-15, 25 (Ex. O, 394:4-6)).

111. Rion criticized Walker for not stopping Whittington from entering H-Dorm and for not "interven[ing]" in the fight by deploying OC (pepper) spray. (Doc. 141-15, 32 (Ex. O-1, 5)).

112. Rion does not know if it would have been consistent with ADOC policy for Walker to deploy OC spray or if Walker could have avoided impacting

bystanders with the OC spray, and it was "a situation where [Walker] had to make an immediate decision."  (Doc. 141-15, 13, 14 (Ex. O, 230:18-232:17; 235:17-23; 237:8-13)).

113.   Rion admitted that Walker called for backup, and "the fact that the responding staff were able to get to Mr. Boyington [sic] and get him some treatment may be why he's still here."  (Id., 15 (Ex. O, 239:4-7)).  In fact, Rion testified that "when Officer Walker called for assistance and the responding staff came in and made sure that Inmate Boykin [sic] got medical treatment, I think that was an example of security operations going well."  (Id., 15, 20 (Ex. O, 239:4-7; 362:6-11)).

114.   Based on the Correctional Experts' experience, facility tour, and review of documents, the Correctional Experts reached the following conclusions regarding the Incident:

- Walker's decision to call for back-up constituted an "appropriate response[,] consistent" with St. Clair policies.   (Doc. 141-18, 28 (Ex. R-1));

- "[S]everal good-faith measures were already underway prior to the incident in question on December 2, 2017," including, "upgrades to safety and security measures, . . . increases in staffing, recruitment, and the construction of a new prison in Elmore County that will ultimately replace" St. Clair. (id., 40);

- No evidence exists to show that "any ADOC staff knew of any history or conflict between" Plaintiff and Whittington or of "any specific, immediate threat by [] Whittington to" Plaintiff.  (id., 18-19); and

- "I observed clear awareness and significant care and action by the leadership of ADOC and [St. Clair] to address contraband, inmate

movement, inmate-on-inmate violence, and staffing." (Doc. 143-1, 35 (Ex. T-1)).

### III.    OPINIONS REGARDING ONGOING EFFORTS AT ST. CLAIR.

115.    Despite opining that "the problems of contraband weapons, uncontrolled inmate movement, and inmate to inmate violence are on-going and pervasive at" St. Clair (Doc. 141-15, 41 (Ex. O-1)), Rion admitted he possesses no information about current conditions at St. Clair.  For example, Rion:

- Possesses no information about current staffing levels at St. Clair and could not say whether a single shift went unfilled in the past 25 months (Doc. 141-15, 23 (Ex. O) 379:4-9; 379:20-380:4));

- Does not know what efforts ADOC made to fix broken locks or increase correctional staffing (id., 18, 26, 342:12-18; 408:5-8);

- Does not know if any inmate entered a dorm unauthorized in 2022 and injured another inmate, and admitted he did nothing to evaluate levels of inmate violence at St. Clair in 2022 or 2023 (id., 22-33, 377:10-14; 378:20-379:3); and

- Was not aware Dunn requested (and did not receive) permission to jam cellphone signals in ADOC prisons (id., 17, 293:6-15).

116.    Rion knows nothing about Commissioner Hamm or any measures Commissioner Hamm implemented.  When asked, "Can you tell me anything about Commissioner Hamm?", Rion responded, "Not really, no."  (Id., 6, 102:10-12).

117.    As set forth in the table below, Rion's Report provides a "variety of measures that could be taken to address the issue of contraband," inmate movement, "inmate-on-inmate violence," and "staffing" previously implemented by Estes,

Dunn, Warden Noe or Commissioner Hamm.  (Doc. 141-14, 42-43 (Ex. O-1)).

| Rion's Recommendations | Evidence of Implementation |
|---|---|
| "Refer[ral] of incidents . . . to outside local law enforcement agencies" (id., 43). | Current practice of LESD and CID. (Supra, ¶ 50; Doc. 141-3, 3 (Ex. C, ¶ 7); 143-1, 19 (T-1)) . |
| "purchase [of] moveable contraband detection equipment" (id., 42). | Previously purchased handheld metal detectors and body scanners (Doc. 141-14, 28 (Ex. N, 71:2-4); 143-1, 19 (T-1); 141-15, 7 (Ex. O, 142:11-16)). |
| "erect[] interior gates and checkpoints" (id.). | Estes oversaw the installation of interior fencing. (Doc. 141-12, 14 (Ex. L, 88:10-16); 143-1, 20 (T-1)). |
| "Require inmates to wear their ID cards" (id., 43). | Implemented policy (Doc. 143-1, 20 (T-1)). |
| Installation of "additional cameras" and ensure "ongoing review of footage" (id.). | Additional cameras installed and review of footage already St. Clair policy. (Doc. 141-12, 15-17 (Ex. L, 100:14-15; 103:19-104:1); 143-1, 20 (T-1)). |
| "Establish comprehensive procedures for in-house investigations" (id.). | Implemented procedures. (Supra, ¶ 49-50; 141-3, 3 (Ex. C, ¶ 5-6)). |
| "Establish a third party [sic] hot line" (id.). | Implemented an inmate "tip line" in which an inmate could call LESD via a "1-800 number . . . to identify any issues" (Doc. 141-11, 19 (Ex. K, 204:6-9); 143-1, 20 (T-1)). |
| "permit retirees to be rehired" (Id.). | Warden Noe currently utilizes retired correctional officers. (Doc. 141-14, 15, 17, 24 (Ex. N, 21:6-9; 37:14-18; 26:15-17; 50:18-20); 143-1, 28 (T-1)). |

