FILED
2023 May-18  PM 10:17
U.S. DISTRICT COURT
N.D. OF ALABAMA

# UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF ALABAMA
## MIDDLE DIVISION

| | |
|---|---|
| AUNDRA DEBREL BOYKINS, )<br><br>    Plaintiff, )<br><br>v. )<br><br>JEFFERSON DUNN, *et al.*, )<br><br>    Defendants. ) | Case No.:  4:19-cv-01934-ACA |

## PLAINTIFF'S OPPOSITION TO THE CORRECTIONAL OFFICIALS' <u>MOTION FOR SUMMARY JUDGMENT</u>

J.S. "Chris" Christie, Jr. (ASB-3162-H07J)
R. Terrell Blakesleay (ASB-5910-B00U)
**DENTONS SIROTE PC**
2311 Highland Avenue South
Post Office Box 55727
Birmingham, AL 35255-5727
Tel: (205) 930-5100
Fax: (205) 930-5101
chris.christie@dentons.com
terrell.blakesleay@dentons.com

Hyongsoon Kim, *pro hac vice*
**AKIN GUMP STRAUSS HAUER & FELD LLP**
4 Park Plaza, Suite 1900
Irvine, CA 92614-2585
Tel: (949) 885-4100
Fax: (949) 885-4101
kimh@akingump.com

Molly E. Whitman, *pro hac vice*
Brett M. Manisco, *pro hac vice*
Jessica Ro, *pro hac vice*
**AKIN GUMP STRAUSS HAUER & FELD LLP**
1999 Avenue of the Stars, Suite 600
Los Angeles, CA 90067-6022
Tel: (310) 229-1000
Fax: (310) 229-1001
mwhitman@akingump.com
bmanisco@akingump.com
jro@akingump.com

Jennifer S. Garrett, *pro hac vice*
Madeleine R. Freeman, *pro hac vice*
**AKIN GUMP STRAUSS HAUER & FELD LLP**
One Bryant Park
New York, NY 10036
Telephone: (212) 872-1065
Fax: (212) 872-1002
jgarrett@akingump.com

*Attorneys for Plaintiff*

Dated:      May 18, 2023

## **TABLE OF CONTENTS**

**Page**

INTRODUCTION ........................................................................................1

LEGAL STANDARD ..................................................................................1

STATEMENT OF FACTS ..........................................................................2

    I.     Response to the Correctional Officials' Statement of
Undisputed Facts ...........................................................................2

    II.    Additional Undisputed Facts ........................................................12

    III.   Additional Disputed Facts ............................................................15

ARGUMENT ..............................................................................................30

    I.     A Reasonable Juror Could Conclude That Estes Was
Deliberately Indifferent to the Substantial Risk of Harm by
Failing to Implement and Enforce Sufficient Policies to Combat
Excessive Inmate Violence............................................................30

    II.    A Reasonable Jury Could Conclude That Estes Was Aware of a
Substantial Risk of Serious Harm to Plaintiff Due to Excessive
Inmate Violence.............................................................................31

    III.   A Reasonable Jury Could Conclude That Estes Responded
Unreasonably to the Substantial Risk of Harm ...........................38

    IV.   A Reasonable Jury Could Conclude That Estes's Deliberate
Indifference Caused Plaintiff's Injuries .......................................42

    V.    A Reasonable Juror Could Conclude That Hamm and Noe Are
Deliberately Indifferent to the Continuing Risk of Serious Harm
to Inmates at St Clair ....................................................................44

    VI.   Genuine Disputes of Material Fact Preclude Qualified
Immunity .......................................................................................46

CONCLUSION ..........................................................................................50

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Adickes v. S.H. Kress*,
   398 U.S. 144 (1970).......................................................................................1, 2

*Anderson v. Liberty Lobby*,
   477 U.S. 242 (1986).........................................................................................1

*Braggs v. Dunn*,
   257 F. Supp. 3d 1171 (M.D. Ala. 2017)...........................................................50

*Braggs v. Dunn*,
   317 F.R.D. 634 (M.D. Ala. 2016)....................................................................46

*Caldwell v. Warden*,
   748 F.3d 1090 (11th Cir. 2014) ...............................................................31, 32

*Carter v. Galloway*,
   352 F.3d 1346 (11th Cir. 2003) (per curiam) ...................................................31

*Celotex Corp. v. Catrett*,
   477 U.S. 317 (1986).........................................................................................2

*Clark v. Alexander*,
   85 F.3d 146 (4th Cir. 1996) .............................................................................2

*Clem v. Lomeli*,
   566 F.3d 1177 (9th Cir. 2009) .......................................................................42

*Cunningham v. Estes*,
   2017 WL 2082690 (N.D. Ala. May 15, 2017) ...................................................2

*Duke v. Dunn*,
   No. 4:14-cv-01952-VEH (N.D. Ala. 2014)......................................................38

*Farmer v. Brennan*,
   511 U.S. 825 (1994)...................................................................................*passim*

*Gaines v. Wardynski*,
   871 F.3d 1203 (11th Cir. 2017) .....................................................................47

*Griffin v. City of Opa-Locka*,
 261 F.3d 1295 (11th Cir. 2001) ............................................................31

*Hale v. Tallapoosa Cty.*,
 50 F.3d 1579 (11th Cir. 1995) ..............................................................47

*Hargrove v. Colbert Cty.*,
 2022 WL 16646712 (11th Cir. Aug. 10, 2022) ....................................37

*Harlow v. Fitzgerald*,
 457 U.S. 800 (1982).............................................................................46

*Hill v. Cundiff*,
 797 F.3d 949 (11th Cir. 2015) ............................................................46

*Hope v. Pelzer*,
 536 U.S. 730 (2002).............................................................................47

*Horton v. Cockrell*,
 70 F.3d 397 (5th Cir. 1995) .................................................................46

*LaMarca v. Turner*,
 995 F.2d 1526 (11th Cir. 1993) ....................................................*passim*

*Lane v. Philbin*,
 835 F.3d 1302 (11th Cir. 2016) ....................................31, 34, 47, 48

*Marsh v. Butler Cty.*,
 268 F.3d 1014 (11th Cir. 2001) ....................................32, 33, 34, 47

*Ogletree v. Colbert Cty.*,
 2021 WL 4477630 (N.D. Ala. Sept. 30, 2021)....................................37

**Statutes**

Ala. Code § 14-1-1.3.............................................................................9

Ala. Code § 14-1-24...........................................................................21

**Other Authorities**

Fed. R. Civ. P. 56(c)..........................................................................1, 2

Fed. R. Evid. 401-03 ..........................................................................2, 8

Fed. R. Evid. 702 ......................................................................................................12

Plaintiff Aundra Boykins submits this Memorandum of Law in Opposition to the Motion for Summary Judgment by Defendants John Hamm, Guy Noe, and Dewayne Estes (collectively, the "Correctional Officials" or the "COs"). ECF 132.

## INTRODUCTION

The COs, current and former administrators of the Alabama Department of Corrections ("ADOC"), have turned a blind eye to the unabated inmate-on-inmate ("IOI") violence at St. Clair Correctional Facility ("St. Clair") for so long that they have forgotten that the U.S. Constitution protects confined individuals from such harm. Cortez Whittington was able to stab Plaintiff repeatedly on December 2, 2017 (the "Assault") due to multiple security failures and administrative neglect, and sadly, the dangerous conditions continue today. A reasonable trier of fact could conclude that the COs' conduct rises to the level of cruel and unusual punishment, and for this reason, summary judgment must be denied.

## LEGAL STANDARD

Summary judgment must be denied unless the moving party demonstrates **both** that there "is no genuine issue as to any material fact" **and** that "the moving party is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(c). Pursuant to Rule 56(c), the moving party carries the burden of demonstrating that the evidence "is so one-sided that [the moving] party [should] prevail as a matter of law." *Anderson v. Liberty Lobby*, 477 U.S. 242, 252 (1986); *Adickes v. S.H. Kress*, 398

U.S. 144, 157 (1970) (moving party "had the burden of showing the absence of a genuine issue as to any material fact"). Defendants cannot meet this burden unless they demonstrate the absence of a genuine issue of material fact. *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986); Fed. R. Civ. P. 56(c).

Federal courts must resolve all reasonable doubts in favor of the non-movant and considering the facts in the "light most favorable to the opposing party." *Adickes*, 398 U.S. at 157; *Clark v. Alexander*, 85 F.3d 146, 150 (4th Cir. 1996); *Cunningham v. Estes*, 2017 WL 2082690, at *1 (N.D. Ala. May 15, 2017).

## STATEMENT OF FACTS

### I.    Response to the Correctional Officials' Statement of Undisputed Facts

Pursuant to Appendix II of this Court's Initial Order (ECF 31 at 17-18), Plaintiff disputes and/or objects to the following facts in the COs' statement of undisputed facts (each identified with "CO ¶"):

CO ¶ 1. Objection. Plaintiff objects to the statement concerning the reason for incarceration as irrelevant and unduly prejudicial. Fed. R. Evid. 401-03.

CO ¶ 15.    Disputed, including because this statement mischaracterizes Plaintiff's testimony, which speaks for itself. Plaintiff knew St. Clair was a maximum security prison but did not know what to expect there. ECF 141-10 at 8-9, 69:13-18, 70:1-10.

CO ¶ 17.    Disputed. The fact mischaracterizes testimony and is incomplete. Plaintiff did not testify that inmates from various St. Clair housing units "regularly interacted" at pill or sick call. *See* ECF 141-10 at 9-11, 72:16-75:17, 78:3-13; 79:3-11. Plaintiff stated only that inmates from different units were in the same general location at defined intervals, such as pill or sick call. *Id.*

CO ¶ 20.    Disputed to the extent it is unclear which "accounts" the COs allege "diverge." Plaintiff objects to the argument in note 2. *See* ECF 145 at 6 n.2.

CO ¶ 21.    Disputed. Plaintiff denies Whittington's claims. Plaintiff is not and never has been affiliated with any gang. ECF 174-1 at 10 ¶ 3.