118.   Rion failed to specify which Correctional Official (if any) possesses or possessed the authority implement any "recommendation[]."  (Doc. 141-15, 42-43 (Ex. O-1)).

119.   Rion recommended "criminal prosecution" of inmates and staff for

contraband, but knows the Correctional Officials lack the authority to initiate criminal prosecutions. (Id., 42; 141-15, 24 (Ex. O, 384:9-385:2)).

120.   With respect to St. Clair's staffing, Rion recommended the "[e]nhancement [of] employee benefits" and "incentives . . . to delay retirement," without any understanding of the complex process of the state retirement system, state agency budgeting and funding, and state employee compensation and benefit legislation.  (Doc. 141-15, 43 (Ex. O-1); 141-18, 37-38 (Ex. R-1); 143-1, 16-17, 27 (Ex. T-1)).

121.   Based on the Correctional Experts' experience, facility tour, and review of documents, they reached the following conclusions regarding the Correctional Officials' efforts to address inmate violence, contraband, and staffing at St. Clair:

- During the tour, Zawilinski observed "numerous locks . . . and doors that had been upgraded" (Doc. 141-18, 17 (R-1));

- St. Clair's staff possessed "adequate contraband detection," "reasonabl[y] and appropriate[ly]" placed throughout the facility (id., 33).

- Dunn, Estes, Commissioner Hamm, and Warden Noe all made "reasonabl[e]" efforts to "supplement the camera system" at St. Clair (id., 36).

- The controlled movement of inmates at St. Clair is "appropriate and advisable," and the internal fencing at St. Clair adequately restricts inappropriate or unnecessary inmate movement.  (id., 34; see also Doc. 141-18, 6 (Ex. R, 216:9) (testifying that, during site tour, he observed "a facility under control"));

- "[A]dding years" to the sentences of inmates, many of whom "have a violent background" and who already possess long and/or life without parole sentences, or implementing "administrative or disciplinary sanctions" on these inmates "for prison-related activities is of no consequence . . . [and] rarely deter[s] an inmate in this setting from violence" (Doc. 141-18, 19 (R-1); 143-1, 15 (T-1));

- Reaching a violence level of "zero" is a goal that "is wholly unrealistic and . . . unachievable in any prison environment" (Doc. 141-18, 36 (R-1));

- In 2021, due to Dunn's "best efforts" in advocating for the Alabama Prison Transformation Initiative, the "Alabama Legislature passed legislation to ensure the construction of at least one new prison facility for men" (id., 22);

- Dunn implemented and/or oversaw "many of the recommendations" from Warren Averett, including working with SPD to implement a "10% pay differential increase for staff" working at facilities like St. Clair and an addition of six (6) new correctional lieutenant positions at St. Clair (id., 23; 143-1, 31 (T-1));

- The Correctional Officials "took reasonable measures to improve and protect the inmate[s]" at St. Clair (Doc. 141-18, 40 (R-1));

- Inch found "no evidence of willful inactivity and acceptance of the status quo that could constitute deliberate indifference by the leadership of" the Correctional Officials (Doc. 143-1, 14 (T-1)); and

- Inch found "an array of agency-wide and facility leadership actions taken to improve the conditions of confinement and rehabilitative opportunities for the" the inmates. (Id.).

122.   For these reasons, the Correctional Experts concluded that Dunn, Estes, Hamm and Noe all acted reasonably in response to the issues raised by Rion.  (Doc. 143-1, 14, 35 (T-1); 141-18, 40 (R-1)).