CO ¶ 22.    Disputed. Plaintiff never stole or possessed a cell phone belonging to Whittington. ECF 141-10 at 19, 168:15-21; ECF 174-1 at 11 ¶ 5.

CO ¶ 27.    Disputed. Whittington, who was not assigned to H Dorm and prohibited from entering [*see* ECF 174-1 at 54; ECF 141-10 at 11, 79:11-25; ECF 174-1 at 19, 162:2-19], was able to enter H Dorm because: Walker was asleep at his post [ECF 141-10 at 24, 188:14-25], allowing Whittington to "walk[] straight past" him [ECF 174-3 at 17, 221:7-12]; Walker did not check Whittington's colored wristband or search him for contraband [ECF 141-17 at 13, 221:7-14]; there were no surveillance cameras in H Dorm [ECF 174-3 at 22]; there was insufficient staffing at St. Clair and specifically in H dorm [ECF 174-1 at 38, 192:1-18; ECF 174-3 at 30, 40:2-5; ECF 174-3 at 59, 42:10-20; ECF 174-4 at 19 (in week of Assault, 88

positions staffed out of 249 spots, or 35% staffing)]; the entrance door lock to H Dorm door was broken [ECF 174-3 at 107, 253:22-254:9]; and there were no metal detectors along the path Whittington likely took [*see, e.g.*, *id.* at 268:8-269:8]. Whittington transferred to St. Clair in September 2017 and was not "new[ ]." ECF 174-1 at 59-61.

CO ¶ 29.    Disputed. The COs mischaracterize the testimony. Walker testified he "could see in there," but did not testify that he was monitoring the room at the time of the Assault. ECF 141-16 at 11, 225:4-10. Someone sitting at Walker's post might not see all parts of the TV room, as Plaintiff testified he could not see Walker at his desk. ECF 141-10 at 21, 175:2-17. Walker also testified that there are "plenty" of blind spots in H Dorm, he could not monitor the entirety of H Dorm from his post, and once he heard "a commotion," he "got up from [his] desk to see what was happening." ECF 141-16 at 10, 224:3-5; ECF 174-1 at 37, 188:17-189:7.

CO ¶ 33. Disputed, including because the characterization of events and testimony is misleading. Whittington admitted he approached Plaintiff from behind. ECF 141-17 at 16, 236:20-23. Whittington was the sole aggressor, and only Whittington—not Plaintiff—was found "guilty of fighting with a weapon." ECF 141-5 at 68-71 (finding Plaintiff not guilty "[b]ased on [Walker's] sworn testimony and the testimony of [Plaintiff] reacting in self defense [sic] of the assault by inmate Whittington"), 78-84; ECF 174-1 at 11-12 ¶¶ 8 & 12.

CO ¶ 35. Disputed. Walker did not see Whittington begin to stab Plaintiff and had to get up from his desk to identify the disturbance. ECF 141-16 at 10, 224:3-5. There is no evidence that Walker "immediately" used his radio to summon other officers. Walker's only recollection of the Assault is in his Incident Report, which shows that it took at least ten minutes after Whittington began stabbing Plaintiff for backup to arrive. ECF 174-1 at 42-43, 221:22–222:13; ECF 141-16 at 16-17. The citation to Ex. S of the COs' Submission does not support this alleged fact.

CO ¶ 37. Disputed. The COs do not support the alleged fact with admissible proof. No ADOC or St. Clair policy requires correctional officers to ███████████ before intervening when an inmate is using deadly force against another. *See* ECF 174-4 at 34-41; ECF 174-4 at 29, 32-33, 118:9-13, 377:16-20, 382:21-383:3; ECF 174-3 at 66, 118:2-23, 120:1-19. St. Clair policy permits correctional officers like Walker to use force, including "in situations where the officer has grounds to reasonably believe that his/her life or the lives of others are in imminent danger of death or serious bodily injury." ECF 174-4 at 40. No ADOC policy prevented Walker from deploying his ADOC-supplied chemical agent or taking any other measure to stop the life-threatening attack on Plaintiff. ECF 174-3 at 62-63, 66, 77:18-22, 84:14-23, 85:1-6, 119:20-120:19.

CO ¶ 40. Clarified. Plaintiff estimated that six or seven officers responded, but does not know how long it took for the officers to respond or how many officers

actually responded because Plaintiff was fighting for his life and lost consciousness at least once due to the loss of blood. ECF 141-10 at 20, 171:5-20.

CO ¶ 41. Disputed. Ample evidence shows that the scene was *not* secured: (1) Whittington "ran" from the scene [ECF 141-16 at 17]; (2) the two knives Whittington used to stab Plaintiff were never recovered [*id.* ("no crime scene or weapons located"); [ECF 174-1 at 44, 247:4-248:20]; (3) no other inmates present in the TV room or elsewhere in H Dorm were searched or even identified [*id.*, 247:4-248:20]; (4) there is no evidence that H Dorm residents were dispersed from the scene, locked down, or sent to their bunks; and (5) the only "security checks" the COs cite were conducted about three hours after the Assault [ECF 141-9 at 6].

CO ¶ 42. Disputed. There is no evidence demonstrating the existence of an ADOC or St. Clair policy or procedure explaining whether or how correctional officers should "security checks."

CO ¶ 43. Disputed as a mischaracterization of the cited evidence, which speaks for itself. Moreover, Whittington, ██████████████████████████ was found guilty of stabbing another inmate on July 15, 2017; thus, the COs were on notice of the potential that he would stab another inmate, including Plaintiff. ECF 174-4 at 53-56; ECF 141-4 at 2 ¶ 2.

CO ¶ 46. Disputed. Plaintiff was admitted to UAB Hospital on December 2, 2017 and discharged on December 5, 2017. *See* ECF 174-4 at 59.

CO ¶ 47. Disputed. The records do not quantify Plaintiff's injuries, and Plaintiff stated that he had "more than seven or eight" wounds. *See* ECF 141-8; ECF 141-10 at 22, 180:9-17. Plaintiff's records reveal that he suffered "multiple stab wounds to right upper lateral arm, left lower abdomen, left flank, right upper scapular [sic], left 3rd and 4th fingers, right thigh 6 wounds, and left thigh 2 wounds." ECF 174-4 at 64; *see also* ECF 174-4 at 60. Plaintiff sustained numerous instances of "penetrating trauma" and other injuries warranting hospitalization. ECF 141-8. CT and MRI results led doctors to conclude, among other things, that Plaintiff suffered a, "[p]enetrating trauma" in his chest suggesting "pulmonary lacerations with associated hematoma[,]" a "suspected additional penetrating trauma seen along left chest[,]" and a "pulmonary contusion." ECF 141-6 at 11.

CO ¶¶ 49-51. Disputed as not supported by competent evidence.[1]

CO ¶ 53. Disputed. Plaintiff was asked to waive prosecution and believed he was being cooperative with Agent Casey's request. ECF 174-1 at 12, ¶ 11; *see also* ECF 174-4 at 65-66. Plaintiff also had several concerns which contributed to his decision to sign the waiver. ECF 174-1 at 12 ¶¶ 11-12; *see also* ECF 174-3 at 14-15, 138:3-5, 138:18-23, 144:21-145:5.

---

[1] Plaintiff has moved to exclude Exhibit C to the COs' Submission [ECF 141-3] and argument based on that exhibit because the declarant is an undisclosed witness. ECF 156.

CO ¶ 54. Disputed; Plaintiff did not know that waiving prosecution would result in the closure of the investigation and a failure to submit Whittington's criminal case to the District Attorney for prosecution. ECF 174-1 at 11 ¶ 9. Plaintiff also objects to the fact because it is irrelevant to the dispute. Fed. R. Evid. 401-403.

CO ¶ 55. Disputed. Plaintiff believed he was cooperating by complying with Agent Casey's request. ECF 174-1 at 12 ¶ 11. No ADOC Administrative Regulation ("AR") or St. Clair Standard Operating Procedure (or "Standard Operational Procedure," with both referred to as "SOP") requires that the Law Enforcement Services Division ("LESD," and formerly "I&I" [ECF 174-4 at 72, 57:11-23]) close investigations of IOI violence involving a deadly weapon if the victim-inmate agrees to waive prosecution. *See* ECF 174-5 at 69, 71, 186:18-187:11, 199:10-22. LESD can recommend that the District Attorney's office prosecute an inmate who has committed a crime even if the victim-inmate waives prosecution. ECF 174-4 at 75, 178:10-21.

CO ¶ 61. Disputed and clarified. Plaintiff feels afraid, anxious, and that he has a target on his back regardless of which facility he is in, including, among other things, because he still sees inmates carrying knives or other weapons nearly every day. ECF 174-1 at 12 ¶ 12.

CO ¶ 66. Clarified. Plaintiff does not have personal knowledge of changes to St. Clair since he was transferred, but has conducted fact discovery on this topic.

CO ¶ 67. Disputed. Plaintiff has concerns about being attacked again at any ADOC facility. ECF 174-1 at 12 ¶ 12.

CO ¶ 70. Disputed and clarified. As Commissioners appointed by the Alabama Governor, both Dunn and Hamm had broad statutory responsibility for leading the ADOC, for the independent direction, supervision, and control of the ADOC, and for approving and issuing AR and changes to ARs. *See* Ala. Code. 1975 § 14-1-1.3 (2010). Dunn was charged with running the ADOC, and had the broad statutory authority to do so. ECF 174-4 at 70, 25:7-18. Dunn acknowledged that he "also had the responsibility to ensure that the policies that we had promulgated were in fact promulgated and that the responsibilities for those policies were delegated to the appropriate individuals in the department." *Id.*, 26:8-15. The Commissioner's responsibility was and is to promulgate regulations that provide guidance to the Wardens of the individual facilities; the Wardens can, in turn, implement facility-specific SOPs and "provide guidance and instructions to the officer and the rest of the employees to carry out those instructions."  ECF 174-6 at 16, 131:4-10; ECF 174-16 at 34-42.