## ARGUMENT

### I. PLAINTIFF'S INDIVIDUAL-CAPACITY CLAIM AGAINST ESTES FAILS AS A MATTER OF LAW.

Plaintiff seeks to hold Estes *personally* liable for Whittington's attack on Plaintiff.. (Doc. No. 65, ¶9). Plaintiff failed to provide any evidence supporting an individual-capacity claim against Estes. "A prison official violates the Eighth Amendment's prohibition against cruel and unusual punishment if [the official] is deliberately indifferent to a substantial risk of serious harm to an inmate who suffers injury." Marbury v. Warden, 936 F.3d 1227, 1233 (11th Cir. 2019). To establish a deliberate-indifference claim, the plaintiff must first objectively demonstrate "'conditions that were extreme and posed an unreasonable risk of serious injury to his future health or safety.'" Marbury, 936 F.3d at 1233 (quoting Lane v. Philbin, 835 F.3d 1302, 1307 (11th Cir. 2019)). The plaintiff must next establish the defendant's deliberate indifference to that risk of serious harm by "making three sub-showings: '(1) subjective knowledge of a risk of serious harm; (2) disregard of that risk; (3) by conduct that is more than mere negligence.'" Swain v. Junior, 961 F.3d 1276, 1285 (11th Cir. 2020) (quoting Lane, 835 F.3d at 1308). "Finally, the plaintiff must show a 'necessary causal link' between the officer's failure to act reasonably and the plaintiff's injury." Marbury, 936 F.3d at 1233 (quoting Rodriguez v. Sec'y for Dep't of Corrs., 508 F.3d 611, 622-23 (11th Cir. 2007)). This well-established law sets a high bar, which Plaintiff cannot overcome.

31

## A.   ESTES' SUPERVISORY ROLE PRECLUDES ANY INDIVIDUAL LIABILITY.

To prevail on an individual-capacity claim against Estes, Plaintiff must demonstrate with admissible evidence that Estes, "*through [his] own individual actions* . . . violated the Constitution." Ashcroft v. Iqbal, 556 U.S. 662, 676-77 (2009). But Plaintiff lacks any evidence demonstrating Estes' "own individual actions" directly caused or had any relationship to the Incident. Instead, Plaintiff relies solely on Estes' general duties as a warden at St. Clair. (Doc. No. 65, ¶ 9). These general duties alone cannot establish individual liability.

"'It is well established in this Circuit that supervisory officials are not liable under § 1983 for the unconstitutional acts of their subordinates on the basis of respondeat superior or vicarious liability.'" Harrison v. Culliver, 746 F.3d 1288, 1299 (11th Cir. 2014) (quoting Cottone v. Jenne, 326 F.3d 1352, 1360 (11th Cir. 2003)). If supervisors cannot bear vicarious liability for their subordinates' actions, they certainly cannot bear vicarious liability for the actions of other inmates. Instead, long-standing precedent provides that a plaintiff seeking "to hold a supervisor liable for constitutional violations must show that the supervisor either participated directly in the unconstitutional conduct or that a causal connection exists between the supervisor's actions and the alleged constitutional violation." Harrison, 746 F.3d at 1298. Plaintiff admits Estes was not at St. Clair the day of the Incident and possessed no advance warning that Whittington intended to attack Plaintiff. (Supra,

¶ 88).   The mere fact that Estes served as St. Clair's warden at the time cannot render him personally liable for the Incident.

### B.    PLAINTIFF FAILED TO ESTABLISH A SUBSTANTIAL RISK OF SERIOUS HARM.

Plaintiff alleges no individualized risk of harm specific to him.   In fact, Plaintiff professed to not knowing Whittington before the Incident.   (Supra, ¶ 19). Thus, Plaintiff's theory proposes an alleged generalized risk applying equally to the entire prison population at St. Clair.   (See generally, Doc. 65, ¶¶ 28-47).   Plaintiff's operative pleading claims the conditions at St. Clair "fostered a culture where prisoner-on-prisoner violence is both expected and accepted."   (Id., ¶ 2).   In support of this allegation, Plaintiff identified ten (10) incidents at St. Clair between 2016 and 2018 – seven (7) of which occurred before the Incident.   (Id., ¶ 38).   Plaintiff also alleged awareness of a culture of violence based on allegations in the United States of America v. State of Alabama, et al., Case No. 2:20-CV-01971-RDP (N.D. Ala.) (the "DOJ Action") and Mark Duke, et al., v. Jefferson Dunn, et al., Case No. 4:14-CV-01952-RDP (N.D. Ala.) (the "Duke Action").   (Doc. 65, ¶¶ 28-47).   Plaintiff failed to provide any evidence supporting these bare allegations.

Like this case, Marbury involved individual-capacity claims against Estes regarding an attack by another inmate.   936 F.3d at 1233.   The plaintiff argued that the same generalized risk from inmate-on-inmate violence existed because "he personally witnessed fifteen inmate-on-inmate stabbings."   Id. at 1234.   The Court

held that this allegation failed to "support the conclusion that serious inmate-on-inmate violence was so pervasive that it constitutes a substantial risk of serious harm to which defendants were deliberately indifferent." Id.; see also Harrison v. Culliver, 746 F.3d 1288, 1300 (11th Cir. 2014)  (holding that thirty-three (33) incidents involving weapons between 2005 and 2008 failed to demonstrate substantial risk of serious harm).  Like Marbury, Plaintiff failed to provide any evidence that the level of violence at St. Clair differs from the level of violence at similar facilities.