CO ¶ 71. Disputed. Dunn was responsible to "evaluate the system" and identify any areas of change, which also involved ensuring that policies were appropriately promulgated. ECF 174-4 at 70-71, 25:19-26:15.

CO ¶ 72. Disputed to the extent that the COs suggest that the stated activities successfully combatted IOI violence, for which there is no evidence. For instance, the "Strategic Plan" does not even mention, let alone set forth any coherent strategy aimed at combatting IOI violence. *See* ECF 141-5 at 6-19. No evidence supports the COs' claim that Dunn's proposed "Alabama Prison Transformation Initiative" has any nexus to curbing IOI violence.

CO ¶ 76. Disputed. *See supra* CO ¶ 70.

CO ¶ 77. Disputed. Hamm is responsible for "approving and issuing [ARs] and changes." ECF 174-6 at 36. ARs are "comprehensive guidelines by which [ADOC] standardizes administrative and operational functions [and] encompass programs, procedures and policies." *Id*. Through the promulgation of ARs, Hamm has responsibility for and influence over the day-to-day operations of St. Clair. *Id.*

CO ¶ 79. Disputed. Hamm is authorized to request annual funding for the ADOC and St. Clair. ECF 141-2 at 3-4 ¶ 7.

CO ¶ 82. Disputed. AR 001 does not require the Commissioner to lobby any government body to issue ARs, which govern ADOC operations. ECF 174-6 at 34-42.

CO ¶ 84. Disputed as the alleged fact is vague and ambiguous.

CO ¶ 85. Disputed to the extent that the COs suggest that Dunn participated in building or achieving any of the purported measures or that these measures actually decreased the frequency of IOI violence, for which there is no evidence.

CO ¶ 87. Disputed. Under SOP 002, signed by Estes, "The Warden or designee is responsible for the development and implementation of all SOP's." ECF 174-6 at 44; *see also* ECF 174-6 at 37 ¶ D(1). Estes had authority to modify the SOPs without permission. ECF 174-3 at 81, 32:3-14, 34:11-14. The Warden is responsible for implementing and promulgating local orders, procedures, and policies through the publication of SOPs. ECF 174-6 at 46-51; ECF 174-6 at 34-42; s*ee also* ECF ECF 174-6 at 15, 112:16-19. Further, Estes had the ability to review the findings of any investigations that had led to an administrative action and use such findings to make or propose a policy change at St. Clair. ECF 174-4 at 76, 241:6-22.

CO ¶ 89. Disputed to the extent there is no evidence that these measures improved inmate safety, other than the addition of cameras and fencing.

CO ¶ 90. Disputed. The COs mischaracterize the cited testimony, which speaks for itself. ECF 141-10 at 32, 244:8-12.

CO ¶ 95. Disputed. No evidence suggests the stated measures have had any impact on the rate of IOI violence.

CO ¶ 96. Disputed. Plaintiff referred the COs to his counsel regarding the specific relief sought. ECF 141-10 at 29, 222:8-13. Plaintiff seeks injunctive relief from Defendant Noe in his official capacity. *See* ECF 65.

CO ¶¶ 97-122. Disputed. Plaintiff objects to the COs' citations to the reports, opinions, and testimony of the expert witnesses disclosed in this case (the "Expert Testimony" section), which do not constitute admissible evidence. Fed. R. Evid. 702. The COs' Expert Testimony section impermissibly sets forth numerous legal conclusions that are not based on admissible record evidence and are not statements of fact.

## II.    Additional Undisputed Facts

1.    H Dorm is in a building physically separate from the general population housing units and connects to those units and other parts of St. Clair by way of a tunnel with gates on both sides. ECF 174-3 at 37, 139:6-10.

2.    St. Clair's policies concerning officer staffing are inconsistent. SOP 031 provides that "during normal operations," ███████ is required to be present in H Dorm. ECF 141-9 at 11. Yet SOP 032—which addresses "Staff Manning Requirements" and was signed by Estes in 2016—provides that H Dorm is to have ███████. ECF 174-6 at 56. SOP 067 ("H-Unit Officer"), signed by Estes in 2016, similarly states that "███████████ trained ████ will be assigned to the H Building." ECF 174-1 at 51 (emphasis added). These assigned rovers, as the

"primary line of security within the institution," "must be constantly on patrol in their assigned areas and check inmates for colored wristband [sic]." *Id.* at 52. The rovers must also "conduct sufficient random personal and area shakedowns to eliminate the flow of contraband." *Id.* at 54.

3.    SOP 064 ("Tunnel Rover") also provides for a tunnel rover who is "responsible for maintaining the proper level of institutional security by controlling the movement of inmates and the transportation of contraband entering and departing the tunnel by gate control and searches."  ECF 174-6 at 61.

4.    SOP 067 indicates that inmates assigned to H Dorm are issued a white wristband and that "[i]f in doubt of any inmate's identification, the information must be verified before permitting any inmate entrance into the H Building." 174-1 at 53. This SOP instructs: "Inmates not assigned to the H Building will not be allowed to visit. NO EXCEPTIONS. Colored wrist bands are to be checked before allowing inmate [sic] to enter H Dorm." *Id.* at 54; *see also* ECF 174-3 at 36, 121:10-14.

5.    SOP 137 requires that "[t]he gates leading from H Dorm to the Industrial area will be kept locked and will be opened and controlled by security personnel only."  ECF 174-3 at 72.

6.    SOP 083 states: "[w]ristbands are an important tool we use in our efforts to keep unauthorized inmates out of unassigned cellblocks." ECF 174-6 at 68. SOP 110 states: "Officers should check inmates for colored wristband [sic]. All

inmates except those in Segregation must wear the appropriate colored wristband, based on their assigned bed assignment, at all times." ECF 174-6 at 6.

7.     ADOC facilities are also to undergo both internal and external security audits pursuant to AR 322 ("Security Audits"). ECF 174-6 at 73-82. The Warden must then formulate a "Corrective Action Plan" designed to "address deficiencies in security practices identified by the audit team." *Id.* at 74. Additionally, the Warden is responsible for (1) developing institutional SOPs, as necessary, to implement AR 322, and (2) appointing an Internal Audit Team. *Id.* at 75.

8.     St. Clair's SOP on security audits, SOP 119, provides that "[t]he Internal Audit Team shall conduct an annual audit." ECF 174-4 at 45. SOP 119 continues: "External security audits shall be conducted at least once every year in accordance with a security audit schedule established by the Institutional Coordinator(s)." *Id*. After an external audit, the Warden is to "submit a corrective action plan outlining the actions taken relative to the recommendations." *Id*. at 47.

9.     AR 331 provides that "[o]n a daily basis, including holidays and weekends, supervisory staff on each shift shall be designated to patrol all areas of the institution accessible to inmates for the purpose of detecting deficiencies or breaches of security." ECF 141-5 at 64. In addition, "Wardens shall coordinate weekly security inspections of all institutional security devices*." Id*. at 65.

### III.    Additional Disputed Facts

### Roles and Responsibilities

10.    As Warden III, Estes was "the head of the facility" and bore the "day-to-day responsibility for the operation of the facility" and "bottom line responsibility for making sure that St. Clair ran as "smoothly and efficiently and safely" as possible. ECF 174-3 at 79 & 81, 21:19-22; 31:13-21.

11.    Estes assessed the SOPs for their effectiveness, but did not recall finding that any were deficient or required change. *Id.* at 82, 34:20-35:2, 35:10-13.

12.    Although the warden of a facility is "responsible for making changes at a particular institution" [*id.* at 115, 311:1-17], Estes did not make any institutional changes as a result of the Assault and didn't think he needed to make any [*id.* at 111, 114, 271:5-9; 307:5-13].

### IOI Violence at St. Clair

13.    St. Clair has the reputation of being a particularly dangerous prison. ECF 174-1 at 27, 39:12-15.

14.    Between October 2011 and May 2016, eight homicides were reported at St. Clair. ECF 174-6 at 83-84. Two additional homicides occurred within seven months of each other, in July 2017 and February 2018. ECFs 174-8 at 109-156; 174-9; 174-10; 174-11; 172-12; 174-13; 174-14; 174-15; 174-16; 174-17 at 1-11; ECFs 174-17 at 12-27; 174-18; 174-19; 174-20.

15.     St. Clair recorded at least 48 IOI stabbings in 2016: five of which occurred in H Dorm, and 27 of which required a hospital visit, along with 13 other incidents of IOI assault that required hospital visits but did not involve stabbing. ECFs 174-8 at 109-156; 174-9; 174-10; 174-11; 172-12; 174-13; 174-14; 174-15; 174-16; 174-17 at 1-11. Then, between October 2016 and September 2017, ADOC reported 90 IOI assaults at St. Clair, meaning an IOI assault occurred on average every four days. ECF 174-6 at 97.

16.     IOI assaults at St. Clair continued at an even higher average rate in the months leading up to the Assault, and there were at least 10 incidents of IOI violence in December 2017, averaging one assault **every three days**. ECF 174-6 at 113; ECF 174-6 at 129; ECF 174-3 at 44, 52. Between January 1, 2017 through December 1, 2017, St. Clair recorded at least 19 IOI assaults involving a weapon, including 18 IOI stabbings, three of which occurred in H Dorm, and 13 of which required a hospital visit, along with 27 other incidents of IOI assault that required hospital visits but did not involve stabbing. ECFs 174-8 at 109-156; 174-9; 174-10; 174-11; 172-12; 174-13; 174-14; 174-15; 174-16; 174-17 at 1-11. In 2016, St. Clair recorded at least 48 IOI assaults involving a weapon. ECF 174-6 at 83-84. Through discovery, Plaintiff has been able to obtain incident reports dated after December 2, 2017 indicating at least two additional homicides since that date, as well as three additional stabbings in H Dorm. ECFs 174-17 at 12-27; 174-18; 174-19; 174-20.