Indeed, violence "is deeply woven into the fabric of prison society," and deterrence of inmate violence represents a challenge.  (Doc. 141-18, 19 (Ex. R-1)). St. Clair's status as a high-security facility housing violent inmates heightens this challenge.  (Id.).  For example, inmates at St. Clair possess long and/or life without parole sentences.  (Id.).  Thus, "adding years" to these sentences or implementing "administrative or disciplinary sanctions" on these inmates "for prison-related activities is of no consequence . . . [and] rarely deter[s] an inmate in this setting from violence."  (Id.; see also Doc. 143-1, 15 (Ex. T-1); 141-3,4 (Ex. C. ¶ 8) ("[T]he threat of criminal prosecution does not deter criminal activity in prison[, and] . . . prosecutors rarely use resources to prosecute those individuals for crimes like possession of contraband or minor assaults.").  Therefore, a prison like St. Clair will never reach a violence level of "zero"—a goal that "is wholly unrealistic and . . . unachievable in any prison environment."  (Doc. 141-18, 36 (Ex. R-1)).

Nevertheless, the level of violence at St. Clair on and around the date of the Incident cannot be characterized as so "pervasive" as to constitute a substantial risk of serious harm to the entire St. Clair inmate population.  <u>Marbury</u>, 936 F.3d at 1234.

Plaintiff apparently relies upon the vague, unsupported assertions in the Rion Report regarding this generalized risk.  However, the Rion Report does not save Plaintiff's claim.  For example, Rion cites a 2021 DOJ report regarding homicides and suicides in prisons "from 2001 to 2019."  (Doc. 141-15, 33 (Ex. O-1)).  Putting aside the fact that the Incident involved neither a homicide nor a suicide, statistics over a 19-year period provide very little information about conditions in 2017, let alone any responsibility Estes bore for those conditions.  Moreover, Rion cherry-picked statistics from that report, leaving out "the most comparable regional state corrections systems" and "omit[ting]" states with "significantly higher numbers of both homicides and suicides when compared to Alabama." (Doc. 143-1, 15 (Ex. T-1); 141-18, 28 (Ex. R-1)).  Next, Rion cites a DOJ report regarding "use of force incidents within" ADOC.  (141-15, 33 (O-1)).  This action, however, does not involve use of force by any ADOC employee[4]; instead, it involves a fight between

---

[4] Rion's reliance upon the DOJ's allegations regarding use of force flies in the face of his criticisms of Walker.  On the one hand, Plaintiff proffers Rion's musings, asking this Court to believe that a culture of violence existed at St. Clair based upon alleged instances of excessive force by correctional officers.  (Doc. 141-15, 33 (Ex. O-1)).  In the same report, Plaintiff offers Rion's criticisms of Walker's restraint and alleged failure to utilize force to quell the altercation between Plaintiff and Whittington. (<u>Id.</u>, 32).  Officer Walker's restraint (which Plaintiff criticizes) certainly undermines Plaintiff's "culture of violence" theory.

two inmates.  Accordingly, the DOJ's use of force report cannot support Plaintiff's claims.  In short, Plaintiff failed to establish with any relevant, admissible evidence that, at the time of the Incident, conditions at St. Clair rose to the level of a "culture of violence" that put every inmate at a substantial risk of serious harm.

### C.  PLAINTIFF FAILED TO ESTABLISH THAT ESTES ACTED WITH DELIBERATE INDIFFERENCE.

Even assuming Plaintiff could proceed on his generalized risk theory and demonstrate Estes' knowledge of that risk, Plaintiff failed to establish that Estes acted with deliberate indifference.  In order to establish deliberate indifference, Plaintiff must show that, objectively, Estes "responded to the known risk in an unreasonable manner, in that he. . . 'knew of ways to reduce the harm' but knowingly or recklessly declined to act."  Marbury, 936 F.3d at 1233  (quoting Rodriguez v. Sec'y, Dept. of Corrs., 508 F.3d 611, 620 (11th Cir. 2007)); Cox v. Nobles, 15 F.4th 1350, 1352 (11th Cir. 2021) (affirming dismissal of failure-to-protect claim where plaintiff alleged knowledge of risk but failed to allege objectively unreasonable response).  The undisputed evidence demonstrates that Estes responded reasonably to the risk of inmate violence at St. Clair.