17.     As Warden III, Estes reviewed all incidents of IOI violence at St. Clair [ECF 174-3 at 83, 42:7-17], and he reported all Class A incidents (homicides, sexual assaults, and inmate-on-inmates with "Serious Injury") to his supervisor, Cheryl Price. ECF 174-6 at 141.

18.     Estes did not recall making any specific recommendations to address IOI incidents. ECF 174-3 at 80, 25:20-23. Nor did he report taking any steps to determine whether St. Clair had more IOI violence than other prisons in Alabama. *Id.* at 82, 134:20-135:1.

19.     The amount of violence at St. Clair while Estes was Warden III stayed the same over time. *Id.* at 96, 166:17-20.

20.     Estes believed that Level V inmates caused a greater number of assaults to occur than Level IV inmates, but did not institute any additional precautionary measures at St. Clair than those at a Level IV institution. *Id.* at 86, 93, 66:6-12, 67:1-5, 148:11-14.

21.     In fact, Estes disclaimed any responsibility for incidents of IOI violence and believed that inmates were solely responsible for those incidents. *Id*. at 312, 312:17-313:5.

22.     There is no evidence Estes ever issued any SOP governing correctional officer investigations of IOI violence, nor is there any such policy today. *Id.* at 83-84, 45:4-16, 46:5-9; *see* ECF 174-6 at 143-52; ECF 174-6 at 153-64.

17

23.    Estes believed that St. Clair was a "secure and safe environment" for inmates and could not identify anything that would have made it safer or any policy or procedure that he put in place to increase the safety of St. Clair. ECF 174-3 at 89-90, 96-98, 100, 114, 127:9-13, 131:16-20, 166:21-167:21, 170:5-8, 194:18-21, 207:5-13, 307:5-13.

24.    In 2017, numerous incidents of IOI violence went unobserved by staff, including at least four incidents in H Dorm and one homicide. ECFs 174-8 at 109-156; 174-9; 174-10; 174-11; 172-12; 174-13; 174-14; 174-15; 174-16; 174-17 at 1-11. Estes did not take any specific actions as a result of these incidents, including after the homicide. *See, e.g.*, ECF 174-3 at 101, 104-06, 212:4-6, 231:3-7, 239:18-20, 242:8-10.

25.    Melinda Allen, a decade-long Prison Rape Elimination Act (PREA) auditor (60 PREA audits in total, including of several maximum security prisons), who conducted a mock audit of St. Clair in April 2018, ranked St. Clair "[t]he lowest" in terms of safety measures compared to others she observed. ECF 174-6 at 171, 173-4, 60:21-23, 117:2-5, 118:16-18. Allen found "so many problems at St. Clair" that she "contacted the Department of Justice [herself]." *Id.* at 173, 117:7-11. She described a St. Clair housing unit as "the scariest that I've ever been to." *Id.* at 172, 115:20-24. Allen observed "lack of control by staff, lack of doors working, inmates being able to move throughout the facility wherever they wanted to, moving

unchallenged, being in locations where they're not supposed to." *Id.* at 175, 121:24-122:9.

26.    Agent Casey, an investigator with LESD from 2016 to 2020, remarked that St. Clair "always seemed as though it was a hot spot" given the amount of incidents that occurred [ECF 174-5 at 63, 133:13-14], and noted that IOI assaults constituted a "fairly regular portion" of his caseload. *Id.* at 62, 78:10-12.

27.    In 2017, the year of the Assault, St. Clair had more violent incidents than other ADOC Level V facilities. ECF 174-6 at 97; ECF 174-6 at 20, 168:20-22. In December 2017 alone, at least 10 incidents of violence occurred at St. Clair, most of which involved a victim-inmate being assaulted with inmate-made weapons and requiring outside hospitalization. *See* ECFs 174-17 at 12-27; 174-18; 174-19; 174-20 (Incident Reports of stabbings or assaults that occurred on 12/4/2017, 12/11/2017, 12/12/2017, 12/14/2017, 12/17/2017, 12/20/2017, and 12/27/2017); ECF 174-3 at 44, 52.

28.    The 2017 ADOC-reported rate of violent incidents at St. Clair could have been under-inclusive due to the manner in which they were reported in 2017. ECF 174-6 at 21, 200:11-12.

29.    Such incidents of IOI violence occurred excessively at St. Clair for years prior to the Assault. *See* ECF 174-6 at 180 (2014 letter from EJI noting that "[d]uring the last year there have been over a dozen nearly fatal stabbings and

assaults at St. Clair"); ECF 174-4 at 78 (discussing settlement agreement for 2014 suit alleging ADOC "had failed to protect inmates at [St. Clair] from the known risk of harm" created by malfunctioning locks, uncontrolled movement, widespread weapons contraband, and a culture of violence, among other issues); ECF 174-6 at 182-211 (152 incidents of assault, with 99 involving weapons, between January 2015 and August 2016); ECF 174-6 at 212-24 (58 fights, with 33 involving weapons, between January 2015 and August 2016); ECF 174-6 at 23-24, ECF 174-6 at 25-33 (records sent to Estes in January 2018 showing 96 incidents of assault and three homicides between 2015 and 2017); ECFs 174-8 at 109-156; 174-9; 174-10; 174-11; 172-12; 174-13; 174-14; 174-15; 174-16; 174-17 at 1-11; ECFs 174-17 at 12-27; 174-18; 174-19; 174-20.

30.    In October 2016, the U.S. Department of Justice ("DOJ") Civil Rights Division initiated an investigation into ADOC conditions, culminating in a report issued on April 2, 2019 finding there is reasonable cause to believe the ADOC has violated and continues to violate inmates' Eighth Amendment rights. ECFs 174-1 at 65-88, 174-2, 174-3 at 1-5.

31.    Estes was aware of the DOJ's investigation, but did not participate in or inquire about the investigation. ECF 174-3 at 111, 273:20-274:8.

32.    A May 2019 EJI report also put Dunn on notice of the "ongoing serious threat of violence" at St. Clair, with the factors contributing to the risk of safety

including "widespread extortion, uncontrolled movement, the presence of weapons contraband, the lack of officer presence, and officers['] indifference to these risks." ECF 174-6 at 227.

33.    ADOC reported that 65 IOI assaults took place in FY 2022[2] against 93 victims as compared to 90 IOI assaults in FY 2017 against 99 victims. *C.f.* ECF 174-7 at 22; ECF 174-6 at 97; *see also* ECF 174-7 at 39 (showing 35 assaults on 48 victims since October 2022).

34.    The most recent ADOC quarterly report, issued under Hamm's authority as required by a 2021 Alabama law, shows that a firearm was confiscated at St. Clair in December 2022. Ala. Code § 14-1-24 (2021); ECF 174-8 at 49.

35.    Noe has acknowledged insufficient staffing as a primary issue affecting inmate safety, which others at the prison including Lieutenant Amanda Price have confirmed. *See* ECF 174-3 at 30, 38:12-39:3; ECF 174-3 at 59-61, 43:4-8, 49:7-50:5.

## **Failure to Control Inmate Movement**

36.    In his December 2015 deposition in the *Duke* case (defined below), Estes acknowledged that "every correctional facility has to control their movements because generally that's when things happen. When people are out of pocket, that's

---

[2] ADOC's fiscal year ("FY") runs from October to September. *See* Sept. 2017 report p. 2.

when incidents occur. So as wardens, we always want to control that."  ECF 174-6 at 142.

37.     Between 2014 and December 2015, Estes drafted a corrective action plan addressed to the security staff at St. Clair, which identified inmate movement as a "Risk." ECF 174-8 at 60-64.

38.     In a May 2018 letter to EJI, Dunn indicated, "We also continue to stress the necessity for inmates to wear their ADOC wrist bands at all times to assist with visually identifying inmates who are in unauthorized areas."  ECF 174-8 at 67.

39.     Unauthorized movement has existed at St. Clair since the 1990s and has not improved [ECF 174-1 at 30, 95:1-11], including following a 2016 homicide that occurred inside a St. Clair dorm where the investigation revealed that the inmates involved were not assigned to that dorm. ECF 174-5 at 64-65, 145:23-147:10; *see also id.* at 64, 69, 143:16-20, 189:20-190:6; ECF 174-3 at 11, 99:14-100:17.

40.     In March 2018, EJI put Dunn on further notice of the issue of unauthorized movement at St. Clair. ECF 174-5 at 6-7 (noting that inmate movement within general population "appear[ed] to be occurring nearly unchecked"; "the vast majority of inmates" were not wearing colored wristbands; there was a "pattern of staff non-compliance with [St. Clair] SOPs regarding unauthorized movement"; and St. Clair staff was "not documenting unauthorized movement in violent incident reports or taking disciplinary action").

41.    When Allen visited St. Clair in April 2018, several inmates were not in their assigned housing units [ECF 174-6 at 178], and, to this day, she has never witnessed a facility like St. Clair "where inmates just basically go where they want to" [*id.*, 150:21-23]. *See also id.* at 176, 122:23-123:10 (St. Clair inmates who "decided they didn't like where they were at [] could just physically pick up their bed roll and move somewhere else" and most inmates were not in their assigned units).

42.    IOI assaults resulting in serious injury at St. Clair—including prior to the Assault—often involve an inmate who was "out of pocket," *i.e.*, in an unauthorized area. *See* ECF 174-3 at 99, 199:23-200:6 (stating "probably more than 50 percent" of IOI violence at St. Clair involved unauthorized movement); ECF 174-1 at 30, 96:19-97:8; *see also* ECF 174-4 at 88 (putting Dunn and Estes on notice that "a significant number of violent incidents occurring at [St. Clair] involve unauthorized movement of inmates from or to [the P-block and Q-block].").

43.    The only documented method St. Clair employs to control unauthorized inmate movement is the use of color-coded wristbands that are supposed to identify and classify inmates by their housing units. ECF 174-1 at 30-32, 95:20-96-4, 109:14-21, 113:18-114:2; ECF 174-4 at 73, 154:22-155:6.