Rion purported to identify "measures that could be taken to address the issue[s] of" contraband, inmate movement, inmate violence, and staffing, but he failed to identify **who** could or should take these actions.  (Doc. 141-15, 42-43 (Ex. O-1)).  Moreover, Rion failed to identify a single specific measure **Estes** "could"

have taken (much less was constitutionally required to take) but failed to take.  In fact, the undisputed evidence establishes that Estes took numerous steps within his authority to address inmate violence, movement, staffing, and contraband, including installing fencing and cameras.  (Supra ¶ 89).  Plaintiff even admitted at his deposition that the additional cameras and fencing that Estes installed both improved security and restricted inmate movement at St. Clair.  (Supra ¶ 89).  In addition, Estes oversaw a "lock replacement" project, during which St. Clair replaced "every lock on every cell door" and the cell doors in the population and segregation units.  (Supra ¶ 89). Estes also actively recruited correctional officers through presentations to college students enrolled in criminal justice courses.  (Supra ¶ 89). Thus, far from turning a blind eye to contraband, inmate violence, and staffing, Estes took multiple steps within his authority to address these issues.

Courts routinely grant summary judgment to prison officials where they responded reasonably to a threat, even where the plaintiff sustained harm.  Swain, 961 F.3d at 1287  ("On this point, the Supreme Court's decision in *Farmer* couldn't be any clearer: '[P]rison officials who actually knew of a substantial risk to inmate health or safety may be found free from liability if they responded reasonably to the risk, *even if the harm ultimately was not averted*.'") (quoting Farmer, 511 U.S. at 844); see also Mosley v. Zachary, 966 F.3d 1265 (11th Cir. 2020) (affirming summary judgment because prison official "reasonabl[y]" placed inmate back into

his cell for count while she looked into the threat, even though inmate was attacked "moments later"). Thus, at a high-security facility like St. Clair, even the most conscientious officials cannot prevent, nor are they expected to prevent, every instance of inmate-on-inmate violence. Id.

Moreover, in determining whether an official responded reasonably to a risk, courts looks to the authority the official possessed. According to the Eleventh Circuit, "[t]here can be no duty, the breach of which is actionable, to do that which is beyond the power, authority, or means of the charged party." Williams v. Bennett, 689 F.2d 1370, 1384 (11th Cir. 1982) (holding that "the critical causation issue here must be whether each individual defendant was in a position to take steps that could have averted the [harm] but, through callous indifference, failed to do so," and "[r]esolution of this issue necessarily entails a very individualized approach, taking into account the duties, discretion and means of each defendant"); see also Pinto v. Nettleship, 737 F.2d 130, 133 (1st Cir. 1984) (affirming summary judgment on individual-capacity claim against prison official because "personal liability in damages under section 1983 cannot be based on prison conditions beyond the control of a defendant"). Plaintiff relies heavily on alleged overcrowding and understaffing at St. Clair. (Doc. No. 65, ¶¶ 41-46). But, Plaintiff cannot point to any evidence that Estes' authority encompassed management of the size of St. Clair's population or number of correctional officers. (Supra, ¶ 87; Doc. 141-2, 13 (Ex. B ¶ 27)). Estes

38

responded reasonably, within the scope of his duties, discretion, and means, to the generalized risk of inmate violence at St. Clair.  (Doc. 143-1, 14, 35 (Ex. T-1, 10, 31); 141-18, 40 (Ex. R-1, 30)).  Accordingly, Estes is entitled to summary judgment on Plaintiff's individual-capacity claim.

## II. ESTES IS ENTITLED TO QUALIFIED IMMUNITY FROM PLAINTIFF'S INDIVIDUAL-CAPACITY CLAIM.

Even if Plaintiff could establish a constitutional violation, Estes would be entitled to qualified immunity from Plaintiff's individual-capacity claim.  "Qualified immunity offers complete protection for government officials sued in their individual capacities so long as their conduct violates no clearly established statutory or constitutional rights which a reasonable person would have known."  Lee v. Ferraro, 284 F.3d 1188, 1193-94 (11th Cir. 2002) (internal quotations and citations omitted).  Qualified immunity allows government officials to carry out their discretionary duties without the fear of personal liability or harassing litigation. Anderson v. Creighton, 483 U.S. 635, 638 (1987); Lee, 284 F.3d at 1194.  This claim represents a perfect example of why qualified immunity exists.  Liability in these circumstances would only compound ADOC's recruiting and promotion challenges, as the threat of personal liability would deter qualified individuals from accepting supervisory positions within ADOC.

For qualified immunity to apply, a public official must "first prove that he was acting within the scope of his discretionary authority when the allegedly wrongful

acts occurred." <u>Lee</u>, 284 F.3d at 1194 (citing <u>Courson v. McMillian</u>, 939 F.2d 1479, 1487 (11th Cir. 1991) (internal citations omitted)).  The burden then shifts to the plaintiff to establish "(1) that the official violated a statutory or constitutional right, and (2) that the right was clearly established at the time of the challenged conduct." <u>Ashcroft v. al-Kidd</u>, 563 U.S. 731, 735 (2011) ; <u>Pearson v. Callahan</u>, 555 U.S. 223, 236-43 (2009) (clarifying that the order in which a court addresses each part of the qualified immunity analysis remains within the sound discretion of the lower courts). Plaintiff cannot demonstrate that Estes violated a clearly established constitutional right, so qualified immunity applies.