44.    The SOPs pertaining to controlling inmate movement and the wristband policy at St. Clair have not changed since Estes was Warden. *See* ECF 174-1 at 49-

57; ECF 174-3 at 69-74; ECF 174-3 at 36, 120:12-16 (Noe's only effort to modify or change the wristband policy was that he "just kept ordering more wristbands").

45.    Correctional officers and officials often do not enforce the wristband policy, in part because inmates routinely cut or remove their wristbands. ECF 174-4 at 73-74, 157:16–158:2; ECF 174-3 at 98, 196:3-13; ECF 174-3 at 36, 119:12-17; ECF 174-3 at 67, 122:1-5; 124:5-7; *see also* ECF 174-3 at 11, 110:22-111:3 (Whittington would "take [his wristband] off, switch with somebody").

46.    There should be check points that are "strategically placed so [inmates] are checked as they move about," with "random checks and searches" of inmates occurring "on a continuous basis." ECF 174-6 at 10, 56:9-12. But such check points either do not exist at St. Clair or are unmanned, resulting in no "checking" of inmates as they move from one area of the facility to another. *Id.*, 55:21-23.

47.    At the time of the Assault, more than 50% of St. Clair was not surveilled by cameras, including none in H Dorm, which had known "blind spots." ECF 174-3 at 87-88, 107, 102:10-20, 74:22-75:6, 75:11-18, 250:16-252:7; ECF 174-6 at 11, 73:13-14; ECF 174-3 at 22.

48.    Of the few cameras that are in place at St. Clair today, many have been tampered with, vandalized, or do not work. ECF 174-5 at 70, 190:4-9; ECF 174-3 at 35, 109:6-17; ECF 174-6 at 177, 137:3-4.

49.    St. Clair has also faced issues with its physical plant, including broken locks, both before and after the Assault. ECF 174-3 at 85, 57:5-22 (even replacement locks broke "quite a bit"); ECF 174-6 at 13, 19, 103:17-21, 159:15-17.

50.    Estes addressed the risks associated with unauthorized inmate movement and poor maintenance in his 2015 corrective action plan [ECF 174-8 at 60-64], yet even two years later, H Dorm still had "notoriously bad locks," and its front door did not lock on the date of the Assault. ECF 174-3 at 107, 253:22-254:9.

51.    EJI notified Dunn several times that St. Clair's poor maintenance posed a safety risk to inmates, including in a March 2018 letter discussing issues with nonfunctional and/or obstructed locks and nonfunctioning cameras, among other physical plant problems, [ECF 174-5 at 4-8], and in a May 2019 report stating that the issue of nonfunctional locks persisted [ECF 174-7 at 2].

## Failure to Control Contraband

52.    Contraband, which includes both free-world and inmate-made weapons, has also long been a problem in St. Clair. ECF 174-1 at 35, 142:8-17; ECF 174-5 at 42-44; ECF 174-8 at 60-64; ECF 174-7 at 51-62; ECF 174-8 at 1-59.

53.    At St. Clair, inmates are and have been able to fashion knives from the chain link fence, bed rails, Coke cans, medical splints, or any piece of metal that the inmates can access [ECF 174-3 at 102, 219:12-220:6, 221:2-12], and evade metal detectors "all the time" [*id*. at 94, 151:4-9].

54.    The majority of inmates at St. Clair carry contraband knives. *See* ECF 174-1 at 44, 248:3-249:10; ECF 174-1 at 12 ¶ 12; ECF 174-3 at 16, 197:7-10 (Whittington testifying that "everybody" at St. Clair had a knife).

55.    Inmates also possess contraband cell phones; according to Noe, cell phones are recovered at St. Clair on at least a weekly basis. ECF 174-3 at 39, 174:11-14. For instance, Whittington used a cell phone every day while at St. Clair [ECF 174-3 at 13, 117:11-13], even when he was in the Restrictive Housing Unit [*id.* at 18, 279:10-13].

56.    Estes and Dunn knew of St. Clair's contraband problem prior to the Assault. *See* ECF 174-8 at 62 ("[t]he interdiction of contraband into and throughout the facility is a daily mission"); ECF 174-5 at 54-56 (January 2017 email from Estes to Dunn reporting findings from one institutional search conducted by the CERT[3] team that uncovered 32 cell phones, 34 knives/stickers, and 13 wooden clubs); ECF 174-3 at 95, 158:11-18 (contraband was found during every "shake down").

57.    Estes had authority to call in the CERT team when he deemed it necessary, but even when he did, the CERT team "would find hundreds of knives. And the next week, there would be plenty more inside the institution." ECF 174-3 at 102, 221:20-222:8.

---

[3] Correctional Emergency Response Team.

58.   Dunn was aware that contraband remained a problem following the Assault; for instance, in a January 2018 letter requesting "technical assistance in contraband detection and elimination" at St. Clair, Dunn acknowledged that "[w]e have had problems with contraband items, drugs and weapons, being thrown over the perimeter fence. It is also believed contraband is being introduced into the facility through visitors and staff members." ECF 174-5 at 57-58.

59.   Dunn was also aware that in 2018, EJI reported that the St. Clair administration "failed to secure the weapon used in many [] incidents [of serious violence involving knife or knife-like weapons]." ECF 174-4 at 96.

60.   Searches are one of the "main sources of preventing or deterring individuals from introducing contraband into [ADOC] institutions." ECF 174-6 at 12, 79:2-6; *see also* ECF 174-6 at 73 (St. Clair policy requires sufficient searches).

61.   The COs failed to enforce the existing rules and/or implement any policy or rule changes designed to eliminate inmate-made or free-world weapons from St. Clair. ECF 174-1 at 35 & 48, 142:18-22, 145:18-21, 296:15-19. *See also* ECF 174-3 at 34, 87:6-12.

62.   Findings from St. Clair's most recent security audit [*see* ECF 174-1 at 7 ¶¶ 7-8], completed in 2014, included that: (1) "[n]o cell searches are being conducted"; (2) "[s]earches of common areas are not being conducted on a regular unannounced basis"; (3) "[r]andom and routine frisk searches are not conducted on

inmates in all areas of the institution"; and "[t]his should be a priority to rectify." ECF 174-5 at 43-44.

63.    Years after the 2014 audit findings, searches remain inconsistent and infrequent, including in H Dorm, largely due to insufficient staff. ECF 174-1 at 45, 253:1-12; ECF 174-3 at 33, 83:6-13; ECF 174-6 at 1 (███ officers to perform cell/room searches—"NO EXCEPTIONS").

64.    Noe could not be sure he had even implemented an SOP about searches. ECF 174-3 at 32, 70:20-71:2.

65.    Noe concedes that additional training for correctional officers, along with increased staffing, would help improve the consistency of searches [ECF 174-3 at 33, 83:6-13], but there is no evidence that Noe has taken action to arrange or request this additional training.

### **Failure to Investigate**

66.    As "the ultimate chief executive of the department," the Commissioner has authority to direct policy within LESD, which is the ADOC division in charge of criminal investigations. ECF 174-5 at 68, 175:10-12.

67.    The longstanding, unwritten policy within St. Clair, including at the time of the Assault, was that any investigation into an incident of IOI non-sexual violence was terminated if the victim-inmate waived prosecution of the assailant.

ECF 174-6 at 22, 278:13-279:3; ECF 174-5 at 67, 69, 173:3-10, 186:11-187:21, 199:10-22; ECF 174-3 at 113, 303:13-16.

68.    It is not uncommon for inmates to waive prosecution, however, due to fear of retaliation. ECF 174-5 at 68, 176:17-22, 177:11-16.

69.    Hamm acknowledged the Restrictive Housing Committee's finding that "roughly 30%" of the inmates in restrictive housing units remained there "because they fear returning to general population." ECF 141-2 at 9.

### The Assault

70.    To enter H Dorm from the St. Clair chow hall, Whittington would have had to pass at least ███ guards, two gates, and two doors, and if the doors had been locked, a correctional officer would have had to let him in. ECF 174-3 at 64, 102:3-4, 104:11-16; 104:22-105:10; ECF 174-3 at 38, 146:1-5.

71.    Since before 2017, H Dorm, which houses between 200-250 inmates, was only staffed by one correctional officer, including on the day of the Assault, when there were 256 inmates assigned to that dorm. ECF 174-1 at 38, 191:19-193:9.

72.    Estes believed that "what keeps people safe inside a prison is a correctional officer who's being visible, roving around, doing shakedowns, and also inmates helping their safety by saying, hey, this trouble is abrewing, you need to look into this." ECF 174-3 at 92, 145:7-14.

73.     Estes knew that correctional officers were falling asleep during shifts. ECF 174-3 at 109, 262:7-12.

74.     Whittington hid the knives used to stab Plaintiff "in an unknown location," and those weapons were never recovered. ECF 141-16 at 17.

75.     The Duty Post Log completed by Walker following the Assault indicated that a security check was done and that "all [was] secure," and did not mention the missing knives. ECF 141-9 at 6.

76.     Following the Assault, Agent Casey did not interview Whittington due in part to Casey's concern that Plaintiff could be put in danger if Whittington learned he could receive criminal charges for the Assault. ECF 174-5 at 66, 166:16-167:2.

**ARGUMENT**

**I.     A Reasonable Juror Could Conclude That Estes Was Deliberately Indifferent to the Substantial Risk of Harm by Failing to Implement and Enforce Sufficient Policies to Combat Excessive Inmate Violence**

Prisoners are not sentenced to be stabbed by other prisoners. The Eighth Amendment, applicable through the Fourteenth Amendment, thus imposes duties on prison officials to ensure reasonable safety of their inmates, including "to protect prisoners from violence at the hands of other prisoners." *Farmer v. Brennan*, 511 U.S. 825, 833, 844-45 (1994) (internal citations and quotation marks omitted). An Eighth Amendment violation gives rise to a Section 1983 civil rights action, as asserted here, when a prison official acts with deliberate indifference to the potential

or actual assault on an inmate by another. *Griffin v. City of Opa-Locka*, 261 F.3d 1295, 1303 (11th Cir. 2001).