### A.    ESTES ACTED WITHIN HIS DISCRETIONARY AUTHORITY.

Plaintiff makes the single conclusory allegation: "Defendants were not acting within their discretionary authority."  (Doc. No. 65, ¶ 61).  To determine if government officials acted within their discretionary authority, a court looks to whether the acts "are of a type that fell within the employee's job responsibilities." <u>Holloman ex rel. Holloman v. Harland</u>, 370 F.3d 1252, 1265 (11th Cir. 2004). Plaintiff alleges that Estes possessed responsibility "for the day-to-day operations at St. Clair."  (Doc. No. 65, ¶ 9).  Actions relating to inmate management plainly fell within "day-to-day operations," and Plaintiff's conclusory allegation cannot defeat qualified immunity.

### B.    PLAINTIFF CANNOT ESTABLISH ESTES VIOLATED CLEARLY ESTABLISHED LAW.

Plaintiff's failure to establish a constitutional violation also means that qualified immunity bars his claim.  McCullough v. Antolini, 559 F.3d 1201, 1205, 08 (11th Cir. 2009) ("Because we can discern no constitutional violation, we need not address whether the constitutional right at issue had been clearly established when the incident arose.").  Thus, the Court need not consider the clearly established prong.  Even if the Court concludes that Plaintiff established a constitutional violation, Plaintiff failed to establish that Estes violated clearly established law. Pearson, 555 U.S. at 232.  Clearly established law must provide "fair warning" to the official that the conduct violated the plaintiff's constitutional rights.  Jones v. Fransen, 857 F.3d 843, 851 (11th Cir. 2017).  A determination as to whether the law was clearly established "'must be undertaken in the light of the specific context of the case, not as a broad general proposition.'"  Riva-Villegas v. Cortesluna, 142 S. Ct. 4, 8 (2021) (per curiam) (quoting Brosseau v. Haugen, 543 U.S. 194, 198 (2004)). Thus, to deprive Estes of qualified immunity, a precedent must exist that put him on notice, as of the date of the Incident, that he could face personal liability for one inmate's attack on another simply by virtue of his position as warden of St. Clair.

No such precedent exists.  To the contrary, multiple Eleventh Circuit decisions demonstrate that individual liability is inappropriate in these circumstances.  See e.g., Marbury, 936 F.3d at 1233-38 (no liability where warden and correctional

officer allegedly ignored plaintiff's requests for transfer before attack by fellow inmate and knew of a general risk of violence within the prison); Harrison, 746 F.3d at 1301-02 (no supervisory liability where complaint alleged that warden knew of incidents of inmate-on-inmate violence, but evidence did "not indicate that inmates were 'exposed to something even approaching the constant threat of violence'") (quoting Purcell ex rel. Estate of Morgan v. Toombs Cnty., Ga., 400 F.3d 1313, 1320 (11th Cir. 2005)); Williams, 689 F.2d at 1384 ("There can be no duty, the breach of which is actionable, to do that which is beyond the power, authority, or means of the charged party"); see also Beck v. Hamblen Cnty., Tenn., 969 F.3d 595, 602 (6th Cir. 2020) (reversing district court's denial of qualified immunity where the plaintiff failed to point to a case that gave the sheriff a "fair and clear warning about what the law requires in the situation . . . [of] a resource-limited official who knew of general safety concerns arising from overcrowding and understaffing problems largely outside his control"). These cases establish that personal liability does not attach for every instance of inmate violence in a prison.

Plaintiff cannot identify clearly established law putting Estes on notice that his actions violated the Constitution. That is especially clear now that the parties have completed discovery in this action. Accordingly, qualified immunity protects Estes from Plaintiff's individual-capacity claim.

### III.    PLAINTIFF FAILED TO ESTABLISH AN OFFICIAL-CAPACITY CLAIM AGAINST COMMISSIONER HAMM OR WARDEN NOE.

#### A.    THE ELEVENTH AMENDMENT BARS PLAINTIFF'S OFFICIAL-CAPACITY CLAIM.

Plaintiff purports to seek damages "jointly and severally" from all Correctional Officials.  (Doc. 65, ¶ 55).  However, the Eleventh Amendment bars damages action against state officials in their official capacities.  Kentucky v. Graham, 473 U.S. 159, 169 (1985); Williams, 689 F.2d at 1376 (Eleventh "amendment effectively bars such actions for monetary relief even when the state is not named as a party").  Accordingly, Plaintiff may not seek damages against Commissioner Hamm and Warden Noe, both of whom he names only in their official capacities.  (Doc. 65, ¶10; Doc. 120).