A motion for summary judgment on a failure-to-protect claim cannot be granted where plaintiff raises genuine issue of material fact regarding "(1) a substantial risk of serious harm; (2) the defendants' deliberate indifference to that risk; and (3) causation." *Carter v. Galloway*, 352 F.3d 1346, 1349 (11th Cir. 2003) (per curiam). Settled Eleventh Circuit precedent has established that supervisory liability for a failure-to-protect claim may exist so long as plaintiff satisfies the deliberate indifference standard under *Farmer* by showing the defendant personally participated in the unconstitutional conduct due to his or her responsibility for control and maintenance of the prison. *See, e.g.*, *LaMarca v. Turner*, 995 F.2d 1526, 1535-39 (11th Cir. 1993).

## II. A Reasonable Jury Could Conclude That Estes Was Aware of a Substantial Risk of Serious Harm to Plaintiff Due to Excessive Inmate Violence

The Eleventh Circuit applies an objective standard to assess whether the conditions of the prison constituted a substantial risk of serious harm. *Caldwell v. Warden*, 748 F.3d 1090, 1099 (11th Cir. 2014). Evidence of "an unjustified constant and unreasonable exposure to violence" satisfies this standard. *LaMarca*, 995 F.2d at 1535. A substantial risk of serious harm may exist even where the plaintiff was not expressly threatened. *Lane v. Philbin*, 835 F.3d 1302, 1307-08 (11th Cir. 2016).

31

The Eleventh Circuit has found that "conditions in a jail facility that allow prisoners ready access to weapons, fail to provide an ability to lock down inmates, and fail to allow for surveillance of inmates," along with non-functioning locks and overcrowding, "pose a substantial risk of serious harm to inmates." *Marsh v. Butler Cty.,* 268 F.3d 1014, 1028 (11th Cir. 2001) (en banc), *abrogated on other grounds by Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 561-63 (2007).

A jury may find that prison officials knew of a substantial risk of serious harm where the "substantial risk of inmate attacks" was "longstanding, pervasive, well-documented, *or* expressly noted by prison officials in the past." *Farmer*, 511 U.S. at 842 (emphasis added) (internal citation and quotation marks omitted). This finding may be inferred from circumstantial evidence or "from the very fact that the risk was obvious." *Id.* Importantly, a jury need not infer that defendants actually intended for a plaintiff to suffer harm, or that they believed that Plaintiff would suffer harm. *Caldwell*, 748 F.3d at 1102. Rather, where prison conditions allow for violence and terror to reign, "it [is] obviously [] irrelevant to liability that the officials could not guess beforehand precisely who would attack whom." *Farmer*, 511 U.S. at 843-44.

***Rate of Inmate-on-Inmate Violence.*** According to ADOC self-reporting, 90 IOI assaults occurred at St. Clair between October 1, 2016 and September 30, 2017, higher than any other ADOC close security facility for that fiscal year. ECF 174-6 at 97. This equates to one assault (including serious and non-serious injuries) every

four days. During October and November 2017, IOI violence occurred approximately every three days. *See supra* ¶ 15.

In 2017, the rate of IOI violence at St. Clair leading up to the Assault was far greater than rates in the COs' cited cases. The violence at St. Clair in 2016 through December 1, 2017 was ***nearly four times*** the incident rate in *Harrison v. Culver*, which concerned a similarly-sized facility. 746 F.3d 1288, 1299-1300 & n.17 (11th Cir. 2014) (where 33 incidents involving weapon over 3.5 years at institution housing approximately 830 to 990 inmates was insufficient to demonstrate substantial risk of serious harm); *see supra* ¶ 16 & ECFs 174-8 at 109-156; 174-9; 174-10; 174-11; 172-12; 174-13; 174-14; 174-15; 174-16; 174-17 at 1-11 (19 assaults involving weapons from January 1 to December 1, 2017); ECF 174-6 at 83-84 (48 assaults involving weapons in 2016). Likewise, there were at least 31 IOI stabbings at St. Clair in the first eleven months of 2017 alone, as compared to only 15 IOI stabbings over the course of a plaintiff's ***six-year*** incarceration in *Marbury v. Warden. See* 936 F.3d 1227, 1234 (11th Cir. 2019); *supra* ¶ 16. Neither the *Harrison* nor *Marbury* courts mentioned the existence of IOI homicides, let alone a homicide that went unobserved by any correctional officer or camera.

***Conditions That Gave Rise to Violence.*** In assessing whether a substantial risk of serious harm existed, courts also evaluate the totality of the circumstances. *See Marsh*, 268 F.3d at 1029. Aside from the high rate of IOI violence itself, a

reasonable jury could conclude that other conditions at St. Clair both during and after Estes's tenure, including inadequate supervision, malfunctioning locks, uncontrolled movement, and ready access to weapons, especially when taken together, were also sufficient to establish a substantial risk of serious harm. *See Marsh*, 268 F.3d at 1024-25 (courts consider prison conditions for claim of deliberate indifference based on unsafe conditions including whether (i) inmates were able to make makeshift weapons from parts of decaying building, (ii) lack of adequate monitoring allowed inmate activities to go unchecked, (iii) locks to doors did not work, and (iv) lack of visual or audio surveillance). The discovery in this action has revealed the following:

Insufficient Supervision and Monitoring. Despite multiple SOPs requiring a minimum of ▮ correctional officers to monitor H dorm, H dorm was persistently understaffed with only one officer, including on the day of the Assault. *See* ECF 174-6 at 52-58; ECF 174-1 at 49-57; *supra* ¶ 71. That lone officer is responsible for keeping between 200 to 250 or more inmates safe (256 on the day of the Assault). *Supra* ¶ 71.

The ratio of one officer to monitor 200 or more inmates in H Dorm is even more egregious than the conditions in *Lane* and *Marsh*, where the courts acknowledged that insufficient supervision is a factor that can establish a serious risk of harm. *See Lane*, 835 F.3d at 1305-06 (surviving motion to dismiss where single officer supervised 100 inmates); *Marsh*, 268 F.3d at 1024 (noting "[l]ack of adequate

monitoring of the inmates," which "allowed inmates activities to go mostly unchecked"). Indeed, prior to the Assault, at least six IOI assaults occurred in H Dorm in 2017, most of which were not observed by a correctional officer, including at least two stabbings where the contraband weapon was not recovered. ECF 174-8 at 109-156; 174-9; 174-10; 174-11; 172-12; 174-13; 174-14; 174-15; 174-16; 174-17 at 1-11. Based on this record, a reasonable jury could conclude that the lack of adequate monitoring and supervision under Estes's control establishes Estes's deliberate indifference to a substantial risk of serious harm.

Broken Locks and Doors. The risk of harm to Plaintiff and other H Dorm residents leading up to the Assault was heightened by the existence of broken locks and cell doors throughout the facility, including the front door of H Dorm. *Supra* ¶¶ 49-51. Without a functioning lock and no rover present to check inmates for identification as they entered and exited, there was no barrier to stop inmates like Whittington who sought to harm inmates assigned to other housing units.

Ready Access to Contraband. It was common knowledge at St. Clair that the inmate population was and remains heavily armed. *See, e.g.*, *supra* ¶ 56; ECF 174-7 at 51-62; ECF 174-8 at 1-59 (showing contraband recovered from St. Clair). Estes acknowledged that St. Clair had a large-scale problem with knives, [*see supra* ¶¶ 53, 56-57], and he knew that knives could be made from the chain link fence, the bed rails, a Coke can, a medical splint, or any piece of metal that the inmates could

access. *Supra* ¶ 53. Inmates could defeat metal detectors "all the time." *Id*. Knives were so pervasive among inmates that Whittington testified that "everybody" at St. Clair had a knife. *Supra* ¶ 54.

**Estes's Awareness of the Deficient Conditions.** The conditions giving rise to a substantial risk of serious harm at St. Clair were "obvious" to Estes. *See Farmer*, 511 U.S. at 842. Although Estes repeatedly asserted that St. Clair was "safe" (*see supra* ¶ 23), the jury may infer his deliberate indifference to a substantial risk of serious harm from circumstantial evidence. *First*, as Warden III, Estes received notice of all reported incidents of IOI violence, including the number of incidents involving unauthorized movement, contraband weapons, and assaults unobserved by any correctional officers (including a homicide prior to the Assault). *See supra* ¶¶ 16-17 Estes reported all Class A incidents (homicides, sexual assaults, and inmate-on-inmates with "Serious Injury") to his supervisor, Cheryl Price. *Supra* ¶ 17.

*Second*, Estes was aware of the numerous conditions that contributed to the uncontrolled movement of inmates, including: the wide-scale problem of broken locks and doors [*supra* ¶ 49]; the lack of functioning cameras [*supra* ¶¶ 47]; and the frequency with which inmates evaded metal detectors [*supra* ¶ 53]. Estes also knew that the wristband policy was wholly ineffective [*supra* ¶ 45], yet there is no evidence that he did anything to change it [*see supra* CO ¶¶ 11, 44, CO ¶ 87]. This lack of surveillance and monitoring allowed inmates like Whittington to move freely

around the prison virtually unchecked, as confirmed by Allen during her April 2018 mock audit. *See supra* ¶ 41. Indeed, these problems existed before Estes transferred to St. Clair, as reflected in a 2014 security audit of St. Clair (the only security audit produced in this case). ECF 174-5 at 11-53; ECF 174-1 at 7 ¶¶ 7-8. Estes's 2015 corrective action plan purportedly attempted address these issues; for instance, Estes discusses wristbands 12 times in the 4-page list of action items. ECF 174-8 at 60-64.

*Third*, Estes was aware of H Dorm's blind spots and that H Dorm was chronically understaffed. *See supra* ¶ 47. A reasonable juror could infer that Estes knew inmates like Whittington would be able to enter H Dorm or other sections of the prison unauthorized because no rover was present to monitor the entrance or check his wristband, and that the blind spots could be exploited. *See id.*; *Ogletree v. Colbert Cty.*, 2021 WL 4477630, at *37 (N.D. Ala. Sept. 30, 2021), appeal dismissed sub nom. *Hargrove v. Colbert Cty.*, 2022 WL 16646712 (11th Cir. Aug. 10, 2022) (collecting cases noting insufficient supervision may establish substantial risk).