Plaintiff also failed to establish an entitlement to injunctive relief of any kind. Plaintiff claims in his "Prayer for Relief" to seek an "injunction prohibiting Defendants from engaging in further violations of the Eighth and Fourteenth Amendments." (Doc. 65 at 26).  Plaintiff provided no evidence to support this form of relief.  Under Ex parte Young, 209 U.S. 123 (1908), a court may, consistent with the Eleventh Amendment, grant prospective injunctive relief only "to prevent a continuing violation of federal law."  Green v. Mansour, 474 U.S. 64, 68 (1985). "The Ex parte Young doctrine applies only when 'a violation of federal law by a state official is *ongoing* as opposed to cases in which federal law has been violated

at one time or over a period of time in the past.'" <u>Nicholl v. Atty. Gen. of Ga.</u>, 769 F. App'x 813, 815 (11th Cir. 2019) (quoting <u>Fla. Ass'n of Rehab. Facilities, Inc. v. Fla. Dep't of Health & Rehab. Servs.</u>, 225 F.3d 1208, 1219 (11th Cir. 2000)) (emphasis added). Plaintiff testified that other than additional fencing and cameras, along with the use of metal detectors (all of which he agreed St. Clair previously installed and/or implemented), "there are no other actions he intends to ask the Court to direct ADOC to complete." (<u>Supra</u>, ¶ 90). In similar fashion, Plaintiff's purported expert possessed no evidence regarding the current conditions inside St. Clair. (<u>See supra</u>, ¶¶ 115-16). Thus, Plaintiff provided no evidentiary basis for any injunctive relief, and the Court should grant summary judgment on his official-capacity claims.

Moreover, the Eleventh Circuit refuses "to apply <u>Ex parte Young</u> where the officer who is charged has no authority" to undertake the actions requested by a plaintiff. <u>Summit Med. Assocs., P.C. v. Pryor</u>, 180 F.3d 1326, 1342 (11th Cir. 1999) (dismissing claims against the Alabama Governor, the Attorney General and a District Attorney without the power to act as barred by Eleventh Amendment). Even if Plaintiff could establish an ongoing constitutional violation (which he cannot do), Plaintiff cannot demonstrate that Commissioner Hamm or Warden Noe possesses the authority to cure alleged understaffing and overcrowding at St. Clair. Therefore, Plaintiff's official-capacity claims against Commissioner Hamm and Warden Noe fail as a matter of law.

### B.    PLAINTIFF FAILED TO ESTABLISH DELIBERATE INDIFFERENCE.

Plaintiff appears to predicate his official-capacity claim on a hypothetical risk of a future attack by another inmate at St. Clair (even though he does not expect to return there).  (Doc. 65, ¶ 60; supra, ¶ 67).  As set forth above, Plaintiff testified that he cannot "think of" any additional measures he would ask Commissioner Hamm or Warden Noe to take at St. Clair beyond the measures the Correctional Officials already implemented.  (Supra, ¶ 90).  Even worse, Plaintiff's purported expert admitted to knowing nothing about Commissioner Hamm or anything undertaken by Hamm during his tenure as Commissioner.  (Doc. 141-15, 5-6 (Ex. O., 100:19-102:12)).  Those admissions should end Plaintiff's official-capacity claim.

Even assuming Plaintiff still seeks some unidentified injunctive relief, he cannot establish an entitlement to an injunction.  An official-capacity conditions-of-confinement claim contains both objective and subjective components.  Chandler v. Crosby, 379 F.3d 1278, 1289 (11th Cir. 2004).  To make the objective showing, a plaintiff "must at the very least show that a condition of his confinement 'poses an unreasonable risk of serious damage to his future health' or safety."  Id. (quoting Helling v. McKinney, 509 U.S. 25, 33 (1993)).  To make the subjective showing, "the plaintiff must show subjective recklessness as used in the criminal law."  Swain v. Junior, 961 F.3d 1276, 1285-86 (11th Cir. 2020)  ("[D]eliberate indifference is *not* a constitutionalized version of common-law negligence.").  As with individual-

capacity claims, "[t]he official may escape liability for known risks 'if [he] responded reasonably to the risk, even if the harm ultimately was not averted.'" Chandler, 379 F.3d at 1290 (quoting Farmer v. Brennan, 511 U.S. 825, 844 (1994)); Swain, 961 F.3d at 1286. To survive a motion for summary judgment, a plaintiff must present evidence that the officials "were at the time suit was filed, and are at the time of summary judgment, knowingly and unreasonably disregarding an objectively intolerable risk of harm, and that they will continue to do so." Farmer, 511 U.S. at 846. Plaintiff cannot make this required showing as to Commissioner Hamm or Warden Noe.