*Fourth*, Estes was aware that correctional officers fell asleep during their shifts (*supra* ¶ 73), only further inhibiting the amount of surveillance and monitoring of inmate activity, as well as the ability of officers to observe and respond to inmate-on-inmate violence.

*Fifth*, Estes was on notice of conditions that could present a substantial risk of serious harm to inmates because he was added as a named defendant to a 2014 prison

conditions case brought by a class of St. Clair prisoners. *Duke v. Dunn*, No. 4:14-cv-01952-VEH (N.D. Ala. 2014) ("*Duke*") (alleging Eighth Amendment violations due to excessive IOI violence, understaffing, and prevalent contraband). Estes was also aware of the DOJ investigation during his time at St. Clair, but he failed to participate in or inquire about the investigation despite its obvious relevance to his duties as Warden. *See supra* ¶¶ 30-31.

With these facts taken together, a reasonable juror could conclude that Estes was subjectively aware of a substantial risk of serious harm to Plaintiff at St. Clair.

### III. A Reasonable Jury Could Conclude That Estes Responded Unreasonably to the Substantial Risk of Harm

Contrary to the COs' assertions, Estes was an unsuccessful leader who failed to remedy rampant IOI violence or enforce or change his own ineffectual policies. Estes could not recall a single policy or procedure that he put in place to increase the safety of St. Clair. *Supra* ¶ 23.

An official's response to a known risk to inmates is objectively unreasonable if he or she "disregards that risk by failing to take reasonable measures to abate it." *Farmer*, 511 U.S. at 847. A prison official "may not escape liability solely because of the legislature's failure to appropriate requested [and necessary] funds." *LaMarca*, 995 F.2d at 1537 (internal quotation marks and citations omitted). A juror may consider alternatives available to the prison official to determine whether he or

she knowingly or recklessly disregarded solutions within his or her means. *Id.* at 1538.

As Warden III, Estes had the authority to institute new SOPs and modify existing SOPs governing St. Clair. *See supra* CO ¶¶ 70, 87. But the evidence demonstrates Estes did not even enforce many of the policies in place, let alone change the policies to account for chronic understaffing, resource constraints, or other reasons why the COs now claim ensuring inmate safety was "impossible." ECF 145 at 54; *see supra* CO ¶¶ 11-12, 18, 20, 22-23.

Searches. A reasonable jury could conclude that Estes unreasonably failed to ensure correctional officers conducted sufficient searches as required under applicable SOPs. For example, SOP 067 states that "[a]ssigned rovers will conduct sufficient random personal and area shakedowns to eliminate the flow of contraband." ECF 174-1 at 54. Indeed, Walker testified that pat searches were infrequently done in H-Dorm prior to the Assault, let alone an "area shakedown," including because such searches required ██ officers. *See supra* ¶ 63. If additional rovers were needed to conduct shakedowns, a reasonable jury could conclude that Estes should have ordered shift commanders to assign extra correctional officers to conduct them. Estes also could have brought in the CERT team to conduct searches as often as he "needed to," but the unflagging presence of contraband demonstrates he did not. *Supra* ¶ 57.

H Dorm Staff. Estes believed that the presence of correctional officers is largely what keeps inmates safe [*see supra* ¶ 72], yet he knowingly failed to ensure that the shift commanders followed his policies, including SOPs 032 and 067. His failure to do so is particularly egregious in light of the fact that he ***knew*** the lock to H Dorm was broken [*supra* ¶ 50] and he ***knew*** that H Dorm had blind spots [*supra* ¶ 47]. To the extent that SOP 031 appears to require ██████ in H Dorm (which is patently unreasonable given that ███ officers are necessary to perform critical tasks like shakedowns [*see supra* ¶ 63], any inconsistency underscores Estes' inattention to his own policies and abdication of his duty to operate St. Clair. *See* ECF 174-6 at 52-58. Estes's failure to ensure compliance with policies, particularly in light of their importance to inmate safety, is unreasonable. There is no evidence that Estes modified any of the policies to attempt to mitigate issues due to lack of staff.

Unauthorized Inmate Movement. Estes's response (or lack thereof) to the rampant unauthorized inmate movement about the facility was also unreasonable. The evidence shows that inmate movement was and is a major safety concern at St. Clair, and Estes knew the wristband and inmate movement policies did not deter that movement, yet there is no evidence that he made any effort to either require their enforcement or evaluate how these failures impacted inmate safety. *See* ECF 174-1 49-57; ECF 174-3 at 69-74; *see supra* ¶¶ 23, 44-45. Nor is there any evidence that

Estes sought alternative solutions. *See supra* ¶¶ 23, 44-45. This abdication of duty directly facilitated the Assault by allowing Whittington to enter H Dorm while armed.

    <u>Failure to Investigate IOI Violence</u>. Estes placed no responsibility whatsoever on himself or his prison staff to investigate the causes of IOI violence. There is no evidence Estes ever issued any SOP governing correctional officer investigations of IOI violence. *See supra* ¶¶ 21-22; ECF 174-6 at 174-6. Estes left all responsibility for the investigation of IOI to I&I.[4] *Id.* As a result, in the absence of any governing policy or procedure, Walker was not required (and made no effort) to secure the crime scene after the Assault, for example by identifying a list of witnesses, cordoning off the area, collecting biological evidence, taking pictures, questioning witnesses. *See supra* CO ¶¶ 37, 41. Walker never even located the two knives Whittington used in the Assault. *Supra* ¶ 74. If Estes had mandated correctional officer responsibilities following a violent attack, crucial information could have been gathered to prevent future harm, including potential harm inflicted by the missing weapons.

    Estes confirmed that he did not take any action in response to each new incident of IOI violence at St. Clair, including after the homicide and the Assault. *See supra* ¶ 24. Instead, he repeatedly asserted that St. Clair was safe, and disclaimed

---

[4] Now referred to as LESD.

any responsibility for the violence. *See supra* ¶¶ 21-22. A reasonable jury could conclude that Estes's failure to act regarding any one of the myriad safety issues plaguing St. Clair and posing a substantial risk of serious harm to Plaintiff and other inmates was unreasonable. *See Clem v. Lomeli*, 566 F.3d 1177, 1182 (9th Cir. 2009) (affirmative action by prison officials is not required to prove 1983 claim; a failure to act in the face of knowledge of a serious risk is sufficient).

## IV.  A Reasonable Jury Could Conclude That Estes's Deliberate Indifference Caused Plaintiff's Injuries

There is also sufficient evidence to demonstrate the necessary causal link between Estes's deliberate indifference to unsafe prison conditions and the Assault. If a plaintiff establishes a causal link between the defendant's acts or omissions and the infirm condition, the defendant is "precluded from contending that the unconstitutional condition was not at least a proximate cause of . . . injuries" that arose from that condition. *LaMarca*, 995 F.2d at 1538 (internal citations omitted). "[T]he finding that a prison condition offends the Eighth Amendment presupposes the distinct likelihood that the harm threatened will result." *Id*. In *LaMarca*, the Eleventh Circuit held that a plaintiff demonstrates the "necessary causal link" where he is able to show that the prison official (1) "had the means substantially to improve" the inmate's safety, (2) "knew that the actions he undertook would be insufficient to provide [the inmate] with reasonable protection from violence," and (3) had "other means [] available to him which he nevertheless disregarded." *Id.* at

1539. Additionally, while the doctrine of *respondeat superior* does not apply to the causal analysis, whether a defendant actually controls, or fails to properly supervise a subordinate, may prove relevant. *Id.* at 1538.

Here, a genuine dispute of material fact exists as to whether the alleged substantial risk of IOI violence flowed directly from Estes's alleged failure to enforce or modify policies and to avail himself of known, alternative measures to improve those conditions. As in *LaMarca*, the excessive inmate violence flowed directly from the lawless prison conditions at the facility Estes was operating. Id.

Estes was on notice of a host of safety issues across the facility as a result of the 2014 audit, as well as the excessive rate of IOI incidents. *See* ECF 174-5 at 11-53; ECFs 174-8 at 109-156; 174-9; 174-10; 174-11; 172-12; 174-13; 174-14; 174-15; 174-16; 174-17 at 1-11. He was aware of his authority to implement safety measures [*see supra* ¶¶ 57, 70, 87], and even drafted a corrective action plan [ECF 174-8 at 60-64], although it is unclear how much of that plan he ever implemented. A reasonable jury could determine that (i) the plan signaled Estes's implicit acknowledgement that the absence of these procedures caused the alleged excessive violence, and/or (ii) he failed to enforce the policies in place, rendering the plan meaningless and ineffectual, take steps that he knew could have addressed the substantial risk of serious harm, despite being in a position to do so, and that such failure facilitated the Assault and caused Plaintiff's injuries.

**V.    A Reasonable Juror Could Conclude That Hamm and Noe Are Deliberately Indifferent to the Continuing Risk of Serious Harm to Inmates at St Clair**

Unfortunately, the COs' laissez-faire attitude toward inmate safety has continued under Noe and Hamm's management, and the substantial risk of harm to St. Clair inmates remains.

*First*, a reasonable juror could conclude that the conditions posing the substantial risk of serious harm leading up to the Assault remain. *See supra* Part I.A. For instance, ADOC reported that 65 IOI assaults took place in FY 2022[5] against **93 victims** as compared to 90 IOI assaults in FY 2017 against **99 victims**—hardly a discernible change. *C.f.* ECF 174-7 at 22; ECF 174-6 at 97; *see also* ECF 174-7 at 39 (showing 35 assaults on 48 victims since October 2022). The curious drop in the number of "assaults" while the number of victims remained nearly the same suggests that the only thing that has changed about the excessive IOI violence at St. Clair is how the ADOC chooses to report it.