All Plaintiff can muster is Rion's suggestion that certain measures "could be taken" to address contraband, inmate movement, inmate violence, and staffing. (Doc. 141-15, 42-43 (Ex. O-1)). Rion admitted at his deposition, however, that he possesses zero knowledge about current conditions at St. Clair. (See supra, ¶¶ 115-16). This admission is fatal to Plaintiff's claim for injunctive relief, because it demonstrates that Plaintiff cannot fulfill Farmer's requirement of demonstrating ongoing deliberate indifference "at the time of summary judgment." Farmer, 511 U.S. at 846. At any rate, as set forth above, Rion's suggestions largely consist of moot recommendations for measures previously implemented and measures outside the Correctional Officials' authority. (Supra, ¶ 117). Aside from Rion's failure to identify *who* should or even could take these measures, he fails to explain if or how

the measures are necessary to comply with the Constitution.  See Chandler, 379 F.3d at 1289  ("Generally speaking, prison conditions rise to the level of an Eighth Amendment violation only when they 'involve the wanton and unnecessary infliction of pain.'") (quoting Rhodes v. Chapman, 452 U.S. 337, 347 (1981)); Hoffer v. Sec'y. Fla. Dep't of Corrs., 973 F.3d 1263, 1272 (11th Cir. 2020) (holding that "the sole question before us is whether the Secretary's approach to [medical treatment of certain inmates with hepatitis C] is so reckless—so conscience-shocking—that it violates the Constitution").  Plaintiff provided no evidence suggesting that the Correctional Officials' efforts to address violence at St. Clair are so "reckless" or "conscience-shocking" that they violate the Constitution.

Indeed, far from the Correctional Officials acting in a "conscience-shocking" manner, Inch opined they responded reasonably to inmate violence at St. Clair:

> I see no evidence of willful inactivity and acceptance of the status quo that could constitute deliberate indifference by the leadership of ADOC, specifically Commissioner Hamm, former Commissioner Dunn, Warden Estes, and Warden Noe.  On the contrary, I see an array of agency-wide and facility leadership actions taken to improve the conditions of confinement and rehabilitative opportunities for the incarcerated population.

(Doc. 143-1, 15 (Ex. T-1, 10)).  Zawilinski likewise concluded that no Correctional Official acted with deliberate indifference:

> [S]everal good-faith measures were already underway prior to the incident in question on December 2, 2017, to include, at a minimum, upgrades to safety and security measures, and several more efforts have occurred since then and are currently ongoing such as increases in

> staffing, recruitment, and the construction of a new prison in Elmore
> County that will ultimately replace [St. Clair]. . . .  It is evident the
> defendants in this matter took reasonable measures to improve and
> protect the inmate population at [St. Clair.]

(Doc. 141-18, 40 (Ex. R-1); see also supra, ¶¶ 85, 89, 95)).

Moreover, Zawilinski opined about the difficulty in curbing inmate violence in maximum-security facilities like St. Clair, and the impossibility of eliminating it altogether.  (141-18, 19, 36 (Ex. R-1)).  In the words of the Eleventh Circuit, "[f]ailing to do the 'impossible' doesn't evince indifference, let alone deliberate indifference."  Swain, 961 F.3d at 1287.  Instead, "[w]e must focus not on isolated failures—or impossibilities, as the case may be—but rather on the defendants' entire course of conduct"); see also Valentine v. Collier, 956 F.3d 797, 802 (5th Cir. 2020) (granting stay of preliminary injunction pending appeal where district court "cited no evidence that [the defendants] subjectively believe the measures they are taking are inadequate").  The mere fact that the Incident occurred, while unfortunate, cannot establish deliberate indifference by Commissioner Hamm or Warden Noe.

## CONCLUSION

Based on the undisputed facts, argument and authorities contained herein, and in the Correctional Officials' Motion, as well as the evidentiary materials included in the Evidentiary Submission, the Correctional Officials respectfully request that the Court grant them summary judgment.

Dated: February 20, 2023

*/s/ William R. Lunsford*

*One of the Attorneys for the*
*Correctional Officials*

William R. Lunsford
Ellie B. Putman
M. Landon Whatley
Matthew B. Reeves
**MAYNARD, COOPER & GALE, PC**
655 Gallatin Street
Huntsville, AL 35801
Telephone: (256) 551-0171
Facsimile: (256) 512-0119
blunsford@maynardcooper.com
lwhatley@maynardcooper.com
mreeves@maynardcooper.com
eputman@mayardcooper.com

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that a copy of the foregoing has been served upon all attorneys of record in this matter by the Court's CM/ECF system and/or via U.S. Mail and email on this 20th day of February, 2023.


/s/  *William R. Lunsford*
*Of Counsel*

50