ADOC's most recently available quarterly report shows that a firearm was confiscated at St. Clair. ECF 174-8 at 49. A reasonable jury could infer that Hamm and Noe have been on notice of likely Eighth Amendment violations based on the three-year DOJ investigation into these issues culminating in a 2019 notice, as well

---

[5] ADOC's fiscal year ("FY") runs from October to September.

as EJI's monitoring reports on the matter. *See* ECFs 174-1 at 65-88, 174-2, 174-3 at 1-5; ECFs 174-4 at 77-108, 174-5 at 1-3; ECF 174-6 at 225-28, 174-7 at 1-16.

*Second*, neither Hamm nor Noe has taken action to improve correctional officers' compliance with SOPs or to improve the SOPs themselves, though Hamm has authority to do so by administering ARs and Noe has the authority as Warden. *See supra* CO ¶¶ 70, 77, 85, 87. And despite management and correctional officials alike acknowledging that the wristband policy *does not work* and is not enforced, it remains the operative policy for handling inmate movement.

Additionally, Hamm and Noe have continued the approach of willful blindness toward safety issues at St. Clair by neglecting to enforce and follow written ADOC and St. Clair policies regarding security audits. AR 322 and SOP 119 require security audits to be conducted, with SOP 119 mandated both internal and external audits on an annual cadence. ECF 174-6 at 73-82; ECF 174-4 at 42-52. But the COs have not produced a single audit report dated after the Assault, and only produced one dated from 2014. *See* ECF 174-5 at 11-53; ECF 174-1 at 7 ¶¶ 7-8. A reasonable juror could conclude that the failure to collect data and evaluate St. Clair's security operations constitutes deliberate indifference. Hamm and Noe should be ordered to implement changes, and Noe should be ordered to perform security audits and prepare a corrective action plan as mandated by AR 322 to address the substantial risk of harm and prevent future harm to St. Clair inmates.

*Third*, although Plaintiff seeks damages from Estes in his individual capacity, Plaintiff only requests injunctive relief from Noe and Hamm in their official capacities. Plaintiff's request for injunctive relief is not moot, as he is subject to involuntary transfer to other ADOC facilities and thus at risk of harm should he return to St. Clair. *See Braggs v. Dunn*, 317 F.R.D. 634, 661 (M.D. Ala. 2016).

## VI.    Genuine Disputes of Material Fact Preclude Qualified Immunity

Plaintiff does not dispute that the COs were acting within their discretionary authority when they committed the alleged unconstitutional conduct.

But qualified immunity only protects government officials performing discretionary functions in their individual capacities from civil liability ***in so far as*** "their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." *Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1982); *accord Hill v. Cundiff*, 797 F.3d 949, 978 (11th Cir. 2015). "Prison authorities must protect not only against current threats [to an inmate's safety], but also must guard against 'sufficiently imminent dangers' that are likely to cause harm in the 'next week or month or year.'" *Horton v. Cockrell*, 70 F.3d 397, 401 (5th Cir. 1995) (quoting *Helling v. McKinney*, 113 S. Ct. 2475, 2480-81 (1993)). When determining whether the law clearly established relevant conduct as a constitutional violation, courts consider whether the government officials had "fair warning" that

the conduct at issue violated a constitutional right. *Gaines v. Wardynski*, 871 F.3d 1203, 1208 (11th Cir. 2017).

A plaintiff may establish sufficient fair warning in two ways, by showing that: (i) the unlawfulness of the defendants' actions was apparent in light of pre-existing caselaw, *Hope v. Pelzer*, 536 U.S. 730, 739 (2002), or (ii) the defendants' actions were so egregious that they violated a broader constitutional rule with obvious clarity, *Gaines*, 871 F.3d at 1208. Where, as here, the evidence taken in the light most favorable to Plaintiff satisfies either prong, the qualified immunity defense is due to be denied.

*First*, longstanding precedent in the U.S. Supreme Court and Eleventh Circuit gave the COs fair warning that their lack of reasonable action was unconstitutional. For example, the rate of inmate assaults was discussed as a basis for a substantial risk of serious harm in *Farmer*, 511 U.S. at 843; *Lane*, 835 F.3d at 1305-06; *Harrison*, 746 F.3d at 1298; *Hale v. Tallapoosa Cty.*, 50 F.3d 1579, 1583 (11th Cir. 1995); and *LaMarca*, 995 F.2d at 1541. Additionally, deficiencies in staffing and inmate monitoring were noted in *Lane*, 835 F.3d at 1305; *Cottone*, 326 F.3d at 1355-56; *Marsh*, 268 F.3d at 1024; and *LaMarca*, 995 F.2d at 1538-39. Further, the prevalence of and failure to confiscate weapons was noted as a factor of unconstitutional risk of inmate violence in *Marsh*, 268 F.3d at 1029, and *LaMarca*, 995 F.2d at 1539. In *Marsh*, for example, the Eleventh Circuit found that the

plaintiffs overcame the sheriff's assertion of qualified immunity on a motion to dismiss based on allegations that the jail was an old building, the decay of which allowed inmates to make weapons (as here); the lack of adequate monitoring allowed inmate activity to go unchecked (as here); locks to the doors did not work (as here); no visual or audio surveillance was in place for the majority of the inmate population (as here); and there was chronic understaffing (as here). *See* 268 F.3d at 1024–25.

Estes himself was a defendant in numerous prison-condition cases, including the *Duke* class action, and therefore was well informed of his constitutional duties and the types of action or inaction that would constitute deliberate indifference.

*Second*, Estes's egregious conduct violated the Eighth Amendment with "obvious clarity." For example, in response to an unobserved IOI homicide in July 2017, Estes could not identify a ***single*** action he took afterward to improve safety at St. Clair. *See supra* ¶ 24. And worse, he knew that his policies either were not being followed, did not work, or both. *See supra* ¶¶ 23, 44-45. The fact that he did not know that Whittington intended to attack Plaintiff is irrelevant. *See Lane*, 835 F.3d at 1307-08 (finding violent prison conditions could pose substantial risk of serious harm to inmate, even when victim was not expressly threatened).

Estes's 2015 corrective action plan allegedly provided a roadmap to address *each* security risk that facilitated the Assault: (a) Controlled Movement; (b) Inmate Identification; (c) Contraband; (d) Inmate Safety Concerns; (e) Problematic Housing

Units; (f) Physical Plant Concerns; and (g) Staffing Issues. ECF 174-8 at 60-64. But in 2023, these security risks continue, and there is no evidence the COs' alleged efforts have had any tangible impact on reducing those risks.

Noe inherited a dysfunctional prison from Estes and has also inherited Estes's failure to act—nowhere is this more apparent than the SOPs reflecting the inmate movement and wristband policies, which Noe has made no effort to change. *See supra* ¶ 41. Similarly, despite being responsible for the day-to-day operations of St. Clair [*supra* ¶ 10], Noe could not even be sure whether he had issued an SOP regarding searches. *Supra* ¶ 64. And although Noe concedes that additional training for correctional officers, along with increased staffing, would help improve the consistency of searches, there is no evidence that Noe has taken any action to arrange or request this additional training. *Supra* ¶ 65. Noe's deficient policymaking exacerbates the substantial risk of harm facing St. Clair inmates, and once they inevitably suffer an act of violence, there are no procedures in place to instruct correctional officers to respond to the incident appropriately. *See supra* ¶ 22.

The COs blame a lack of financing and understaffing for the years of persistent and excessive inmate violence. But the COs' staggering failure to enforce their own policies, modify those that are decidedly ineffective, and implement new ones to mitigate these challenges is equally to blame. Further, "[t]he Supreme Court has clearly held that the Eleventh Amendment does not bar an order requiring

expenditure of state funds if it is ancillary to injunctive relief for an ongoing violation." *Braggs v. Dunn*, 257 F. Supp. 3d 1171, 1266 (M.D. Ala. 2017) (citing *Edelman v. Jordan*, 415 U.S. 651, 668 (1974)).

A reasonable fact finder could conclude that the COs had fair warning that their conduct violated and continues to violate Plaintiff and St. Clair inmates' clearly established constitutional rights, thus the COs are not entitled to qualified immunity, and summary judgment should be denied.

## CONCLUSION

Because genuine issues of material fact preclude a finding of summary judgment and the application of qualified immunity as to each of the CO defendants, summary judgment should be denied.

Dated:  May 18, 2023

/s/ *Molly E. Whitman*

Molly E. Whitman (*pro hac vice*)
Brett M. Manisco (*pro hac vice*)
Jessica Ro (*pro hac vice*)
**Akin Gump Strauss Hauer & Feld LLP**
1999 Avenue of the Stars, Suite 600
Los Angeles, CA 90067-6022
Tel: (310) 229-1000
Fax: (310) 229-1001
mwhitman@akingump.com
bmanisco@akingump.com
jro@akingump.com

J.S. "Chris" Christie, Jr. (ASB-3162-H07J)
R. Terrell Blakesleay (ASB-5910-B00U)
**Dentons Sirote PC**
2311 Highland Avenue South
Post Office Box 55727
Birmingham, AL 35255-5727
Tel: (205) 930-5100
Fax: (205) 930-5101
chris.christie@dentons.com
terrell.blakesleay@dentons.com

Jennifer S. Garrett (*pro hac vice*)
Madeleine R. Freeman (*pro hac vice*)
**Akin Gump Strauss Hauer & Feld LLP**
One Bryant Park
New York, NY 10036
Telephone: (212) 872-1065
Fax: (212) 872-1002
jgarrett@akingump.com
mfreeman@akingump.com

Hyongsoon Kim (*pro hac vice*)
**Akin Gump Strauss Hauer & Feld LLP**
4 Park Plaza, Suite 1900
Irvine, CA 92614-2585
Tel: (949) 885-4100
Fax: (949) 885-4101
kimh@akingump.com


*Attorneys for Plaintiff*

## **CERTIFICATE OF SERVICE**

I hereby certify that on this 18th day of May, 2023, I electronically filed the foregoing with the Clerk of the Court using the CM/ECF system.

/s/ *Molly E. Whitman*