2023 Jun-26  PM 02:20
U.S. DISTRICT COURT
N.D. OF ALABAMA

- Within two months, in consultation with NIC, and with the aid of a consultant approved by the Department, review all relevant ADOC, and individual facility, policies and procedures. Based upon the review, ADOC should, within two months, make appropriate changes to ADOC's—and to each individual prison's—policies and procedures.

- Within six months, provide remedial training on security measures, with a curriculum approved by the Department, to all correctional staff. Thereafter, provide at least 40 hours of in-service training to all staff annually.

- Within two months, ensure that security rounds are conducted in all living areas at least once every hour, and at least once every half hour in any special management population areas (segregation, mental health housing, etc.), or more frequently as required for prisoners on suicide watch. These rounds should be documented in a bound log book maintained on each housing unit, as well as a master log for each prison, and the documentation should be reviewed at least weekly by facility leadership and not less than quarterly by ADOC leadership. Deficiencies in complying with these requirements should be addressed immediately.

- Within two months, develop a centralized system that will contain autopsies of all prisoners who die in ADOC custody. ADOC should conduct an interdisciplinary administrative and medical post mortem following each death and, at least quarterly, assess the system for patterns and trends, and implement remedial measures to correct any identified issues.

3. Contraband. ADOC should:

- Immediately implement shakedowns such that at least 15% of all housing units are searched every day, with congregate areas searched weekly; written documentation showing the results of those shakedowns must be maintained. ADOC should immediately implement daily searches of the interior of the perimeter, the yard, and congregate feeding and recreation areas before and after each use by prisoners, and searches of visiting rooms (including restrooms) before and after every visiting period, with the results of these searches documented. Those results should be analyzed for patterns and trends. ADOC should implement plans to address any patterns or trends discovered.

- Within one month, draft a policy requiring the screening of *every* individual who enters a facility (staff, visitors, volunteers, etc.). Once the policy has been submitted to the Department and approved, implement the policy system-wide within one month.

- Within two months, ensure that each facility has working metal detectors at every entrance, and that each facility has implemented a procedure to use them on all persons entering the prison.

52

BOYKINS000104

- Within one month, consult with a nationally recognized expert, approved by the Department, to determine other methods of detecting illegal drugs and other contraband being brought into the facilities, for those drugs that will not be detected by metal detectors. Include recommended measures in ADOC policy on screening.

- Within six months, implement any reasonable additional screening procedures for illegal drugs and other contraband that cannot be detected by a metal detector.

- Within two months, provide adequate medical treatment, using evidence-based treatment, for all prisoners detoxifying as illegal drugs and other contraband are reduced and eventually eliminated from the facilities.

4. Sexual Abuse.

    ADOC should:

- Immediately revise ADOC's disciplinary process to avoid subjecting victims to unnecessary disciplinary actions when they seek assistance or protection from ADOC due to threatened or actual sexual abuse.

- Immediately institute a process whereby every allegation of sexual abuse is investigated and the investigation is properly documented. In order to do so, ADOC should ensure a professional investigation unit is in place with the training, skills, and sufficient staffing to investigate every allegation within 60 days.

- Within one month, hire a nationally recognized expert on PREA, to be approved by Department, who will produce a report within two months of hiring. The report should suggest immediate and long-term remedies to address the sexual safety issues in Alabama's prisons. ADOC should implement all immediate measures within three months of receiving the report.

- Within three months, reclassify every prisoner for sexual safety issues, and ensure that potential predators are separated from potential victims.

5. Facility Conditions. ADOC should:

- Within one month, identify all broken locks in Alabama's prisons, and identify how they will be repaired or replaced. Within a month after that, secure funds for such repairs or replacement, and hire a contractor to perform the job within 30 days.

- Within six months, ensure that at least 80 percent of toilets, sinks, and showerheads at each prison are in working condition.

53

- Within six months, install cameras throughout all prisons that will remain open for more than one year, with locations to be approved by the Department. All video should be retained for 90 days unless an assault on a prisoner or staff occurs in an area surveilled, in which case the video should be preserved until the matter is fully investigated and prosecuted or dismissed by authority of the Commissioner. Wardens should review video at least monthly. Any out-of-service video equipment should be replaced within 72 hours.

- Within 90 days, identify the three prisons in the worst physical condition and take preliminary steps to ensure remedies are initiated which provide humane living conditions.

## B.    **Long-Term Measures**

ADOC should:

- By 2020, staff Alabama's prisons consistent with the requirements of the *Braggs* staffing orders.

- Establish competitive base starting salaries and benefits packages for employees.

- Ensure that applicants for ADOC employment can apply and interview in their local area, and provide frequent testing for applicants.

- Continuously track correctional officer turnover by year, breaking out exits by years of service, age, gender, ethnicity, and facility, and use information learned through this tracking to remedy reasons for attrition.

- Employ systematic exit interviews of correctional officers and report annually on reasons for departures, cross-tabulated by age, gender, ethnicity, and facility.

- Ensure that prisoner housing areas are adequately supervised, through direct supervision, whenever prisoners are present.

- Ensure that prisoners are tested for synthetic drugs on a regular, but random, basis. Each prisoner should be tested at least every six months, and the testing should be documented and the results reviewed by ADOC administrators.

- Develop a plan and implement a policy for detecting and reducing the amount of contraband throughout ADOC facilities, including the appointment of a Chief Interdiction Officer for contraband interdiction.

- Ensure that ADOC has, and is following, policies and procedures for an appropriate, objective classification system that separates prisoners in housing

BOYKINS000106

units by classification levels in order to protect prisoners from unreasonable risk of harm.

- Discontinue the use of "behavior modification" dormitories ("Hot Bays") unless mental health professionals play a role in both the assignment of prisoners to such placements and are involved in the treatment provided.

- Ensure that every prisoner-on-prisoner assault is documented and investigated, and that staff is trained on how to prevent and address such incidents.

- Comply with PREA and its implementing regulations, the National Standards to Prevent, Detect, and Respond to Prison Rape (28 C.F.R. §§ 115 *et seq.*).

- Develop and implement a policy on prevention, detection, reporting, and investigation of prisoner-on-prisoner and staff extortion of prisoners and their families.

- Develop a written institutional plan to coordinate actions taken in response to an incident of physical abuse, sexual abuse, and/or extortion among staff first responders, medical and mental health practitioners, investigators, and facility leadership.

- Develop an effective substance abuse disorder program.

- Develop and implement an effective grievance process. In the event that a grievance is filed against a staff member, the submission process must allow for options of submission that are neither seen by, nor referred to, the staff member who is the subject of the complaint.

- Develop and implement a plan to prevent prisoners from entering housing units other than the ones to which they are assigned.

- Implement procedures to ensure sanitary prisons.

---

## VI.    CONCLUSION

---

The Department has reasonable cause to believe that ADOC violates the constitutional rights of prisoners housed in Alabama's prisons by failing to protect them from prisoner-on-prisoner violence, prisoner-on-prisoner sexual abuse, and by failing to provide safe conditions.

We are obligated to advise you that 49 days after issuance of this letter, the Attorney General may initiate a lawsuit pursuant to CRIPA to correct deficiencies identified in this letter if State officials have not satisfactorily addressed our concerns. 42 U.S.C. § 1997b(a)(1). The Attorney General may also move to intervene in related private suits 15 days after issuance of

55

BOYKINS000107

this letter.  42 U.S.C. § 1997c(b)(1)(A).  Please also note that this Notice is a public document. It will be posted on the Civil Rights Division's website.

BOYKINS000108

# EXHIBIT 5

Page 1

1              UNITED STATES DISTRICT COURT

2         FOR THE NORTHERN DISTRICT OF ALABAMA

3                    MIDDLE DIVISION

4

5    Case No.:  4:19-cv-01934-ACA

6

7    AUNDRA DEBREL BOYKINS,

8              Plaintiff,

9    v.

10   JEFFERSON DUNN, et al.,

11             Defendants.

12

13

14         VIDEO DEPOSITION TESTIMONY OF

15              CORTEZ WHITTINGTON

16

17

18   October 4, 2022

19   9:07 a.m.

20

21

22   COURT REPORTER:

23   MELANIE PETIX BEASLEY, CCR

Page 2

1     S T I P U L A T I O N S
2        It is hereby stipulated and
3  agreed, by and between the parties through
4  their counsel, that the deposition of CORTEZ
5  WHITTINGTON may be taken before Melanie
6  Petix Beasley, Certified Court Reporter and
7  Notary Public for the State of Alabama at
8  Large, at Jefferson County Jail, 809 Richard
9  Arrington Jr. Boulevard North, Birmingham,
10  Alabama 35203, on October 4, 2022,
11  commencing at 9:07 a.m.
12        It is further stipulated and
13  agreed that the signature to and the reading
14  of the deposition by the witness are waived,
15  the deposition to have the same force and
16  effect as if full compliance had been had
17  with all laws and rules of Court relating to
18  the taking of depositions.
19        It is further stipulated and
20  agreed that it shall not be necessary for
21  any objections to be made by counsel as to
22  any questions except as to form or leading
23  questions, and that counsel for the parties

Page 3

1  may make objections and assign grounds at
2  the time of trial, or at the time said
3  deposition is offered in evidence, or prior
4  thereto.
5        In accordance with Rule 5(d) of
6  The Alabama Rules of Civil Procedure, as
7  amended, effective May 15, 1988, I, Melanie
8  Petix Beasley, Certified Court Reporter, am
9  hereby delivering to R. Terrell Blakesleay,
10  Esq. the original transcript of the oral
11  testimony taken on October 4, 2022, along
12  with exhibits.
13        Please be advised that this is the
14  same and not retained by the Court Reporter,
15  nor filed with the Court.
16
17
18
19
20
21
22
23

Page 4

1     A P P E A R A N C E S
2
3  FOR THE PLAINTIFF:
4     J.S. "CHRIS" CHRISTIE, ESQ.
5     R. TERRELL BLAKESLEAY, ESQ.
6     DENTONS SIROTE PC
7     2311 Highland Avenue South
8     Birmingham, Alabama 35205
9
10     BRETT M. MANISCO, ESQ.
11     JENNIFER S. GARRETT, ESQ.
12     AKIN, GUMP, STRAUSS, HAUER & FELD, LLP
13     1999 Avenue of the Stars
14     Suite 600
15     Los Angeles, California 90067
16
17  FOR THE DEFENDANT:
18     ELLIE PUTMAN, ESQ.
19     LANDON WHATLEY, ESQ.
20     MAYNARD, COOPER & GALE, PC
21     655 Gallatin Street
22     Huntsville, Alabama 35801
23

Page 5

1     A P P E A R A N C E S
2        (Continued)
3
4     PEGGY ROSSMANITH, ESQ.
5     OFFICE OF THE ATTORNEY GENERAL
6     STATE OF ALABAMA
7     501 Washington Avenue
8     P.O. Box 300152
9     Montgomery, Alabama 36130
10
11
12  ALSO PRESENT:  Ted Yost, Videographer
13
14
15
16
17
18
19
20
21
22
23

2 (Pages 2 - 5)

Page 6

1           I N D E X
2
3  EXAMINATION BY:              PAGE:
4  Mr. Blakesleay             14
5
6
7           E X H I B I T S
8
9  PLAINTIFF'S:                PAGE:
10 Exhibit 1 - Bates CORR 001217-1219      62
11 Exhibit 2 - Diagram            161
12 Exhibit 3 - Diagram            214
13
14
15
16
17
18
19
20
21
22
23

Page 7

1       I, Melanie Petix Beasley, a
2  Certified Court Reporter and Notary Public
3  for the State of Alabama at Large, acting as
4  Commissioner, certify that on this date,
5  pursuant to the Alabama Rules of Civil
6  Procedure, and the foregoing stipulations of
7  counsel, there came before me at Jefferson
8  County Jail, 809 Richard Arrington Jr.
9  Boulevard North, Birmingham, Alabama 35203,
10 on October 4, 2022, commencing at or about
11 9:07 a.m., CORTEZ WHITTINGTON, witness in
12 the above cause, for oral examination,
13 whereupon, the following proceedings were
14 had:
15
16      MR. CHRISTIE:  Ms. Putman, I got
17 your e-mail.  And I'm assuming that you can
18 hear me?
19      MS. PUTMAN:  Yes.  Not -- not
20 extremely clearly, but I can hear you.
21      MR. CHRISTIE:  All right.  Great.
22 Give you an opportunity to put anything on
23 the record if you want before Mr. Cortez --

Page 8

1  he's right outside the room, so before he
2  gets in the room, I thought I would give you
3  an opportunity to put anything on the record
4  based on the e-mail that you sent.  I will --
5      MS. PUTMAN:  Sure.  I will --
6  first of all, I would ask that you -- you
7  prove that the subpoena for Mr. Whittington
8  was served.  We haven't received that and it
9  don't -- it don't look like it's been filed
10 with the Court.
11      MR. CHRISTIE:  We're here taking
12 the deposition.  We're going to take the
13 deposition.  I don't -- we don't have the
14 proof of service with us today.
15      MS. PUTMAN:  When -- when was he
16 served?
17      MR. CHRISTIE:  He was served in
18 Cullman and then the ADOC transferred him to
19 Jefferson County.
20      MR. BLAKESLEAY:  And he got -- he
21 got served here as well.
22      MS. PUTMAN:  When was he served?
23      MR. CHRISTIE:  And he got served

Page 9

1  here also.
2      MR. BLAKESLEAY:  This was --
3      MS. PUTMAN:  Okay.  You're not
4  answering my question.  When was he served
5  with a subpoena?
6      MR. CHRISTIE:  Twice.  He was
7  served once in Cullman and once in Jefferson
8  County.  I don't know the exact days.
9      MR. BLAKESLEAY:  This was last
10 week I believe he was served here in
11 Jefferson County.
12      MR. CHRISTIE:  Yeah, last week, he
13 was served here in Jefferson County.
14      MS. PUTMAN:  Okay.  Well, I just
15 want to put on the record that the Internet
16 access in Jefferson County jail seems to be
17 very spotty.  We asked counsel yesterday to,
18 you know, provide us with an explanation of
19 what steps you've taken to ensure that this
20 was going to be -- that we would be able to
21 participate fully by video.  So if -- if,
22 you know, we encounter any issues with
23 Internet, then I'm afraid we'll have a need

Page 58

1 as people putting money on your store
2 account?
3     A.  Yeah.
4     Q.  Can you explain that for me?
5     A.  I mean, you could do -- you could
6 do money on your book, Green Dot.  There's
7 different ways in prison, like --
8     Q.  Okay.
9     A.  It ain't nec -- you ain't nec --
10 it ain't necessarily going to be no track of
11 no money if you getting it illegally.
12     Q.  Right.
13     A.  They going to try to do -- it
14 going to be -- everything going to be done
15 through they cell phone.
16     Q.  Okay.
17     A.  To keep -- just to keep down so
18 many transactions, 'cause the person going
19 to want to know where all this type of money
20 coming from.
21     Q.  Okay.  So it's -- is it difficult,
22 I guess, for correctional officers or
23 whatnot to track those type of transactions?

Page 59

1     A.  Yeah, it's harder for them.  It's
2 a way like that we know how to get around
3 them from knowing.
4     Q.  And they won't know at all?
5     A.  Uh-uh.
6     Q.  Okay.
7     A.  Only way they probably know, if
8 they get -- find the phone and hook it up to
9 the computer and do all that, dump the
10 photos or whatever.
11     Q.  Okay.  And so getting back to the
12 incident where you were involved in a
13 stabbing at Elmore, so you got into that
14 altercation, how were you caught?  Were you
15 caught by COs in that instance?
16     A.  No.  I mean, yeah.  As a matter of
17 fact, I never got away.
18     Q.  Okay.
19     A.  It was like they observed.
20     Q.  Oh, so they saw it?
21     A.  (Nods head.)
22     Q.  Okay.  And what happened after
23 they saw it?

Page 60

1     A.  I went to lockup.
2     Q.  Okay.  And by lockup, what do you
3 mean by that?
4     A.  Solitary confinement, a room by
5 myself.
6     Q.  Is that like -- also like --
7     A.  Until they see is they going to
8 get rid of me or get rid of him or can we
9 live together.  But now, I think they
10 stopped the living agreement.  Like you can
11 get into it with some -- I think they
12 stopped it because people act like they can
13 live around, then they'll go right back out
14 there and do the same thing, try to hurt
15 each other again.
16     Q.  So by lockup, do you mean
17 restricted housing?
18     A.  Yeah.
19     Q.  Is that another name for it?
20     A.  (Nods head.)
21     Q.  Okay.  So how many times, I guess
22 -- well, first of all, how many times -- did
23 he stab you in that instance?

Page 61

1     A.  Yes.
2     Q.  How many times did he stab you?
3     A.  I would say one -- three.
4     Q.  Okay.  How many times did you stab
5 him?
6     A.  About six, seven.
7     Q.  Do you remember where you stabbed
8 him?
9     A.  Uh-uh.  I just -- I don't
10 remember.  I just was defending my, you
11 know --
12     Q.  Okay.  So let's go to -- to after
13 that, was there a disciplinary involved in
14 that incident?
15     A.  It should be.
16     Q.  Okay.
17
18         (Discussion off the record.)
19
20     Q.  I'm going to mark this as
21 Plaintiff's Exhibit 1.  Okay.  I'm marking
22 this as Plaintiff's Exhibit 1.  And the
23 Bates number range for this is CORR 001217

16 (Pages 58 - 61)

Page 98

1 they know everybody here. I know they
2 probably not going to catch everything,
3 someone -- somebody is going to get away
4 with something.
5    Q.  Right. So --
6    A.  There's so many inmates.
7    Q.  So in your experience, just to
8 clarify, you're saying that there were times
9 that they would -- and by they, I mean the
10 correctional officers or whoever was doing
11 the count, they would check the roster
12 sheet, but would they physically go in and
13 see who was in each cell and make sure that
14 they were in each cell?
15    A.  They do that -- I ain't going to
16 say they do that every night or every day,
17 but at least twice or three -- two, three
18 times a week, they going to ask you your
19 name or ask you what's your -- what's your
20 number, make sure you're in the right cell,
21 stuff like that.
22    Q.  And they check the ID card?
23    A.  Yeah.

Page 99

1    Q.  Okay.
2    A.  Or -- or some people might be
3 familiar with you, they might see you and
4 already know you.
5    Q.  Okay. But there were times that
6 an inmate could go unnoticed?
7    A.  Yeah. They might see you at the
8 bathroom, like what you doing down here,
9 man.
10    Q.  So --
11    A.  Write your name down, that's a
12 write-up, and they go on and let you go, but
13 they going to write you up.
14    Q.  And so how many times did you
15 experience or did that occur where inmates
16 would stay in other dorms and go unnoticed?
17    A.  Since -- I mean, that probably go
18 on every day.
19    Q.  How many times did you experience
20 it at St. Clair, would you say?
21    A.  Now, when you say experience, you
22 mean me?
23    Q.  Either you or you knowing somebody

Page 100

1 else that did it.
2    A.  I mean, at least -- that go on a
3 lot.
4    Q.  Okay. Well, how many times --
5 have you done it before?
6    A.  Yeah.
7    Q.  Okay.
8    A.  I've done it a lot. I mean, I
9 ain't no inmate that stand out, like I don't
10 be loud, calling attention, I ain't friendly
11 with the police. The police don't even know
12 me like that. If they do, they know me from
13 being young, the youngest person in the
14 prison or something, they might be like
15 teenager. But other than that, I ain't --
16 they ain't familiar with me causing a
17 problem.
18    Q.  Okay. But there were times that
19 you stayed in other dorms outside of PQ?
20    A.  Yeah.
21    Q.  When you were assigned to PQ?
22    A.  Not H-dorm, though.
23    Q.  Okay.

Page 101

1    A.  I never slept down there, but I
2 done violated, I done went down there and
3 left.
4    Q.  Okay. So -- well, let's take the
5 first part. So what dorms did you stay the
6 night in outside of PQ when you were
7 assigned to PQ?
8    A.  All -- so you know, it's four
9 dorms.
10    Q.  Okay.
11    A.  So I ain't never lived in no other
12 dorm but P and Q.
13    Q.  Okay.
14    A.  But it's P1, P2. And Q1 and Q2, I
15 might be -- my assigned might be Q2, but I
16 might be across the hall.
17    Q.  Okay. In like the Q1 or something
18 like that?
19    A.  Yeah.
20    Q.  Okay.
21    A.  In the same hallway, but this
22 ain't my assigned spot.
23    Q.  Okay. Good deal.

26 (Pages 98 - 101)

Page 110

1 also wear armbands as well during your time
2 there?
3     A.   I don't remember it was ID or an
4 armband.  I know we had to have it to catch
5 -- catch store.
6     Q.   Okay.
7     A.   I think it was an ID, for real.
8     Q.   Okay.  But you don't recall ever
9 having an armband?
10     A.   Uh-uh.  Did we have an armband?
11 Hold on.  I don't know whether I was at
12 Elmore or St. Clair.  We had a armband.  It
13 was for to notify what dorm we live in.
14     Q.   Okay.
15     A.   The color go for the dorm.  If --
16 I don't remember -- I don't know was it
17 Elmore or whatever.
18     Q.   Okay.  But you do remember having
19 an armband at some facility at some point?
20     A.   Yeah, and they notify the dorm you
21 sleep in.
22     Q.   Right.  Did you always wear the
23 armband?

Page 111

1     A.   No.  Sometimes, you could take it
2 off, switch with somebody, you know.  It
3 different ways you could do stuff.
4     Q.   How would you say or how effective
5 did you believe the armbands were as far as
6 tracking the -- the movement of inmates?
7     A.   (No response.)
8     Q.   Did you -- do you believe --
9         MS. PUTMAN:  Object to form.
10     A.   It helped, but I don't know, I'm a
11 convict, so I think of ways to get around
12 stuff.
13     Q.   Okay.
14     A.   So, I mean, some people probably,
15 you know, go by the rules, but I'm trying to
16 dodge the rule, I ain't -- I'm already in
17 jail.
18     Q.   And so at St. Clair, you don't
19 remember having -- whether you had an
20 armband or whether they had that in place at
21 St. Clair?
22     A.   I don't remember.
23     Q.   Okay.  Do you know what the phrase

Page 112

1 out of pocket means?
2     A.   Yes.
3     Q.   What does that mean?
4     A.   Unauthorized area.
5     Q.   Okay.
6     A.   A place you don't supposed to be.
7     Q.   So that's kind of what we were
8 talking about with inmates being in
9 different dorms, would that be considered
10 out of pocket?
11     A.   Correct.
12     Q.   Okay.  How often would you or
13 would other inmates be out of pocket at St.
14 Clair?
15     A.   I mean, I really can't speak for
16 nobody else, for real.
17     Q.   In your experience, was it common
18 or was it not?
19     A.   I mean, I can't -- I only speak
20 for myself.
21     Q.   Okay.  Okay.  Well --
22     A.   I did it a few times, but the --
23 so I don't really know about nobody else

Page 113

1 like --
2     Q.   Did you ever experience anybody
3 being out of pocket in PQ-dorm, meaning
4 somebody that lived in another dorm was in
5 PQ?
6     A.   Yeah.
7     Q.   Okay.  How often did that happen?
8     A.   I saw -- I saw the guy that I got
9 a disciplinary on up there before.
10     Q.   Okay.  And did you see anybody
11 from any other dorms or maybe another inmate
12 from H-dorm, did you ever experience that as
13 well?
14     A.   (Nods head.)
15     Q.   How often?
16     A.   A lot.  Probably like a couple of
17 times, I know -- a couple of times.
18     Q.   Like a couple of times a week or a
19 couple of times a month?
20     A.   Yeah, at least -- at least once a
21 day, somebody going to sneak by.
22     Q.   Okay.  All right.  Let me touch on
23 this contraband stuff for just a second.  So

29 (Pages 110 - 113)

Page 114

1 what type of, I guess -- well, first of all,
2 is -- illegal contraband, was that
3 prohibited at St. Clair as well?
4     A.  You said what type?
5     Q.  So my first question is contraband
6 was not allowed at St. Clair; is that
7 correct?
8     A.  Correct.
9     Q.  Okay.  And what types of
10 contraband did you experience at St. Clair?
11    A.  Phone -- phone, drugs and knives.
12    Q.  Okay.  Phone, drugs and knives?
13 Anything --
14    A.  That's about it.
15    Q.  Anything else?
16    A.  (Shakes head.)
17    Q.  Okay.
18    A.  Not while I was there.
19    Q.  Okay.  We've already been through
20 the knives.  The same way that you
21 experienced at the other facilities, these
22 wee inmate knives?
23    A.  Correct.

Page 115

1     Q.  And they came in all shapes and
2 sizes; is that correct?
3     A.  Correct.
4     Q.  Okay.  What about the drugs, what
5 type of drugs would you experience at St.
6 Clair?
7     A.  Marijuana, that's all I really
8 know about.
9     Q.  How often were inmates caught with
10 marijuana?
11    A.  I mean, they do random drug tests.
12    Q.  Okay.
13    A.  And if you pee dirty for
14 marijuana, you have to pay 150.
15    Q.  How often did they do the random
16 drug tests?
17    A.  At least every week, they going to
18 do at least 15, 20 inmates.
19    Q.  Did you ever have to do a random
20 drug test at St. Clair?
21    A.  Yeah.
22    Q.  Were you ever caught with
23 marijuana?

Page 116

1     A.  In my system?  I don't think so.
2 I can't say for sure.
3     Q.  Okay.  Were there times where
4 inmates were actually caught like physically
5 smoking the marijuana by COs?
6     A.  Not that I know of.
7     Q.  Okay.
8     A.  I mean -- I mean, there's people
9 who been shook down and stuff probably found
10 with it or something like that.
11    Q.  Okay.  And you also talked about
12 cell phones --
13    A.  Uh-huh.
14    Q.  -- is that right?  How many times
15 did you -- or were you caught with a cell
16 phone at St. Clair, if you recall?
17    A.  Never.
18    Q.  Did you ever have a cell phone at
19 St. Clair?
20    A.  Yes.
21    Q.  And how did you, I guess, obtain
22 the cell phone, did you buy it?
23    A.  I bought it.

Page 117

1     Q.  So like in the same way where we
2 talked about earlier with the knives, you
3 would buy the knives?
4     A.  Either Green Dot it or something
5 like that.
6     Q.  Okay.  You --
7     A.  PayPal, Wal-Mart to Wal-Mart.
8     Q.  And you would buy it from another
9 inmate?
10    A.  (Nods head.)
11    Q.  So how many times at St. Clair do
12 you think that you used a cell phone?
13    A.  Every day.
14    Q.  And this was a cell phone that you
15 had bought from somebody else?
16    A.  Correct.
17    Q.  Since you live St. -- left St.
18 Clair, have you used a cell phone?
19    A.  Just at other facilities?
20    Q.  Correct.
21    A.  Correct.
22    Q.  After St. Clair?
23    A.  Correct.

30 (Pages 114 - 117)

Page 138

1    Q.   -- just at St. Clair?
2    A.   That's just prison stuff.
3    Q.   Okay.  When did you become
4 affiliated with the ██████ gang?
5    A.   When I was a kid.
6    Q.   Do you remember how old you were?
7    A.   I mean, I really was raised on it,
8 like coming up my whole life, like it's a
9 family tradition, like it was passed on.
10    Q.   Yeah.  So you had other family
11 members that were in it as well?
12    A.   (Nods head.)
13    Q.   And then when you got to prison,
14 were there already ██████ gang members
15 that were --
16    A.   That knew me and heard about me
17 from being plugged in on the street.
18    Q.   Okay.  So at St. Clair, there were
19 already -- when you arrived there, there
20 were already ██████ gang members there?
21    A.   And there was a couple of people
22 who knew I was coming before I came and all
23 that, like --

Page 139

1    Q.   So how could you tell the
2 difference between who was in the ██████
3 gang versus who was in the ██████ or the
4 ██████?
5    A.   By who they hung with, who they
6 communicated with.
7    Q.   So you being in the ██████
8 gang, you would only talk to certain people,
9 or how did that work?
10    A.   See, I don't -- I don't take it
11 that serious.
12    Q.   Okay.
13    A.   But you got some people who really
14 be on that.  That why they made my cellmate
15 move away from around me.
16    Q.   Okay.
17    A.   'Cause they really will be like if
18 it ain't your kind or the same gang or
19 organization as you, then you don't need to
20 be living around -- they will try to make
21 that a problem and try to violate them, do
22 all that.
23    Q.   Okay.  Well, why was that not a

Page 140

1 problem for you?
2    A.   I feel like if you -- if you my
3 partner, you my partner, that can't come
4 between us.
5    Q.   Okay.  So you would --
6    A.   I mean, this is what I am, but I
7 ain't fixing to go against the grain for
8 that.  I know what's important.
9    Q.   Okay.  So I guess just to clarify,
10 so like if you were friends with somebody
11 that wasn't in the ██████ gang --
12    A.   I ain't going to look at them no
13 different.
14    Q.   Okay.
15    A.   Like I wouldn't even -- you going
16 to have to do something to me personally.
17 Like that's what you is.  I don't know who
18 -- like I ain't fixing to look at you no
19 different 'cause you ain't a ██████.  You
20 still my partner and you still my folk,
21 whatever.
22    Q.   Were there any inmates that would
23 not talk to you because you were in the

Page 141

1 ██████ gang?
2    A.   Yeah.  But I knew I had small
3 time, so I ain't tripping, I'm just trying
4 to go on, I'm just passing by.
5    Q.   Were there things that the gangs
6 would do on behalf of, I guess, other
7 inmates while inside the prison?
8    A.   Like?
9    Q.   So like did you have to do
10 anything --
11    A.   For them?
12    Q.   Yeah.  For another ██████ gang
13 member?
14    A.   No, not me.  They probably have,
15 but not me.
16    Q.   Okay.
17    A.   I wouldn't even put myself in that
18 position 'cause I'm not fixing to let nobody
19 make me do nothing I don't want to do.
20    Q.   Right.  Do you know if other
21 inmates that were part of the gangs had to
22 do something as far as initiation process or
23 anything on behalf of --

36 (Pages 138 - 141)

1    A.  To show them they got a heart or
2  something?
3    Q.  Right.
4    A.  Probably so.  I -- yeah.
5    Q.  I mean, did you experience that
6  like for sure or you don't know?
7    A.  I mean, I can't say.  I can't
8  really speak on that.
9    Q.  Okay.  But you never had to do
10  anything on behalf of your gang?
11    A.  No.  No.
12    Q.  No one ever -- another inmate
13  never requested you to do anything on behalf
14  of the gang?
15    A.  Never.  They always told me to get
16  my GED and go home.
17    Q.  Okay.
18    A.  I'm just passing by.
19    Q.  Were you ever requested by a CO to
20  do anything on behalf of -- of them against
21  another inmate?
22    A.  Never.
23    Q.  So you said you could tell who was

1  in what gang by the way that they
2  communicated.  Is there any other way that
3  you could tell who was in a gang as far as
4  either your gang or a ████ or a ████?  How
5  could you tell outside of communicating with
6  them that they were in a gang?
7    A.  I mean, for real, but not for
8  real, they going to make it known, like they
9  going to be hollering on -- ████ on ████.
10    Q.  Okay.  So let's talk about that.
11  So they -- would they use like hand gestures
12  to show that they were in a gang?
13    A.  Uh-huh.
14    Q.  Would they say different phrases
15  to show or to say that they were in a gang?
16    A.  Yep.
17    Q.  What type of things would they
18  say?
19    A.  I'm ████, I'm ████, I'm a boss.
20    Q.  Okay.  And then they had, I guess,
21  the hand gestures as well?
22    A.  Different type of sign.
23    Q.  Yeah.  Yeah.  Different type of

1  hand signs.  What about any like tattoos or
2  anything like that?
3    A.  Yeah.
4    Q.  So what type of tattoos would you
5  notice about somebody that was either a
6  ████ or --
7    A.  ████████.
8    Q.  Okay.  Is that for the ████?
9    A.  (Nods head.)
10    Q.  What about for the ████?
11    A.  ████, they might have ████,
12  something like that on them.
13    Q.  Is that like the number?
14    A.  Yeah.
15    Q.  Okay.  And the ████████ gang, did
16  you guys have --
17    A.  ████████.
18    Q.  You had a ████████████?  So you
19  said the ████ had a ████████████?
20    A.  (Nods head.)
21    Q.  And the -- your gang, the
22  ████████, y'all -- y'all have a ████████
23  ████?

1    A.  Correct.
2    Q.  You have that tattoo?
3    A.  Yeah.
4    Q.  Where do you have that at?
5    A.  On my face.
6    Q.  Okay.  Good deal.  So in your
7  opinion, other inmates -- well, first of
8  all, let me ask you this:  Were there
9  inmates in the prison that weren't involved
10  in any gang activity at all?
11    A.  Correct.
12    Q.  Did you associate with them as
13  well?
14    A.  Correct.
15    Q.  Now, for people that were -- are
16  inmates that were not in gangs, would they,
17  I guess, be picked on or singled out by
18  people that were in gangs?
19    A.  Like sometimes.  But someone could
20  be on -- like they don't need protection,
21  'cause nine times out of 10, when you're in
22  a gang, you ain't going to do nothing by
23  yourself.

37 (Pages 142 - 145)

Page 194

1    A.  -- since I've been there.
2    Q.  Okay.
3    A.  So I can't say at that time,
4  'cause I wasn't really looking for that.  I
5  ain't expect nothing to happen like that.
6    Q.  Right.  And so if there were two
7  COs sitting in these cubes right here on
8  this diagram, they would have saw
9  Mr. Boykins walk out?
10    A.  (Nods head.)
11    Q.  Is that correct?
12        MS. PUTMAN:  Object to form.
13    A.  Correct.
14    Q.  Okay.  So just on that day,
15  December 1st, 2017, what did you do after
16  the incident?
17    A.  December the 1st?
18    Q.  Yes.
19    A.  I mean, I sweated.  I was waiting
20  to get the yard on or something so I could
21  make a move.
22    Q.  When you -- when you say make a
23  move, were you like planning to get it back?

Page 195

1    A.  Yeah.
2    Q.  The cell phone back?
3    A.  I was determined either we was
4  fixing to get it back or both of us fixing
5  to go to lockup.
6    Q.  And by lockup, what do you mean?
7    A.  Solitary confinement, isolation.
8  'Cause your reputation -- if I let the man
9  take my phone, everybody going to think I'm
10  sweet, everybody going to be trying then, I
11  ain't going to be able to have nothing.
12    Q.  Okay.  So let's move on to the
13  next day, okay?
14    A.  December 2nd?
15    Q.  December 2nd, 2017.  You're not --
16  are you good on bathroom, are you good?
17    A.  I'm good.
18    Q.  Okay.
19    A.  We can keep going.
20    Q.  Let's move on to the next day,
21  December 2nd, 2017.  First of all, when did
22  you plan to go down and -- and try get
23  the phone back?

Page 196

1    A.  December 1st.
2    Q.  And what was your plan that you
3  created to go get it back?
4    A.  Either he fixing to give me my
5  phone back or both of us going to lockup.  I
6  knew he had a knife.
7    Q.  How did you know he had a knife?
8  On the day before or --
9    A.  'Cause when he approached me,
10  everybody in the jail got a knife, and the
11  day before he approached me, he had one.  So
12  knowing if you just did this, I know you
13  better keep your knife with you if you --
14  can't underestimate nobody.  So I just felt
15  like -- I knew he had a knife.  That's why I
16  had two knifes.
17    Q.  Did you create a specific plan,
18  though, on December 1st as far as how you
19  were going to get from PQ-dorm --
20    A.  Correct.
21    Q.  -- to H-dorm?
22    A.  Correct.  I did.
23    Q.  Okay.  And what was that plan that

Page 197

1  you created on December 1st?
2    A.  Put a skull cap on, put on a
3  couple of jackets, so when he stab me, it
4  won't really go through, it will slow it
5  down, but -- and I always look like I'm
6  bigger than what I am.  When I go in there,
7  I'm going to go in there like I'm real cold,
8  with a towel around my neck.  That's how I
9  made it passed the police with a skull cap
10  on.
11    Q.  Okay.  And where did you get the
12  jackets from?
13    A.  I mean, they give you one and my
14  -- a brother.
15    Q.  Another one you got from where?
16  I'm sorry.
17    A.  My brother.
18    Q.  Okay.
19    A.  Like a ███████.
20    Q.  Okay.
21    A.  I laced them up before I did that
22  so they wouldn't be in the blind.
23    Q.  Okay.  So yeah, that was going to

Page 218

1    Q.   Did he ask to search you?
2    A.   Uh-uh.  He didn't even say nothing
3 to me.  I guess he thought I --
4    Q.   He didn't say anything to you at
5 all?
6    A.   I guess he thought I stayed down
7 there.
8    Q.   Had he -- had he seen you before?
9    A.   I mean, I can't say I -- he
10 probably recog -- nine times out of 10, he
11 ain't recognize me.
12    Q.   Okay.  And why do you believe he
13 did not recognize you?
14    A.   'Cause he would have said
15 something.  That man don't play, the officer
16 that was down there, the old man.
17    Q.   Oh, so you saw him before?
18    A.   Yeah, like --
19    Q.   Do you remember who he was?
20    A.   I mean, let me see.
21    Q.   Does Officer Walker sound
22 familiar?
23    A.   Yeah.  Old man, fat, heavyset.

Page 219

1    Q.   Yeah, describe his physical
2 features for me, if you don't mind?
3    A.   Brown skin with glasses, weigh
4 about 250, 300, short.
5    Q.   And on the times that you would
6 hang out at H-dorm before this incident
7 happened, was he typically the CO that was
8 down there?
9    A.   Uh-uh.  It be different ones.
10    Q.   Okay.  How many other different
11 correctional officers did you see at H-dorm
12 when you were down there?
13    A.   I can't say for sure.  I don't
14 really remember.
15    Q.   But it was more than one?
16    A.   I know they don't never work the
17 same shift every day.
18    Q.   Right.  And so it was more than
19 one --
20    A.   Yeah.
21    Q.   -- that you had seen at H-dorm?
22    A.   I can't really say.
23    Q.   Okay.  Can you say how many times

Page 220

1 you had seen Officer Walker there?
2    A.   No, not for real.
3    Q.   But you had seen him before?
4    A.   At H-dorm?
5    Q.   Yes.
6    A.   I mean, I don't know.  I can't
7 really say.
8    Q.   Okay.
9    A.   Like I --
10    Q.   Where else -- where else did you
11 see him?
12    A.   I know I saw him on G-dorm before,
13 up there with me.
14    Q.   Okay.
15    A.   And I think I saw him standing by
16 -- he was standing in the middle of the
17 walkway.  But I try to avoid the police.  I
18 don't even -- I can't really say for real,
19 can't speak on that.
20    Q.   Did he ever -- was he ever on post
21 at PQ?
22    A.   But I know he's strict, that's all
23 I know.

Page 221

1    Q.   Okay.  Was he ever on post at PQ
2 for your dorm?
3    A.   Yes.
4    Q.   Okay.  How often did you see him
5 up there, if you can recall?
6    A.   I can't say.
7    Q.   Okay.  So you went inside of
8 H-dorm and, again, Officer Walker didn't say
9 anything to you?
10    A.   I walked straight past him.
11    Q.   You walked straight past him?
12    A.   (Nods head.)
13    Q.   Did he try and search you at all?
14    A.   No.
15    Q.   And do you know if there were any
16 cameras like inside of H-dorm at the time?
17    A.   I can't speak on it.  I don't
18 know.
19    Q.   Okay.  So what did you do when you
20 got -- or after you got inside and walked
21 past the correctional officer?
22    A.   Pulled up on my brother.
23    Q.   Where was he at on this diagram

56 (Pages 218 - 221)

Page 278

1    A.  Uh-uh.
2    Q.  Did you -- were you able to get
3 the phone back?
4    A.  Yep.
5    Q.  When did you get the phone back?
6    A.  Like seven days after, they sent
7 it back there to me in lockup.
8    Q.  Who sent it back there to you?
9    A.  ███████
10    Q.  Oh, one of your -- one of your
11 brothers?
12    A.  ███████
13    Q.  ███████?  Oh, the one that you slid
14 it to?
15    A.  Uh-huh.
16    Q.  So you had the phone while you
17 were --
18    A.  I had to pay $150 to get it back
19 there.
20    Q.  Okay.  But you had it while you
21 were in restrictive housing?
22    A.  I got it back, for sure.
23    Q.  Okay.  Now, restrictive housing,

Page 279

1 what kind of, I guess, security is up there?
2    A.  Every -- I mean, you in a cell,
3 police come by every hour.
4    Q.  Do you get searched every day?
5    A.  Uh-uh.  They ain't going to bother
6 you if you don't bother them.  If you ain't
7 (inaudible) and kicking no door, if you just
8 doing your time, then they going to let you
9 do your time.
10    Q.  So were you able to use your cell
11 phone throughout the time you were in
12 restrictive housing?
13    A.  Uh-huh.  Yeah.  And I had a
14 charger too.
15    Q.  Was there ever a cell -- cell
16 search or anything like that?
17    A.  I had a hiding spot.
18    Q.  Okay.  So you had a hiding spot?
19    A.  (Nods head.)
20    Q.  Okay.  So let me ask you this:  I
21 know you said there were some like metal
22 detector wands that were there when you got
23 there that they used every now and then; is

Page 280

1 that correct?
2    A.  Correct.
3    Q.  When would they use the metal
4 detector wands while you were there?
5    A.  Like if you spec -- like -- like
6 say if they feel like you somewhere you
7 don't supposed to be, they'll tell you get
8 on the wall, man.
9    Q.  Okay.
10    A.  Or if you hot, if you be walking
11 around eyes red, high, stumbling, come on,
12 man, what you got going on, man.
13    Q.  Yeah.
14    A.  They'll pull you over and see
15 what's going on.
16    Q.  How many times did you get wanded
17 by a metal detector while you were at St.
18 Clair?
19    A.  Not that many, for real, 'cause
20 they look at me as a youngster, like they
21 don't expect the stuff that I do.
22    Q.  Okay.  Did you ever see -- first
23 of all, was there a fence around H-dorm when

Page 281

1 you got there to St. Clair, like the first
2 time you arrived at St. Clair?
3    A.  I think -- I don't know, for real.
4 I know they were put -- they put them up
5 since I -- when I got transferred, they put
6 a lot of gates up to segregate a lot of
7 stuff from happening.
8    Q.  Okay.  But when -- so during this
9 incident --
10    A.  I don't --
11    Q.  -- did you have to go through a
12 fence?
13    A.  I went through a tunnel.
14    Q.  Okay.
15    A.  Like a door.
16    Q.  Yeah.
17    A.  But it led to out -- I went
18 through a tunnel and then I was back
19 outside, then I walked to H-dorm down the
20 little sidewalk.
21    Q.  Okay.  Do you know if they ever
22 fixed the cameras or whatnot that you said
23 were broken in St. Clair?

71 (Pages 278 - 281)

# EXHIBIT 6



**ROBERT BENTLEY**
GOVERNOR

# State of Alabama
# Alabama Department of Corrections
St. Clair Correctional Facility
1000 St. Clair Road
Springville, Alabama 35146



**JEFFERSON S DUNN**
COMMISSIONER

**February 13, 2017**

## VIDEO SURVEILLANCE

### I.    GENERAL

This St. Clair Correctional Facility Institutional Standard Operating Procedure (SOP)
establishes the responsibilities, policies, and procedures to provide guidelines for Video
Surveillance.

### II.    POLICY

It is the policy of St. Clair Correctional Facility to establish standard procedures for
viewing, recording, maintaining and appropriate use of video surveillance
systems.  The camera placement, sight lines and camera capabilities are considered
confidential security safety information.

### III.    DEFINITIONS AND ACRONYM(S)

A.    Downloading:  Electronic transfer of video to a viewable file.

B.    Export:  Electronic transfer of video to the hard drive and archiving to the ▆▆▆▆
▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆.

C.    Fixed Camera:  A camera that has a set defined range of vision.

D.    Presets:  Initial placement of camera angles, alarm sets, and the focal points the
camera should return to once a specific focus is completed.

E.    Privacy Blocks:  Shaded areas on the video surveillance monitors used to
create privacy screens for specific areas to prevent viewing (such as showers and
bathrooms).

F.    PTZ:  Refers to the camera that allows the operator to pan, tilt, and zoom.

G.    Scheduling:  Retention schedule for length of storage and recall capabilities.

H.    Surveillance Area:  The area of the institution where authorized personnel view,
maintain, and control video surveillance.

HIGHLY CONFIDENTIAL-ATTORNEYS' EYES ONLY

SOP #233
Video Surveillance  Page #2

 

 

I. Video Surveillance Administrator:  A employee of ADOC authorized by the Warden to provide network support and maintenance of computer hardware and software systems that support the video surveillance system.

J. Video Surveillance Operator:  An employee of ADOC authorized by the Warden to monitor the Video Surveillance System.

## IV. RESPONSIBILITIES

A. The Warden shall be responsible for:

 1. Ensuring that this Standard Operating Procedure is enforced at all times.

 2. Approving assigned user roles/access for applicable ADOC personnel.

 3. Reviewing and approving camera settings and placements.

B. The Captain shall be responsible for:

 1. Ensuring the surveillance areas are properly staffed and secure from unauthorized viewers.

 2. Approved exporting and downloading to the ████████████ when
necessary.

 3. Overall operations of the video surveillance system.

 4. Ensuring maintenance of all cameras and other video surveillance equipment is completed as needed.

 5. Reporting maintenance problems to the Warden when necessary so system can be fixed immediately.

C. Video surveillance operators shall be responsible for:

 1. Monitoring activity inside and outside the secure facility by viewing the Video Surveillance System on a consistent basis.

 2. Reporting serious, suspicious and unusual incidents to the Shift Commander.

HIGHLY CONFIDENTIAL-ATTORNEYS' EYES ONLY

SOP #233
Video Surveillance  Page #3

      3.     Completing incident reports as instructed by the Shift Commander and when necessary.

      4.     Maintaining a Duty Post Log of all activity during a shift, (on posts designated to maintain logs.)

  E.    The Shift Commander shall be responsible for:

      1.     Monitoring the video surveillance operators for policy compliance.

      2.     Investigating all reported incidents from the video surveillance operators.

      3.     Reporting any malfunctioning video surveillance equipment to the video surveillance administrator.

## V.  PROCEDURES

  A.    Video Surveillance Monitoring:

      1.     When installing or updating a video monitoring system, consideration will be given to how such technology will enhance the overall security and the ability to protect inmates for sexual abuse (PREA §115.13).

      2.     Video Surveillance Monitors are preset and shall not be adjusted unless authorized by the Warden.

      3.



      a.    Video surveillance monitors located

      b.    Surveillance areas shall be staffed 24 hours a day / 7 days a week.  Video Surveillance Officers will be correctional cubicle operators, correctional officers or supervisors.

      c.    Correctional cubicle operators and officers shall not leave their assigned post without being properly relieved by authorized persons.

      4.     Any video down loaded from the system shall be limited to the following staff members unless authorization is granted by the Warden:

HIGHLY CONFIDENTIAL-ATTORNEYS' EYES ONLY

SOP #233
Video Surveillance  Page #4

          a.     Institutional PREA Compliance Manager

          b.     Shift Commander

          c.     Captain or above

5.     Under no circumstances shall an inmate be allowed to access video equipment.

6.     Central Control operators, correctional cubicle operators and officers shall immediately report all suspicious activity, major and / or serious incidents to the Shift Commander that's viewed on surveillance monitor.  Posts requiring a Duty Post Log will log all such incidents.

7.     Any person who tampers with or destroys video surveillance equipment shall be subject to criminal prosecution and / or disciplinary action.

8.     Any unauthorized viewing or use of video surveillance equipment by an employee shall result in formal disciplinary action or termination, as outlined in Administrative Regulation 208-Employee Standards of Conduct and Discipline.  Criminal prosecution will be sought for offenses involving a violation of state law.

9.     Any malfunction of cameras or monitors must be reported immediately to the Shift Commander and a maintenance request completed and submitted to a Captain or above.

B.     Retention Schedule:

1.     Captains shall ensure surveillance footage of all Class A incidents is downloaded to the █████████████

2.     No recorded video shall be removed from the facility without approval from the Warden.

3.     Video exports of Class A incident reviews shall be recorded five minutes before and five minutes after the incident.

HIGHLY CONFIDENTIAL-ATTORNEYS' EYES ONLY

SOP #233
Video Surveillance  Page #5

4.    The Shift Commander/Investigator/Other will provide the Captain or above with specific information relative to the incident which includes the time, date and location of the incident being downloaded.

5.    All video images reviewed as part of an official investigation or administrative process, including but not limited to the use of force review process, inmate disciplinary process, PREA investigation process, employee disciplinary process, etc., shall be maintained for review.

6.    In the course of reviewing incidents of a sexual abuse, the Sexual Abuse Incident Review Committee shall address how the incident happened, who was involved, when and where it occurred, and implications moving forward.  The team shall also assess whether monitoring technology should be implemented or increased to supplement staff supervision (PREA §115.86).

C.    Requests for viewing/public information requests for surveillance recordings:

1.    Inmates will not be allowed to view video recording of evidence used in disciplinary hearings.  The video recording may be discussed during the hearing; however the inmate is prohibited from viewing the video for security and safety reasons.

2.    Video images from incidents with training value may be used during training sessions upon Wardens approval.

3.    Under no circumstances will recordings involving criminal investigations, administrative investigations, inmate discipline, or serious incident reviews be released to the media unless approved by the Commissioner.

4.    All stored video images are considered confidential and anyone that has access shall not allow unauthorized viewing or recording.

5.    The Captain and/or Warden's designee shall be allowed to view downloaded and/or exported images for incident reviews.

D.    Camera Maintenance:

1.    Any camera or other part of the video surveillance system found inoperable by a correctional cubicle operator or officer shall be reported to the Shift Commander and Captain.

HIGHLY CONFIDENTIAL-ATTORNEYS' EYES ONLY

SOP #233
Video Surveillance  Page #6

  2.     The camera system shall be assessed at least annually to determine if a
         need exists for new or additional monitoring technology and to develop a
         plan for securing such technology if needed (PREA §115.13).

  E.     PREA Considerations:

  1.     The Video Surveillance System is employed as a tool to prevent incidents
         and assist in investigations of alleged incidents (PREA§115.13).

  2.     When planning, adding or designing any substantial expansion or
         modification of existing housing units or buildings, the effect of the
         design, acquisition, expansion or modification upon a building shall be
         considered and the ability to protect inmates from sexual abuse (PREA
         §115.18).

  3.     When updating the video monitoring system or adding additional cameras,
         electronic surveillance system, or other monitoring technology, the agency
         shall consider how such technology may enhance the agency's ability to
         protect inmates from sexual abuse (PREA §115.18).

**VI.     DISPOSITION**

   Any forms used will be disposed of and retained according to the Departmental
   Records Disposition Authority (RDA)

**VII.    SUPERCEDES**

   This is a new Standard Operating Procedure and does not supersede any other
   Standard Operating Procedure.

**VIII.   PERFORMANCE**

   Administrative Regulation 454, Sexual Assault and Harassment Awareness
   (PREA)


_____          _____
Dewayne Estes, Warden III                      Date

HIGHLY CONFIDENTIAL-ATTORNEYS' EYES ONLY                           CORR006178

# EXHIBIT 7

HIGHLY CONFIDENTIAL - ATTORNEYS EYES ONLY

Page 1

1          IN THE UNITED STATES DISTRICT COURT

2          FOR THE NORTHERN DISTRICT OF ALABAMA

3                    MIDDLE DIVISION

4

5    CASE NUMBER:  4:19-CV-01934-ACA

6

7    AUNDRA DEBREL BOYKINS,

8              Plaintiff,

9              vs.

10   JEFFERSON DUNN, et al.,

11             Defendants.

12             S T I P U L A T I O N

13             IT IS STIPULATED AND AGREED,

14   by and between the parties through their

15   respective counsel, that the deposition of

16   GUY NOE may be taken before Michelle L.

17   Parvin, Commissioner, at the offices of

18   Maynard, Cooper & Gale, 1901 Sixth Avenue

19   North, Suite 1700, Birmingham, Alabama, 35203,

20   on the 2nd day of August, 2022, at 9:35 a.m.

21             IT IS FURTHER STIPULATED AND

22   AGREED that the signature to and the reading

23   of the deposition by the witness is waived,

HIGHLY CONFIDENTIAL - ATTORNEYS EYES ONLY

Page 2

1 the deposition to have the same force and
2 effect as if full compliance had been had
3 with all laws and rules of Court relating to
4 the taking of depositions.
5         IT IS FURTHER STIPULATED AND
6 AGREED that it shall not be necessary for any
7 objections to be made by counsel to any
8 questions, except as to form or leading
9 questions, and that counsel for the parties
10 may make objections and assign grounds at the
11 time of trial, or at the time said deposition
12 is offered in evidence, or prior thereto.
13         IT IS FURTHER STIPULATED AND
14 AGREED that notice of filing of the
15 deposition by the Commissioner is waived.
16
17
18
19
20
21
22
23

Page 4

1       Monthly Statistical Report for December
2       2017
3 Exhibit 7               140
4       St. Clair Correctional Facility
5       schematic
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23

Page 3

1            I N D E X
2
3 EXAMINATION BY:          PAGE NUMBER:
4 Mr. Blakesleay              10
5
6 DEFENDANT'S EXHIBITS:
7 Exhibit 1             14
8      Plaintiff's Fourth Amended Complaint
9 Exhibit 2             34
10      Investigation of Alabama's State
11      Prisons For Men April 2, 2019
12 Exhibit 3             43
13      Alabama Department of Corrections
14      Monthly Statistical Report for May 2022
15 Exhibit 4             43
16      Alabama Department of Corrections
17      Monthly Statistical Report for December
18      2021
19 Exhibit 5              55
20      Alabama Department of Corrections
21      Administrative Regulation Number 212
22 Exhibit 6             94
23      Alabama Department of Corrections

Page 5

1    IN THE UNITED STATES DISTRICT COURT
2    FOR THE NORTHERN DISTRICT OF ALABAMA
3            MIDDLE DIVISION
4
5 CASE NUMBER:  4:19-CV-01934-ACA
6
7 AUNDRA DEBREL BOYKINS,
8        Plaintiff,
9        vs.
10 JEFFERSON DUNN, et al.,
11        Defendants.
12
13 BEFORE:
14      Michelle L. Parvin, Certified
15 Court Reporter
16 APPEARANCES:
17      DENTONS SIROTE by Mr. R. Terrell
18 Blakesleay and Mr. J.S. "Chris" Christie,
19 2311 Highland Avenue, Birmingham, Alabama,
20 35203, appearing on behalf of the Plaintiff.
21      AKIN, GUMP, STRAUSS, HAUER &
22 FIELD, LLP, by Ms. Jennifer L. Garrett, One
23 Bryant Park, Bank of America Tower, New York,

2 (Pages 2 - 5)

Page 6

1 New York, 10036, appearing on behalf of the
2 Plaintiff.
3        MAYNARD, COOPER & GALE by Mr.
4 Matthew B. Reeves, 305 Church Street, SW,
5 Suite 800, Huntsville, Alabama, 35801,
6 appearing on behalf of the Defendants.
7        ALABAMA ATTORNEY GENERAL by Ms.
8 Peggy Rossmanith, 501 Washington Avenue,
9 Montgomery, Alabama, 36104, appearing on
10 behalf of the Defendants.
11        MAYNARD, COOPER & GALE by Ms.
12 Ellie Putman, 1901 Sixth Avenue North, Suite
13 100, Birmingham, Alabama, 35203, appearing on
14 behalf of the Defendants.
15
16 Also Present:
17 Ted Yost-Videographer
18
19
20
21
22
23

Page 7

1        I, Michelle L. Parvin, a Court
2 Reporter of Birmingham, Alabama, acting as
3 Commissioner, certify that on this date, as
4 provided by the Alabama Rules of Civil
5 Procedure and the foregoing stipulation of
6 counsel, there came before me at 1901 Sixth
7 Avenue North, Suite 1700, Birmingham,
8 Alabama, 35203, beginning at 9:35 a.m., GUY
9 NOE, witness in the above cause, for oral
10 examination, whereupon the following
11 proceedings were had:
12
13        THE VIDEOGRAPHER:  Good morning.
14 We are going on the record at 9:35 a.m. on
15 August 2nd, 2022.  This is Media Unit 1 of
16 the video-recorded deposition of Warden Guy
17 Noe taken by counsel for plaintiff in the
18 matter of Aundra Debrel Boykins versus
19 Jefferson Dunn, et al., filed in the United
20 States District Court For The Northern
21 District of Alabama, Middle Division, Case
22 Number 4:19-CV-01934-ACA.
23        The location of the deposition is

Page 8

1 1901 Sixth Avenue North, Suite 1700,
2 Birmingham, Alabama.  My name is Ted Yost
3 representing Veritext, and I'm the
4 videographer.  The court reporter is Michelle
5 Parvin from the firm Veritext.
6        At this time, counsel and all
7 present will now state their appearance and
8 affiliations for the record.
9        MR. BLAKESLEAY:  Terrell
10 Blakesleay here for the plaintiff.
11        MR. CHRISTIE:  Chris Christie
12 representing plaintiff.
13        MR. REEVES:  Matt Reeves here on
14 behalf of defendants Jefferson Dunn, Guy Noe,
15 and Dwayne Estes.
16        THE WITNESS:  Guy Noe, Warden 3,
17 St. Clair Correctional Facility.
18        THE VIDEOGRAPHER:  Will the
19 reporter please swear in the witness?
20        MS. GARRETT:  Oh, sorry.  We
21 have -- we have two other -- can you hear us?
22        MR. REEVES:  Yes.
23        MS. GARRETT:  You can?  Okay.

Page 9

1 This is Jennifer Garrett also for plaintiff
2 with Akins, Gump, Strauss, Hauer & Field.
3 But I believe Peggy was also trying to make
4 an appearance, but it's on mute.
5        You're still on mute.
6        MS. ROSSMANITH:  There we go.
7 Sorry.  Thank you.  This -- this is Peggy
8 Rossmanith here on behalf of defendant Mark
9 Walker.
10        MR. CHRISTIE:  So, is Ellie
11 Putman not participating?
12        MR. REEVES:  She is.  I believe
13 she's on by phone.  I don't know if she can
14 come off mute or not.  Actually, there she
15 is.
16        MS. PUTMAN:  Yes.  I'm Ellie
17 Putman appearing on behalf of Warden Noe.
18        MS. GARRETT:  And I'll just state
19 for the record that my colleague, Jessica
20 Rowe, for plaintiff is on the line.  She's
21 not appeared in this section.
22        THE VIDEOGRAPHER:  Would the
23 reporter please swear in the witness?

HIGHLY CONFIDENTIAL - ATTORNEYS EYES ONLY

Page 38

1 with all the new officers and getting by
2 and -- and the main purpose of that was to
3 get them to stay and get them -- get them
4 part of our team.
5     Q.   Okay.  First of all, what's an
6 OJT program?
7     A.   On-the-job training.  We extended
8 it.  We had an on-the-job training program,
9 but what we did is, we created a field
10 training officer who oversees their process
11 for up to ninety days.
12    Q.   Now, why did you, I guess,
13 believe that staffing or recruiting would
14 help resolve some of the -- the violence
15 issues that were happening at St. Clair?
16    A.   That's at any facility.  You get
17 boots on the ground, you know, you've got --
18 you -- you're covering places that officer
19 presence is a -- is a dig deterrent.
20    Q.   And how did you know that
21 staffing or recruiting was an issue at St.
22 Clair when you became warden?
23    A.   You can tell by -- you can just

Page 39

1 tell by the officers you've got, you know,
2 that's assigned to the facility.  They --
3 they needed more officers.
4     Q.   Okay.  Is there any report or
5 memo or any correspondence that you made
6 regarding your staffing needs?
7     A.   At St. Clair?
8     Q.   Correct.
9     A.   Can you be a little more specific
10 on what you -- on what you're talking about?
11    Q.   So, how did you recommend that
12 you needed more staff at St. Clair when you,
13 I guess, found out that it was an issue?
14    A.   It -- it -- it's not just me that
15 found out it the issue.  It was the State of
16 Alabama.  They knew that this is a issue.
17 They hired a firm -- I'm trying to think of
18 the name of the firm -- who did -- Warren
19 Averett did a staffing analysis.  They
20 started recruiting for the state.  They
21 started a state -- they had a state -- they
22 hired state recruiters.  They advertised on
23 TV.  They advertised on radio and made

Page 40

1 attempts to increase staffing statewide.
2     Q.   Okay.  So, when you got to St.
3 Clair, were all your staffing positions
4 filled?
5     A.   No, sir.
6     Q.   How many were vacant when you got
7 there?
8         MR. REEVES:  Object to the form.
9     A.   I can't give you a -- an accurate
10 number on that.  I wouldn't -- I didn't
11 recollect it back at that time exactly what
12 our staffing levels were at that time.
13    Q.   (BY MR. BLAKESLEAY) Okay.  What
14 about the correctional officers specifically?
15    A.   Again, I couldn't give you an
16 accurate number.  I -- it would be a -- a
17 guess.
18    Q.   Do you recall how many you've
19 hired since you've been there?
20    A.   I can say not -- not specific
21 number, but I can say it's been -- it's
22 been -- it's been a lot.
23    Q.   Okay.  What's a lot?  Is that

Page 41

1 five, is that ten?
2     A.   Probably fifty.
3     Q.   And this is correctional
4 officers?
5     A.   Correctional officers, basic
6 correctional officers, lieutenants,
7 sergeants, captains, from the top all the way
8 down.
9     Q.   Okay.  And so, what's
10 contributing, I guess, to -- is there a
11 turnover rate problem or why is there such a
12 need for you to have hired that many?
13        MR. REEVES:  Object to the form.
14    A.   I can't answer that before I got
15 there.  There's not been a turnover issue
16 since I've been there.
17    Q.   (BY MR. BLAKESLEAY) Okay.  So,
18 there have been no people -- correctional
19 officers that have quit or anything like
20 that?
21    A.   There has been some that's quit
22 and there has been some that's been -- that's
23 been terminated.  But for the most part,

HIGHLY CONFIDENTIAL - ATTORNEYS EYES ONLY

Page 46

1    Q.   -- maxed out?
2         MR. REEVES:  Objection to form.
3    Q.   (BY MR. BLAKESLEAY) So, how does
4  that affect, I guess, your ability, or your
5  CO's ability to properly supervise and secure
6  and things of that nature?
7         MR. REEVES:  Object to the form.
8    A.   So, as a process in general, you
9  know, from intake all the way into our
10 general population, we have gotten an
11 increase in number due to the decommission,
12 but we've maintained about -- vary some on
13 the -- on the -- the violence levels from
14 then to now.  The difference is we do
15 got -- we've got better supervisors, we've
16 got more supervisors, and we're working on
17 improving the staffing, which helps manage
18 these housing units.
19   Q.   (BY MR. BLAKESLEAY) Okay. So,
20 by working on improving the staffing, what do
21 you mean by that?
22   A.   Recruiting.  Recruiting,
23 recruiting, recruiting, getting officers in.

Page 47

1  If you go out in front of St. Clair, you'll
2  see a sign that says St. Clair is hiring. I
3  carry around cards in my pocket that --
4  that -- that will link you to a email for
5  questions, and it'll also give you a direct
6  line to me if you're interested in employment
7  at St. Clair.
8    Q.   Okay. And how does the over
9  capacity affect, like, the inmates' movement,
10 uncontrolled movement within the prison?
11        MR. REEVES:  Object to the form.
12   A.   Basically, the movement in the
13 prison is a direct reflection of -- of what
14 happened that day.  And so, you know, we --
15 be a little bit more specific.  I'm not
16 exactly sure what you're asking.  I'm kind of
17 going left field on this one.
18   Q.   (BY MR. BLAKESLEAY) So, does the
19 fact that you're over, you know, capacity at
20 St. Clair, does that have any effect on
21 inmate movement within the prison?
22        MR. REEVES:  Object to the form.
23   A.   So, what you're ask -- ask the

Page 48

1  question again.  I'm not quite getting what
2  you're -- what you're asking.
3         MR. BLAKESLEAY:  Can you read it
4  back to him if you don't mind?
5
6         (Whereupon, the desired portion
7         of the testimony was read back by
8         the court reporter.)
9
10        MR. REEVES:  Object to the form.
11   A.   Not -- not at this time with --
12 with that -- that amount of increase, it does
13 not affect it.
14   Q.   (BY MR. BLAKESLEAY) And why do
15 you think that is?
16   A.   Because I think that with what
17 we've got going on, decrease of -- of our
18 programs, increasing of our drug treatment,
19 they've got stuff to do.  And we're trying to
20 keep them in a routine.  And that's every
21 day.  That's not just because we get an extra
22 load of inmates in.  We have them on a
23 program.  We have them on a routine.

Page 49

1    Q.   Okay.  Now, you said not at this
2  time.  So, I guess, do you see it being a
3  problem in the future?
4         MR. REEVES:  Object to the form.
5    A.   I can't answer that.  It's a lot
6  more factors than -- than just this.
7    Q.   (BY MR. BLAKESLEAY) Okay. What
8  about the ability to actually house these
9  inmates; I mean, if you're over capacity, how
10 are you housing these extra inmates that you
11 have to take in?
12        MR. REEVES:  Object to the form.
13   A.   So, I know that when I -- when I
14 got there, there was some areas that were
15 being repurposed, redone.  Nine eighty-four
16 was the number on this capacity.  There's
17 always -- we've always had empty beds.  We've
18 not had, since I've been there, been full to
19 what they -- what they had -- what beds they
20 had slotted if that's makes any sense.
21   Q.   (BY MR. BLAKESLEAY) Okay. So,
22 you're saying that every inmate has a bed?
23   A.   Yes, sir.

13 (Pages 46 - 49)

HIGHLY CONFIDENTIAL - ATTORNEYS EYES ONLY

Page 70

1  For example, like, are they ever called,
2  like, shanks or anything like that?
3      A.   Of course.
4      Q.   Okay.  Are there any other names
5  that you associate with those or --
6      A.   Shanks, knives, stickers.
7      Q.   Anything else?
8      A.   Not that I can think of.  I'm
9  sure there is.
10     Q.   Good deal.  So, is there a -- a
11 policy regarding, I guess, search protocol or
12 checking or pat-downs, things of that nature,
13 cell searches?
14     A.   There is a policy on -- on
15 searches, yes.
16     Q.   Okay.  Can you sort of break it
17 down for me, what that policy is?
18     A.   Not off the top of my head, I
19 can't.
20     Q.   Okay.  Did you implement a policy
21 when you came in as warden regarding
22 searches?
23     A.   I think I have a -- I think I

Page 71

1  have.  I'm not a million percent sure that I
2  have an SOP on searches.  I've also
3  implemented, you know, camera systems, metal
4  detectors, handhelds in certain areas, you
5  know, during chow, when you're coming off the
6  yard, to -- to detour and -- and eliminate
7  the -- the movement and the possession of
8  contraband.
9      Q.   And you say you think you've
10 created a policy with that.  Is that, I
11 guess, on paper?
12     A.   Yes.  The SOP would be on -- the
13 SOP that -- that I think is done is -- is on
14 paper.
15     Q.   And how accessible is that for
16 you?
17     A.   How accessible?
18     Q.   Yeah, like, for --
19     A.   For me or for my officers or
20 for --
21     Q.   So, if I wanted to look at it,
22 like, would you be able to get that to me?
23     A.   If it's one of the ones I've

Page 72

1  updated, yes.
2      Q.   Okay.  And I'll get with you
3  about that, if there's any on-paper policy
4  that I can look at regarding anything you've
5  implemented as far as procedure-wise with
6  doing any searches.  But there is
7  procedure -- there are procedures in place;
8  is that what you're saying?
9      A.   Yes, sir.
10     Q.   Okay.  So, I guess, can you sort
11 of break down what -- let's just start
12 here.  What kind of shakedowns do you guys do
13 at St. Clair with the inmates?
14     A.   So, like I said, two -- two
15 days -- or two weeks out of the -- out of the
16 month, we have CERT support.  They come in
17 and I brief them first thing in the morning.
18 Randomly, we pick out different dorms,
19 different areas that we go and we conduct
20 searches on.  Occasionally, I'll get tips,
21 and we'll do searches in that area.  The
22 Warden 2 also communicates with them and
23 gives them -- gives them stuff to search.

Page 73

1  That's not their only job while they're
2  there.  They're also there to -- to help with
3  the security.
4      Q.   And how often are they there?
5      A.   Right now, they're there two
6  weeks out of the month.
7      Q.   And by two weeks, do you mean --
8  is that Monday through Friday or is that
9  Sunday --
10     A.   Monday through -- Monday through
11 Friday.
12     Q.   Okay.  And who's a part of the
13 search support team?
14     A.   Talking about as in -- more
15 specific on what you're talking about?
16     Q.   So, you said there are people
17 that -- from search support that come in
18 to --
19     A.   So, it's -- it's different teams.
20 This -- this -- this rotation, I think
21 we're -- got the north central team.
22 Sometimes we'll get the southern team, the
23 northern team, the south central team, the --

19 (Pages 70 - 73)

HIGHLY CONFIDENTIAL - ATTORNEYS EYES ONLY

Page 82

1 searches are done only incident related. We
2 don't do a -- lot of strip searches. When
3 we go into a -- if we were going to search a
4 cell, we would do a strip search of the
5 inmate. If we were looking for something, we
6 would do a strip search of the inmate. If we
7 thought he had something on him, we would do
8 a strip search of the inmate. But a lot of
9 our metal detectors -- if -- if you -- if a
10 metal detector goes off, we're going to do a
11 strip search.
12     Q.    And then, what about the cell
13 searches? You mentioned those as well.
14     A.    Cell searches, you know, in --
15 you know, daily, we go through there and --
16 and -- to -- to get them in compliance and
17 to -- to get their areas -- to get them up
18 and get their areas clean and -- you know,
19 if, you know, we see something in there as
20 we're walking through or we get intelligence
21 that there might be something in there, you
22 know, it could be random, it could be
23 directed, you know, under -- you know, if we

Page 83

1 found some intelligence, then, we would --
2 you know, we would go do a search.
3     Q.    And you say y'all do the cell
4 searches daily or how often?
5     A.    I would say daily, every shift
6 would do -- would do searches. Is it as
7 consistent as I'd like, probably not, but
8 we're working on that.
9     Q.    And what are you trying to do to
10 improve the consistency of the searches?
11     A.    Improve -- well, one is training,
12 and then, the other one is increase staffing
13 levels. Recruiting, recruiting, recruiting.
14     Q.    And so, are you saying that
15 recruiting is the reason why the searches are
16 inconsistent, or what other factors sort of
17 play into the inconsistency?
18     A.    It depends on your staffing
19 levels. It really does. It depends on if
20 you've got -- how many medical runs you've
21 got out, how many inmates you have at the
22 hospital, how many appointments you've got to
23 make. All those take correctional officers.

Page 84

1         And we do partner with a outside
2 agency to -- to -- to help us sit on these
3 inmates when they're outside. But some --
4 some, they -- we can't let them do or we
5 won't let them do. And then, some that they
6 just -- with COVID and with staffing and
7 trying to hire somebody, they have
8 difficulties finding -- finding people just
9 to be able to do their contract.
10     Q.    So, has there been times where,
11 you know, either a pat-down or a cell search
12 or any type of search has been done, has
13 there been times where you've found
14 contraband on inmates even after they've been
15 searched?
16         MR. REEVES:  Object to the form.
17     A.    And this is at St. Clair or is
18 this --
19     Q.    (BY MR. BLAKESLEAY)  Correct.
20     A.    -- anywhere?
21     Q.    At St. Clair.
22     A.    Off the top of my head, I would
23 say -- I would say, yes, there has.  I cannot

Page 85

1 recall, you know, any of them that would --
2 that I remember. But I know that -- I mean,
3 just a little piece of paper could have dope
4 in it. You know, you just -- you just don't
5 know. It'll look like a little -- a
6 little -- a little crumpled up, you know,
7 corner of a piece of paper. You just never
8 know what's in it.
9     Q.    Yeah. So, how do you -- or how
10 does St. Clair document, you know, when
11 contraband is found on an inmate?
12     A.    In the incident report module, a
13 302 is done, and it's put into the incident
14 report module.
15     Q.    And how often do you review these
16 incident report modules?
17     A.    Probably myself or my other two
18 wardens would -- would review them at least
19 two to three times a week.
20     Q.    Okay. And who is responsible for
21 ensuring that these search protocols are
22 being followed correctly?
23     A.    As in --

22 (Pages 82 - 85)

HIGHLY CONFIDENTIAL - ATTORNEYS EYES ONLY

Page 86

1    Q.    At St. Clair.
2        A.    There's procedures in place
3    with -- with the admin reg and the SOP.  And
4    then, you've got your -- you know, your
5    contraband management and you've got your --
6    your lieutenant that's -- that -- or sergeant
7    that's on the ground supervising the -- the
8    incident or at -- sometimes, that's the one
9    that's conducting the -- the -- the incident.
10   It's put into the incident module.  If --
11   anything that's out of the ordinary would be
12   looked at further with the use and force
13   investigative officer or a -- or a LESD.
14       Q.    So, what is your responsibility
15   specifically in regard to making sure that
16   the search protocols are being followed
17   correctly?
18       A.    So, what my responsibility is is
19   to ensure that -- that when we're -- when
20   we're given a task, that it's done properly.
21   That's part of my accountability.  You know,
22   reviewing the incident reports, sometimes
23   overseeing the search itself.  Not that I'm

Page 87

1    down there to do a lot of searches, but I put
2    my two wardens -- my two wardens are
3    actually -- their offices are in the -- in
4    the facility.  And they get out and they
5    mingle a lot, too.
6        Q.    Now, has there been any
7    modifications or changes that you have made
8    to the search protocol based upon the
9    incident reports that you reviewed or even
10   reviewing the search itself?
11       A.    Nothing that I've changed, no,
12   sir.
13       Q.    Okay.  And why not?
14       A.    Like I said, we've had a -- a
15   reduction, and that's opinion, probably in
16   the contraband that we've had at the
17   facility.
18       Q.    And we've talked about, you know,
19   inmate-on-inmate violence a little bit
20   before.  I want to ask some more specific
21   questions regarding that.  You talked
22   about -- or you mentioned violence
23   indicators.

Page 88

1        A.    Okay.
2        Q.    Can you just explain what that
3    means and how those are administered?
4        A.    Okay.  Violence indicators is
5    just a ADOC report that's found in there.
6    You can pull it up.  Monthly, I pull up my
7    violence indicator.  Also, I print off --
8    during the month, I print off all my violent
9    incidents for that month.  And I review my
10   violent incidents with my team.  We talk
11   about it.  Then, I turn around and have a --
12   a meeting with my boss and with other --
13   other wardens and discuss violent indicators
14   and trends that are happening at my facility
15   and what actions we're taking to -- to try to
16   remedy or improve or detour these type of
17   incidents.
18       Q.    And who actually, I guess,
19   creates the -- the violence indicators?
20       A.    The -- the incident report module
21   does.
22       Q.    Okay.  So, based upon the
23   incident report modules and the -- and the

Page 89

1    violence indicators, what trend have you seen
2    with the amount of inmate-on-inmate violence
3    at St. Clair?
4        A.    I've seen a reduction and a -- a
5    maintenance of -- at -- for Level 5
6    facilities, St. Clair has probably got the --
7    it's at the lowest.  It also -- we're not
8    seeing -- we're seeing a lot less inmate on
9    inmate with a weapon and more just inmate on
10   inmate in a physical altercation.
11       Q.    Okay.  Can you break down -- you
12   just mentioned it and it just came back to
13   me.  Can you break down, I guess, the levels
14   of the prisons --
15       A.    Yes.
16       Q.    -- and distinguishing those?
17            Can you do that for me?
18       A.    Best I -- best I can.  Level 5 is
19   your highest custody level.  When you come
20   into Kilby on intake, based on your crime,
21   your violent history, and your behavior,
22   you -- classification -- assessment's done.
23   I'm not sure -- I've not sat through Kilby,

23 (Pages 86 - 89)

HIGHLY CONFIDENTIAL - ATTORNEYS EYES ONLY

Page 106

1 seventy.
2    Q.   And are there any areas of St.
3 Clair where there's not any cameras?
4    A.   Yes, there are.
5    Q.   Can you explain those areas?
6    A.   Most of the cameras are where
7 you'd have inmate and employee traffic.  Some
8 of those -- out of the ████████, some
9 of them have been vandalized.  They like to
10 put, like, lacquer on them that they get off
11 of hobby crafts, run it across the lens, and
12 that'll blur your camera.  And so, they --
13 they basically will let you see what they
14 want you to see.
15    Q.   So, what improvements do you need
16 to the camera system or whatnot?
17       MR. REEVES:  Object to the form.
18    A.   It's really beyond my expertise
19 on that.  I don't know.
20    Q.   (BY MR. BLAKESLEAY)  Well, do you
21 need more cameras or are you good with the
22 amount of cameras you have?
23    A.   We've got a good camera system,

Page 107

1 you know, more cameras in the state than --
2 than, you know -- than, you know, there ever
3 has been.  You can always use more and
4 there's always areas you see where you -- you
5 want to add one.
6    Q.   And what areas of the prison at
7 St. Clair do you want to add more cameras?
8       MR. REEVES:  Object to the form.
9    A.   Probably in the ████ where --
10 where the -- where they're already -- where
11 they're already vandalizing them.  Maybe
12 reevaluating -- having the company reevaluate
13 where they put them or maybe some sort of,
14 you know, barrier, protective barrier over
15 them so they -- they can't get vandalized.
16    Q.   (BY MR. BLAKESLEAY)  And are the
17 ████ where cameras are the most vandalized?
18    A.   ████
19    Q.   And that's -- are those ████,
20 population ████ where the cameras are most
21 vandalized that you've seen?
22    A.   Yes.
23    Q.   Why do you think that is?

Page 108

1    A.   They're low.  The way -- the
2 design of St. Clair, they're low and they're
3 easily to -- easily accessible.
4    Q.   Do you think there needs to be
5 any improvement with the placement of the
6 cameras?
7       MR. REEVES:  Object to the form.
8    A.   I think they've been put in the
9 best place that -- that -- that they can be,
10 based on the design of St. Clair.
11    Q.   (BY MR. BLAKESLEAY)  So, in your
12 experience as warden at St. Clair, how much
13 of the inmate-on-inmate violence occurs in
14 the dorms?
15    A.   During my time, the majority of
16 it occurs in the dorms.
17    Q.   Okay.  And what specific dorms?
18 Is it any of the dorms or is there particular
19 dorms that have received or experienced more
20 violence than others?
21    A.   Any dorm.
22    Q.   And so, how would having cameras
23 that actually work help to deter the

Page 109

1 inmate-on-inmate violence in the dorms?
2       MR. REEVES:  Object to the form.
3    A.   Really the cameras are fairly
4 new.  So, I really don't have a good answer
5 for that.
6    Q.   (BY MR. BLAKESLEAY)  So, I think
7 you mentioned earlier that some of the
8 cameras in the ████ were vandalized.  Does
9 that mean that they're still working or
10 they're not working as adequately or not
11 working at all?  What do you mean by
12 vandalized?
13    A.   Vandalized.  So, basically, the
14 few cameras I've got, they tend -- they tend
15 to put some kind of brown substance on them
16 that is so hard and so dark that it just
17 blurs the camera.  So, we order lenses to
18 replace them, but, you know, it just takes a
19 walk through and a paintbrush or something,
20 you know, to -- to put them down for a little
21 bit, a little bit of time.
22    Q.   So, have there been instances of
23 inmate-on-inmate violence where you have

28 (Pages 106 - 109)

HIGHLY CONFIDENTIAL - ATTORNEYS EYES ONLY

Page 118

1    Q.   Okay.
2    A.   And it's all done through --
3  through radio commo.
4    Q.   Okay.  So, when you got there as
5  warden and became warden, is there anything
6  that you modified about how the inmates move
7  within St. Clair, for example, adding more
8  checkpoints?
9    A.   The only thing that I really
10 modified was increasing -- like, putting
11 somebody at that checkpoint with -- with the
12 metal detector.
13   Q.   And why'd you do that?
14   A.   Because if you're putting a metal
15 detector on inmates, they tend to not have
16 contraband in their pockets, they tend to not
17 have weapons in their pockets, they tend
18 to -- to either not have one or leave it in
19 the block.  As a deterrent, that's what --
20 that's what I put metal detectors out there.
21 It actually does.
22   Q.   So, let me ask you this:  How
23 many -- well, how many metal detectors were

Page 119

1  there when you got there at St. Clair?
2    A.   The walk-throughs, there was, I'm
3  going to say, at least -- at least seven to
4  twelve.
5    Q.   And how many more have you added?
6    A.   The handhelds I've added is
7  probably -- I've probably bought twenty of
8  them.
9    Q.   And why did you add more, I
10 guess, handhelds?
11   A.   Because -- because they work.
12   Q.   All right.  I want to talk about
13 this wristband policy.  Is that still in
14 effect?
15   A.   It is not enforced.  We order
16 them, and every time we order them, they
17 cut -- they'll cut them off.  And so, we tend
18 to -- you know, we tend to keep -- keep
19 trying.
20   Q.   So, what is, I guess, the --
21 what -- what's supposed to be the wristband
22 procedure or protocol with the -- the
23 inmates?

Page 120

1    A.   Every man -- every -- every dorm
2  has a color.  And that's how you tell when
3  you're letting them go back and forth into
4  their dorms what the color of their wristband
5  is.  What they'll do is, they'll cut it off,
6  cut it off, stretch it out, trade it, sell
7  it, modify it.
8    Q.   And so, is this something that
9  you implemented --
10   A.   No, sir.
11   Q.   -- when you -- okay.
12        And what you have you done, I
13 guess, to try and modify or change the
14 wristband policy?
15   A.   Just kept ordering more
16 wristbands.
17   Q.   Now, as far as the wristbands and
18 the colors themselves, what different colors
19 are there for these wristbands?
20   A.   You've just got a different
21 color.  I mean, it could be yellow, blue,
22 red, orange.  It could be any -- any color.
23   Q.   And based upon the type of

Page 121

1  wristband that the inmate is supposed to
2  have, are they restricted from certain areas
3  of the prison?
4    A.   They're restricted in -- to -- to
5  going into other blocks.
6    Q.   By blocks, is that different than
7  dorms or what do you mean by that?
8    A.   Other dorms in -- in the -- in
9  the population.
10   Q.   So, if an inmate has, for
11 example, a wristband that's not -- that
12 doesn't have the color associated with H
13 dorm, is that inmate allowed in H dorm?
14   A.   No.
15   Q.   And so, if an inmate was found in
16 H dorm without having the correct wristband
17 on, that would be against the protocol --
18   A.   Yes.
19   Q.   -- the wristband protocol?
20        Have there been issues at St.
21 Clair where, I guess, a correctional officer
22 is not able to tell what dorm the inmate is
23 in because of the lack of the wristband?

31 (Pages 118 - 121)

HIGHLY CONFIDENTIAL - ATTORNEYS EYES ONLY

Page 138

1 lot of times, it's not the program, but it's
2 based on your involvement into a program. We
3 may host a graduation. We may let the -- the
4 religious groups feed -- feed the inmates,
5 feed them as a -- as a whole or feed them as
6 a graduation ceremony-type class.
7     Q.    So, is there anything -- let me
8 say, are there any circumstances in which an
9 inmate not housed in H dorm would be in H
10 dorm?
11     A.    Repeat that question one more
12 time.
13     Q.    So, let me be more clear. Is
14 there any time where an inmate that's not
15 particularly housed in H dorm, are there any
16 times that an inmate not housed in that dorm
17 would be in that dorm?
18     A.    No, if they're housed in A
19 dorm -- or H dorm, it would be in H dorm.
20     Q.    Okay. So, if an inmate that
21 wasn't housed in H dorm was found in H dorm,
22 that would be against protocol or procedure
23 at St. Clair?

Page 139

1     A.    Yes.
2     Q.    Okay. What are some of the, I
3 guess, procedures or policies in place to
4 help prevent that from happening?
5     A.    So, there is -- there's some
6 checkpoints that are involved. That dorm --
7 that particular dorm is isolated off of
8 the -- off the main -- main dorm. And you
9 have to go through a tunnel. And there's
10 gates that close both sides of that tunnel.
11 There's also a gate that's -- that has to --
12 that goes to the back of the RHU and
13 infirmary.
14         And so, you've got a tunnel
15 officer, you've got a trade school officer
16 there, and you have a ACI officer that
17 manages the flow of traffic through those
18 areas. And so, that's the first thing.
19         And then, also, the -- on the
20 faith-based side of it, there's a structure
21 setup down there where you have interns and
22 you've got dorm reps and you've got monitors
23 that are monitoring the activities and the --

Page 140

1 the stuff that's going on inside the dorm and
2 outside the dorm.
3     Q.    And so, I guess the procedures
4 that you just laid out, what of those were
5 ones that you implemented when you got there?
6     A.    They were all in place when I got
7 there.
8     Q.    Okay.
9
10         (Whereupon, Defendant's Exhibit 7
11         was marked for identification and
12         copy of same is attached hereto.)
13
14     Q.    (BY MR. BLAKESLEAY) I'm showing
15 you what is being marked as Plaintiff's
16 Exhibit 7. Let me know if you recognize this
17 exhibit.
18     MR. REEVES: I'll note that
19 Plaintiff's Exhibit 7 is marked highly
20 confidential, attorneys eyes only, and
21 therefore, I know we'll designate at least
22 this section of the transcript and the video
23 as highly confidential, attorneys eyes only.

Page 141

1     Q.    (BY MR. BLAKESLEAY) Do you
2 recognize this?
3     A.    Oh, yes, sir.
4     Q.    Okay. What is it?
5     A.    It is a -- a rough diagram of St.
6 Clair.
7     Q.    Okay. Is this sort of an
8 accurate representation of how -- or the
9 layout of St. Clair, or at least the dorms?
10     A.    The layout's fairly accurate.
11 The -- the designations are -- need to be
12 updated.
13     Q.    Okay. What about for H dorm?
14     A.    It is not the TC dorm.
15     Q.    What do you mean by --
16     A.    It's the faith/character based
17 honor dorm.
18     Q.    Yeah, but my question is, is
19 that --
20     A.    That's where it's at, yes.
21     Q.    Okay.
22     A.    Yeah.
23     Q.    Good deal. All right. So,

Veritext Legal Solutions
877-373-3660                                          800.808.4958

HIGHLY CONFIDENTIAL - ATTORNEYS EYES ONLY

Page 146

1    Q.    So, if an inmate is accessing H
2  dorm and they have to go through a gate, is
3  the correctional officer the one that lets
4  them through that gate?
5    A.    Yes.
6    Q.    And so, if a correctional officer
7  does not let them through that gate, that
8  would be against protocol?
9      MR. REEVES:  Object to the form.
10    A.    I didn't -- repeat your question.
11  I kind of didn't understand what you were
12  asking.
13    Q.    (BY MR. BLAKESLEAY)  Yeah.  So,
14  if a correctional officer doesn't allow or
15  give access to an inmate through the gate to
16  get to -- to get to H dorm, would that be
17  against protocol?
18      MR. REEVES:  Object to the form.
19    Q.    (BY MR. BLAKESLEAY)  In other
20  words, the correctional officer is supposed
21  to let an inmate into the dorms, correct?
22    A.    Let them into the gates there,
23  yes.

Page 147

1    Q.    Give them access to the dorms?
2    A.    Yes.
3    Q.    And so, if an inmate didn't
4  receive access to the dorm by a correctional
5  officer, would that be against a protocol?
6    A.    Yes.
7    Q.    Okay.  And so, my follow-up
8  question to that is, who's responsible to
9  ensure that that protocol is followed?
10    A.    Them checkpoint officers.
11    Q.    Okay.  What happens to a
12  correctional officer if an inmate is found
13  not being where he's supposed to be on that
14  correctional officer's duty or under that
15  correctional officer's supervision?
16    A.    You could find out who -- who let
17  them through the gate, and then, you could
18  take corrective action on -- on that
19  correctional officer for letting them through
20  the gate.
21    Q.    Have you had any incidents where
22  an inmate was found being in a dorm that he
23  wasn't supposed to be in while under a

Page 148

1  correctional officer's supervision?
2    A.    In a dorm?  Yes.
3    Q.    In H dorm.
4    A.    In H dorm.  Not to my knowledge,
5  I don't have anybody that's been out of
6  pocket at H dorm.
7    Q.    Okay.  And why do you think that
8  is?
9    A.    Why do I think that is?  Because
10  it's not as appealing to go down -- down
11  there.  They've got structure down there,
12  they've got an officer down there, and
13  they're real quick to tell on you if you go
14  down and it's not your area.
15    Q.    Okay.  So, would you say that's a
16  result of the policies and the procedures
17  that are in place --
18    A.    Yes.
19    Q.    -- regarding access to H dorm?
20    A.    Yes.
21    Q.    Okay.  All right.  I'm going to
22  shift your focus now on the audits that occur
23  at St. Clair.  So, can you just describe to

Page 149

1  me, I guess, what is a security audit at --
2  at St. Clair, when does it happen, how does
3  it happen?
4    A.    Okay.  What we've got going on at
5  St. Clair now is we have the IG's office.
6  And so, they have several different employees
7  that's assigned to the IG's office.  They
8  give them a part of the instrument tool to
9  audit, like, key control for an example or
10  tool control for an example or something
11  that's in their audit, they'll assign it to
12  that particular person.  That person comes
13  down and does a walk-through of the facility,
14  documents their findings, and then, we come
15  up with a plan to correct the deficiencies.
16    Q.    Okay.  You said the IG's office.
17  What does IG stand for?
18    A.    Inspector general.
19    Q.    And where are they from or where
20  do they come from?
21    A.    They come from Montgomery.
22    Q.    Okay.
23    A.    It's a new position that Mr. Dunn

HIGHLY CONFIDENTIAL - ATTORNEYS EYES ONLY

Page 174

1   A.   There -- the door was locked.  It
2   was -- it was closed.  It was one of the
3   doors that goes into the -- into the
4   visitation yard.  It was -- wasn't used.
5   There was another way around.  It's not none
6   of the doors that were inside the -- inside
7   the blocks that roll.
8       Q.   Now, are cell phones a form of
9   contraband at St. Clair?
10      A.   Yes.
11      Q.   How often have you recovered cell
12  phones at St. Clair?
13      A.   Weekly.  Two or three times a
14  week sometimes.
15      Q.   And do you create reports based
16  upon what you find?
17      A.   Yes, we do.
18      Q.   Okay.
19      A.   We preserve the evidence.  LESD
20  gets the phone.  We see if we can track it
21  back to see whose phone it is, who bought it,
22  and see if we can take any criminal action on
23  it.

Page 175

1       Q.   In your experience, what are they
2   using -- the inmates using these cell phones
3   for, or trying to?
4           MR. REEVES:  Object to the form.
5       A.   They're using them for the same
6   thing that we use them for.  They call home,
7   they transfer money, make connections.
8       Q.   (BY MR. BLAKESLEAY)  Okay.  So, I
9   know I've used the word "incident" and you've
10  used the word "incident" throughout my line
11  of questioning, things of that nature.  When
12  it comes to inmate-on-inmate violence or
13  uncontrolled movement, contraband, what do
14  you mean by incident?  So, if an incident
15  occurs, as far as inmate-on-inmate violence,
16  what would you mean by that?
17      A.   If I said an incident, an
18  inmate-on-inmate, it's either two inmates
19  fighting in the dorm.  That's -- that could
20  be three or four inmates fighting in the
21  dorm.  It could be anybody that's engaged
22  in -- in mutual combat or assaultive behavior
23  on somebody.

Page 176

1       Q.   Okay.  Describe for me when an
2   incident of inmate-on-inmate violence is
3   nonviolent.
4           MR. REEVES:  Object to the form.
5       A.   Do you want to repeat that
6   question one more time?
7       Q.   (BY MR. BLAKESLEAY)  So, for
8   example, were there times -- would there be
9   times where an inmate would -- if there's an
10  inmate-on-inmate violence incident, would
11  there be times where not -- it doesn't
12  involve a weapon or anything like that?
13      A.   Oh, yes, where it wouldn't
14  involve a weapon.
15      Q.   Okay.  And how do those
16  different -- how do those type of incidents
17  differ from incidents when it does involve a
18  weapon as far as the violence, the level of
19  violence?
20      A.   That's awful broad.
21      Q.   So, is an incident typically
22  worse if an inmate uses a weapon that you've
23  seen in your experience or --

Page 177

1           MR. REEVES:  Object to the form.
2       Q.   (BY MR. BLAKESLEAY)  -- is it
3   about the same?
4           MR. REEVES:  Object to the form.
5       A.   In most cases, if the -- if a
6   weapon's used, you're going to have more
7   injury.
8       Q.   (BY MR. BLAKESLEAY)  Okay.  All
9   right.  We talked about the violence
10  indicator.  I think you mentioned there were
11  meetings associated with that when you
12  reviewed the violence indicator?
13      A.   Yes, sir.
14      Q.   Okay.  What happens during these
15  meetings?
16      A.   We discuss what incidences we
17  had, where they were located, if there was
18  any particular hot spot or a particular time
19  or particular event that caused the incident,
20  was it isolated, was it over debt, was it
21  over drugs, was it gang related, and what can
22  we do to improve security in that area, that
23  hot spot.

45 (Pages 174 - 177)

# EXHIBIT A

PLAINTIFF'S EXHIBIT
PENGAD 800-631-6989

# ALABAMA DEPARTMENT OF CORRECTIONS

# Monthly Statistical Report

## for

# December 2017

### Fiscal Year 2018

*All data in this report is for the end of month unless otherwise stated.*



## Jefferson S. Dunn
*Commissioner*

*Compiled and Published*
*by*
*The Research and Planning Division*
*www.doc.alabama.gov*
*334.353.3883*

**Alabama Department of Corrections**
**December 2017 Monthly Statistical Report**

# Legend

## LOCATION

### ADOC INMATE JURISDICTIONAL - CUSTODY ASSIGNMENT BY LOCATION

*Population data are for the last working day of the month and is collected 60 days later to allow for processing of admissions and releases.*

| LOCATION | ADOC JURISDICTIONAL POPULATION | ADOC CUSTODY POPULATION | ADOC IN-HOUSE POPULATION |
|---|:---:|:---:|:---:|
| ADOC Major Institution | • | • | • |
| ADOC Community Work Center | • | • | • |
| ADOC Work Release | • | • | • |
| Alabama Therapeutic Education Facility (ATEF) | • | • | |
| Supervised Re-Entry Program (SRP) | • | • | |
| Medical Furlough | • | • | |
| Leased Facilities | • | • | |
| State Mental Facility | • | | |
| Other Locations | • | | |
| County Jail | • | | |
| Central Records Monitor | • | | |
| Community Corrections Program | • | | |
| Federal Prison | • | | |
| Other States | • | | |

**ADOC Jurisdictional Population:** Defines an inmate sentenced by the court to the Alabama Department of Corrections. ADOC Jurisdictional Population includes all inmates serving time within ADOC facilities / programs, as well as in the custody of other correctional authorities, such as county jails, other State DOCs, Community Correction Programs, Federal Prisons, and Privately Leased Facilities.

**ADOC Custody Population:** Defines an inmate where ADOC maintains and/or oversees custody of an inmate sentenced by the court. ADOC Custody Population includes In-House Population plus those housed in other ADOC leased facilities and special programs.

**ADOC In-House Population:** Defines an inmate where ADOC maintains custody of an inmate to a period of incarceration. ADOC In-House Population inmates are housed within correctional facilities owned and operated by ADOC; this includes transient inmates between correctional facilities.

**Alabama Therapeutic Education Facility (ATEF):** Leased facility with contracted bed space, as well as intensive inmate rehabilitative and training services, located in Columbiana, AL.

**Central Records Monitor:** Defines the temporary status of an inmate pending transition to the status of release, death, or escape. After the change, the inmate will be removed from the corresponding inmate population count.

**Community Corrections Program:** Community based corrections program, including non-profits and those operated by county government, with oversight provided by ADOC. Governed by the 1991 Community Punishment and Corrections Act, Alabama Code, 1975, §15-18-170 et al., as amended in 2003.

**Leased or contract Facilities:** Private or municipal/county government owned correctional facilities that provide supplemental leased or contract inmate bed space to ADOC.

**Major Facility:** Includes all Close and medium security correctional facilities.

**Medical Furlough Program:** The *Alabama Medical Furlough Act* became law on September 1, 2008. This act provides the Commissioner of the Department of Corrections discretionary authority to grant medical furloughs for terminally ill, permanently incapacitated, and geriatric inmates who suffer from a chronic infirmity, illness, or disease related to aging, and who do not constitute a danger to themselves or society.

**Prison Reform / Justice Reinvestment Initiative Population:** Offenders who are technical violators of parole or probation, and are sanctioned to ADOC custody for a period up to 45 days. Also includes offenders sentenced to ADOC custody for Class D felonies.

**Split Sentence Inmates:** Inmates sentenced under Act 754 of the Alabama Code, allowing the sentencing judge to retain control over the inmate length of sentence with the option of probation after a specified length of incarceration.

**Supervised Re-Entry Program (SRP):** Defines an inmate in a residential environment, under supervision of a sponsor and an ADOC SRP Supervisor, where they may obtain employment, education, and / or training and pay court-ordered restitution.

**Year or YTD:** Year or YTD column headings are cumulative totals for the current fiscal year, October to September.



**Alabama Department of Corrections**
**December 2017 Monthly Statistical Report**

## Trend Summaries

| | Dec 2016 | Jan 2017 | Feb 2017 | Mar 2017 | Apr 2017 | May 2017 | Jun 2017 | Jul 2017 | Aug 2017 | Sep 2017 | Oct 2017 | Nov 2017 | Dec 2017 | 12-Month Δ |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| **ADOC POPULATION TREND SUMMARY** | | | | | | | | | | | | | | |
| ADOC JURISDICTIONAL POPULATION[1] | 28,992 | 28,865 | 28,912 | 28,646 | 28,323 | 28,256 | 28,296 | 27,926 | 27,890 | 27,803 | 27,886 | 27,847 | 27,677 | (1,315) |
| ADOC CUSTODY POPULATION[1] | 23,376 | 23,164 | 23,087 | 22,824 | 22,624 | 22,313 | 22,201 | 21,868 | 21,616 | 21,563 | 21,509 | 21,511 | 21,524 | (1,852) |
| ADOC IN-HOUSE POPULATION[1] | 22,963 | 22,764 | 22,688 | 22,425 | 22,233 | 21,953 | 21,888 | 21,556 | 21,306 | 21,213 | 20,966 | 20,924 | 21,007 | (1,956) |
| ADOC In-House Designed capacity | 13,318 | 13,318 | 13,318 | 13,318 | 13,318 | 13,318 | 13,318 | 13,318 | 13,318 | 13,318 | 13,318 | 13,318 | 13,318 | |
| **ADOC IN-HOUSE POPULATION TREND SUMMARY** | | | | | | | | | | | | | | |
| Close Security Facilities | 7,507 | 7,368 | 7,369 | 7,207 | 7,243 | 7,234 | 7,177 | 7,092 | 7,136 | 7,205 | 7,254 | 7,307 | 7,374 | (133) |
| Medium Security Facilities | 11,715 | 11,652 | 11,596 | 11,552 | 11,430 | 11,340 | 11,286 | 11,115 | 10,961 | 10,876 | 10,684 | 10,593 | 10,574 | (1,141) |
| Minimum Security Facilities | 293 | 313 | 348 | 354 | 353 | 336 | 308 | 286 | 237 | 224 | 213 | 218 | 207 | (86) |
| Minimum Security - Work Centers | 1,803 | 1,788 | 1,777 | 1,744 | 1,696 | 1,613 | 1,693 | 1,706 | 1,669 | 1,630 | 1,554 | 1,568 | 1,571 | (232) |
| Minimum Security - Work Release Facilities | 1,645 | 1,643 | 1,598 | 1,568 | 1,511 | 1,430 | 1,424 | 1,357 | 1,303 | 1,278 | 1,261 | 1,238 | 1,281 | (364) |
| **SPECIAL INTEREST POPULATION TREND SUMMARY** | | | | | | | | | | | | | | |
| SUPERVISED RE-ENTRY PROGRAM | 27 | 23 | 18 | 15 | 10 | 8 | 8 | 5 | 4 | 4 | 8 | 10 | 11 | (16) |
| THERAPEUTIC EDUCATION FACILITY | 324 | 327 | 322 | 323 | 323 | 305 | 278 | 278 | 281 | 294 | 286 | 278 | 253 | (71) |
| COMMUNITY CORRECTIONS | 3,655 | 3,649 | 3,655 | 3,642 | 3,548 | 3,571 | 3,584 | 3,483 | 3,587 | 3,618 | 3,669 | 3,677 | 3,655 | 0 |
| COUNTY JAIL: Total Population | 1,574 | 1,674 | 1,789 | 1,760 | 1,722 | 1,969 | 2,103 | 2,169 | 2,266 | 2,204 | 2,308 | 2,236 | 2,073 | 499 |
| County Jail: On-The-Way[2] Population | 270 | 205 | 246 | 426 | 299 | 343 | 268 | 125 | 277 | 332 | 536 | 536 | 214 | 0 |
| LEASED/CONTRACT BEDS | 57 | 45 | 55 | 58 | 52 | 41 | 22 | 23 | 19 | 49 | 245 | 295 | 248 | 191 |
| **ADMISSIONS / RELEASES TREND SUMMARY** | | | | | | | | | | | | | | |
| **ADMISSIONS** | | | | | | | | | | | | | | |
| New Commitment | 165 | 200 | 187 | 213 | 170 | 244 | 218 | 116 | 237 | 215 | 224 | 225 | 154 | |
| Split Sentence | 190 | 269 | 279 | 281 | 208 | 347 | 277 | 170 | 332 | 231 | 341 | 318 | 190 | |
| Parole Re-admissions | 67 | 81 | 68 | 78 | 78 | 64 | 74 | 78 | 83 | 79 | 147 | 177 | 161 | |
| Probation Revocation | 167 | 168 | 170 | 174 | 150 | 174 | 210 | 129 | 238 | 192 | 275 | 269 | 254 | |
| Returned Escapees | 73 | 59 | 69 | 64 | 56 | 76 | 70 | 55 | 65 | 59 | 67 | 65 | 50 | |
| Others | 132 | 186 | 197 | 210 | 183 | 256 | 235 | 139 | 286 | 244 | 102 | 89 | 64 | |
| Total Monthly Jurisdictional Admissions | 794 | 963 | 970 | 1,020 | 845 | 1,161 | 1,084 | 687 | 1,241 | 1,020 | 1,156 | 1,143 | 873 | |
| Jurisdictional Admissions Y-T-D | 2,925 | 3,888 | 4,860 | 5,886 | 6,793 | 8,248 | 9,451 | 10,185 | 11,477 | 12,643 | 1,156 | 2,299 | 3,220 | 295 |
| Admissions to ADOC Custody | 831 | 575 | 571 | 728 | 730 | 821 | 789 | 472 | 754 | | 847 | 835 | 756 | |
| Admissions to ADOC Custody Y-T-D | 2,251 | 2,820 | 3,385 | 4,101 | 4,819 | 5,609 | 6,360 | 6,817 | 7,532 | 8,297 | 847 | 1,682 | 2,435 | 184 |
| **RELEASES** | | | | | | | | | | | | | | |
| End of Sentence | 343 | 293 | 246 | 288 | 261 | 275 | 236 | 233 | 248 | 246 | 234 | 235 | 255 | |
| Paroles Granted[4] | 325 | 292 | 369 | 333 | 308 | 384 | 309 | 219 | 219 | 296 | 342 | 412 | 277 | |
| Parole Releases | 306 | 278 | 291 | 313 | 457 | 489 | 362 | 384 | 556 | 308 | 308 | 300 | 219 | |
| Parole Releases Y-T-D | 879 | 1,157 | 1,448 | 2,074 | 2,675 | 2,707 | 3,429 | 3,451 | 3,807 | 4,115 | 308 | 697 | 820 | (59) |
| Split Sentence | 341 | 327 | 304 | 359 | 324 | 355 | 272 | 296 | 372 | 336 | 348 | 349 | 340 | |
| Other | 262 | 192 | 214 | 207 | 203 | 266 | 279 | 269 | 235 | 321 | 292 | 312 | 318 | |
| Total Monthly Jurisdictional Releases | 1,252 | 1,090 | 1,055 | 1,167 | 1,245 | 1,385 | 1,149 | 1,182 | 1,211 | 1,211 | 1,182 | 1,196 | 1,132 | |
| Jurisdictional Releases Y-T-D | 3,557 | 4,647 | 5,702 | 8,036 | 9,359 | 9,499 | 11,745 | 11,778 | 12,989 | 14,200 | 1,182 | 2,378 | 3,488 | (69) |
| Total Monthly Custody Releases | 901 | 732 | 716 | 798 | 930 | 1,015 | 849 | 861 | 898 | 864 | 817 | 824 | 763 | |
| Custody Releases Y-T-D | 2,513 | 3,245 | 3,961 | 5,557 | 6,619 | 6,704 | 8,376 | 8,388 | 9,286 | 10,150 | 817 | 1,639 | 2,375 | (138) |

[1] See Legend on page 1 for definition.
[2] On-the-way describes those inmates programmed for transfer from county to an ADOC facility.
[3] Original architectural design plus renovations.
[4] Paroles Granted are not included in Release Totals.
[5] Parole and Probation Dunks are included in Parole Re-admissions, Probation Revocations, and Other Admissions

# Alabama Department of Corrections
## December 2017 Monthly Statistical Report

### Facility Operations

| | FACILITY | Designed Capacity[1] | Current Beds[6] | Month End Population | Difference[2] | Occupancy Rate[3] | Total Disciplinaries Month | Total Disciplinaries Y-T-D | Total Assaults Month | Total Assaults Y-T-D | Deaths Month | Deaths Y-T-D | Escapes Month | Escapes Y-T-D | Visits & Passes[4] Month | Visits & Passes Y-T-D | Leaves & Furloughs[5] Month | Leaves & Furloughs Y-T-D |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| **CLOSE SECURITY** | Holman | 581 | 674 | 655 | 19 | 112.7% | 46 | 143 | 13 | 35 | 1 | 1 | 0 | 0 | 0 | 0 | 0 | 0 |
| | Death Row | 56 | 190 | 155 | 35 | 276.8% | 0 | 2 | 1 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| | Kilby | 440 | 1,448 | 1,379 | 69 | 313.4% | 61 | 267 | 16 | 17 | 1 | 3 | 2 | 2 | 0 | 0 | 0 | 0 |
| | St. Clair | 984 | 1,075 | 1,016 | 59 | 103.3% | 52 | 166 | 12 | 41 | 1 | 1 | 0 | 0 | 0 | 0 | 0 | 0 |
| | (Female) Tutwiler | 417 | 724 | 632 | 92 | 151.6% | 50 | 165 | 1 | 21 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| | Death Row | 5 | 5 | 5 | 0 | 100.0% | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| | Donaldson | 968 | 1,582 | 1,386 | 196 | 143.2% | 88 | 214 | 15 | 40 | 1 | 2 | 0 | 0 | 1 | 7 | 0 | 0 |
| | (Female) Death Row | 24 | 24 | 22 | 2 | 91.7% | 0 | 4 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| | Limestone | 1628 | 2,494 | 2,124 | 370 | 130.5% | 65 | 150 | 1 | 7 | 3 | 7 | 0 | 0 | 1 | 7 | 0 | 0 |
| | **Close Subtotal** | **5,103** | **8,216** | **7,374** | **842** | **144.5%** | **364** | **1,111** | **59** | **161** | **7** | **14** | **2** | **2** | **1** | **7** | **0** | **0** |
| **MEDIUM SECURITY** | Bibb | 918 | 1,948 | 1,872 | 76 | 203.9% | 156 | 506 | 13 | 41 | 1 | 4 | 0 | 0 | 0 | 0 | 0 | 0 |
| | Bullock | 919 | 1,609 | 1,278 | 331 | 139.1% | 103 | 300 | 14 | 39 | 0 | 4 | 0 | 0 | 0 | 0 | 0 | 0 |
| | Draper | 656 | 1,235 | 864 | 371 | 131.7% | 101 | 380 | 11 | 33 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| | Easterling | 652 | 1,340 | 1,049 | 291 | 160.9% | 53 | 121 | 10 | 41 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| | Elmore | 600 | 1,176 | 1,131 | 45 | 188.5% | 148 | 513 | 20 | 71 | 1 | 1 | 0 | 0 | 0 | 0 | 0 | 0 |
| | Fountain | 719 | 1,118 | 1,062 | 56 | 147.7% | 196 | 518 | 1 | 35 | 0 | 1 | 0 | 0 | 0 | 0 | 0 | 0 |
| | Hamilton A/I | 123 | 302 | 258 | 44 | 209.8% | 37 | 95 | 1 | 1 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| | (Female) Montgomery | 192 | 300 | 292 | 8 | 152.1% | 21 | 82 | 0 | 1 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| | Staton | 508 | 1,399 | 1,272 | 127 | 250.4% | 55 | 179 | 1 | 25 | 1 | 2 | 0 | 0 | 0 | 0 | 0 | 0 |
| | (Female) Tutwiler Annex | 128 | 250 | 247 | 3 | 193.0% | 11 | 51 | 2 | 1 | 0 | 0 | 0 | 0 | 1 | 1 | 0 | 0 |
| | Ventress | 650 | 1,335 | 1,249 | 86 | 192.2% | 102 | 405 | 36 | 69 | 1 | 2 | 0 | 0 | 1 | 2 | 0 | 0 |
| | **Med Subtotal** | **6,065** | **12,012** | **10,574** | **1,438** | **174.3%** | **983** | **3,150** | **109** | **357** | **4** | **14** | **0** | **0** | **0** | **0** | **0** | **0** |
| **Min Security** | JO Davis | 250 | 250 | 207 | 43 | 82.8% | 17 | 60 | 0 | 0 | 0 | 1 | 0 | 0 | 0 | 0 | 0 | 0 |
| | **Min Subtotal** | **250** | **250** | **207** | **43** | **82.8%** | **17** | **60** | **0** | **0** | **0** | **1** | **0** | **0** | **0** | **0** | **0** | **0** |
| **MIN SECURITY - WORK CENTER** | Alex City | 35 | 56 | 53 | 3 | 151.4% | 3 | 15 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| | Atmore | 112 | 254 | 0 | 254 | 0.0% | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| | (Female) Birmingham | 30 | 166 | 145 | 21 | 483.3% | 5 | 16 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| | Camden | 15 | 86 | 52 | 34 | 346.7% | 1 | 7 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| | Childersburg | 151 | 260 | 189 | 71 | 125.2% | 22 | 93 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| | Decatur | 37 | 453 | 336 | 117 | 908.1% | 35 | 107 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| | Elba | 15 | 20 | 20 | 0 | 133.3% | 1 | 5 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| | Frank Lee | 109 | 150 | 149 | 1 | 136.7% | 18 | 43 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| | Hamilton | 25 | 54 | 51 | 3 | 204.0% | 1 | 4 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| | Loxley | 120 | 240 | 198 | 42 | 165.0% | 35 | 140 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| | Mobile | 15 | 101 | 61 | 40 | 406.7% | 34 | 81 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| | Red Eagle | 104 | 340 | 317 | 23 | 304.8% | 19 | 70 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| | **WC Subtotal** | **768** | **2,180** | **1,571** | **609** | **204.6%** | **174** | **581** | **0** | **0** | **0** | **0** | **0** | **0** | **17** | **48** | **5** | **14** |
| **MIN SECURITY-WORK RELEASE** | Alex City | 145 | 188 | 142 | 46 | 97.9% | 24 | 62 | 0 | 0 | 0 | 0 | 0 | 0 | 60 | 175 | 10 | 20 |
| | (Female) Birmingham | 120 | 104 | 96 | 8 | 80.0% | 4 | 13 | 0 | 0 | 0 | 0 | 0 | 0 | 4 | 48 | 10 | 46 |
| | Camden | 40 | 50 | 21 | 29 | 52.5% | 6 | 15 | 0 | 0 | 0 | 0 | 0 | 0 | 7 | 7 | 8 | 21 |
| | Childersburg | 176 | 150 | 101 | 49 | 57.4% | 7 | 54 | 0 | 0 | 0 | 0 | 0 | 0 | 17 | 54 | 17 | 74 |
| | Decatur | 91 | 292 | 236 | 56 | 259.3% | 28 | 121 | 0 | 0 | 0 | 0 | 0 | 0 | 22 | 76 | 19 | 37 |
| | Elba | 40 | 234 | 115 | 119 | 287.5% | 21 | 57 | 0 | 0 | 0 | 0 | 0 | 0 | 1 | 5 | 1 | 1 |
| | Frank Lee | 119 | 150 | 149 | 1 | 125.2% | 14 | 30 | 0 | 0 | 0 | 0 | 0 | 0 | 3 | 14 | 5 | 33 |
| | Hamilton | 91 | 224 | 143 | 81 | 157.1% | 4 | 20 | 0 | 0 | 0 | 0 | 0 | 0 | 26 | 82 | 8 | 10 |
| | Loxley | 175 | 298 | 174 | 124 | 99.4% | 25 | 81 | 0 | 0 | 0 | 0 | 0 | 0 | 16 | 24 | 11 | 1 |
| | Mobile | 135 | 161 | 104 | 57 | 77.0% | 24 | 76 | 0 | 4 | 0 | 0 | 0 | 0 | 9 | 32 | 11 | 32 |
| | **WR Subtotal** | **1,132** | **1,851** | **1,281** | **570** | **113.2%** | **157** | **529** | **0** | **2** | **0** | **0** | **0** | **0** | **165** | **517** | **106** | **275** |
| | **In-House Total** | **13,318** | **24,509** | **21,007** | **3,502** | **157.7%** | **1,695** | **5,431** | **168** | **520** | **11** | **29** | **2** | **2** | **183** | **572** | **111** | **289** |

1-Original architectural design plus renovations.
2-The number of unused beds includes special management beds which are not suitable for general population inmates, such as segregation, hospital, treatment, special program, or intake.
3-Occupancy Rate is the count of month end population divided by designed capacity
4-Visits and Passes include emergency visits and discretionary passes IAW AR 405, Inmate Emergency Visit/Pass, and Leave program.
5-Leaves and Furloughs include Discretionary Furloughs IAW AR 405, Inmate Emergency Furlough, Visit, Pass, and Leave program.
6-Current Beds do not include beds being held for out-gated inmates.
7-The Montgomery WF "Month End Population" has 88 Medium, 164 minimum and 40 Work Release inmates for the month of December
8-The Atmore Facility will no longer be used as efforts are made to augment staffing shortages at Holman

**Alabama Department of Corrections**
**December 2017 Monthly Statistical Report**

## Inmate Distributions with County Jails

*Based on Month End Populations*

| Location | ADOC JURISDICTIONAL POPULATION | ADOC CUSTODY POPULATION | ADOC IN-HOUSE POPULATION | Male | Female |
|---|---|---|---|---|---|
| **TOTAL DISTRIBUTION** | **27,677** | **21,524** | **21,007** | **25,194** | **2,483** |
| *Percentage of Total* | 100% | 78% | 75.9% | 91.0% | 9.0% |
| ADOC Major Institution | 17,948 | 17,948 | 17,948 | 16,772 | 1,176 |
| ADOC Work Release | 1,281 | 1,281 | 1,281 | 1,185 | 96 |
| ADOC Community Work Center | 1,778 | 1,778 | 1,778 | 1,633 | 145 |
| Sub-Total | 21,007 | 21,007 | 21,007 | 19,590 | 1,417 |
| Alabama Therapeutic Education Facility | 253 | 253 | | 253 | 0 |
| Supervised Re-entry Program[1] | 11 | 11 | | 0 | 11 |
| Medical Furlough Program[1] | 5 | 5 | | 5 | 0 |
| Taylor Hardin State Mental Health Facility | 248 | 248 | | 247 | 1 |
| Pre-Therapeutic Community Program—Contract | 0 | 0 | | 0 | 0 |
| Autauga County Jail—Contract | 0 | 0 | | 0 | 0 |
| Butler County Jail—Contract | 0 | 0 | | 0 | 0 |
| Clarke County Jail—Contract | 0 | 0 | | 0 | 0 |
| Clay County Jail—Contract | 0 | 0 | | 0 | 0 |
| Crenshaw County Jail—Contract | 0 | 0 | | 0 | 0 |
| Lowndes County Jail—Contract | 0 | 0 | | 0 | 0 |
| Pickens County Jail—Contract | 0 | 0 | | 0 | 0 |
| Sumter County Jail—Contract | 0 | 0 | | 0 | 0 |
| Talladega County Jail—Contract | 0 | 0 | | 0 | 0 |
| Wilcox County Jail—Contract | 0 | 0 | | 0 | 0 |
| Sub-Total | 517 | 517 | | 505 | 12 |
| Central Records Monitor | 72 | | | 61 | 11 |
| County Jail | 2,073 (7.49%) | | | 1,757 | 316 |
| Community Corrections Program | 3,655 (13.21%) | | | 2,948 | 707 |
| Other Locations[2] | 0 | | | 0 | 0 |
| Federal Prison | 127 | | | 121 | 6 |
| Other State Correctional Facility | 226 | | | 212 | 14 |
| Sub-Total | 6,153 (22.23%) | | | 5,099 | 1,054 |
| *Total Leased or contract Beds* | 248 (0.9%) | | | | |

[1] Medical Furlough Program inmates are under SRP supervision.

[2] Other Locations typically may include inmates held under the custody of Pardon and Paroles (Life Tech) or Department of Youth Services (DYS).

*This Population is included in Major Institution Count.

[3] Jefferson County includes Jefferson (235) and Bessemer (2)

## COUNTY JAIL DISTRIBUTION

### Jurisdictional Population Detailed by County Jail Location

| County | Pop | County | Pop | County | Pop |
|---|---|---|---|---|---|
| Autauga | 28 | Dallas | 8 | Marion | 19 |
| Baldwin | 52 | DeKalb | 24 | Marshall | 14 |
| Barbour | 5 | Elmore | 36 | Mobile | 191 |
| Bibb | 5 | Escambia | 43 | Monroe | 3 |
| Blount | 9 | Etowah | 142 | Montgomery | 53 |
| Bullock | 0 | Fayette | 8 | Morgan | 104 |
| Butler | 17 | Franklin | 18 | Perry | 1 |
| Calhoun | 57 | Geneva | 13 | Pickens | 17 |
| Chambers | 14 | Greene | 1 | Pike | 10 |
| Cherokee | 9 | Hale | 2 | Randolph | 11 |
| Chilton | 34 | Henry | 4 | Russell | 24 |
| Choctaw | 0 | Houston | 43 | Shelby | 60 |
| Clarke | 43 | Jackson | 29 | St. Clair | 48 |
| Clay | 3 | Jefferson[3] | 237 | Sumter | 2 |
| Cleburne | 10 | Lamar | 5 | Talladega | 30 |
| Coffee | 11 | Lauderdale | 23 | Tallapoosa | 25 |
| Colbert | 7 | Lawrence | 18 | Tuscaloosa | 96 |
| Conecuh | 2 | Lee | 88 | Unknown | 0 |
| Coosa | 5 | Limestone | 23 | Walker | 39 |
| Covington | 22 | Lowndes | 3 | Washington | 6 |
| Crenshaw | 7 | Macon | 3 | Wilcox | 1 |
| Cullman | 53 | Madison | 124 | Winston | 22 |
| Dale | 7 | Marengo | 2 | | |

**County Jail Distribution Total: 2,073**

The number of county jail inmates that are On-the-Way to ADOC, as of October 31, 2017 ... 214

Over 30 day Count ... 25

# Alabama Department of Corrections
## December 2017 Monthly Statistical Report

### Admissions into ADOC Jurisdictional Custody

| ADMISSIONS BY TYPE | NEW COMMITMENTS | SPLIT SENTENCE | PAROLE RE-ADMISSIONS[1] | PROBATION REVOCATIONS[3] | RETURNED ESCAPEES | OTHER | TOTAL |
|---|---|---|---|---|---|---|---|
| (Monthly) | 154 | 190 | 161 | 254 | 50 | 64 | 873 |
| Y-T-D | 613 | 878 | 489 | 805 | 186 | 249 | 3,220 |

#### Jurisdictional Admission Details

| Offenses | Number Inmates | Y-T-D |
|---|---|---|
| Personal | 134 | 470 |
| Property | 286 | 1,048 |
| Drugs | 292 | 1,112 |
| Other | 99 | 367 |
| Public | 62 | 223 |
| Total | 873 | 3,220 |

| Sentence Length | Number Inmates | Y-T-D |
|---|---|---|
| Up to 2 yrs | 349 | 1,361 |
| 2 to 5 yrs | 150 | 572 |
| 5 years | 60 | 244 |
| 5 to 10 yrs | 68 | 245 |
| 10 years | 47 | 152 |
| 10 to 15 yrs | 12 | 42 |
| 15 years | 57 | 181 |
| 15 to 20 yrs | 18 | 42 |
| 20 years | 55 | 184 |
| 20 to 25 yrs | 4 | 21 |
| 25 to 35 yrs | 24 | 84 |
| Over 35 years | 9 | 23 |
| Life | 16 | 59 |
| Life/Barred Parole | 0 | 0 |
| Life without Parole | 3 | 7 |
| Death | 0 | 0 |
| Unknown | 1 | 3 |
| Total | 873 | 3,220 |

| Race | Number Inmates | Y-T-D |
|---|---|---|
| Black | 370 | 1,365 |
| White | 495 | 1,826 |
| Unknown | 8 | 29 |
| Total | 873 | 3,220 |

| Ages | Number Inmates | Y-T-D |
|---|---|---|
| 16 | 0 | 1 |
| 17 | 3 | 13 |
| 18 | 9 | 28 |
| 19 | 23 | 68 |
| 20 | 21 | 71 |
| 21-25 | 131 | 486 |
| 26-30 | 194 | 696 |
| 31-35 | 160 | 625 |
| 36-40 | 137 | 511 |
| 41-45 | 82 | 301 |
| 46-50 | 52 | 185 |
| 51-55 | 36 | 129 |
| 56-60 | 14 | 57 |
| 60+ | 11 | 49 |
| Total | 873 | 3,220 |

| County | Monthly | Y-T-D |
|---|---|---|
| All Other Counties | 223 | 937 |
| Mobile | 84 | 325 |
| Jefferson | 84 | 312 |
| Madison | 62 | 209 |
| Calhoun | 38 | 122 |
| Morgan | 37 | 156 |
| Tuscaloosa | 34 | 108 |
| Baldwin | 31 | 130 |
| Shelby | 31 | 99 |
| Autauga | 28 | 47 |
| Etowah | 26 | 123 |
| Montgomery | 26 | 104 |
| Russell | 25 | 52 |
| St. Clair | 21 | 73 |
| Covington | 20 | 72 |
| Houston | 19 | 82 |
| Cullman | 17 | 54 |
| Randolph | 17 | 35 |
| Talladega | 17 | 65 |
| Tallapoosa | 17 | 47 |
| Lee | 16 | 68 |
| Total | 873 | 3,220 |

| Sex | Number Inmates | Y-T-D |
|---|---|---|
| Male | 714 | 2,668 |
| Female | 159 | 550 |
| Unknown | 0 | 2 |
| Total | 873 | 3,220 |

### Admissions into ADOC Custody

| ADMISSIONS BY TYPE | NEW COMMITMENTS | SPLIT SENTENCE | PAROLE RE-ADMISSIONS[2] | PROBATION REVOCATIONS[5] | RETURNED ESCAPEES | OTHER[2] | TOTAL |
|---|---|---|---|---|---|---|---|
| (Monthly) | 160 | 159 | 105 | 233 | 29 | 70 | 756 |
| Y-T-D | 512 | 439 | 405 | 718 | 112 | 249 | 2,435 |

#### Custody Admission Details

| Offenses | Number Inmates | Y-T-D |
|---|---|---|
| Personal | 141 | 442 |
| Property | 241 | 751 |
| Drugs | 222 | 738 |
| Other | 103 | 347 |
| Public | 49 | 157 |
| Total | 756 | 2,435 |

| Race | Number Inmates | Y-T-D |
|---|---|---|
| Black | 339 | 1,025 |
| White | 412 | 1,399 |
| Unknown | 5 | 11 |
| Total | 756 | 2,435 |

| Sex | Number Inmates | Y-T-D |
|---|---|---|
| Male | 631 | 2,040 |
| Female | 125 | 395 |
| Unknown | 0 | 0 |
| Total | 756 | 2,435 |

68 Parole Re-Admissions were revocations.[1]
220 Parole Re-Admissions and other admissions were dunks.[2]   (YTD =200)
126 of the 254 Probation Revocations were split sentence revocations.[3]   (YTD =649)
84 of the Jefferson County admissions: Jefferson (69) & Bessemer (15) Circuit Court Districts.[4]   (YTD = 367)
109 of the 233 Probation Revocations were split sentence revocations.[5]   (YTD = 318)

**Alabama Department of Corrections**
**December 2017 Monthly Statistical Report**

**Leading Contributors**

## LEADING CONTRIBUTORS OF INMATES TO JURISDICTIONAL POPULATION

### Within the Jurisdictional Population

*Number of Offenders Serving First or Subsequent Incarceration* — *Offenders that are Classified as*

| County | 1st Alabama Incarceration | Previous Incarceration[1] | Total Contributed | Percent | Habitual Offenders[2] | Recidivists[3] |
|---|---|---|---|---|---|---|
| All Other Counties | 3864 | 3049 | 6,913 | 25.0% | 1,458 | 1,536 |
| Jefferson[4] | 2129 | 1894 | 4,023 | 14.5% | 898 | 1,098 |
| Mobile | 1606 | 1207 | 2,813 | 10.2% | 274 | 687 |
| Montgomery | 938 | 775 | 1,713 | 6.2% | 468 | 471 |
| Madison | 824 | 783 | 1,607 | 5.8% | 412 | 417 |
| Houston | 667 | 489 | 1,156 | 4.2% | 322 | 303 |
| Tuscaloosa | 538 | 593 | 1,131 | 4.1% | 343 | 264 |
| Etowah | 527 | 504 | 1,031 | 3.7% | 261 | 265 |
| Calhoun | 472 | 434 | 906 | 3.3% | 207 | 245 |
| Morgan | 476 | 409 | 885 | 3.2% | 248 | 208 |
| Baldwin | 459 | 319 | 778 | 2.8% | 177 | 169 |
| Lee | 390 | 261 | 651 | 2.4% | 80 | 152 |
| Talladega | 324 | 248 | 572 | 2.1% | 240 | 145 |
| Shelby | 265 | 289 | 554 | 2.0% | 213 | 158 |
| Russell | 360 | 149 | 509 | 1.8% | 196 | 79 |
| St. Clair | 227 | 214 | 441 | 1.6% | 130 | 120 |
| Walker | 255 | 183 | 438 | 1.6% | 22 | 99 |
| Lauderdale | 214 | 203 | 417 | 1.5% | 104 | 96 |
| Cullman | 183 | 227 | 410 | 1.5% | 30 | 118 |
| Covington | 185 | 200 | 385 | 1.4% | 104 | 122 |
| Marshall | 210 | 143 | 353 | 1.3% | 44 | 82 |
| **Total** | **15,113** | **12,573** | **27,686** | **100.0%** | **6,231** | **6,834** |
| | 54.6% | 45.4% | | | 22.5% | 24.7% |

### Jurisdictional Monthly Admissions

| County | Total Contributed | Percent |
|---|---|---|
| All Other Counties | 223 | 25.5% |
| Mobile | 84 | 9.6% |
| Jefferson[5] | 84 | 9.6% |
| Madison | 62 | 7.1% |
| Morgan | 38 | 4.4% |
| Chilton | 37 | 4.2% |
| Etowah | 34 | 3.9% |
| Calhoun | 31 | 3.6% |
| Baldwin | 31 | 3.6% |
| Lee | 28 | 3.2% |
| Montgomery | 26 | 3.0% |
| Houston | 26 | 3.0% |
| Shelby | 25 | 2.9% |
| Tuscaloosa | 21 | 2.4% |
| Talladega | 20 | 2.3% |
| Walker | 19 | 2.2% |
| Marshall | 17 | 1.9% |
| Covington | 17 | 1.9% |
| Limestone | 17 | 1.9% |
| Cullman | 17 | 1.9% |
| Russell | 16 | 1.8% |
| **Total** | **873** | **100.0%** |

Note:
1 - Includes all inmates with previous sentence to ADOC jurisdiction.
2 - Habitual Offender convictions are defined and sentenced under the Code of Alabama, 1975, as amended, § 13A-5-9.
3 - % of Jurisdictional Population that are recidivists (returned to ADOC jurisdiction within 3 years of release).
4 - Jefferson County includes Jefferson and Bessemer Circuit Court Districts, subtotals are: 2129 (1,788/341), 1894 (1,617/277), 898 (725/173), 1098 (946/152)
5 - Jefferson County includes Jefferson (69) and Bessemer (15) Circuit Court Districts.

**Alabama Department of Corrections**
**December 2017 Monthly Statistical Repor**

## Treatment & Education Programs

### Inmate Drug Treatment Activities

| Program | Currently Enrolled | Completed Month | Year |
|---|---|---|---|
| **Primary Drug Treatment Programs** | | | |
| Relapse Treatment | 11 | 9 | 16 |
| 8-Week SAP | 100 | 255 | 476 |
| 8 Wk Mtrx | 19 | 57 | 101 |
| 8 Week Co-Occurring | 0 | 0 | 0 |
| 6-Month Crime Bill (RSAT) | 210 | 71 | 121 |
| Therapeutic Community | 90 | 1 | 13 |
| **Total** | 430 | 393 | 727 |
| **Pre-Treatment & Aftercare Programs** | | | |
| Pre-Treatment 8 Week SAP | 144 | 0 | -- |
| Aftercare | 1,628 | 20 | -- |
| Pre-Treatment 6-Month Crime Bill (RSAT) | 0 | -- | -- |
| **Total** | 1,772 | -- | -- |

### Inmate Re-entry Programs

| | Month | Year |
|---|---|---|
| Completed In-House Re-entry Program | 164 | 424 |
| Completed Limestone CF 90-Day Re-entry Program | 34 | 104 |
| **Total** | 198 | 528 |

### Alabama Therapeutic Education Facility (ATEF)

| | Month | Year |
|---|---|---|
| **Intakes/Transfer Information** | | |
| New Intakes | 44 | 157 |
| Transfers Out | 52 | 201 |
| **Treatment Information** | | |
| Graduates | 41 | 170 |
| GED | 2 | 7 |
| Vocation Cert | 69 | 293 |
| Alabama Career Readiness Cert | 0 | 0 |
| Anger Mgmt | 15 | 72 |
| Domestic Violence | 1 | 4 |
| Meth Matrix | 5 | 17 |
| SAP | 35 | 127 |
| Stress Mgmt | 0 | 0 |
| Disciplinary Returns | 8 | 23 |
| Administrative Returns | 3 | 8 |
| Case Managers | 25:1 | --- |
| **Drug Screen Information** | | |
| Positive Drug Screens Upon Enrollment | 7 | 19 |
| Random Drug Screens | 152 | 366 |
| Positive Drug Screens | 0 | 0 |
| **Security Information** | | |
| Escapes | 0 | 0 |

### Medical Furlough Program

| | Currently Enrolled | New Enrollees Month | Year |
|---|---|---|---|
| Medical Furlough Program Totals | 5 | 1 | 2 |

**Alabama Department of Corrections**
**December 2017 Monthly Statistical Report**

## Program Totals Since Inception

| | Since Inception [1] | FY 2007 | FY 2008 | FY 2009 | FY 2010 | FY 2011 | FY 2012 | FY 2013 | FY 2014 | FY 2015 | FY 2016 | FY 2017 | FY 2018 |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Supervised Re-Entry Program—Entered [2] | 8,789 | 141 | 1,155 | 1,273 | 1,419 | 1,089 | 1,117 | 960 | 747 | 527 | 361 | 18 | -- |
| Supervised Re-Entry Program—Released [2] <br> Successfully released through end of sentence or Parole | 6,817 | -- | 775 | 936 | 1,057 | 937 | 846 | 862 | 572 | 412 | 420 | 56 | -- |
| Alabama Therapeutic Education Facility Graduates | 5,969 | -- | 98 | 574 | 775 | 708 | 631 | 634 | 617 | 609 | 543 | 610 | 170 |
| Offenders Receiving GED [3] | 6,821 | 872 | 980 | 593 | 703 | 658 | 593 | 646 | 412 | 694 | 227 | 443 | -- |
| Offenders Receiving VocTech Certificate [3] | 9,079 | 718 | 645 | 612 | 699 | 599 | 816 | 1,377 | 1,161 | 1,185 | 551 | 716 | -- |
| Offenders Completing Drug Treatment | 35,765 | -- | 4,807 | 4,463 | 5,242 | 4,177 | 3,377 | 2,930 | 2,733 | 2,698 | 2,760 | 1,851 | 727 |
| Re-Start Graduates [2] | 518 | -- | -- | -- | -- | 112 | 106 | 99 | 67 | 107 | 27 | -- | -- |
| In-House Re-entry Graduates | 32,551 | -- | -- | -- | 5,193 | 4,899 | 4,727 | 4,162 | 3,239 | 5,298 | 2,684 | 1,925 | 424 |
| Limestone Re-entry Graduates | 4,321 | -- | -- | -- | 529 | 441 | 396 | 355 | 770 | 660 | 557 | 509 | 104 |
| Offenders Entering Medical Furlough | 58 | -- | -- | 5 | 4 | 5 | 6 | 6 | 9 | 4 | 13 | 4 | 2 |

1- Since Inception is based on inception of the program or when program data was first collected.
2- Alabama Re-Start Program and the SuperVised Re-Entry Program is no longer implemented.
3- This data will be provided at the end of FY2018.

**Alabama Department of Corrections**
**December 2017 Monthly Statistical Report**

## Demographics and Sentencing

### Inmate Population by Race and Sex

| | Jurisdictional Population | | | Habitual Offenders | | |
|---|---|---|---|---|---|---|
| | Male | Female | Totals | Male | Female | Totals |
| White | 10,846 39.2% | 1,789 6.5% | 12,635 45.6% | 2,402 38.5% | 205 3.3% | 2,607 |
| Black | 14,206 51.3% | 693 2.5% | 14,899 53.8% | 3,523 56.5% | 88 1.4% | 3,611 |
| Other | 150 0.5% | 2 0.0% | 152 0.5% | 13 0.2% | 0 0.0% | 13 |
| Totals | 25,202 91.0% | 2,484 9.0% | 27,686 | 5,938 95.3% | 293 4.7% | 6,231 |

### Inmate Population by Age

| | Jurisdictional | Habitual Offenders |
|---|---|---|
| Age 15 | 1 0.0% | 0 0.0% |
| Age 16 | 1 0.0% | 0 0.0% |
| Age 17 | 9 0.0% | 1 0.0% |
| Age 18 | 34 0.1% | 1 0.0% |
| Age 19 | 127 0.5% | 0 0.0% |
| Age 20 | 196 0.7% | 4 0.1% |
| Ages 21-25 | 2292 8.3% | 166 2.7% |
| Ages 26-30 | 4030 14.6% | 579 9.3% |
| Ages 31-35 | 4346 15.7% | 896 14.4% |
| Ages 36-40 | 4636 16.7% | 1,141 18.3% |
| Ages 41-45 | 3381 12.2% | 922 14.8% |
| Ages 46-50 | 2942 10.6% | 837 13.4% |
| Ages 51-60 | 3978 14.4% | 1,225 19.7% |
| Ages 60+ | 1713 6.2% | 459 7.4% |
| Totals | 27,686 100.0% | 6,231 100.0% |

### Distribution of LWOP Inmate Population by Custody Level

| Institution | Close | Medium | Unclass | Totals |
|---|---|---|---|---|
| Donaldson | 23 | 607 | 2 | 632 |
| St. Clair | 13 | 430 | 3 | 446 |
| Holman | 5 | 365 | 0 | 370 |
| Tutwiler | 0 | 53 | 0 | 53 |
| Kilby | 0 | 7 | 1 | 8 |
| Other* | 3 | 2 | 8 | 13 |
| Hamilton A&I | 0 | 7 | 0 | 7 |
| Limestone | 1 | 5 | 0 | 6 |
| Fountain | 0 | 0 | 0 | 0 |
| Easterling | 0 | 0 | 0 | 0 |
| ADOC Clay County | 0 | 0 | 0 | 0 |
| Total | 45 | 1,476 | 14 | 1,535 |

### Inmate Population by Custody Level

| | | |
|---|---|---|
| Close | 477 | 1.7% |
| Medium | 13,110 | 47.4% |
| Minimum-Community | 1,928 | 7.0% |
| Minimum-Out | 3,240 | 11.7% |
| Minimum-In | 2,206 | 8.0% |
| Escape | 223 | 0.8% |
| Recaptured Escapee | 276 | 1.0% |
| Recaptured Parolee | 412 | 1.5% |
| Unclassified | 5,814 | 21.0% |
| Total | 27,686 | 100.0% |

### Violent Offenders by Race and Sex

| | | |
|---|---|---|
| White Male | 6428 | 34.7% |
| Black Male | 11000 | 59.4% |
| Other Male | 109 | 0.6% |
| White Female | 605 | 3.3% |
| Black Female | 388 | 2.1% |
| Other Female | 1 | 0.0% |
| Total | 18,531 | 100.0% |

**% of Jurisdictional Population 66.9%**

### Inmate Deaths

| | Month | YTD |
|---|---|---|
| Homicides | 0 | 0 |
| Suicides | 1 | 1 |
| Executions | 0 | 0 |
| Other* | 10 | 28 |
| Total | 11 | 29 |

* Includes deaths due to natural causes and those deaths where a cause has yet to be determined.

### Sentence Length Summary: Jurisdictional Population

| Sentence Length | Total | Percent |
|---|---|---|
| Up to 2 yrs | 3,296 | 11.9% |
| Between 2 and 5 yrs | 2,997 | 10.8% |
| 5 yrs | 1,497 | 5.4% |
| Between 5 & 10 yrs | 1,664 | 6.0% |
| 10 yrs | 1,564 | 5.6% |
| Between 10 & 15 yrs | 524 | 1.9% |
| 15 yrs | 2,015 | 7.3% |
| From 15 to 20 yrs | 689 | 2.5% |
| 20 yrs | 3,900 | 14.1% |
| From 20 to 25 yrs | 613 | 2.2% |
| 25 yrs | 1,347 | 4.9% |
| From 25 to 35 yrs | 1,231 | 4.4% |
| Over 35 yrs | 1,116 | 4.0% |
| Life | 3,480 | 12.6% |
| Life/Barred Parole | 15 | 0.1% |
| Life without Parole | 1,519 | 5.5% |
| Death Row | 183 | 0.7% |
| Unknown | 36 | 0.1% |
| Total | 27,686 | 100.0% |

### Sentence Length Summary: Habitual Offenders

| Sentence Length | Total | Percent |
|---|---|---|
| Up to 2 yrs | 284 | 4.6% |
| Between 2 and 5 yrs | 375 | 6.0% |
| 5 yrs | 235 | 3.8% |
| Between 5 and 10 yrs | 295 | 4.7% |
| 10 yrs | 226 | 3.6% |
| Between 10 & 15 yrs | 90 | 1.4% |
| From 15 to 20 yrs | 817 | 13.1% |
| From 20 to 25 yrs | 1276 | 20.5% |
| From 25 to 35 yrs | 666 | 10.7% |
| Over 35 yrs | 237 | 3.8% |
| Life | 1191 | 19.1% |
| Life/Barred from Parole | 3 | 0.0% |
| Life without Parole | 532 | 8.5% |
| Death Row | 4 | 0.1% |
| Total Hab Offenders | 6,231 | 100.0% |

**% Habitual of Jurisdictional Population: 22.5%**

* Includes inmates in ADOC jurisdiction that are currently in federal or another state's custody.

**Alabama Department of Corrections**
**December 2017 Monthly Statistical Report**

## Releases From ADOC Jurisdiction

### RELEASES by RELEASE TYPE

| | END of SENTENCE | | PAROLE | | SPLIT-SENTENCE | | OTHER | | TOTAL | |
|---|---|---|---|---|---|---|---|---|---|---|
| | Month | Y-T-D | Month | Y-T-D | Month | Y-T-D | Month | Y-T-D | Month | Y-T-D |
| | 255 | 726 | 219 | 820 | 340 | 1,036 | 318 | 906 | 1,132 | 3,488 |
| % of total | | 20.8% | | 23.5% | | 29.7% | | 26.0% | | 100.0% |
| Number of Releases--Female Inmates | 37 | 111 | 29 | 86 | 46 | 155 | 68 | 182 | 180 | 534 |
| Number of Releases--Male Inmates | 218 | 615 | 190 | 734 | 294 | 881 | 249 | 721 | 951 | 2,951 |

### RELEASES by FACILITY TYPE

| | END of SENTENCE | | PAROLE | | SPLIT-SENTENCE | | OTHER | | TOTAL | |
|---|---|---|---|---|---|---|---|---|---|---|
| | Month | Y-T-D | Month | Y-T-D | Month | Y-T-D | Month | Y-T-D | Month | Y-T-D |
| CLOSE FACILITY | 18 | 63 | 20 | 68 | 21 | 66 | 101 | 328 | 160 | 525 |
| MEDIUM FACILITY | 100 | 287 | 91 | 359 | 106 | 317 | 131 | 319 | 428 | 1,282 |
| MINIMUM FACILITY | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| WORK CENTER | 13 | 41 | 36 | 143 | 29 | 67 | 1 | 4 | 79 | 255 |
| WORK RELEASE | 14 | 40 | 57 | 183 | 23 | 76 | 0 | 2 | 94 | 301 |
| LEASED FACILITIES | 0 | 0 | 0 | 0 | 0 | 1 | 0 | 6 | 0 | 7 |
| SRP | 0 | 0 | 2 | 5 | 0 | 0 | 0 | 0 | 2 | 5 |
| State Mental Health | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| CUSTODY SUB-TOTAL | 145 | 431 | 206 | 758 | 179 | 527 | 233 | 659 | 763 | 2,375 |
| COMMUNITY CORRECTIONS | 84 | 206 | 0 | 0 | 87 | 296 | 72 | 210 | 243 | 712 |
| COUNTY JAIL | 23 | 84 | 13 | 61 | 73 | 209 | 12 | 36 | 121 | 390 |
| FEDERAL PRISON | 2 | 3 | 0 | 1 | 1 | 3 | 0 | 0 | 3 | 7 |
| OTHER STATES | 1 | 2 | 0 | 0 | 0 | 1 | 1 | 1 | 2 | 4 |
| ALL OTHERS | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| SUB-TOTAL | 110 | 295 | 13 | 62 | 161 | 509 | 85 | 247 | 369 | 1,113 |
| JURISDICTIONAL TOTAL | 255 | 726 | 219 | 820 | 340 | 1,036 | 318 | 906 | 1,132 | 3,488 |

### RELEASES by SECURITY LEVEL

| | END of SENTENCE | | PAROLE | | SPLIT-SENTENCE | | OTHER | | TOTAL | |
|---|---|---|---|---|---|---|---|---|---|---|
| | Month | Y-T-D | Month | Y-T-D | Month | Y-T-D | Month | Y-T-D | Month | Y-T-D |
| Close | 2 | 10 | 3 | 12 | 6 | 17 | 8 | 15 | 19 | 54 |
| Medium | 106 | 339 | 90 | 361 | 127 | 408 | 93 | 261 | 416 | 1,369 |
| Minimum | 43 | 121 | 57 | 220 | 55 | 178 | 35 | 97 | 190 | 616 |
| Community | 25 | 75 | 66 | 222 | 49 | 135 | 48 | 146 | 188 | 578 |
| Unclassified | 79 | 180 | 3 | 6 | 103 | 297 | 134 | 384 | 319 | 867 |
| JURISDICTIONAL TOTAL | 255 | 725 | 219 | 821 | 340 | 1,035 | 318 | 903 | 1,132 | 3,484 |

**Alabama Department of Corrections**
**December 2017 Monthly Statistical Report**

## Disciplinaries, Assaults, Homicides, and Suicides

| FACILITY | MAJOR AR 403 Mo | MAJOR Yr | MINOR AR 403 Mo | MINOR Yr | II Asslt w/ Serious Inj Mo | Yr | II Victims Mo | Yr | II Asslt w/o Serious Inj Mo | Yr | II Fights Mo | Yr | II Asslt Throwing Subst Mo | Yr | IS Asslt w/ Serious Inj Mo | Yr | IS Victims Mo | Yr | IS Asslt w/o Serious Inj Mo | Yr | IS Asslt Throwing Subst Mo | Yr | Inm on Inm Homicides Mo | Yr | Pris on Staff Homicides Mo | Yr | Suicides Completed Mo | Yr | Suicides Attempted Mo | Yr |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| **CLOSE SECURITY** |||||||||||||||||||||||||||||||
| Holman | 46 | 128 | 0 | 15 | 2 | 11 | 4 | 29 | 4 | 16 | 3 | 3 | 0 | 0 | 0 | 0 | 6 | 7 | 5 | 6 | 2 | 2 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 1 |
| Death Row | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 1 |
| Kilby | 55 | 225 | 6 | 42 | 0 | 0 | 1 | 12 | 1 | 11 | 0 | 2 | 0 | 0 | 0 | 0 | 3 | 6 | 3 | 6 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 1 |
| St. Clair | 48 | 153 | 4 | 13 | 5 | 12 | 9 | 31 | 5 | 20 | 1 | 1 | 0 | 0 | 1 | 1 | 7 | 13 | 2 | 3 | 0 | 1 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| (Female) Tutwiler | 41 | 133 | 9 | 32 | 0 | 0 | 14 | 19 | 12 | 18 | 6 | 12 | 0 | 0 | 0 | 0 | 5 | 23 | 3 | 13 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 1 |
| (Female) Death Row | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| Donaldson | 76 | 186 | 12 | 28 | 0 | 0 | 8 | 16 | 10 | 20 | 1 | 6 | 1 | 1 | 0 | 0 | 5 | 23 | 3 | 3 | 0 | 9 | 0 | 0 | 0 | 0 | 0 | 0 | 1 | 1 |
| Death Row | 2 | 4 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| Limestone[1] | 49 | 124 | 16 | 26 | 1 | 2 | 1 | 4 | 1 | 5 | 1 | 4 | 0 | 0 | 0 | 0 | 0 | 8 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 1 | 1 | 1 | 1 |
| **Close Subtotal** | 317 | 955 | 47 | 156 | 8 | 25 | 37 | 111 | 33 | 90 | 12 | 28 | 1 | 1 | 1 | 2 | 18 | 56 | 10 | 32 | 6 | 11 | 0 | 0 | 0 | 0 | 1 | 1 | 2 | 4 |
| **MEDIUM SECURITY** |||||||||||||||||||||||||||||||
| Bibb | 112 | 365 | 44 | 141 | 3 | 5 | 8 | 34 | 6 | 27 | 13 | 30 | 0 | 0 | 1 | 1 | 3 | 11 | 3 | 7 | 1 | 1 | 0 | 0 | 0 | 0 | 0 | 0 | 1 | 1 |
| Bullock | 88 | 220 | 15 | 80 | 2 | 7 | 11 | 27 | 9 | 21 | 3 | 3 | 0 | 0 | 0 | 0 | 3 | 11 | 3 | 11 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| Draper | 89 | 320 | 12 | 60 | 3 | 10 | 10 | 32 | 8 | 26 | 2 | 9 | 0 | 0 | 0 | 0 | 4 | 4 | 3 | 4 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 4 |
| Easterling | 36 | 73 | 17 | 48 | 1 | 4 | 4 | 27 | 5 | 23 | 8 | 21 | 0 | 0 | 0 | 0 | 4 | 15 | 3 | 11 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 1 | 3 |
| Elmore | 130 | 441 | 18 | 72 | 4 | 13 | 14 | 58 | 14 | 51 | 11 | 55 | 0 | 0 | 0 | 0 | 2 | 7 | 2 | 7 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 3 |
| Fountain | 171 | 444 | 25 | 74 | 1 | 1 | 9 | 27 | 10 | 29 | 5 | 12 | 0 | 0 | 0 | 0 | 3 | 5 | 2 | 5 | 1 | 2 | 0 | 0 | 0 | 0 | 0 | 0 | 3 | 3 |
| Hamilton A&I | 20 | 72 | 17 | 23 | 0 | 0 | 0 | 1 | 0 | 1 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| (Female) Montgomery | 11 | 47 | 10 | 35 | 0 | 0 | 0 | 1 | 0 | 1 | 0 | 2 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| Staton | 55 | 172 | 7 | 17 | 0 | 0 | 9 | 23 | 6 | 19 | 9 | 20 | 0 | 0 | 1 | 1 | 2 | 0 | 0 | 0 | 0 | 1 | 0 | 0 | 0 | 0 | 0 | 0 | 2 | 0 |
| (Female) Tutwiler Annex | 7 | 34 | 4 | 17 | 0 | 0 | 0 | 1 | 0 | 1 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 1 |
| Ventress | 89 | 351 | 13 | 54 | 1 | 1 | 20 | 72 | 14 | 44 | 10 | 25 | 0 | 0 | 0 | 0 | 0 | 0 | 4 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 1 |
| **Medium Subtotal** | 808 | 2,539 | 175 | 611 | 15 | 41 | 72 | 303 | 72 | 243 | 58 | 178 | 0 | 0 | 1 | 2 | 20 | 59 | 16 | 50 | 2 | 4 | 0 | 0 | 0 | 0 | 0 | 0 | 7 | 16 |
| **MIN SECURITY** |||||||||||||||||||||||||||||||
| JO Davis | 10 | 49 | 7 | 11 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| **Minimum Subtotal** | 10 | 49 | 7 | 11 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| **MIN SECURITY – WORK CENTER** |||||||||||||||||||||||||||||||
| Alex City | 1 | 10 | 2 | 5 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| (Female) Birmingham | 4 | 14 | 1 | 2 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| Camden | 1 | 7 | 0 | 1 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| Childersburg | 19 | 78 | 3 | 15 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| Decatur | 28 | 92 | 3 | 15 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| Elba | 1 | 5 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| Frank Lee | 15 | 40 | 3 | 3 | 0 | 0 | 0 | 1 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| Hamilton | 1 | 3 | 1 | 1 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| Loxley | 28 | 111 | 7 | 29 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| Mobile | 29 | 73 | 5 | 8 | 0 | 0 | 0 | 1 | 0 | 2 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 2 | 0 | 1 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| Red Eagle | 16 | 55 | 3 | 15 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 1 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| **Work Center Subtotal** | 143 | 488 | 31 | 93 | 0 | 0 | 0 | 5 | 0 | 6 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 1 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| **MIN SECURITY – WORK RELEASE** |||||||||||||||||||||||||||||||
| Alex City | 20 | 53 | 4 | 9 | 0 | 0 | 1 | 2 | 2 | 3 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| (Female) Birmingham | 1 | 8 | 0 | 1 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| Camden | 6 | 14 | 1 | 1 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| Childersburg | 7 | 42 | 11 | 59 | 0 | 0 | 0 | 0 | 0 | 1 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| Decatur | 17 | 62 | 6 | 10 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| Elba | 14 | 46 | 0 | 3 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| Frank Lee | 8 | 20 | 0 | 1 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| Hamilton | 3 | 15 | 5 | 11 | 0 | 0 | 1 | 1 | 1 | 1 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| Loxley | 25 | 70 | 0 | 5 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| Mobile | 18 | 63 | 6 | 13 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| **Work Release Subtotal** | 119 | 393 | 38 | 136 | 0 | 0 | 2 | 2 | 4 | 4 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| **In-House Total** | 1,397 | 4,424 | 298 | 1,007 | 23 | 66 | 123 | 421 | 108 | 343 | 70 | 207 | 2 | 4 | 2 | 4 | 38 | 116 | 26 | 83 | 8 | 15 | 0 | 0 | 0 | 0 | 1 | 1 | 9 | 20 |

[1]Limestone CF: Separate housing has been eliminated for HIV positive inmates in order to comply with the Americans with Disabilities Act.
Note – As of December, 2005, all incidents of inmate violence matching the criteria for the categories listed on this page of the Monthly Statistical Report are counted.
Prior reports counted only those incidents that were classified by ADOC regulation required internal investigation. ADOC regulation of incident reporting was revised accordingly.

**Alabama Department of Corrections**
**December 2017 Monthly Statistical Report**

## Work Release Program

| FISCAL TRANSACTIONS | Alex City | Birmingham[1] | Camden | Childersburg | Decatur | Elba | Frank Lee | Hamilton | Loxley[1] | Mobile | Montgomery[1] | Total | YTD |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Gross Salaries Earned | $179,862.90 | $86,453.12 | $16,850.19 | $138,650.42 | $314,246.30 | $157,277.21 | $163,749.05 | $263,411.67 | $195,604.72 | $165,776.65 | $31,632.76 | $1,713,594.99 | $5,325,917.76 |
| Federal Tax Withheld | $59,584.18 | $55,529.47 | $5,972.25 | $56,977.67 | $16,144.60 | $10,430.50 | $8,701.45 | $12,635.46 | $13,154.52 | $59,562.74 | $31,691.85 | $593,774.69 | $289,555.39 |
| State Tax Withheld | $55,034.44 | $2,213.65 | $458.44 | $3,698.04 | $16,311.01 | $4,603.72 | $4,108.42 | $7,498.25 | $53,376.20 | $4,370.55 | $749.20 | $46,642.04 | $144,876.45 |
| City Tax Withheld | $368.02 | $503.54 | $50.00 | $174.12 | $50.00 | $50.00 | $50.00 | $1,565.88 | $515.87 | $50.00 | $50.00 | $2,627.43 | $8,693.67 |
| Social Security | $10,663.04 | $5,338.77 | $1,044.71 | $58,293.37 | $17,883.08 | $9,916.31 | $9,875.35 | $15,572.60 | $11,662.35 | $59,503.99 | $1,976.95 | $109,736.52 | $912,565.69 |
| SUI | $2,492.75 | $1,220.33 | $244.13 | $1,934.16 | $4,069.78 | $2,212.11 | $12,124.77 | $3,641.91 | $2,730.49 | $2,081.71 | $542.93 | $23,195.29 | $72,108.68 |
| Other Misc. Deds. | $3,851.50 | $946.99 | $142.05 | $4,241.75 | $5,652.47 | $4,697.75 | $4,003.62 | $59,203.57 | $58,535.75 | $2,846.83 | $50.00 | $44,122.28 | $138,532.40 |
| Average Monthly Inmate Salary | $1,788.43 | $993.71 | $1,053.14 | $1,733.13 | $1,421.93 | $2,185.79 | $1,670.91 | $1,995.54 | $1,358.37 | $1,841.96 | $1,054.43 | $1,601.69 | $4,835.19 |
| Total Deductions | $31,993.93 | $15,752.75 | $2,861.78 | $25,119.11 | $52,481.06 | $31,360.39 | $28,313.61 | $50,117.67 | $59,805.18 | $28,365.84 | $4,860.93 | $311,092.25 | $965,672.28 |
| Net Salaries Earned | $147,848.97 | $70,700.37 | $13,988.41 | $113,531.31 | $261,765.24 | $126,016.82 | $135,435.44 | $213,294.00 | $135,799.54 | $137,410.81 | $26,771.83 | $1,402,502.74 | $4,360,245.48 |
| Total Deduction Check Discrepancy[2] | $50.00 | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 | $50.00 | $0.00 |
| Amount Paid to ADOC | $71,937.19 | $34,581.20 | $6,740.03 | $55,460.13 | $125,665.66 | $62,950.88 | $65,499.48 | $105,323.46 | $77,935.66 | $66,310.62 | $12,653.11 | $685,047.42 | $5,609,338.89 |
| Amount Paid to ADOC--year-to-date | $239,726.23 | $121,895.83 | $22,022.84 | $189,812.22 | $367,255.97 | $166,425.68 | $208,196.16 | $338,526.42 | $234,179.86 | $208,772.64 | $32,438.06 | $1,425,090.91 | $264,212.59 |
| ADOC Transportation Fees | $57,430.00 | $7,535.00 | $580.00 | $7,912.50 | $14,592.50 | $55,375.00 | $9,877.50 | $11,400.00 | $56,005.00 | $56,047.50 | $2,580.00 | $579,595.00 | $44,619.24 |
| Dependent Disbursements | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 | $5,820.00 | $2,803.24 | $0.00 | $0.00 | $0.00 | $0.00 | $24,788.24 | $323,431.88 |
| Restitution & Civil Claims Paid | $10,167.94 | $6,488.18 | $1,115.87 | $5,052.06 | $7,254.77 | $11,722.27 | $10,531.44 | $18,609.56 | $14,747.36 | $11,117.02 | $1,237.40 | $98,493.87 | $6,670.38 |
| Medical/Dental Payments to private providers | $143.80 | $50.00 | $50.00 | $50.00 | $50.00 | $50.00 | $50.00 | $1,739.00 | $50.00 | $50.00 | $50.00 | $1,882.80 | $52,277.89 |
| Miscellaneous Bills Paid | $50.00 | $50.00 | $50.00 | $50.00 | $548.25 | $50.00 | $50.00 | $50.00 | $50.00 | $1,038.62 | $50.00 | $1,080.87 | $1,080.87 |
| Amount Disbursed to Inmate | $55,036.00 | $55,767.00 | $270.00 | $53,896.00 | $15,683.00 | $51,760.00 | $53,836.00 | $55,699.00 | $54,502.00 | $54,502.00 | $861.00 | $547,310.00 | $147,401.00 |
| Court Ordered Child Support through ADOC | $1,360.20 | $692.82 | $17.30 | $2,588.45 | $2,362.55 | $2,233.90 | $1,528.09 | $54,763.08 | $4,725.45 | $1,595.29 | $0.00 | $21,867.13 | $66,565.49 |
| Medical Co-Pay Paid | $124.00 | $268.00 | $16.00 | $188.00 | $672.00 | $52.00 | $196.00 | $164.00 | $188.00 | $44.00 | $556.00 | $2,668.00 | $96,497.00 |
| Positive Drug Test Fees Paid | $63.00 | $63.00 | $63.00 | $50.00 | $63.00 | $50.00 | $50.00 | $50.00 | $50.00 | $31.50 | $157.50 | $630.00 | $2,303.50 |
| Replacement ID Fee Paid | $56.00 | $8.00 | $0.00 | $0.00 | $939.00 | $50.00 | $344.00 | $59.00 | $28.00 | $59.00 | $0.00 | $514.00 | $5,303.00 |
| Amount Deposited into Inmate Savings | $56,166.84 | $21,069.17 | $5,173.21 | $42,321.17 | $94,894.51 | $37,953.77 | $44,975.69 | $71,254.40 | $51,907.57 | $51,221.26 | $9,587.82 | $486,525.41 | $1,524,112.69 |
| Inmates Owing Restitution | 107 | 69 | 11 | 80 | 79 | 68 | 89 | 157 | 141 | 18 | 18 | 886 |  |
| Inmates Paid Restitution | 89 | 69 | 12 | 63 | 54 | 73 | 89 | 114 | 114 | 0 | 18 | 695 |  |
| Average Restitution Paid per Payment | $119.30 | $94.03 | $92.99 | $80.19 | $134.35 | $160.58 | $118.33 | $163.24 | $129.36 | #DIV/0! | $68.74 | $141.72 |  |

| INMATE TRANSACTIONS | Alex City | Birmingham[1] | Camden | Childersburg | Decatur | Elba | Frank Lee | Hamilton | Loxley | Mobile | Montgomery[1] | Total | YTD |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Inmates Employed | 143 | 100 | 87 | 16 | 80 | 72 | 98 | 132 | 144 | 90 | 30 | 1,070 |  |
| Percent Inmates Employed | 136.00% | 90.6% | 76.2% | 79.3% | 93.6% | 62.6% | 65.8% | 92.3% | 85.7% | 87.4% | 75.0% | 81.4% | 81.4% |
| Average Monthly Salary | $1,798.43 | $993.71 | $1,053.14 | $1,733.13 | $1,421.93 | $2,185.79 | $1,670.91 | $1,995.54 | $1,358.37 | $1,841.96 | $1,054.43 | $1,601.69 | $4,835.19 |
| Inmates Unemployed | 15 | 1 | 2 | 0 | 46 | 26 | 17 | 20 | 19 | 0 | 0 | 176 |  |
| Inmates on Staff, in SAP, or Restricted | 2 | 3 | 0 | 1 | 1 | 0 | 0 | 0 | 3 | 0 | 3 | 14 |  |
| Inmates eligible for employment | 4 | 3 | 0 | 2 | 9 | 1 | 6 | 6 | 7 | 10 | 0 | 15 |  |
| Transferred Out | 4 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 39 |  |
| Terminated: Disciplinary | 4 | 0 | 0 | 0 | 0 | 0 | 1 | 4 | 0 | 0 | 0 | 4 |  |
| Terminated: Due Process | 3 | 2 | 0 | 3 | 3 | 6 | 6 | 3 | 3 | 3 | 0 | 17 |  |
| Removed: Medical | 6 | 1 | 1 | 1 | 8 | 5 | 3 | 3 | 7 | 1 | 0 | 30 |  |
| Escaped | 0 | 0 | 0 | 0 | 4 | 18 | 5 | 3 | 6 | 0 | 3 | 54 |  |
| Released: EOS | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 1 | 181 |  |
| Released: Parole | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 5 |  |
| Released: Death |  |  |  |  |  |  |  |  |  |  |  | 1 |  |
| Released: To SIR/VCCF | 142 | 96 | 21 | 101 | 236 | 115 | 149 | 143 | 168 | 103 | 40 | 9 |  |
| Total End-of-Month | 142 | 96 | 21 | 101 | 236 | 115 | 149 | 143 | 168 | 103 | 40 | 1,314 |  |
| Discrepancy[2] | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |  |
| Black Males | 96 |  |  | 13 | 113 | 75 | 103 | 70 | 93 | 63 |  | 684 |  |
| White Males | 46 |  | 8 | 8 | 123 | 40 | 46 | 72 | 75 | 39 | 15 | 492 |  |
| Black Females | 0 |  | 38 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 15 | 52 |  |
| White Females | 0 |  | 58 | 0 | 0 | 0 | 0 | 1 | 0 | 1 | 25 | 83 |  |
| Other Males | 0 |  | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 3 | 2 |  |
| Other Females | 0 |  | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 1 |  |
| Check Total | 142 | 96 | 21 | 21 | 236 | 115 | 149 | 143 | 168 | 103 | 40 | 1,314 |  |
| Discrepancy[2] | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |  |

1: Work Release Program for Women
2: Provided to assist each facility to report accurate information.

**Alabama Department of Corrections**
**December 2017 Monthly Statistical Report**

## Prison Reform/ Justice Reinvestment Initiative

### Probation Dunks Details

| | Dec 2016 | Jan 2017 | Feb 2017 | Mar 2017 | Apr 2017 | May 2017 | Jun 2017 | Jul 2017 | Aug 2017 | Sep 2017 | Oct 2017 | Nov 2017 | Dec 2017 | YTD |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Admissions | 96 | 83 | 119 | 151 | 135 | 154 | 157 | 85 | 177 | 162 | 145 | 125 | 116 | 386 |
| Releases | 105 | 97 | 83 | 131 | 112 | 113 | 146 | 136 | 102 | 157 | 128 | 142 | 152 | 420 |
| Month-End Population | 116 | 102 | 138 | 158 | 181 | 222 | 233 | 182 | 257 | 262 | 180 | 163 | 127* | — |

### Parole Dunks Details

| | Dec 2016 | Jan 2017 | Feb 2017 | Mar 2017 | Apr 2017 | May 2017 | Jun 2017 | Jul 2017 | Aug 2017 | Sep 2017 | Oct 2017 | Nov 2017 | Dec 2017 | YTD |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Admissions | 31 | 38 | 52 | 81 | 67 | 84 | 61 | 31 | 84 | 76 | 88 | 71 | 87 | 246 |
| Releases | 41 | 45 | 31 | 63 | 21 | 38 | 48 | 38 | 63 | 85 | 75 | 71 | 76 | 205 |
| Month-End Population | 40 | 33 | 54 | 72 | 118 | 164 | 177 | 170 | 191 | 182 | 85 | 85 | 96* | — |

### Class D Offenders Details

| | Dec 2016 | Jan 2017 | Feb 2017 | Mar 2017 | Apr 2017 | May 2017 | Jun 2017 | Jul 2017 | Aug 2017 | Sep 2017 | Oct 2017 | Nov 2017 | Dec 2017 | YTD |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Monthly Admissions | 45 | 56 | 87 | 74 | 77 | 90 | 89 | 35 | 111 | 104 | 79 | 98 | 61 | 238 |
| Month-End Population | 262 | 324 | 408 | 425 | 459 | 511 | 539 | 580 | 691 | 744 | 743 | 841 | 880 | — |

### Class D Offenders Population Demographics

**Details by Race**

| | Dec 2016 | Jan 2017 | Feb 2017 | Mar 2017 | Apr 2017 | May 2017 | Jun 2017 | Jul 2017 | Aug 2017 | Sep 2017 | Oct 2017 | Nov 2017 | Dec 2017 | YTD |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Black | 103 | 117 | 148 | 155 | 169 | 181 | 188 | 198 | 229 | 247 | 258 | 290 | 299 | — |
| White | 157 | 205 | 258 | 267 | 287 | 327 | 348 | 378 | 458 | 492 | 482 | 547 | 575 | — |
| Unknown | 2 | 2 | 2 | 3 | 3 | 3 | 3 | 4 | 4 | 5 | 3 | 4 | 6 | — |
| Total | 262 | 324 | 408 | 425 | 459 | 511 | 539 | 580 | 691 | 744 | 743 | 841 | 880 | — |

**Details by Sex**

| | Dec 2016 | Jan 2017 | Feb 2017 | Mar 2017 | Apr 2017 | May 2017 | Jun 2017 | Jul 2017 | Aug 2017 | Sep 2017 | Oct 2017 | Nov 2017 | Dec 2017 | YTD |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Male | 212 | 264 | 336 | 350 | 381 | 417 | 439 | 467 | 548 | 590 | 595 | 674 | 699 | — |
| Female | 50 | 60 | 72 | 75 | 78 | 94 | 100 | 113 | 143 | 154 | 148 | 167 | 181 | — |
| Unknown | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | — |
| Total | 262 | 324 | 408 | 425 | 459 | 511 | 539 | 580 | 691 | 744 | 743 | 841 | 880 | — |

**Details by Major Offense**

| | Dec 2016 | Jan 2017 | Feb 2017 | Mar 2017 | Apr 2017 | May 2017 | Jun 2017 | Jul 2017 | Aug 2017 | Sep 2017 | Oct 2017 | Nov 2017 | Dec 2017 | YTD |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Poss/Control Substance | 243 | 299 | 376 | 387 | 418 | 453 | 474 | 513 | 608 | 654 | 633 | 716 | 749 | — |
| Other | 19 | 25 | 32 | 38 | 41 | 58 | 65 | 67 | 83 | 90 | 110 | 125 | 131 | — |
| Total | 262 | 324 | 408 | 425 | 459 | 511 | 539 | 580 | 691 | 744 | 743 | 841 | 880 | — |

**Institution Population Class D Offenders**

| | Dec 2016 | Jan 2017 | Feb 2017 | Mar 2017 | Apr 2017 | May 2017 | Jun 2017 | Jul 2017 | Aug 2017 | Sep 2017 | Oct 2017 | Nov 2017 | Dec 2017 | YTD |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| ADOC | 97 | 109 | 153 | 148 | 174 | 187 | 177 | 200 | 239 | 260 | 252 | 283 | 305 | — |
| Community Corrections | 126 | 159 | 202 | 217 | 230 | 254 | 284 | 294 | 345 | 374 | 370 | 422 | 446 | — |
| County Jail | 16 | 28 | 29 | 32 | 37 | 52 | 52 | 53 | 70 | 76 | 87 | 102 | 98 | — |
| Unassigned | 23 | 28 | 24 | 28 | 18 | 18 | 26 | 33 | 37 | 34 | 34 | 34 | 31 | — |
| Total | 262 | 324 | 408 | 425 | 459 | 511 | 539 | 580 | 691 | 744 | 743 | 841 | 880 | — |

*Parole and Probation Dunk end-of-month populations are based on those inmates serving dunks in ADOC custody at the end of the month.

**Alabama Department of Corrections**
**December 2017 Monthly Statistical Report**

## Correctional Industries

| Correctional Industries Totals | Inmates | Expenses | Revenues (Billed & Pending) | Profit/Loss |
|---|---|---|---|---|
| | **432** | **$3,668,238.57** | **$3,909,292.91** | **$241,054.34** |

### Detailed by Activity

| Activity | Average Inmates | Expenses YTD | Revenues YTD | Profit/Loss |
|---|---|---|---|---|
| Chair Plant | 15 | $86,639.85 | $83,440.28 | ($3,199.57) |
| Chemical Plant | 23 | $206,857.86 | $253,358.94 | $46,501.08 |
| Tutwiler/Holman Clothing | 65 | $276,877.11 | $502,271.93 | $225,394.82 |
| Draper Furniture | 49 | $186,568.32 | $210,157.00 | $23,588.68 |
| Furniture Restoration | 55 | $80,110.62 | $58,319.64 | ($21,790.98) |
| Mattress Plant | 8 | $78,021.32 | $159,736.55 | $81,715.23 |
| Modular Plant | 18 | $260,793.01 | $80,360.64 | ($180,432.37) |
| Printing Plant | 89 | $531,786.35 | $704,396.93 | $172,610.58 |
| Vinyl Products | 7 | $7,459.11 | $600.00 | ($6,859.11) |
| Vehicle Tag Plant | 39 | $728,805.65 | $1,435,961.24 | $707,155.59 |
| **Sub-Total** | **368** | **2,443,919.20** | **3,488,603.15** | **1,044,683.95** |
| Fleet Services | 51 | $488,828.70 | $414,507.34 | ($74,321.36) |
| **Sub-Total** | **51** | **$488,828.70** | **$414,507.34** | **($74,321.36)** |
| Admin & Warehouse Services | **13** | **$735,490.67** | **$6,182.42** | **($729,308.25)** |

# EXHIBIT 8

HIGHLY CONFIDENTIAL

Page 1

1        IN THE UNITED STATES DISTRICT COURT

2       FOR THE NORTHERN DISTRICT OF ALABAMA

3                  MIDDLE DIVISION

4

5   CASE NUMBER:  4:19-CV-01934-ACA

6   AUNDRA DEBREL BOYKINS,

7            Plaintiff,

8            vs.

9   JEFFERSON DUNN, et al.,

10            Defendants.

11

12        S T I P U L A T I O N

13          IT IS STIPULATED AND AGREED by

14   and between the parties through their

15   respective counsel, that the deposition of

16   Amanda Price may be taken before Sara

17   Wilson, CCR, at the offices of Dentons

18   Sirote, at 2311 Highland Avenue South,

19   Suite 500, Birmingham, Alabama 35205, on

20   the 27th day of September, 2022.

21

22          DEPOSITION OF AMANDA PRICE

23

HIGHLY CONFIDENTIAL

Page 2

1        IT IS FURTHER STIPULATED AND
2   AGREED that the signature to and the
3   reading of the deposition by the witness is
4   waived, the deposition to have the same
5   force and effect as if full compliance had
6   been had with all laws and rules of Court
7   relating to the taking of depositions.
8        IT IS FURTHER STIPULATED AND
9   AGREED that it shall not be necessary for
10  any objections to be made by counsel to any
11  questions except as to form or leading
12  questions, and that counsel for the parties
13  may make objections and assign grounds at
14  the time of the trial, or at the time said
15  deposition is offered in evidence, or prior
16  thereto.
17       IT IS FURTHER STIPULATED AND
18  AGREED that the notice of filing of the
19  deposition by the Commissioner is waived.
20
21  * * * * * * * * * * * * *
22
23

Page 3

1   * * * * * * * * * * * * *
2          I N D E X
3         EXAMINATION
4              PAGE   LINE
5   By Mr. Farid              6    22
6
7      PLAINTIFF'S EXHIBITS
8              PAGE   LINE
9   Exhibit 1  Incident Report     78    2
10     2/11/22
11  Exhibit 2  Duty Office Report    100    5
12     12/2/17
13  Exhibit 3  Diagram of St. Clair  102   12
14     Correctional Facility
15  Exhibit 4  SOP Inmate Movement   124   15
16     Control
17
18
19  * * * * * * * * * * * * *
20
21
22
23

Page 4

1     IN THE UNITED STATES DISTRICT COURT
2     FOR THE NORTHERN DISTRICT OF ALABAMA
3          MIDDLE DIVISION
4
5   CASE NUMBER:  4:19-CV-01934-ACA
6
7   AUNDRA DEBREL BOYKINS,
8        Plaintiff,
9        vs.
10  JEFFERSON DUNN, et al.,
11        Defendants.
12
13  BEFORE:
14      Sara Wilson, Commissioner.
15  APPEARANCES:
16      OMAR FARID, ESQUIRE, of AKIN,
17  GUMP, STRAUSS, HAUER & FELD, 2001 K Street,
18  Northwest, Washington, DC, 20006, appearing
19  on behalf of the Plaintiff.
20      JENNIFER S. GARRETT, ESQUIRE, of
21  AKIN, GUMP, STRAUSS, HAUER & FELD, One
22  Bryant Park, New York, New York, 10036,
23  appearing on behalf of the Plaintiff.

Page 5

1   APPEARANCES:  (Cont.)
2       BRETT E. MANISCO, ESQUIRE, of
3   AKIN, GUMP, STRAUSS, HAUER & FELD, 1999
4   Avenue of the Stars, Suite 600, Los
5   Angeles, California, 90067, appearing
6   remotely on behalf of the Plaintiff.
7       ELLIE PUTMAN, ESQUIRE, of
8   MAYNARD, COOPER & GALE, 655 Gallatin
9   Street, Huntsville, Alabama, 35801,
10  appearing on behalf of the Defendants.
11      LANDON WHATLEY, ESQUIRE, of
12  MAYNARD, COOPER & GALE, 655 Gallatin
13  Street, Huntsville, Alabama, 35801,
14  appearing remotely on behalf of the
15  Defendants.
16      PEGGY ROSSMANITH, ESQUIRE, of
17  STATE OF ALABAMA, 501 Washington Avenue,
18  Montgomery, Alabama, 36104, appearing
19  remotely on behalf of the Defendant.
20
21
22      * * * * * *
23

2 (Pages 2 - 5)

HIGHLY CONFIDENTIAL

Page 42

1    Q.   How many correctional officers    09:55:18
2  are in the facility on a typical day or    09:55:24
3  night shift?    09:55:27
4    A.   On the night shift?  You said the    09:55:28
5  night shift?    09:55:30
6    Q.   On both.  The day shift and night    09:55:31
7  shift.    09:55:33
8    A.   Maybe forty, fifty, maybe.  I    09:55:34
9  don't -- I'm unsure.    09:55:46
10    Q.   Is it your opinion that St. Clair    09:55:47
11  has adequate staffing?    09:55:53
12       MS. PUTMAN:  Object to form.    09:55:54
13    A.   10-4.  Yes.    09:55:57
14    Q.   So, it's your opinion that St.    09:56:02
15  Clair has enough officers?    09:56:07
16    A.   No.    09:56:08
17       MS. PUTMAN:  Object to form.    09:56:09
18    A.   Oh, no, sir.  We could always    09:56:09
19  have more officers.  But we have good -- we    09:56:11
20  have enough officers to run the shift.    09:56:13
21    Q.   So, is it fair to say that more    09:56:16
22  officers would help keep you safe?    09:56:18
23       MS. PUTMAN:  Object to form.    09:56:21

Page 43

1    A.   More officers -- I ain't going to    09:56:22
2  say to keep me safe, but we could always    09:56:28
3  use more officers.    09:56:30
4    Q.   Is it fair to say that more    09:56:31
5  officers would keep the inmates safer?    09:56:33
6       MS. PUTMAN:  Object to form.    09:56:37
7    A.   I guess more officers will always    09:56:38
8  -- I mean, more officers would help.    09:56:41
9    Q.   A few minutes ago you mentioned    09:56:49
10  that you work overtime.  What are the    09:56:53
11  reasons that you work overtime?    09:56:55
12    A.   Take care of my family.    09:56:57
13    Q.   Do you ever work overtime because    09:57:00
14  there's not enough staff to work and    09:57:02
15  relieve you of duty?    09:57:04
16    A.   No, sir.    09:57:06
17    Q.   Does St. Clair ever mandate that    09:57:06
18  you work a certain amount of overtime?    09:57:11
19    A.   Yes, sir.    09:57:13
20    Q.   How much?    09:57:17
21    A.   Three days a month.    09:57:18
22    Q.   And does that mandatory overtime    09:57:24
23  affect your job performance?    09:57:26

Page 44

1    A.   No, sir.    09:57:28
2    Q.   Is it your opinion that it    09:57:29
3  affects other correctional officers job    09:57:30
4  performance?    09:57:34
5       MS. PUTMAN:  Object to form.    09:57:35
6    A.   I can't speak for other    09:57:38
7  correctional officers.    09:57:39
8    Q.   How many times have you worked a    09:57:40
9  sixteen-hour shift?    09:57:43
10    A.   In my career?    09:57:46
11    Q.   At St. Clair.    09:57:53
12    A.   At St. Clair?  I can't put a    09:57:54
13  number on it.    09:58:03
14    Q.   Would you say it's once a month?    09:58:07
15    A.   Since I've been back -- let me    09:58:13
16  see.  Since I've been back to St. Clair,    09:58:18
17  since December, maybe five times in that    09:58:22
18  time, in six months, seven months.    09:58:24
19    Q.   Are you aware of any rules or    09:58:33
20  procedures that set the maximum number of    09:58:34
21  hours that you should work in a twenty-four    09:58:37
22  hour shift?    09:58:39
23    A.   It's an SOP, I believe, and    09:58:39

Page 45

1  sixteen is the max.    09:58:41
2    Q.   Have you ever worked more than    09:58:44
3  sixteen hours in a twenty-four hour    09:58:48
4  timeframe?    09:58:50
5    A.   I don't recall working more than    09:58:50
6  sixteen hours at a time.    09:58:54
7    Q.   Are there any reasons why you    09:58:58
8  would work more than sixteen hours?    09:58:59
9    A.   Maybe, if you work at the    09:59:02
10  hospital, you might get relieved and your    09:59:06
11  drive-time back to the facility might push    09:59:11
12  you over sixteen hours.    09:59:18
13    Q.   Do you agree that working more    09:59:19
14  than sixteen hours in a twenty-four hour    09:59:21
15  time period could affect your job    09:59:24
16  performance?    09:59:26
17       MS. PUTMAN:  Object to form.    09:59:27
18    A.   Yes, sir.    09:59:28
19    Q.   Could it affect your ability to    09:59:31
20  be attentive?    09:59:32
21       MS. PUTMAN:  Object to form.    09:59:36
22    A.   To be what?    09:59:37
23    Q.   Attentive?    09:59:39

12 (Pages 42 - 45)

HIGHLY CONFIDENTIAL

Page 46

1    A.   Attentive?  It's possible, yes.   09:59:40
2    Q.   Have you ever fallen asleep while   09:59:43
3 on duty?                              09:59:46
4    A.   No, sir.                       09:59:48
5    Q.   Have you heard of instances where   09:59:52
6 other correctional officers have fallen   09:59:56
7 asleep while on duty?                  09:59:58
8    A.   Yes, sir.                       09:59:59
9    Q.   Can you tell me about that?    10:00:03
10    A.   I just heard they fell asleep.   10:00:05
11    Q.   Who did you hear that from?    10:00:12
12    A.   Just -- let me say an officer.   10:00:13
13    Q.   Did an officer tell you that they   10:00:21
14 fell asleep while on duty?            10:00:23
15    A.   No.  They didn't tell me.      10:00:25
16    Q.   So, is it fair to say you've   10:00:27
17 heard from other officers about other   10:00:35
18 officers falling asleep on duty?      10:00:35
19    A.   Yes.  It's safe to say I've heard   10:00:35
20 that before.                          10:00:35
21    Q.   Has an inmate ever told you that?   10:00:35
22        MS. PUTMAN:  Object to form.    10:00:37
23    A.   No, sir.                       10:00:37

Page 47

1    Q.   Is sleeping on the job permitted   10:00:38
2 under the ADOC's policies?            10:00:41
3    A.   No, sir.                       10:00:43
4    Q.   Do you agree that under the    10:00:45
5 ADOC's policies, sleeping on the job is not   10:00:47
6 permitted and may be cause for discipline,   10:00:50
7 including suspension?                 10:00:52
8        MS. PUTMAN:  Object to form.    10:00:54
9    A.   Yes, sir.                       10:00:58
10        (Recess taken.)               10:01:03
11    Q.   Ms. Price, let's go back to your   10:20:14
12 background for a little bit.  What was your   10:20:19
13 job at St. Clair when you first started?   10:20:21
14    A.   I was a CO.                    10:20:23
15    Q.   Were you a correctional officer   10:20:25
16 in December 2017?                     10:20:29
17    A.   Yes, sir.                       10:20:31
18    Q.   And when did your job change?   10:20:33
19    A.   It changed, 2018.              10:20:35
20    Q.   Do you recall when in 2018?    10:20:46
21    A.   Ten, October.                  10:20:48
22    Q.   You testified earlier that you   10:20:51
23 left.  When did you leave?            10:20:54

Page 48

1    A.   10/2018.                       10:20:55
2    Q.   And when you say you leave, where   10:20:57
3 did you go?                           10:20:58
4    A.   I went to Birmingham           10:20:59
5 Work-Release.                         10:21:01
6    Q.   And when did you return to St.   10:21:01
7 Clair?                                10:21:01
8    A.   December, 2021.                10:21:12
9    Q.   As a correctional officer, did   10:21:14
10 you ever provide written reports?      10:21:16
11    A.   I had to keep a log of what    10:21:17
12 happened throughout the day while I was in   10:21:21
13 that unit.                            10:21:22
14    Q.   Can you tell me more about that?   10:21:24
15    A.   I just -- you just document the   10:21:26
16 activities that happen in that block.   10:21:30
17    Q.   Did you check in with somebody on   10:21:33
18 a daily basis?                        10:21:34
19    A.   Yes.                           10:21:37
20    Q.   Who?                           10:21:38
21    A.   My supervisor, which was       10:21:39
22 Lieutenant Baker.                     10:21:45
23    Q.   What about in your current role?   10:21:49

Page 49

1 Do you check in with someone on a daily   10:21:51
2 basis?                                10:21:54
3    A.   Warden Noe.                    10:21:54
4    Q.   Other than Warden Noe, do you   10:21:55
5 check in with anyone else on a daily basis?   10:21:57
6    A.   No, sir.                       10:21:59
7    Q.   You testified earlier that you   10:22:00
8 could always use more officers.  Could you   10:22:02
9 tell me more about that?              10:22:04
10    A.   Everybody is short.  Everybody   10:22:06
11 could use more people to work.  So, every   10:22:09
12 job could have more workers.           10:22:19
13    Q.   But in this job, specifically,   10:22:21
14 what would -- what would more officers do   10:22:24
15 to help you or the inmates?            10:22:27
16        MS. PUTMAN:  Object to form.    10:22:28
17    A.   More officers would be just more   10:22:30
18 staff.  More people able to move around.   10:22:33
19    Q.   What would having more people   10:22:43
20 able to move around provide to the    10:22:45
21 facility?                             10:22:48
22    A.   More security, I would imagine.   10:22:49
23    Q.   More security for you?          10:22:52

13 (Pages 46 - 49)

HIGHLY CONFIDENTIAL

Page 50

1    A.    More security for everybody.    10:22:54
2    Q.    Is it fair to say it would    10:22:56
3  provide more security for the officers and    10:22:58
4  the inmates?    10:23:00
5    A.    Yes, sir.    10:23:01
6    Q.    You testified earlier that there    10:23:02
7  were new gates that were put up.  Were    10:23:14
8  those gates there in December of 2017?    10:23:18
9    A.    '17?  No, sir.    10:23:21
10    Q.    When were those gates installed?    10:23:22
11    A.    I don't know.    10:23:24
12    Q.    You also testified earlier about    10:23:26
13  restrictive housing.  What is restrictive    10:23:30
14  housing; can you tell me about that?    10:23:33
15    A.    It's where inmates are assigned    10:23:34
16  that have disciplinary time where they did    10:23:37
17  something that they didn't have no business    10:23:41
18  doing.  So, it's segregation time.    10:23:44
19    Q.    What is the purpose of that?    10:23:47
20    A.    It's, like, if an inmate was    10:23:49
21  fighting, it's where they go to for a    10:23:54
22  certain amount of time.    10:23:57
23    Q.    Does the restrictive housing keep    10:23:59

Page 51

1  the inmates safer?    10:24:01
2        MS. PUTMAN:  Object to form.    10:24:03
3    A.    Yes, I guess so.  I guess.    10:24:04
4    Q.    Can you tell me more about that?    10:24:18
5    A.    They're in a single cell by their    10:24:20
6  self.  So, housed alone until their    10:24:23
7  disciplinary time is up for whatever reason    10:24:29
8  they went back there.  And then they go    10:24:32
9  back out to population, if they don't have    10:24:34
10  an enemy or something like that.    10:24:37
11    Q.    Would you say that inmates that    10:24:39
12  are housed in restrictive housing are kept    10:24:42
13  from -- are prevented from hurting other    10:24:45
14  inmates?    10:24:49
15        MS. PUTMAN:  Object to form.    10:24:50
16    A.    It depends on what they went back    10:24:50
17  there for.    10:24:52
18    Q.    You also testified earlier about    10:24:54
19  a special safety unit.  Can you tell me    10:24:56
20  about that?    10:24:59
21    A.    It's for -- it's for inmates that    10:24:59
22  don't want to be housed out in population    10:25:15
23  with the other inmates.    10:25:17

Page 52

1    Q.    Why would an inmate not want to    10:25:18
2  be housed in general population with other    10:25:22
3  inmates?    10:25:23
4    A.    Like, with me, I deal with PREA.    10:25:24
5  Some are transgender.  They just want to    10:25:29
6  be, you know, in a block with a certain    10:25:32
7  amount of people.  They don't come out and    10:25:35
8  interact with everybody else.    10:25:38
9    Q.    So, do inmates request to be in    10:25:41
10  the special safety unit because they fear    10:25:43
11  for their safety?    10:25:45
12    A.    I'm not going to say fear for    10:25:46
13  safety, they just -- some just like that    10:25:48
14  block, like, being in that building because    10:25:54
15  they don't have to come out with everybody    10:25:57
16  else.  It's kind of in its own little area.    10:25:58
17    Q.    Are the special safety units    10:26:02
18  safer than the general population?    10:26:04
19        MS. PUTMAN:  Object to form.    10:26:12
20    A.    It's no different to me.  I don't    10:26:12
21  believe there's any difference.    10:26:12
22    Q.    So, other than being a smaller    10:26:13
23  population in the special safety unit, are    10:26:15

Page 53

1  there any other differences between it and    10:26:18
2  the general population?    10:26:20
3    A.    The other ones can, like, go --    10:26:21
4  they walk to chow.  They are able to go to    10:26:23
5  the chow hall and eat chow hall in there.    10:26:25
6  They go to the gym or go -- it's a little    10:26:31
7  different.    10:26:36
8    Q.    Okay.  Let's go back for a minute    10:26:37
9  to your time as a correctional officer.    10:26:42
10  Would you say that correctional officers    10:26:44
11  are responsible for keeping inmates safe?    10:26:46
12    A.    Yes, sir.    10:26:49
13    Q.    Can you tell me more about that?    10:26:50
14    A.    Yeah.  We are responsible for    10:26:51
15  keeping inmates safe, staff safe, the    10:26:55
16  public safe.    10:26:58
17    Q.    And how do you do that?    10:27:01
18    A.    Just doing your job.  Patrolling,    10:27:02
19  being aware, looking at anything unusual    10:27:06
20  that could be going on in the facility.    10:27:10
21  Just holding the inmates accountable for    10:27:12
22  what they supposed to be doing and what    10:27:16
23  they're not supposed to be doing.    10:27:17

14 (Pages 50 - 53)

Page 74

1   Q.   What do you use your email for?   10:45:09
2   A.   I receive documents from the   10:45:12
3 shift, any inmate movement, messages from   10:45:16
4 my supervisor.   10:45:21
5   Q.   How often do you use that email?   10:45:24
6   A.   Every day.   10:45:25
7   Q.   Do you receive emails from   10:45:26
8 correctional officers on there?   10:45:28
9   A.   Yes, sir.   10:45:30
10   Q.   Do those emails come from ADOC   10:45:31
11 emails?   10:45:33
12   A.   I believe it come from the   10:45:36
13 printer.   10:45:40
14   Q.   What does that mean?   10:45:42
15   A.   They scan it to me from the   10:45:43
16 printer.   10:45:45
17   Q.   Have you ever received an email   10:45:46
18 from a correctional officer that came from   10:45:48
19 an ADOC email?   10:45:51
20   A.   Yes, sir.   10:45:52
21   Q.   Would it surprise you if a   10:45:53
22 correctional officer testified that they   10:45:57
23 did not have access to an ADOC email?   10:45:58

Page 75

1   A.   No, sir.   10:46:01
2   Q.   Why is that?   10:46:03
3   A.   I didn't have none when I was a   10:46:04
4 CO.   10:46:06
5   Q.   Do only some correctional   10:46:07
6 officers get ADOC emails?   10:46:09
7   A.   I don't know.   10:46:11
8   Q.   You testified earlier that you   10:46:12
9 heard from a correctional officer about   10:46:26
10 another correctional officer falling asleep   10:46:29
11 on duty.  When did you hear that?   10:46:31
12   A.   Maybe about a couple months ago,   10:46:32
13 something like that.   10:46:50
14   Q.   How many officers were they   10:46:51
15 referring to?   10:46:53
16   A.   One.   10:46:54
17   Q.   Which officers were they   10:46:56
18 referring to?   10:46:57
19   A.   I think it's -- what is his name?   10:46:58
20 A CO.  Let me see.  I think his name is   10:47:11
21 Officer Hitchcock.   10:47:18
22   Q.   Do you know why someone like   10:47:34
23 Officer Hitchcock would fall asleep on   10:47:34

Page 76

1 duty?   10:47:35
2   A.   I believe he said he had a   10:47:35
3 doctor's appointment earlier that day.  I   10:47:37
4 think that's what it was.   10:47:41
5   Q.   Do you know anything about how   10:47:42
6 long he worked that day?   10:47:43
7   A.   I don't.   10:47:45
8   Q.   Were you surprised to hear that a   10:47:48
9 correctional officer fell asleep on duty?   10:47:50
10   A.   Yes.   10:47:53
11   Q.   Why is that?   10:47:55
12   A.   Because we have great officers   10:47:55
13 there, and I don't see it.  No lie.  I   10:47:58
14 don't see it happen a lot.   10:48:06
15   Q.   How many times have you seen it   10:48:14
16 happen?   10:48:14
17   A.   I ain't never seen it happen, but   10:48:14
18 that's the first I've heard that an officer   10:48:14
19 went to sleep.   10:48:14
20   Q.   To your knowledge, there aren't   10:48:16
21 any other incidents of correctional   10:48:17
22 officers falling asleep?   10:48:21
23   A.   Not of me knowing.   10:48:22

Page 77

1   Q.   You testified earlier that if   10:48:24
2 there was inmate-on-inmate violence and   10:48:31
3 there was a weapon involved, that you would   10:48:33
4 intervene; correct?   10:48:36
5   A.   Yes, sir.   10:48:37
6   Q.   What does it mean to intervene?   10:48:38
7   A.   I am going to go in and try to   10:48:39
8 stop the inmates from fighting or hurting   10:48:41
9 each other.   10:48:43
10   Q.   What does it mean to go in?   10:48:45
11   A.   I'm going to step in and stop the   10:48:48
12 fight.   10:48:49
13   Q.   Can you tell me more about what   10:48:52
14 you might do, what tactics you might use?   10:48:53
15   A.   I'm going to give them a direct   10:48:55
16 order and then I'm going to utilize my OC   10:48:57
17 spray.   10:49:01
18   Q.   So, to be clear, if you give a   10:49:01
19 direct order in that situation and they did   10:49:02
20 not comply, you would spray?   10:49:07
21   A.   Yes.  I'm going to spray and I'm   10:49:08
22 going to attempt to separate.   10:49:10
23        (Plaintiff's Exhibit 1   10:49:10

HIGHLY CONFIDENTIAL

Page 82

1 he's, like: I'm not going to the cell.    10:56:02
2 And just pulling -- pulled away and went    10:56:05
3 the other direction.    10:56:08
4    Q.    Did you fear for your safety in    10:56:09
5 that moment?    10:56:11
6    A.    No.    10:56:12
7    Q.    Did you think you might be in    10:56:13
8 danger in that moment?    10:56:15
9    A.    No.    10:56:16
10    Q.    Why did you administer the    10:56:16
11 chemical agent?    10:56:18
12        MS. PUTMAN: Object to form.    10:56:20
13    A.    Because he pulled away. He    10:56:20
14 pulled away and I had gave him several    10:56:22
15 direct orders to go to the cell and he was    10:56:25
16 refusing -- refusing. So, when he pulled    10:56:27
17 away, it was -- yeah.    10:56:32
18    Q.    So, in what situations would you    10:56:43
19 administer a chemical agent?    10:56:45
20        MS. PUTMAN: Object to form.    10:56:47
21    A.    If you're walking -- I think if    10:56:48
22 you're walking towards somebody, you know,    10:56:51
23 and they're giving you a direct order to    10:56:56

Page 83

1 stop and they're walking towards you in    10:56:58
2 your -- like in your area. What is it    10:57:04
3 called? I can't say what it's called. I    10:57:06
4 can't say the proper word.    10:57:18
5        I don't know. It's in your hand    10:57:33
6 area. Like, I don't know. I don't believe    10:57:35
7 that inmate -- you know, I think he was    10:57:39
8 just angry, you know. And I wanted to    10:57:44
9 de-escalate the situation, you know, and    10:57:48
10 talking to him wasn't working. And, so,    10:57:49
11 once he snatched away, you know, it's my    10:57:52
12 job to make sure that they don't go further    10:57:57
13 than what it is.    10:58:01
14    Q.    If you had not shot the chemical    10:58:02
15 agent, what may have happened?    10:58:05
16        MS. PUTMAN: Object to form.    10:58:07
17    A.    He could have possibly caused a    10:58:08
18 riot to make everybody else not want to    10:58:10
19 lockdown. Like, I'm not going to lockdown    10:58:13
20 and he could have possibly caused a riot,    10:58:15
21 initiating more people to refuse to    10:58:18
22 lockdown.    10:58:21
23    Q.    So, I understand that you    10:58:23

Page 84

1 administered the chemical agent because he    10:58:25
2 refused to lockdown, but what purpose does    10:58:27
3 the chemical agent serve?    10:58:30
4        MS. PUTMAN: Object to form.    10:58:32
5    A.    To get them to stop. To stop    10:58:32
6 being aggressive. Because once he snatched    10:58:36
7 away, it's like, he snatched -- he snatched    10:58:39
8 away from me. He was -- he was aggressive.    10:58:41
9 He was -- you know, he was angry. He was    10:58:45
10 aggressive, and we needed to get him on out    10:58:47
11 -- to calm down and on out of there before    10:58:52
12 he made the whole block, you know, upset    10:58:56
13 too.    10:58:59
14    Q.    Are you trained to use a chemical    10:59:00
15 agent?    10:59:03
16    A.    I am, yes, sir.    10:59:04
17    Q.    Does every correctional officer    10:59:05
18 know how to use a chemical agent?    10:59:07
19    A.    Yes, sir.    10:59:09
20    Q.    Does every correctional officer    10:59:10
21 have a chemical agent on their body at all    10:59:11
22 times?    10:59:14
23    A.    Yes, sir.    10:59:14

Page 85

1    Q.    Was that the case in 2017?    10:59:15
2    A.    What's the case? What happened    10:59:17
3 in 2017?    10:59:19
4    Q.    Did correctional officers always    10:59:21
5 have chemical agents on their body in 2017?    10:59:24
6    A.    Yes, sir. I imagine, yes.    10:59:28
7    Q.    So, I'm a little confused. So,    10:59:29
8 let's clarify for the Record. Did you    10:59:32
9 administer the chemical agent to get this    10:59:36
10 individual to follow your orders or he was    10:59:41
11 being aggressive?    10:59:46
12    A.    He was being aggressive. He was    10:59:47
13 being aggressive.    10:59:49
14    Q.    If you turn to the first page of    10:59:53
15 the incident report under type of incident,    10:59:55
16 where it says: Injury, accident, inmate    11:00:00
17 serious. Do you know what that means for    11:00:04
18 it to be serious?    11:00:06
19        MS. PUTMAN: Object to form.    11:00:08
20    A.    Say it again.    11:00:09
21    Q.    Under number 6, type of incident.    11:00:10
22    A.    Okay.    11:00:14
23    Q.    On the second-to-last line where    11:00:15

22 (Pages 82 - 85)

Page 102

1 P dorm. Would seeing a map of St. Clair    11:35:40
2 refresh your recollection?    11:35:50
3    A.   Leaving from P dorm? He should    11:35:51
4 have passed at least three.    11:35:57
5    Q.   So, it's fair to say that    11:36:03
6 Whittington probably passed by at least    11:36:05
7 three guards on his way to the H dorm?    11:36:07
8    A.   I think, to come from P, I think    11:36:10
9 that he should have passed three.    11:36:12
10       (Plaintiff's Exhibit 3    11:36:12
11           was marked for    11:36:12
12           identification.)    11:36:15
13    Q.   Would he have passed by any    11:36:15
14 closed doors or gates?    11:36:17
15       I'm going to introduce we're    11:36:26
16 marking as Plaintiff's Exhibit 3.    11:36:27
17       MS. PUTMAN:  I would say we want    11:36:55
18 to mark this portion of the transcript as    11:36:56
19 highly confidential.    11:37:00
20    Q.   Do you recognize this diagram?    11:37:09
21    A.   Yes. This is St. Clair    11:37:11
22 Correctional Facility.    11:37:17
23    Q.   Do you see where the P dorm is on    11:37:17

Page 103

1 this diagram?    11:37:19
2    A.   I do. Yes.    11:37:21
3    Q.   Do you see where the H dorm is on    11:37:25
4 the diagram?    11:37:27
5    A.   Yes.    11:37:29
6    Q.   Is this diagram an accurate    11:37:30
7 reflection of the placement of the dorms in    11:37:32
8 the facility?    11:37:36
9    A.   Yes, sir.    11:37:36
10    Q.   So, looking at this diagram, if    11:37:37
11 Whittington was coming from the P dorm to    11:37:42
12 the H dorm, how many gates or closed doors    11:37:46
13 would he have had to pass?    11:37:50
14    A.   Coming out of his block; right?    11:37:51
15    Q.   Assuming he was in his block,    11:37:54
16 sure.    11:37:57
17    A.   His door, the block door. Oh,    11:37:57
18 you said gates. Let me see. Gates. One,    11:38:02
19 two, three. Three.    11:38:12
20    Q.   So, Whittington would have had to    11:38:20
21 pass through three gates on his way to the    11:38:23
22 H dorm, if he were coming from the P dorm;    11:38:25
23 correct?    11:38:29

Page 104

1    A.   Depending on -- yes, yes. Should    11:38:29
2 have.    11:38:32
3    Q.   What about doors?    11:38:33
4    A.   He have his building door -- I    11:38:36
5 mean, he have his block door, so that's    11:38:38
6 two.    11:38:45
7    Q.   So, two doors and three gates?    11:38:46
8    A.   Two doors, yes.    11:38:48
9    Q.   What if he were coming from the    11:38:52
10 kitchen?    11:38:54
11    A.   And if he was coming from the    11:38:55
12 kitchen? Two.    11:38:57
13    Q.   Doors or gates?    11:39:02
14    A.   Gates. Gates.    11:39:04
15    Q.   And what about doors?    11:39:07
16    A.   Two.    11:39:08
17    Q.   Are any of those gates or doors    11:39:13
18 locked?    11:39:16
19    A.   Yes. It's -- sometimes. It    11:39:16
20 depends on what's going on. Was he working    11:39:23
21 in the kitchen?    11:39:25
22    Q.   Let's stick with -- let's stick    11:39:31
23 with he was either in the kitchen or the P    11:39:33

Page 105

1 dorm. Let's just talk about either of    11:39:36
2 those situations.    11:39:38
3    A.   Okay.    11:39:39
4    Q.   He -- how could someone like    11:39:40
5 Whittington have gone through those gates    11:39:43
6 or doors, if they had locks on them?    11:39:45
7    A.   Okay. So, if they were locked,    11:39:49
8 someone would have had to let him in, if    11:39:53
9 they were locked. He wouldn't have had a    11:39:55
10 key. Officer would have had to let him in.    11:39:57
11    Q.   Does that often happen? Officers    11:40:00
12 let inmates go from block to block?    11:40:04
13    A.   H dorm normally comes up to go to    11:40:07
14 the gym. So, the gate will open for those    11:40:10
15 guys to come up.    11:40:15
16       If he's in the kitchen, and we're    11:40:16
17 letting H dorm come up to go to the gym, he    11:40:19
18 could go through that gate while that gate    11:40:21
19 is open, while we're having the movement.    11:40:24
20    Q.   So, are you saying that there is    11:40:26
21 a way for an inmate to get from the kitchen    11:40:27
22 to the H dorm without passing by any locked    11:40:31
23 doors?    11:40:34

27 (Pages 102 - 105)

HIGHLY CONFIDENTIAL

Page 106

1    A.   No, it would be a gate.  But,    11:40:34
2   what I'm saying, if we're releasing H dorm   11:40:37
3   and it's an inmate in the kitchen, he can    11:40:40
4   go through that gate while we're releasing   11:40:43
5   H dorm to come up to go to the gym.    11:40:46
6    Q.   Does that concern you at all?    11:40:49
7    A.   It don't concern -- no, it don't.   11:40:51
8    Q.   It doesn't concern you that in    11:40:54
9   that specific situation --    11:41:03
10    A.   That if we're letting H dorm come   11:41:03
11   up and -- I mean, he should be wrote up    11:41:03
12   because he went down there and he don't    11:41:05
13   live down there, but, yeah, I guess so.    11:41:08
14   Yeah.  He should be wrote up for being in   11:41:10
15   an unauthorized area.    11:41:13
16       But us opening up that gate to    11:41:15
17   let that H dorm come up to the gym, that's   11:41:17
18   normal for us to open the gate and let them   11:41:21
19   come up to go to the gym or to open that    11:41:24
20   gate to let them go eat.    11:41:27
21    Q.   Is it concerning that an inmate    11:41:29
22   can get to an unauthorized area so freely?   11:41:32
23       MS. PUTMAN:  Object to form.    11:41:33

Page 107

1    A.   It's not so freely.  It's not    11:41:34
2   freely.  It don't happen freely, but it can   11:41:38
3   happen.  It's not no freely thing that they   11:41:41
4   can just move around and go through gates   11:41:43
5   and -- it's not.  So, for him to get down   11:41:47
6   there, yes, it is a concern that he made it   11:41:52
7   down there.    11:41:55
8    Q.   Does that contribute to violence   11:41:56
9   at St. Clair?    11:41:58
10       MS. PUTMAN:  Object to form.    11:42:00
11    A.   Him going to?    11:42:00
12    Q.   An inmate being able to go from   11:42:01
13   one area to an unauthorized area.    11:42:05
14    A.   I don't know if it contributes to   11:42:07
15   the violence.  I don't know.    11:42:09
16    Q.   Okay.  What about in this    11:42:10
17   situation here?    11:42:12
18    A.   In this situation?  The guy going   11:42:14
19   down, yes, this is a problem because    11:42:16
20   somebody got hurt.  So, yes, this is a    11:42:18
21   problem.    11:42:20
22    Q.   And are there any procedures in   11:42:21
23   place from preventing that exact thing from   11:42:22

Page 108

1   happening?    11:42:26
2    A.   To continue to keep the gates    11:42:26
3   locked, making sure that officers are    11:42:27
4   watching who is in an unauthorized area.    11:42:30
5   Making sure to keep those guys from going   11:42:35
6   down there to H, so, yes.    11:42:39
7    Q.   Why weren't those gates locked on   11:42:40
8   this day in question?    11:42:42
9    A.   I don't know.  I didn't know the   11:42:43
10   gates were unlocked.  I don't know.  I    11:42:46
11   don't know.    11:42:49
12    Q.   Would Whittington have had to    11:42:49
13   pass by any cameras?    11:42:55
14    A.   I don't know.    11:42:58
15    Q.   What about metal detectors?    11:43:01
16    A.   I don't know what's going on at   11:43:06
17   this time, so, I don't know if he would    11:43:13
18   have -- if it's chow time, he would have   11:43:15
19   had to.  We have an officer scanning, using   11:43:17
20   a scanner.  So, I don't know what's    11:43:19
21   happening at this time, what was going on   11:43:21
22   on this day.    11:43:25
23    Q.   How do you think he was able to   11:43:28

Page 109

1   make it to the H dorm with a weapon?    11:43:29
2       MS. PUTMAN:  Object to form.    11:43:33
3    A.   He had to hide it.  I think he    11:43:35
4   had to hide it real good.    11:43:40
5    Q.   Can inmates hide weapons so well   11:43:43
6   that they go undetected by a metal    11:43:46
7   detector?    11:43:48
8    A.   Evidently he did.  I guess he    11:43:51
9   did.    11:43:56
10    Q.   Were any changes instituted as a   11:43:56
11   result of that?    11:43:59
12    A.   We are -- I don't know if there's   11:43:59
13   any changes made.  We just continue --    11:44:05
14   we're searching and doing shakedowns,    11:44:08
15   pat-downs, using our metal detectors.  So,   11:44:11
16   we've been doing this, so, making sure    11:44:18
17   we're more thorough, I guess.    11:44:20
18    Q.   You testified earlier that you    11:44:22
19   check in with Warden Noe on a daily basis?   11:44:24
20    A.   I do.    11:44:27
21    Q.   Did he do anything in response to   11:44:27
22   this to make sure that weapons aren't    11:44:29
23   traveling freely?    11:44:32

28 (Pages 106 - 109)

HIGHLY CONFIDENTIAL

Page 118

1   A.   Have I what?                    11:53:09
2   Q.   Do you have a duty to intervene?    11:53:09
3   A.   I believe we do.                 11:53:09
4   Q.   Would you be surprised if other    11:53:09
5   correctional officers were not intervening    11:53:10
6   in those situations?                 11:53:13
7   A.   I believe they would intervene.    11:53:14
8   Q.   You would --                    11:53:16
9   A.   I have to believe that they are    11:53:17
10  going to intervene.                  11:53:19
11  Q.   Are you surprised that Officer    11:53:20
12  Walker testified that he did not intervene    11:53:21
13  on inmate-on-inmate violence because he was    11:53:26
14  outnumbered?                        11:53:28
15       MS. PUTMAN:  Object to form.    11:53:29
16  A.   I am surprised.                 11:53:30
17  Q.   Can you tell me more about that?    11:53:32
18  A.   I just -- it's your job.  I    11:53:33
19  believe that it don't matter about me being    11:53:36
20  outnumbered, it don't matter about me being    11:53:39
21  a female.  I'm going in and help whoever is    11:53:43
22  being hurt or in distress.  I'm doing it.    11:53:45
23  I signed up for it.                  11:53:49

Page 119

1   Q.   Why do you think Officer Walker    11:53:51
2   failed to intervene?                 11:53:53
3        MS. PUTMAN:  Object to form.    11:53:54
4   A.   I don't know.                  11:53:54
5   Q.   Do you believe that an officer    11:54:00
6   who does not intervene in a situation like    11:54:01
7   that should be disciplined?          11:54:03
8        MS. PUTMAN:  Object to form.    11:54:05
9   A.   Yes.                          11:54:06
10  Q.   Are there any policies in place    11:54:07
11  about discipline in such a situation?    11:54:09
12  A.   I'm pretty sure it is.          11:54:11
13  Q.   Can you tell me more about that?    11:54:13
14  A.   You don't do your job.  Failure    11:54:15
15  to do your job.  I have to look at the    11:54:24
16  admin reg, pull it up and see what to write    11:54:27
17  them up on, what is up under that    11:54:29
18  qualification, but I'm pretty sure it's    11:54:32
19  something.                          11:54:34
20  Q.   You testified earlier that you    11:54:35
21  received training about intervention and    11:54:37
22  deescalation.                       11:54:38
23  A.   Yes.                          11:54:38

Page 120

1   Q.   In that training, were you ever    11:54:39
2   instructed not to intervene if you're    11:54:40
3   alone?                             11:54:42
4   A.   I wasn't.                      11:54:43
5   Q.   Were you ever instructed to not    11:54:43
6   intervene if you were outnumbered?    11:54:46
7   A.   No, I wasn't.                  11:54:47
8   Q.   So, it's safe to say that, no    11:54:48
9   matter how many people are there, if    11:54:49
10  there's inmate-on-inmate violence --    11:54:49
11  A.   You call for assistance and    11:54:51
12  somebody is coming.  And you stop, you step    11:54:52
13  in there and deescalate that situation.    11:54:54
14  Q.   And to be clear, you would step    11:54:59
15  in there --                         11:55:00
16  A.   I would step in.               11:55:01
17  Q.   -- even before the backup    11:55:02
18  arrived?                           11:55:04
19  A.   Yes, sir.  I would.            11:55:04
20  Q.   Can you tell me about the    11:55:08
21  wristband policy at St. Clair?       11:55:09
22  A.   The what?                     11:55:11
23  Q.   The wristband policy.          11:55:12

Page 121

1   A.   They supposed to have a wristband    11:55:14
2   on and it notifies what building they live    11:55:16
3   in.                               11:55:19
4   Q.   How long has that policy been in    11:55:19
5   place?                            11:55:22
6   A.   I don't know, sir.            11:55:22
7   Q.   Was it in place in December of    11:55:23
8   2017?                             11:55:26
9   A.   I don't know.  I don't know.    11:55:27
10  Q.   Has it not been there the whole    11:55:39
11  time that you've worked at St. Clair?    11:55:41
12  A.   I don't know.  I think so.  I'm    11:55:44
13  going to say yes.                   11:55:55
14  Q.   Yes, it has been there?       11:55:58
15  A.   I think -- I think so.  I think    11:56:00
16  so.                               11:56:01
17  Q.   So, is it safe to say that in    11:56:03
18  December of 2017, on the day of the    11:56:05
19  incident, Mr. Whittington was wearing a    11:56:07
20  wristband that did not correspond to the H    11:56:10
21  dorm?                             11:56:12
22  A.   I don't know if he had it on or    11:56:12
23  not.                              11:56:16

31 (Pages 118 - 121)

HIGHLY CONFIDENTIAL

Page 122

1    Q.   Are there incidents where inmates   11:56:18
2   don't wear their wristbands?              11:56:20
3    A.   Yes.                                11:56:22
4    Q.   How come?                           11:56:25
5    A.   They pull them off.                 11:56:26
6    Q.   What happens when an inmate pulls   11:56:27
7   one off?                                  11:56:29
8    A.   If -- I believe they're supposed    11:56:30
9   to be written up, because that wristband  11:56:33
10  justifies where they live at.  They're not 11:56:36
11  in there for being saints, so . . .        11:56:39
12   Q.   So, what would you do if you saw    11:56:44
13  an inmate not wearing a wristband, as a   11:56:46
14  correctional officer?                     11:56:48
15   A.   As a correctional officer, it's     11:56:49
16  your job to know who live in your building. 11:56:52
17  So, I'm not going to let somebody in that  11:56:54
18  don't live in my building.  That's me.     11:56:57
19   Regardless if they -- I can see           11:57:00
20  their wristband or they got their wristband 11:57:02
21  on, that's you learning your building that 11:57:04
22  you working in.  So, if they don't live in 11:57:06
23  there, I'm not letting them in there.      11:57:10

Page 123

1    Q.   What if they're wearing a           11:57:18
2   wristband corresponding to a different     11:57:20
3   dorm?                                      11:57:22
4    A.   If they're going to a what?  Say    11:57:23
5   it again.                                  11:57:25
6    Q.   What if they're wearing a           11:57:26
7   wristband that corresponds to one dorm on  11:57:27
8   their way to the other dorm?               11:57:30
9    A.   They shouldn't be in the area.      11:57:33
10  It's an unauthorized area.                 11:57:35
11   Q.   Would you say that the wristband    11:57:38
12  policy is effective?                       11:57:39
13   A.   I don't think so.  I don't know.    11:57:40
14  I don't -- I don't know if it's effective  11:57:44
15  or not.  I'm in PREA.  I don't -- I'm not  11:57:47
16  out there on the yard, so, it could be     11:57:52
17  effective.                                 11:57:55
18   Q.   Can you think of a more effective   11:57:58
19  way to keep inmates in their right         11:58:00
20  positions?                                 11:58:03
21   MS. PUTMAN:  Object to form.             11:58:04
22   A.   We have the gates, so, that's       11:58:04
23  what's helping.  The gates -- of keeping   11:58:06

Page 124

1   the gates and once we let that building    11:58:09
2   out, see all the other buildings are locked 11:58:11
3   down.  So, the gates is helping a whole    11:58:14
4   lot.                                       11:58:17
5    Q.   Would you say it's easy for the     11:58:25
6   inmates to remove their wristbands?        11:58:25
7    A.   Yes.                                11:58:25
8    Q.   Has anything been done to address   11:58:25
9   that?                                      11:58:26
10   A.   Giving them another one.  You see    11:58:27
11  them without a wristband on, just keep     11:58:29
12  giving them another wristband.             11:58:32
13       (Plaintiff's Exhibit 4  11:58:32
14        was marked for          11:58:32
15        identification.)        12:00:00
16   Q.   I want to introduce what we're      12:00:00
17  marking as Plaintiff's Exhibit 4.  And I'll 12:00:03
18  give you a moment to review.               12:00:17
19       Have you seen this before?           12:01:17
20   A.   Yes, sir.                           12:01:18
21   Q.   What is this?                       12:01:19
22   A.   This is an SOP, inmate movement     12:01:20
23  control.                                   12:01:24

Page 125

1    Q.   What's an SOP?                      12:01:24
2    A.   It is standard operational          12:01:25
3   procedure.                                 12:01:30
4    Q.   When did you become aware of this   12:01:31
5   SOP?                                       12:01:33
6    A.   I probably became aware of it       12:01:35
7   when I became an officer, because you read 12:01:42
8   a lot of SOPs, and as I was promoting up,  12:01:44
9   studying.                                  12:01:51
10   Q.   Are correctional officers           12:01:52
11  informed when new SOPs are issued?         12:01:53
12   A.   Yes.  Yes, sir.                      12:01:57
13   Q.   Can you tell me about that?  How    12:01:58
14  are you informed?                          12:02:01
15   A.   Yes, you are -- your supervisor     12:02:02
16  will let you know.  You'll sign it.  We    12:02:04
17  have documentation where officers sign     12:02:07
18  saying that they reviewed an SOP.  It's    12:02:12
19  also a book in central -- I mean, in the   12:02:17
20  shift office with all of our SOPs, everyone 12:02:20
21  has access to it.                          12:02:25
22   Q.   Could you take a look at page 3,    12:02:28
23  please?                                    12:02:30

32 (Pages 122 - 125)

HIGHLY CONFIDENTIAL

Page 134

1 to St. Clair after stabbing another inmate    12:09:40
2 at another prison. When an inmate stabs    12:09:44
3 another inmate, are correctional officers    12:09:48
4 informed?    12:09:49
5    A.    From another facility?    12:09:51
6    Q.    Yeah.    12:09:53
7    A.    Or at St. Clair?    12:09:54
8    Q.    Both.    12:09:56
9    A.    Both? I don't think so.    12:09:56
10    Q.    So, if an inmate stabs another    12:10:04
11 inmate within St. Clair, correctional    12:10:05
12 officers are not informed of that?    12:10:08
13    A.    I believe they are informed at    12:10:09
14 St. Clair. If he came from another    12:10:11
15 facility and something happened to him at    12:10:13
16 another -- I don't know if they know or    12:10:14
17 not. I'm unaware.    12:10:16
18        I have access to the module, so    12:10:17
19 I'm aware of -- if I choose to look up that    12:10:19
20 inmate. I don't know if they're aware or    12:10:22
21 not.    12:10:29
22    Q.    You testified that correctional    12:10:29
23 officers are responsible for the safety of    12:10:30

Page 135

1 the inmates; is that correct?    12:10:32
2    A.    Yes, sir.    12:10:33
3    Q.    So, is it your opinion that    12:10:34
4 correctional officers should know that an    12:10:38
5 inmate had stabbed another inmate in    12:10:41
6 another facility prior to coming to this    12:10:43
7 facility?    12:10:45
8        MS. PUTMAN: Object to form.    12:10:46
9    A.    I think our officers should be    12:10:46
10 aware of every inmate. Just -- they should    12:10:48
11 pay attention and be aware of every inmate,    12:10:51
12 regardless if he stabbed somebody or didn't    12:10:53
13 stab anybody. Everybody should -- you    12:10:55
14 should pay attention to everyone.    12:10:58
15    Q.    Should you pay any extra    12:11:00
16 attention to somebody who stabbed another    12:11:02
17 inmate in the past?    12:11:03
18    A.    I don't. I pay attention to    12:11:04
19 everybody that I deal with.    12:11:06
20    Q.    You don't think that there should    12:11:14
21 be any special attention paid to somebody    12:11:14
22 with a propensity for violence?    12:11:14
23        MS. PUTMAN: Object to form.    12:11:17

Page 136

1    A.    I don't.    12:11:17
2    Q.    Why is that?    12:11:18
3    A.    I'm judging them. They came to    12:11:18
4 prison for something. So, you know I'm not    12:11:20
5 looking at what they came to prison for.    12:11:24
6 So, I'm going to treat everyone the same.    12:11:28
7        And I'm going to observe and do    12:11:30
8 my job the same with everybody, regardless    12:11:31
9 if you there for stealing or robbing    12:11:35
10 somebody or if you there for murder. I'm    12:11:38
11 going to do my -- I'm going to treat y'all    12:11:40
12 the same. And I'm going to do the same    12:11:42
13 when it comes to any inmate that entered    12:11:44
14 that facility.    12:11:48
15    Q.    Well, not all inmates that come    12:11:49
16 to prison are then behaving violently    12:11:51
17 within the prison; correct?    12:11:54
18    A.    Say it again.    12:11:56
19    Q.    Not all inmates that come to a    12:11:59
20 prison are behaving violently in the    12:12:02
21 prison; correct?    12:12:06
22    A.    I don't think so.    12:12:07
23    Q.    So, my question is not about an    12:12:09

Page 137

1 inmate who may have committed a violent    12:12:13
2 crime prior to coming to prison.    12:12:16
3    A.    Uh-huh. Right.    12:12:18
4    Q.    What I'm referring to is an    12:12:20
5 inmate who stabbed another inmate while in    12:12:22
6 prison.    12:12:25
7    A.    Uh-huh.    12:12:26
8    Q.    Should that be paid any extra    12:12:26
9 attention?    12:12:28
10    A.    I think you should be aware of    12:12:28
11 every inmate. No, I don't think so. I    12:12:30
12 think every inmate -- Inmates go through    12:12:33
13 things, so look here, they can be good    12:12:35
14 today, but then angry and hurt that they    12:12:37
15 lost someone tomorrow. That's with people    12:12:39
16 in general.    12:12:42
17        So, I think that every inmate    12:12:43
18 should be paid attention to and you should    12:12:45
19 be aware of what's going on with them,    12:12:47
20 regardless if they stabbed somebody at    12:12:49
21 another facility or if they came over there    12:12:51
22 with a clear record.    12:12:54
23    Q.    So, if an inmate stabbed somebody    12:12:56

35 (Pages 134 - 137)

# EXHIBIT A



PLAINTIFF'S
EXHIBIT
4
A. Price



*State of Alabama*
*Alabama Department of Corrections*
St. Clair Correctional Facility
1000 St. Clair Road
Springville, Alabama 35146



May 11, 2016

**STANDARD OPERATIONAL PROCEDURE**                **OPR:  CAPTAINS**
**NUMBER**                                    **137**

### INMATE MOVEMENT CONTROL

### I.  GENERAL

The purpose of this procedure is to provide guidance to the officers of this facility in controlling the flow of inmate movement and to ensure orderly movement as well as provide increased security.

### II.  POLICY

It is the policy of the St. Clair Correctional Facility that the Inmate Movement Control procedure is adhered to in a uniform and consistent manner at all times, by all shifts and in accordance with this SOP and applicable Administrative Regulations and post orders.

### III.  DEFINITION(S) and ACRONYM(S)

Not applicable.

### IV.  RESPONSIBILITIES

A.  All staff of this facility is responsible for the implementation of this procedure. Each employee is responsible for ensuring that the provisions of this SOP are strictly adhered to for the maintenance of security and control.

B.  The Shift Commander shall be responsible for the proper controlled movement of inmates, both individually and groups, at the St. Clair Correctional Facility. All movement, both individually and groups, shall be escorted by the security staff during the hours of darkness.  NO EXCEPTIONS.

C.  All security employees are responsible for ensuring that all inmate movements required by his/her position, are done in a professional manner and as expeditiously as possible.

HIGHLY CONFIDENTIAL -
ATTORNEYS' EYES ONLY

SOP #137
May 11, 2016
Page 2

## V.    PROCEDURES

A.    All inmate movement is to be controlled in the following manner as it pertains to
the Inmate Services Area, which includes the Dining Hall, Infirmary, Social
Services and Visiting Area.

1.    Dining Hall: █████████████████████████████
████████████████████████████████████████████
████████████████████.

2.    Infirmary: Sick/Pill Call hours will be established by the Assistant


3.    Social Services: ████████████████████████

B.    All movement will be coordinated by the shift commander's office via the radio
and telephone and shall be documented in the shift clerks' duty post log.

1.    Communication between staff members is vital to the movement of
inmates at the St. Clair Correctional Facility. Therefore, staff shall utilize
all available means, i.e. telephones, hand-held radios, etc. to enhance the
control of movement of individual or groups of inmates.

2.    When it becomes necessary for the mass movement of groups of inmates,
example: feeding/pill call, work call/sick call, etc., the shift commander
shall assign a sufficient number of security staff to monitor, track and
coordinate the movements.

HIGHLY CONFIDENTIAL -
ATTORNEYS' EYES ONLY

SOP #137
May 11, 2016
Page 3

    C.   The gates leading from H Dorm to the Industrial area will be kept locked and will be opened and controlled by security personnel only. Security personnel will check inmates for colored wristbands prior to opening the gate and letting inmates through the gates leading from H Dorm to the Industrial area.

    D.   Scheduled appointments for Social Services, Medical, Dental, Mental Health Services, etc. shall be placed in the daily newsletter at least one (1) day prior to the appointment.

        1.   The information shall include the inmate's name, AIS number, date and time of appointment, the name of the staff member, department or clinic who scheduled the appointment, special instructions, etc.

        2.   The shift commander shall coordinate with his/her subordinates, support staff, etc., to ensure that the inmate(s) arrive at the scheduled appointment at the specified time.

        3.   Should an inmate not arrive for his appointment at the scheduled time, the Correctional Officer assigned to the front infirmary, social service, etc. shall notify the shift commander/shift clerk, who shall in turn coordinate with the rover(s) assigned to the inmate's living area, etc. The rovers shall locate the inmate and escort him to the location of the appointment.

    E.   Inmates who do not arrive at their scheduled appointment within the specified time shall be subject to disciplinary action.

    F.   Inmates will not be allowed to congregate in the canteen/mail window areas. Only inmates with authorized business will be allowed in this area.

    G.   Inmates will not be permitted to loiter in or visit, unassigned living areas, job sites, program areas, etc. unless they are officially assigned to the area or have obtained prior approval from the shift commander or higher authority. Each inmate shall be issued a picture identification card and color coded wrist band to positively identify each inmate prior to the inmate being permitted to enter or depart the infirmary, social services area, canteen, visitation, etc. All violators will be subject to disciplinary action.

    H.   Inmates assigned to G-yard will not be permitted to visit the H Dorm without prior authorization from the Shift Commander or higher authority and the Therapeutic Community Staff. In most cases, inmates assigned to the G-yard who wish to visit TC for interviews, will be accommodated every Wednesday from 9:00am to 11:00am.

HIGHLY CONFIDENTIAL -
ATTORNEYS' EYES ONLY

CORR002587

I. Any employee taken hostage or otherwise under duress is without authority regardless of rank.

SOP #137
May 11, 2016
Page 4

J. Inmates assigned to work crews outside of the correctional facility will be identified by a laminated identification card that is secured at the backgate. The identification card will include:

1. Photo

2. Name

3. AIS

4. Custody Level

5. Date of Birth

6. Physical Description

7. Sentence Information: Crime, Sentencing County, Time

K. Diabetic Treatment Care

1. Inmates assigned to the general population, screened/approved, etc., by the authorized medical staff to participate in the Diabetic Treatment Care program will be allowed to go to feeding when diabetic feeding is announced.

2. Diabetics will be allowed to go to dining hall ▮ on each meal.

3. A list of diabetics will be distributed, by the medical staff, to the Captain or his/her designee and the food service department on a daily basis, Monday – Friday.

4. The Captain/designee will distribute copies of the diabetic care list to all population living area cubicles, dormitories, work stations, G-Gate, assigned pill call rover, and dining hall rover(s) on a daily basis Monday – Friday.

5. Cubicle Officers, cellblock rovers, G-Gate Rover, dining hall rover(s), etc., shall monitor/challenge, the inmates going to feeding to ensure that the policy is strictly enforced. Inmates should be checked for colored wristbands before exiting the cellblock. Inmates who violate the policy

HIGHLY CONFIDENTIAL -
ATTORNEYS' EYES ONLY    CORR002588

shall be subject to disciplinary action in accordance with Administrative Regulation 403.

SOP #137
March 24, 2015
Page 5

L.    Standard Operational Procedures cannot cover every incident or eventuality. Employees assigned to any post shall use good judgment paying careful attention to the general and specific issues and details related to post assignment.

**VI.    DISPOSITION:**
Any forms will be disposed of and retained according to the Departmental Records Disposition Authority (RDA).

**VII.    FORMS:**
There are no forms associated with the implementation of the SOP.

**VIII.    SUPERCEDES:**
This Standard Operational Procedure supersedes SOP 137 dated October 23, 2006.

**IX.    PERFORMANCE:**
Not Applicable.

_____  5-11-16
Dewayne Estes, Warden III

HIGHLY CONFIDENTIAL -
ATTORNEYS' EYES ONLY                CORR002589

# EXHIBIT 9

CONFIDENTIAL - ATTORNEY'S EYES ONLY

Page 1

1          IN THE UNITED STATES DISTRICT COURT

2        FOR THE NORTHERN DISTRICT OF ALABAMA

3                  MIDDLE DIVISION

4

5

6   CIVIL ACTION NUMBER:  4:19-CV-01934-ACA

7

8   AUNDRA DEBREL BOYKINS,

9            Plaintiff,

10  vs.

11  JEFFERSON DUNN, et al.,

12            Defendants.

13

14

15      CONFIDENTIAL DEPOSITION TESTIMONY OF

16                  DEWAYNE ESTES

17

18

19  AUGUST 4, 2022

20  9:09 A.M.

21

22  COURT REPORTER:

23  MELANIE PETIX BEASLEY, CCR

CONFIDENTIAL - ATTORNEY'S EYES ONLY

Page 2

1          S T I P U L A T I O N S
2          It is hereby stipulated and
3  agreed, by and between the parties through
4  their counsel, that the deposition of
5  DEWAYNE ESTES may be taken before Melanie
6  Petix Beasley, Certified Court Reporter and
7  Notary Public for the State of Alabama at
8  Large, at the offices of Maynard, Cooper &
9  Gale, P.C., 1901 6th Avenue North, Suite
10  1700, Birmingham, Alabama on August 4, 2022,
11  2022, commencing at 9:09 a.m.
12          It is further stipulated and
13  agreed that the signature to and the reading
14  of the deposition by the witness are waived,
15  the deposition to have the same force and
16  effect as if full compliance had been had
17  with all laws and rules of Court relating to
18  the taking of depositions.
19          It is further stipulated and
20  agreed that it shall not be necessary for
21  any objections to be made by counsel as to
22  any questions except as to form or leading
23  questions, and that counsel for the parties

Page 3

1  may make objections and assign grounds at
2  the time of trial, or at the time said
3  deposition is offered in evidence, or prior
4  thereto.
5          In accordance with Rule 5(d) of
6  The Alabama Rules of Civil Procedure, as
7  amended, effective May 15, 1988, I, Melanie
8  Petix Beasley, Certified Court Reporter, am
9  hereby delivering to Jennifer Garrett, the
10  original transcript of the oral testimony
11  taken on August 4, 2022, along with
12  exhibits.
13          Please be advised that this is the
14  same and not retained by the Court Reporter,
15  nor filed with the Court.
16          --oOo--
17
18
19
20
21
22
23

Page 4

1          A P P E A R A N C E S
2
3  FOR THE PLAINTIFF:
4      JENNIFER S. GARRETT, Esq.
5      AKIN GUMP STRAUSS HAUER & FELD LLP
6      One Bryant Park, Bank of America Tower
7      New York, New York 10036-6745
8
9
10      BRETT M. MANISCO, Esq.
11      JESSICA H. RO, Esq.
12      AKIN GUMP STRAUSS HAUER & FELD LLP
13      1999 Avenue of the Stars, Suite 600
14      Los Angeles, California 90067-6022
15      (Via Zoom)
16
17
18      R. TERRELL BLAKESLEAY, Esq.
19      DENTONS SIROTE PC
20      2311 Highland Avenue South
21      Birmingham, Alabama 35205
22
23

Page 5

1          APPEARANCES (Continuing)
2
3  FOR THE DEFENDANTS:
4      MATTHEW REEVES, Esq.
5      LANDON WHATLEY (Via Zoom)
6      MAYNARD, COOPER & GALE, P.C.
7      655 Gallatin Street
8      Huntsville, Alabama 35801
9
10      PETTY ROSSMANITH, Esq.
11      OFFICE OF THE ATTORNEY GENERAL
12      State of Alabama
13      501 Washington Avenue
14      Montgomery, Alabama 36130
15      (Via Zoom)
16
17
18  ALSO PRESENT:  Ted Yost, Videographer
19
20
21
22
23

2 (Pages 2 - 5)

CONFIDENTIAL - ATTORNEY'S EYES ONLY

Page 6

1          I N D E X
2
3 EXAMINATION BY:                PAGE
4   MS. GARRETT                9
5
6
7          E X H I B I T S
8
9 PLAINTIFF'S                  PAGE
10 Exhibit 1 - Complaint          13
11 Exhibit 2 - Security Position Status    108
12 Exhibit 3 - Statistical Report    137
13 Exhibit 4 - Incident Report      208
14 Exhibit 5 - Incident Report      213
15 Exhibit 6 - Incident Report      229
16 Exhibit 7 - Incident Report      232
17 Exhibit 8 - Incident Report      241
18 Exhibit 9 - Inmate Movement History   245
19 Exhibit 10 - Incident Report     247
20 Exhibit 11 - Roster              259
21 Exhibit 12 - Layout (Highly Confidential) 264
22 Exhibit 13 - DOJ Investigation        275
23 Exhibit 14 - DOC Reclassification     290

Page 7

1        I, Melanie Petix Beasley, a
2 Certified Court Reporter and Notary Public
3 for the State of Alabama at Large, acting as
4 Commissioner, certify that on this date,
5 pursuant to the Alabama Rules of Civil
6 Procedure, and the foregoing stipulations of
7 counsel, there came before me at the offices
8 of Maynard, Cooper & Gale, P.C., 1901 6th
9 Avenue North, Suite 1700, Birmingham,
10 Alabama, on August 4, 2022, commencing at or
11 about 9:09 a.m., DEWAYNE ESTES, witness in
12 the above cause, for oral examination,
13 whereupon, the following proceedings were
14 had:
15
16        THE VIDEOGRAPHER:  Good morning.
17 We are going on the record at 9:09 a.m. on
18 August 4th, 2022.  This is Media Unit 1 of
19 the video recorded deposition of Dewayne
20 Estes taken by counsel for plaintiff in the
21 matter of Aundra Debrel Boykins versus
22 Jefferson Dunn, et al., filed in the United
23 States District Court for the Northern

Page 8

1 District of Alabama, Middle Division, Case
2 Number 4:19-CV-01934-ACA.  Location of this
3 deposition is 1901 6th Avenue North, Suite
4 1700, Birmingham, Alabama.
5        My name is Ted Yost representing
6 Veritext, and I'm the videographer.  The
7 court reporter is Melanie Beasley from the
8 firm Veritext.
9        At this time counsel and all
10 present in the room and attending remotely
11 will now state their appearance and
12 affiliations for the record.
13        MS. GARRETT:  Jennifer Garrett,
14 G-a-r-r-e-t-t, for plaintiff, Aundra Boykins
15 from Akin Gump Strauss Hauer & Feld.
16        MR. BLAKESLEAY:  Terrell
17 Blakesleay here on behalf of plaintiff,
18 Aundra Boykins, from Dentons Sirote.
19        MR. MANISCO:  Brett Manisco
20 appearing remotely, Akin Gump, and appearing
21 for plaintiff.
22        MS. RO:  Jessica Ro, also from
23 Akin Gump, also appearing remotely.

Page 9

1        MR. REEVES:  Matt Reeves with
2 Maynard, Cooper & Gale appearing on behalf
3 of Jefferson Dunn, Guy Noe and Dewayne
4 Estes.
5        THE VIDEOGRAPHER:  Would the
6 reporter please swear in the witness.
7
8        DEWAYNE ESTES,
9 having been first duly sworn (affirmed), was
10 examined and testified as follows:
11
12        COURT REPORTER:  Usual
13 stipulations?
14        MS. GARRETT:  Yes.  Can you please
15 state them for the record?
16        THE REPORTER:  Reserving all
17 objections until the time of trial except
18 for the objection to form, and waiving
19 reading and signing.
20        MR. REEVES:  That is fine.
21
22 EXAMINATION BY MS. GARRETT:
23    Q.  Can you please state and spell

CONFIDENTIAL - ATTORNEY'S EYES ONLY

Page 18

1 point?
2     A.   To a correctional officer I while
3 I was there.
4     Q.   How long were you a correctional
5 officer I at St. Clair?
6     A.   Until June of 1985.
7     Q.   And I know you've had a lot of
8 positions at the ADOC, so could you briefly
9 walk through them --
10     A.   Sure.
11     Q.   -- after correctional officer I at
12 St. Clair?
13     A.   I was promoted to correctional --
14 well, to sergeant at West Jefferson
15 Correctional Facility in June of '85.  In
16 June of '87 I was promoted to lieutenant at
17 Limestone Correctional Facility.  And about
18 November of '89 I was promoted to captain at
19 Easterling Correctional Facility.
20         In '92 Easterling closed down and
21 I was transferred to Childersburg Community
22 Work Center as a captain.  And then
23 Easterling opened back up in October of that

Page 19

1 same year and I went back to Easterling as a
2 captain.
3         And in 1998 I was promoted to
4 warden 1 at Elba Work Release.  And then I
5 think 2000 I was promoted to warden II at
6 Childersburg Community Work Center.  We had
7 a boot camp and also work release there.
8         While I was there, I was also
9 assigned as the warden for Alex City Work
10 Release.  And then in September of 2002 I
11 was laterally transferred from those
12 facilities to Bibb Correctional Facility as
13 a warden II.
14         And in 2012 I was promoted to
15 warden III at limestone.  And then on March
16 the 1st, 19 -- I'm sorry.  March the 1st,
17 2015 I was transferred to St. Clair
18 Correctional Facility.
19         And then in 2018 I was transferred
20 from St. Clair to -- back to Limestone.  And
21 then I retired in 2019.
22     Q.   So can you confirm for the record
23 the time you were a warden III at St. Clair?

Page 20

1     A.   I was a warden III at St. Clair
2 from March the 1st, 2015 until around May, I
3 think it was May of 2018.  I'm thinking
4 that's what it was, yes.
5     Q.   And did your job position change
6 at any point while you were a warden III --
7     A.   No, ma'am.
8     Q.   -- at St. Clair?  So overall,
9 you've been in the position of warden III
10 since 2012?
11     A.   Yes, ma'am.
12     Q.   Is that right?  And at Limestone
13 when you were a warden III, was that a
14 similar level prison to St. Clair?
15     A.   Yes and no.  It was, it was a
16 Level V security institution at that time
17 but it was generally designed to be a Level
18 IV security institution.
19         It was only deemed to be a Level V
20 security institution because at the time
21 prior to that, we were segregating our HIV
22 inmates at Limestone.  And because some of
23 our HIV inmates were life-withouters or

Page 21

1 higher security, they designated Limestone
2 to be a Level V security institution, so yes
3 and no.
4     Q.   Thank you for that.
5         So you talked about being warden
6 I, warden II, warden III.  Can you walk me
7 through the seniority levels of each and the
8 responsibilities of each while you were at
9 St. Clair as warden III?
10     A.   I'm sorry?
11     Q.   Can you walk me through the
12 different roles of warden I, warden II,
13 warden III at St. Clair while you were a
14 warden III?
15     A.   At St. Clair, okay, because there
16 are different roles at different
17 institutions.
18     Q.   Okay.
19     A.   At St. Clair, the warden III is
20 the head of the facility and day-to-day
21 responsibility for the operation of the
22 facility.
23         Warden II is primarily responsible

6 (Pages 18 - 21)

CONFIDENTIAL - ATTORNEY'S EYES ONLY

Page 22

1  for security aspects of the institution.
2        And warden I is primarily
3  responsible for programs and classification
4  at the institution.
5      Q.  Did the warden II report to you?
6      A.  He did, uh-huh.
7      Q.  Who was the warden II at St. Clair
8  while you were there?
9      A.  When I first started, it was Eric
10  Evans.  And then at some point in time,
11  Mr. Specks, I forget what his first name is,
12  but Mr. Specks became the warden II.
13     Q.  Do you know approximately when he
14  became the warden II?
15     A.  I really don't recall the date.
16     Q.  And you said the responsibilities
17  of the wardens differed at different
18  prisons.  How, if at all, were the
19  responsibilities different at Limestone than
20  when you came to St. Clair as warden III?
21     A.  They weren't any different.  I was
22  just talking about warden Is are generally
23  wardens at work release facilities, and then

Page 23

1  we have some at major facilities.  Warden
2  IIs are generally work camp facility
3  wardens, but we have them also at major
4  facilities as well.
5      Q.  Can you talk to me about how you
6  came to be the warden III of St. Clair, how
7  your transfer happened?
8      A.  I was just advised I was going to
9  be transferred to St. Clair.
10     Q.  Did you have a choice in the
11  matter?
12     A.  I'm sorry?
13     Q.  Did you have a choice in the
14  matter?
15     A.  I did not.
16     Q.  Were you given any reason for your
17  transfer?
18     A.  I was not.
19     Q.  Do you know whom you replaced as
20  the warden III of St. Clair?
21     A.  It starts with a D.
22     Q.  Does Davenport sound right?
23     A.  That's right, uh-huh.

Page 24

1      Q.  Were you aware at the time of your
2  transfer that Davenport had been suspended?
3      A.  No, uh-uh.
4      Q.  Were you aware at the time of your
5  transfer of any press at the time about
6  lawsuits against St. Clair?
7      A.  About lawsuits as --
8      Q.  About lawsuits concerning St.
9  Clair that were filed around the time that
10  you were transferred?
11     A.  Press release, I don't recall
12  any -- seeing anything on the news or
13  anything like that.
14     Q.  And so when you transferred, you
15  hadn't read any of the complaints that were
16  filed about St. Clair?
17     A.  No, ma'am.
18     Q.  When you were warden III at St.
19  Clair, who did you report to, if anyone?
20     A.  I had the regional coordinator I
21  reported to.  I believe the sole time I was
22  there or the beginning, it was Cheryl Price
23  was the regional coordinator.  And at some

Page 25

1  point in time, I believe Mr. Ellington
2  became, I'm thinking -- I might be -- I
3  believe it was, yeah, he became my
4  supervisor.
5      Q.  What were you required to report
6  to Cheryl Price, if anything?
7      A.  Well, major instances, things that
8  disrupt the day-to-day operations of the
9  institution, just keeping your supervisor
10  aware of things as they come up.
11     Q.  Were you ever required to report
12  instances of inmate-on-inmate violence to
13  her?
14     A.  Major incidents, yes, ma'am.
15     Q.  And how did those conversations
16  generally go?
17     A.  It was just a reporting of things
18  that happened, who was involved and what
19  action was taken and stuff like that.
20     Q.  Did you ever make any specific
21  recommendations to her as to how to address
22  instances of inmate-on-inmate violence?
23     A.  I don't recall that I did.

7 (Pages 22 - 25)

CONFIDENTIAL - ATTORNEY'S EYES ONLY

Page 30

1  A.  When you say overseeing, can you
2  explain that a little bit better.
3  Q.  So did you supervise anyone who
4  was responsible for intake -- intake for
5  prisoners coming in and housing them, taking
6  any measures to make sure the transition was
7  smooth?
8  A.  We had a classification division
9  and ICS officer, and the ICS officer would
10 assign housing for inmates coming in.  And
11 the classification team would review the
12 jackets and get some idea of what the inmate
13 was about disciplinary-wise and things like
14 that.
15 Q.  Who did the ICS officer report to?
16 A.  Probably the captain.
17 Q.  And then who did the captain
18 report to?
19 A.  Deputy warden, warden II.
20 Q.  And then the warden II reported to
21 you?
22 A.  Correct.
23 Q.  At the time you were at St. Clair,

Page 31

1  did the warden II ever express any concerns
2  to you about any ICS officer?
3  A.  Not that I can recall.
4  Q.  I would like to just generally go
5  through to make sure I have a full
6  understanding of your roles and
7  responsibilities as warden III, so could you
8  go over, other than I know supervising
9  warden II, anything -- and reporting to
10 Cheryl Price, any other roles or
11 responsibilities that you can list here
12 today that you had?
13 A.  Just bottom line responsibility
14 for the day-to-day operation of the
15 facilities to make sure that we comply with
16 the laws and the rules and regulations, the
17 SOPs and the admin regs of the Department of
18 Corrections, and just make sure that the
19 facility functions as smoothly and
20 efficiently and as safely as we possibly
21 can.
22 Q.  Were you familiar with the rules
23 and regulations applying to St. Clair at the

Page 32

1  time you were warden?
2  A.  Yes, ma'am, I believe I was.
3  Q.  And what were your roles and
4  responsibilities with regards to those rules
5  and regulations other than to make sure the
6  prison was following them, if any?
7  A.  Just enforce them, yes, ma'am.
8  Uh-huh.
9  Q.  Did you have any authority to
10 modify them?
11 A.  I didn't have any authority to
12 modify admin regs, but if there was any need
13 to modify SOPs, yes, ma'am, I had the
14 authority to do that.
15 Q.  What is an SOP?
16 A.  Standard operating procedure.
17 That's a facility document or policies and
18 procedures that tells how we do a particular
19 thing at that facility.
20 Q.  How does an SOP differ from an
21 administrative regulation?
22 A.  Administrative regulation is for
23 the entire Department of Corrections, and

Page 33

1  it's a broad base policy or procedure,
2  whereas a SOP hones it down to a particular
3  facility.
4  Q.  Did you review the SOPs for St.
5  Clair when you were first transferred there?
6  A.  It was an ongoing process, uh-huh.
7  Q.  And during your time as warden at
8  St. Clair, did you ever recommend any
9  modifications to SOPs?
10 A.  I'm sure that I did.  I can't
11 recall specifics, but I'm sure some were
12 changed and I resigned them and things like
13 that, yes, ma'am, uh-huh.
14 Q.  When you had them changed or made
15 recommendations, do you recall who you would
16 have made those recommendations to?
17 A.  We -- SOP, if we deemed it needing
18 to be changed, we would change it and
19 publish it and make sure that everybody was
20 aware of the new SOP or the current version
21 of the SOP.  And moving forward, we would do
22 it with regard to the way that new SOP
23 states for it to be done.

9 (Pages 30 - 33)

CONFIDENTIAL - ATTORNEY'S EYES ONLY

Page 34

1    Q.   So could you unilaterally modify
2 an SOP?  You see an SOP you think that it
3 needs to change, could you go ahead and
4 modify it and publish it or did you need any
5 specific approvals?
6    A.   No, ma'am.  As far as the
7 institution is concerned, yes, ma'am.  The
8 warden is responsible for the institutional
9 SOPs, they have to comply with the admin
10 regs, they can't go beyond the admin regs.
11       But yes, ma'am, up and to the
12 point where the SOP does not change an admin
13 reg, there's nothing that I have to get
14 permission above to do.
15    Q.   Were there any SOPs that you found
16 to be particularly important for safety of
17 the inmates?
18    A.   Well, I consider all SOPs to be
19 important for the safety of the inmates.
20    Q.   And did you -- when you came to
21 St. Clair as a warden, did you assess the
22 SOPs for their effectiveness at all?
23    A.   Just, you know, assess whether or

Page 35

1 not they were working, whether or not --
2 yes, ma'am, uh-huh.
3    Q.   And how often do you think you
4 took a look back at the SOPs to consider
5 whether or not changes should be made?
6    A.   I can't say that I did it on a
7 monthly or -- weekly or monthly basis.  Just
8 if something would arise that we thought we
9 needed to address, we would address it.
10    Q.   Sitting here today, do you recall
11 any SOPs that you found to be deficient or
12 that needed to be changed?
13    A.   Not that I can recall.
14    Q.   So other than the day-to-day
15 operations, supervising the warden III,
16 reporting to Cheryl Price, reviewing --
17    A.   Supervising the warden II.
18    Q.   Supervising warden II.  Thank you
19 for that correction.
20       So to be clear, other than
21 managing and overseeing the day-to-day
22 operation, supervising warden II, reporting
23 to Cheryl Price, reviewing and making

Page 36

1 changes to the SOPs and enforcing them,
2 reviewing and enforcing the ARs, anything
3 else that you were responsible for or that
4 were part of your job duties as warden III?
5    A.   I think that about covers it.
6    Q.   Do you recall any ARs that you
7 found to be deficient at any point while you
8 were warden at St. Clair?
9    A.   No, ma'am.
10    Q.   Did you ever draft any reports or
11 memoranda about safety risks or safety
12 issues at St. Clair while you were a warden?
13    A.   I think that I did.
14    Q.   Do you recall when that was
15 approximately?
16    A.   I sure -- sure don't.
17       MS. GARRETT:  I want to say for
18 the record, I don't think that we have any
19 memoranda drafted by Mr. Estes about safety
20 risks.
21       MR. REEVES:  We've produced what
22 exists.
23    Q.   (BY MS. GARRETT:)  I want to talk

Page 37

1 now about the incident reports.
2    A.   Uh-huh.
3    Q.   You said you reviewed incident
4 reports in preparation for the deposition.
5 Can you tell me what an incident report is?
6    A.   An incident report is a legal
7 document that explains the facts of what
8 transpired during an incident.
9    Q.   What would qualify as an incident?
10    A.   Pretty much anything that's out of
11 the norm for a daily, for the daily
12 operation.  I mean, anything, failure to
13 obey a direct order, a fire, just any
14 incident that occurs during the normal
15 function of a day.
16    Q.   Who would draft the incident
17 reports?
18    A.   The officer that was there at the
19 that -- that observed the action or observed
20 the incident, he would be the one that would
21 draft it.
22    Q.   Were there any written policies or
23 procedures that governed how the officer

10 (Pages 34 - 37)

CONFIDENTIAL - ATTORNEY'S EYES ONLY

Page 42

1 reviewed by every warden at St. Clair?
2    A.  By every warden, that's correct.
3    Q.  Not every incident report was
4 reviewed by you as the head warden at St.
5 Clair?
6    A.  That's correct.
7    Q.  Was every inmate-on-inmate
8 incident regarding violence reviewed by you?
9    A.  Yes, ma'am, I read them, yes,
10 ma'am.
11    Q.  Did officers or anyone else at the
12 prison have any duty to report instances of
13 inmate-on-inmate violence to you?
14    A.  Any time there's inmate-on-inmate
15 violence, there would always be an incident
16 report then, so yes, ma'am, I would review
17 those.
18    Q.  But it was someone's
19 responsibility in their job description or
20 in a rule or regulation that they needed to
21 report those instances of inmate-on-inmate
22 violence to you?
23    A.  If I could understand your

Page 43

1 question, an incident occurred and a
2 correctional officer witnessed the incident,
3 he would initiate the incident report after
4 we took care of the incident and after all
5 the action was taken with regard to the
6 particular incident.
7        Then the officer would initiate
8 the incident report, and he would send it to
9 his supervisor, and his supervisor, the
10 shift commander, may for those type
11 incidents would report to me.
12    Q.  So I know that you said that there
13 were rules and regulations governing
14 incident reports.  Were there any rules or
15 regulations governing, other than the
16 incident reporting, what a correctional
17 officer was required to do if they observed
18 or learned about an instance of
19 inmate-on-inmate violence such, as you said,
20 report it to the shift commander, anything
21 else?
22    A.  Well, I just want to say any time
23 anything came to the attention of a

Page 44

1 correctional officer, it would be an
2 incident, and there would be an incident
3 that would be written about it.
4        So anything that -- dealing with
5 inmate-on-inmate violence or any situation,
6 if it was reported to a correctional
7 officer, he would initiate an incident
8 report.
9    Q.  Did correctional officers have any
10 responsibility for securing a crime scene?
11    A.  Yes, ma'am.  If there was a crime
12 scene, if there was a apparent crime scene,
13 yes, ma'am, they would secure it until they
14 indicated to the shift commander that there
15 was a crime scene, then the shift commander
16 would take responsibility for securing it.
17    Q.  Did correctional officers while
18 you were warden have a responsibility to
19 secure any weapons that were found?
20    A.  Yes, ma'am.  Again, if you're the
21 responding officer to an incident and
22 there's weapons involved and you see the
23 weapons or contraband or whatever it is,

Page 45

1 then, yes, ma'am, it's your responsibility
2 to secure that weapon or that contraband or
3 things like that, yes, ma'am.
4    Q.  Did correctional officers have any
5 responsibility to investigate the cause of
6 maybe an injury of an inmate that they
7 observed?
8    A.  No.
9    Q.  Who was responsible for
10 investigating an incident of violence?
11    A.  The Department of Corrections has
12 a what I will call -- I don't know what the
13 acronym for it is today, but the I&I
14 division, the organization within the
15 Department of Corrections that's responsible
16 for investigating crimes, uh-huh.
17    Q.  I think the acronym today is LERC,
18 LER --
19        MR. REEVES:  It's LESD.
20    Q.  LESD, does that sound right to
21 you?
22    A.  I thought that was it, but I
23 couldn't --

12 (Pages 42 - 45)

CONFIDENTIAL - ATTORNEY'S EYES ONLY

Page 46

1    Q.   So in your understanding, LESD is
2  the same as the I&I when you were the
3  warden?
4    A.   Yes, ma'am, uh-huh.
5    Q.   What was your role, if any, with
6  respect to investigations of
7  inmate-on-inmate violence?
8    A.   I wasn't responsible for that at
9  all.  That was strictly I&I division.
10    Q.   Did the warden II have any
11  responsibilities --
12    A.   No.
13    Q.   -- with respect to
14  inmate-on-inmate violence?
15       For the record, I know sometimes I
16  go a little bit slow finishing my question.
17  Hopefully wait for me to finish to make the
18  court reporter's job a little bit easier.
19    A.   Sorry.
20    Q.   I apologize for that type thing.
21       So when an investigation would
22  occur, were you ever made aware that an
23  investigation was going to happen into an

Page 47

1  incident of inmate-on-inmate violence?
2    A.   Any time there was
3  inmate-on-inmate violence, there was going
4  to be an investigation, yes, ma'am, and I&I
5  would take care of that.
6    Q.   And would I&I report the findings
7  of their investigation to you?
8    A.   Sometimes they would -- I would
9  get them, sometimes I would not get them.
10    Q.   Would you get them in the context
11  of any homicides that happened at St. Clair?
12    A.   Again, sometimes and sometimes
13  not.
14    Q.   Do you know what would make a
15  difference in terms of whether you got the
16  findings?
17    A.   No, ma'am.
18    Q.   If you asked for the findings of
19  an investigation, would you get them?
20    A.   Probably, uh-huh.
21    Q.   Do you have any reason to believe
22  that you were restricted from getting --
23    A.   No.

Page 48

1    Q.   -- the findings of an
2  investigation?
3    A.   No.
4    Q.   And I want to talk about not just
5  inspections of incidents, but inspections of
6  the facility in general.  Were there ever
7  any inspections of St. Clair as a facility?
8    A.   On what level?
9    Q.   Let's start with physical
10  maintenance, repairs that were needed, did
11  anyone ever come in or was anyone ever
12  responsible for walking around the prison
13  and assessing whether there needed to be any
14  maintenance or repairs?
15    A.   We had a maintenance division and
16  that was their responsibility to keep
17  everything in proper order, uh-huh.
18    Q.   Did any third parties while you
19  were warden come in to inspect the physical
20  conditions of the prison?
21    A.   Not that I can recall.  Again, are
22  you talking about -- I apologize.  Are you
23  talking about departmental level or are you

Page 49

1  talking about --
2    Q.   A third party, so any consultants
3  or someone that the prison hired, a third
4  party to come in to take a look at the
5  prison conditions and say whether they were
6  sufficient?
7    A.   You know, we had the lawsuit going
8  on and we had some people that came in to
9  look at the institution.  Whether or not
10  they were specifically seeing or looking or,
11  you know, checking the facility for
12  deficient items, I can't tell you.  I don't
13  recall.
14    Q.   So which lawsuit are you referring
15  to?
16    A.   I don't recall the name of it.
17       THE WITNESS:  Do you recall the --
18    Q.   Is it a class action lawsuit
19  perhaps?
20    A.   Yeah, I think so, uh-huh.
21    Q.   Does the Duke name sound familiar?
22    A.   I think that rings a bell, uh-huh.
23    Q.   And so when someone would come in

13 (Pages 46 - 49)

CONFIDENTIAL - ATTORNEY'S EYES ONLY

Page 54

1  to fix them.
2     Q.   Were there any written policies or
3  procedures about how quickly the facility
4  would need to repair locks once they learned
5  about the locks being broken?
6     A.   I don't -- I don't recall that.
7     Q.   Do you recall any resource
8  limitations for fixing locks such as staff
9  shortage, time limitations, anything like
10 that?
11    A.   I don't recall that.
12    Q.   And can you tell me what -- about
13 these locks at St. Clair, how the doors
14 worked, how the cells worked, what kinds of
15 locks there were in place.
16    A.   Well, the original locks that were
17 placed in the cells, the population cells at
18 St. Clair was a much smaller lock, very easy
19 to brake.
20       The replacement lock that they
21 placed on there -- the original locks --
22 well, I don't see a lock on this door -- was
23 much like the locks you see on houses, but

Page 55

1  the locks that they placed on them was a lot
2  more sturdier, so to speak.
3     Q.   And I know this was a long time
4  ago.
5     A.   Uh-huh.
6     Q.   But can you walk me through your
7  understanding, if any, about how many locks
8  were broken at any given time while you were
9  warden?
10    A.   I'm not understanding.
11    Q.   So do you have a sense maybe on
12 average --
13    A.   Uh-huh.
14    Q.   -- on a certain day how many locks
15 were broken?
16       MR. REEVES:  Object to the form.
17    A.   Yeah.  I guess I'll answer this
18 way is that when that lock project began, I
19 think it was in 2016, I'm thinking it was,
20 and the institution was originally built in
21 1983, all right, since 1983 to 2016, there
22 was never a total lock replacement.  It was
23 repair them as you could when you had stuff.

Page 56

1       But in 2016, we began the process
2  where we changed every lock on every cell
3  door and replaced the cell doors themselves
4  in population and in segregation.
5     Q.   Do you recall whether prior to
6  December 2017 any locks or cell doors were
7  repaired or replaced in H dorm?
8     A.   Not that I can recall.  H dorm is
9  a dormitory.  It's not a cell block.
10    Q.   Can you walk me through what a
11 dormitory is versus a cell block?
12    A.   A cell block has individual cells
13 in it.  And a dormitory is an open bay
14 dormitory where inmates are housed in an
15 open bay dormitory with beds.
16    Q.   How many locks do you recall were
17 in place at H dorm?
18    A.   How many -- I'm sorry?
19    Q.   How many locks were in place
20 around or in H dorm?
21    A.   I couldn't tell you how many there
22 were.  Sorry.
23    Q.   So the locks that were replaced

Page 57

1  that became sturdier, as you said, what was
2  sturdier about them?  What, if anything,
3  made them less difficult or less easy, I
4  should say, to break?
5     A.   I explained it when I said that
6  the original locks were much smaller, and
7  the locks they replaced them with was much
8  larger.
9     Q.   So given that they were larger,
10 does that mean it was more difficult to
11 stuff something in them or --
12    A.   If you want --
13    Q.   -- physically tear them?
14    A.   To be truthful about it, it just
15 talks about the level of force necessary to
16 slam them hard enough to break them.
17    Q.   Are you aware of any replacement
18 locks that were broken?
19    A.   Absolutely, yes, ma'am.
20    Q.   Do you recall how frequently
21 replacement locks would be broken?
22    A.   Quite a bit.
23    Q.   And did anyone ever express to you

15 (Pages 54 - 57)

CONFIDENTIAL - ATTORNEY'S EYES ONLY

Page 66

1    Q.   When you were warden, did you
2 believe that St. Clair could have done
3 anything else to make the facility safer and
4 more secure for inmates?
5    A.   I do not.
6    Q.   What precautionary measures, if
7 any, did you see as warden of a Level V
8 facility in terms of preventing
9 inmate-on-inmate violence that were not
10 present, for example, at a Level IV
11 facility?
12    A.   There really is none.
13 Correctional officers rove the institution
14 and shake down the institutions, do
15 searches, and roving the institution to make
16 sure inmates are safe and secure is what
17 they do on a daily basis.
18        And shaking down or searching
19 either one inmate or a group of inmates or a
20 cell or a cell block, that's what they do,
21 what correctional officers do in order to
22 maintain a safe and secure facility, and
23 that's what we did.

Page 67

1    Q.   So sitting here today, can you
2 identify any extra safety measures that St.
3 Clair had in place that Bibb, for example,
4 did not have in place?
5    A.   No.
6    Q.   Let's talk about the correctional
7 officers.  You said earlier that they report
8 to shift commanders; is that right?
9    A.   That's correct, uh-huh.
10    Q.   What are the daily responsibility
11 -- what were the daily responsibilities of a
12 shift commander while you were warden at St.
13 Clair?
14    A.   Well, the shift commander is
15 responsible for the day-to-day function of
16 the shift in relation to the institution;
17 feeding, housing, making sure, you know, the
18 laundry runs, the kitchen runs, we get
19 people to the healthcare unit, dental unit,
20 making transports for off-site medical
21 visits.
22        If we had -- if we were -- if an
23 inmate was transferred from our facility

Page 68

1 that we were responsible for transporting,
2 he would be responsible for taking care of
3 that transport.  Just the general day-to-day
4 operation of a shift.
5    Q.   Who determined how long a
6 correctional officer's shift would be?
7    A.   Again, whether our facility was on
8 a 12-hour shift or 8-hour shift, that was
9 something decided by Montgomery, the central
10 office.
11    Q.   Did the shift commanders that were
12 on staff, did they have any authority to
13 change a correctional officer's schedule
14 around?
15    A.   When you say change, what are you
16 referring to?
17    Q.   So if a correctional officer
18 needed to leave early, needed to take a day
19 off, who would they go to to get approval
20 for that?
21    A.   Their shift commander, uh-huh.
22    Q.   Did the shift commander need to
23 report to anyone before deciding whether a

Page 69

1 correctional officer could take off or leave
2 early for the day?
3    A.   No, ma'am.
4    Q.   And did you know at the time you
5 were a warden whether shift commanders ever
6 patrolled the prison to inspect whether
7 correctional officers were where they were
8 supposed to be?
9    A.   Yes, ma'am.
10    Q.   How often would shift commanders
11 walk around the prison to check that
12 correctional officers were where they were
13 supposed to be?
14    A.   I would say that the sergeants and
15 lieutenants continuously walked around the
16 facility to ensure the correctional officers
17 were doing their job.
18        And as I previously stated, I
19 walked daily inside the institution.  I
20 tried to visit every cell block or every
21 dormitory of the facility at least once a
22 week, and that was what we did was we
23 ensured the correctional officers were doing

18 (Pages 66 - 69)

CONFIDENTIAL - ATTORNEY'S EYES ONLY

Page 74

1    And in cell blocks, of course, if
2 you're standing in any part of the cell
3 block, you couldn't see every inmate because
4 of the individual cells, inmates would be in
5 their individual cells, and no.
6    So the answer to your question is
7 there's probably not one point in any
8 facility in any state where you can stand
9 and see every inmate inside that particular
10 living area, no.
11    Q.  Including dormitories?
12    A.  Including dormitories.
13    Q.  Are you familiar with the layout
14 of H dorm?
15    A.  Somewhat that I can recall,
16 somewhat familiar.
17    Q.  Are you able to tell me today
18 whether there was a location in H dorm where
19 a correctional officer could see every
20 inmate in H dorm at one time?
21    A.  No, ma'am.
22    Q.  Just to be clear, there was no
23 location in H dorm where a correctional

Page 75

1 officer could see every inmate in the H
2 dorm?
3    A.  That's correct, there was no one
4 location in H dorm where an officer could be
5 standing just to view every inmate in that
6 facility or in that housing unit.
7    Q.  Do you recall as warden how many
8 correctional officers were assigned to rove
9 H dorm at a given time?
10    A.  It was no more than ▇▇.
11    Q.  Would it surprise you if at a
12 certain point while you were warden only one
13 correctional officer was roving H dorm at a
14 time?
15    A.  That would be -- I would know
16 that, yes, ma'am, because there would only
17 be one at a time.  There would be no more
18 than ▇▇, but many times there would be one.
19    Q.  Was there any point in which there
20 would be no correctional officer roving H
21 dorm?
22    A.  I do not think so.
23    Q.  And what is that based on?

Page 76

1    A.  Just that it's a post and it's a
2 housing unit, so we would assign a
3 correctional officer to that housing unit.
4    Q.  If you didn't have enough
5 correctional officers for every housing
6 unit, were there any measures in place to
7 get backup?
8    A.  When you say any measures, what
9 are you referring to?
10    Q.  If there were any written policies
11 or procedures or any practices in place for
12 a shift commander to make sure that every
13 post had a correctional officer that was
14 supposed to, if, for example, certain
15 correctional officers had to be off-site to
16 escort a prisoner somewhere or they called
17 in sick?
18    Were there any measures in place
19 to get additional correctional officers to
20 the prison to make sure there was someone
21 where they were supposed to be at all times?
22    A.  Shift commanders could call
23 off-duty correctional officers and see if

Page 77

1 they would come in to work.  We would
2 mandate officers to work over their shift,
3 to work overtime over their shift.
4    Beyond that, if there was a
5 situation where we couldn't man our post,
6 that would be a situation I would call the
7 regional coordinator, my boss, and say,
8 Here's what we got, here's where we're at,
9 here's what we're going to do, got any
10 suggestions?
11    Q.  Do you recall any instances of
12 someone reporting to you that there were not
13 enough correctional officers on duty at St.
14 Clair?
15    A.  Not that I can recall.
16    Q.  If there were not enough
17 correctional officers on duty at St. Clair,
18 is that something that would have been
19 reported to you as warden?
20    A.  Yes, ma'am, uh-huh.
21    Q.  And moving to the overtime that
22 you mentioned --
23    A.  Uh-huh.

CONFIDENTIAL - ATTORNEY'S EYES ONLY

Page 102

1    I don't recall how many numbers,
2 but I know that there were cameras placed in
3 there during that project.
4    Q.   Were there areas of the facility
5 that were not captured by cameras where
6 prisoners were living?
7    A.   Where prisoners were living?  As a
8 part of that lock project, yes, ma'am, there
9 were.
10    Q.   How many areas would you say?
11 Would you say more than 50 percent of the
12 facility were not covered or surveilled by
13 cameras as a result of the project?
14    A.   It was more than 50 percent,
15 uh-huh, sure.
16    Q.   Would you say more than 75 percent
17 was not visible by cameras?
18    A.   I'm going to say somewhere between
19 50 and 60 percent because H dorm didn't --
20 there wasn't any cameras placed in H dorm,
21 there wasn't any cameras placed in █ dorm,
22 there weren't any cameras placed in the
23 ████████.  I don't believe there was any

Page 103

1 cameras placed in the healthcare unit.
2    So yeah, about 60 percent.  None
3 in segregation.
4    Q.   Do you know why there were no
5 cameras placed in H dorm?
6    A.   It wasn't part of the locking
7 change mechanism or project.  The locking
8 upgrade project was only in the cell blocks,
9 the population cell blocks and restricted
10 housing cell blocks.
11    Q.   So the lock project did not cover
12 H dorm or other open bay dormitories?
13    A.   No, not at St. Clair.
14    Q.   Did you ever make any
15 recommendations for more cameras at St.
16 Clair?
17    A.   I believe that I did.
18    Q.   And why did you do that?
19    A.   Well, I was a firm believer in
20 camera systems in that it aids the
21 correctional officer in doing their job.
22    And also it's for supervisors can
23 look at the cameras and make sure the

Page 104

1 officers did their job.
2    Q.   Do you believe that cameras played
3 any role in the safety of people at the
4 prison?
5    A.   No, ma'am, I do not.
6    Q.   And why not?
7    A.   It's just a tool.
8    Q.   Can you tell me more about that?
9    A.   It's just a tool that you use,
10 whereas, what really makes inmate safe
11 inside a correctional facility or staff safe
12 inside a correctional facility is the staff
13 of the facility and inmates.  It can't be
14 all staff.
15    It has to kind of like be a dual
16 issue; inmates have to have a part of it,
17 and the officers have to play a major role
18 in it.  But the inmates have to also assist
19 us, like say if somebody comes in the
20 dormitory that's not supposed to be there,
21 hey, man, you're not supposed to be here, or
22 hey, correctional officer, inmate so-and-so
23 is in here, he's not supposed to be here.

Page 105

1    And if something -- if they feel
2 unsafe to report it to correctional officers
3 or report it to somebody.  I mean, safety is
4 big thing.
5    Q.   Would you say that having more
6 correctional officers placed in a certain
7 cell block or dorm would make that cell
8 block or dorm safer?
9    A.   Well, certainly the -- having more
10 staff inside of a facility gives you a
11 greater opportunity to rove more and to
12 search more, but I don't think there is a
13 correctional facility in America that
14 wouldn't want to have more correctional
15 officers.
16    Q.   So when you say that more
17 correctional officers means roving more, how
18 does roving connect to safety?  How does
19 roving make a facility safer?
20    A.   You know why police officers have
21 those nice cars and they drive up and down
22 in neighborhoods?  It makes people feel
23 good, right; it's being visible.  And

27 (Pages 102 - 105)

CONFIDENTIAL - ATTORNEY'S EYES ONLY

Page 126

1 just all kinds of ways that you get people
2 to do what you want them to do.
3    Q.  In turning back to Exhibit 2 when
4 we looked at the rate of COs that were
5 manning, do you believe those percentages,
6 41 percent and 35 percent, were adequate for
7 protecting the safety of inmates?
8        MR. REEVES:  Object to the form.
9    A.  I do.
10        THE WITNESS:  I'm sorry.
11        MR. REEVES:  Go ahead.
12    A.  I do.
13    Q.  (BY MS. GARRETT:)  And what about
14 those percentages do you feel was sufficient
15 for protecting the safety of inmates?
16        MR. REEVES:  Object to the form.
17    A.  You know, again, we rove around in
18 the institution, we observe inmates, and
19 that's what makes inmates safe is us walking
20 around on a day-to-day basis doing our job
21 as correctional officers.
22        And then also inmates coming to us
23 and say, hey, listen, this is happening or

Page 127

1 that's happening or I don't feel this way or
2 that way, and us taking that into
3 consideration and doing what it takes to
4 make it through the day.
5    Q.  If those numbers had said a
6 percentage closer to 65 percent or 75
7 percent, for example, would you believe that
8 the prison would be safer as a result?
9    A.  That's being speculative.  I just
10 want to say that I believe that with the
11 correctional officers that we had at St.
12 Clair, that the inmates lived in a secure
13 and safe environment.
14        Did I want more correctional
15 officers, absolutely.  What warden of any
16 facility wouldn't want to have more
17 correctional officers, okay, but would it
18 have made it any safer?  Couldn't tell you
19 whether or not it would have and wouldn't,
20 because kind of an old saying with the
21 Department of Corrections is you would like
22 to supervise ten correctional officers
23 that's working their buts off to get the job

Page 128

1 done as opposed to working with 50
2 correctional officers and 40 of them are
3 just trying to make the day.
4    Q.  Do you believe that the presence
5 of correctional officers deters
6 inmate-on-inmate violence?
7    A.  That's the reason why we have
8 correctional officers employed in prisons.
9    Q.  Do you believe that the presence
10 of additional correctional officers, for
11 example, two assigned to a dorm as opposed
12 to just one, that that would further deter
13 inmate-on-inmate violence?
14    A.  I would be stupid to sit here and
15 say it wouldn't, okay.  But again, I want to
16 tell you that with the correctional officers
17 we had, with them doing their job, it was a
18 safe and secure environment.
19    Q.  Do you recall how many
20 inmate-on-inmate homicides happened while
21 you were warden at St. Clair at the St.
22 Clair facility?
23    A.  No, ma'am.  I know that there were

Page 129

1 homicides.  The exact number, I couldn't
2 tell you.
3    Q.  Would the fact that there were
4 homicides committed by inmates at St. Clair
5 while you were warden, would that have any
6 impact on your view whether St. Clair was a
7 safe and secure facility for inmates?
8    A.  When we're reading in the paper
9 about there being a murder in our
10 neighborhood, are we saying that our
11 neighborhood is less safe, because no.  It
12 is a prison.
13        And I'm not trying to be callus by
14 saying that crap happens inside an
15 institution, but unfortunately, things
16 happen inside of an institution.
17        Correctional officers are there to
18 make sure that we provide a safe and secure
19 environment for inmates, and we did that.
20 Now, are there -- were there homicides in
21 our correctional facilities, not only St.
22 Clair but other facilities as well in
23 Alabama during that time, okay.

33 (Pages 126 - 129)

CONFIDENTIAL - ATTORNEY'S EYES ONLY

Page 130

1    So it doesn't go to the fact if
2  you had a hundred more correctional officers
3  inside of St. Clair, you can't point to one
4  of those homicides and say that wouldn't
5  have occurred, you just can't do that, you
6  just don't know.
7    Because all homicides, aren't they
8  about opportunity, you know, and we're all
9  human.  And no matter how many people you
10 have in a given environment, there's going
11 to be an opportunity.  If somebody is dead
12 set on doing a particular thing, it doesn't
13 really matter how many people you got there,
14 they're going to do what they're going to
15 do.
16   Q.  Would you agree that there would
17 be fewer opportunities if there were more
18 boots on the ground, correctional officers
19 on the ground?
20   A.  Again, I can't tell you that.
21 That's a judgment and I can't tell you that.
22   Q.  As warden, did you ever take any
23 steps to determine whether more boots on the

Page 131

1  ground of correctional officers had an
2  impact on opportunity for crime?
3    A.  Again, I believe that we provided
4  a safe and secure environment at St. Clair
5  with the officers that we had.  Now, would I
6  want more correctional officers, what warden
7  in their right mind wouldn't want more
8  correctional officers, okay?
9    Would it have made the institution
10 safer, you can't say that, you just don't
11 know, because there will always be motive
12 and opportunity, okay.  And if someone is
13 dead set on killing somebody or hurting
14 somebody, they're going to find an
15 opportunity.
16   Q.  Is there anything that would make
17 St. Clair -- while you were warden, is there
18 anything that would have made it safer for
19 inmates?
20   A.  I do not believe so.  I believe
21 the environment of a correctional facility,
22 be it St. Clair, be it a facility in Kansas,
23 be it a facility in California is an

Page 132

1  inherently problematic environment.  And
2  there's going to be inmate-on-inmate
3  situations, and God forbid there may be
4  deaths in there.
5    You even look at the federal
6  prison system; it's the same way there, all
7  right?  St. Clair was not any different, any
8  worse than any other prison in the State of
9  Alabama or in the United States.
10   The correctional officers at St.
11 Clair provided a secure environment for the
12 general public in that we kept inmates
13 there, and we also provided a safe
14 environment for the inmates.
15   Q.  Were you aware when you were
16 warden of St. Clair how the homicide rate at
17 St. Clair and other Alabama prisons compared
18 to the nationwide homicide prisons rate?
19   A.  No, ma'am, I'm not, or wasn't.
20   Q.  Would it surprise you to learn
21 that the homicide rate at Alabama prisons is
22 higher than the national average of other
23 prisons?

Page 133

1    MR. REEVES:  Object to the form.
2    A.  I don't know how they compile
3  those statistics or if the statistics were
4  accurate.  I don't even know who compiled
5  the statistics, but you can make anything to
6  be anything you want it to be with
7  statistics.  It depends on who's compiling
8  the statistics and how they compile them.
9    Q.  Is it safe to say that statistics
10 were not part of your considerations in how
11 to make St. Clair safer?
12   A.  Ma'am, I just want to say that I
13 felt as if during the time that I was there
14 as warden, that walking around the facility,
15 listening and talking to the convicts,
16 listening to their problems, listening to
17 their concerns, that we provided, or I
18 provided with the help of my staff at St.
19 Clair, we conducted a safe and secure
20 facility and safe for all the inmates
21 concerned.
22   Q.  I appreciate that.  I do.
23   A.  Thank you.

34 (Pages 130 - 133)

CONFIDENTIAL - ATTORNEY'S EYES ONLY

Page 134

1    Q.   In terms of my specific question,
2 were statistics -- do you recall statistics
3 ever being a consideration that you had when
4 thinking about how to make St. Clair safer?
5    A.   Again, it depends on who's doing
6 those statistics and what the information
7 they're doing to arrive at the statistics.
8 And here's the answer, no, I didn't.
9 Because I'm more concerned about the
10 security and welfare of my staff at the
11 facility and the inmates at my facility, be
12 it St. Clair, be it Limestone or wherever I
13 was at at the particular time.
14        So it was my job to make sure that
15 we had as safe of an environment as we
16 possibly could, and I believe that we did
17 that.
18    Q.   And you mentioned that homicides
19 happen at multiple prisons, inmate-on-inmate
20 violence happens at multiple prisons.  Did
21 you take any steps to determine whether St.
22 Clair had more inmate-on-inmate violence
23 than other prisons in Alabama?

Page 135

1    A.   I don't think that we did.
2    Q.   And what would you base that on?
3    A.   Listening to other wardens talk
4 about what's going on at their facility,
5 listening to what the -- our regional
6 coordinators would say when we would have
7 wardens meetings.
8        Listening and talking to other
9 wardens inside of those facilities, we were
10 all dealing with the same issues, we're all
11 dealing with the same problems.  And at
12 Level V institutions, we're having this,
13 that and the other, you know, going on, be
14 it inmate-on-inmate violence, be it
15 whatever.  Level IVs was having this, Level
16 IIs and Level Is was having that.
17    Q.   All right.  On the topic of
18 statistics, I would like to introduce what
19 will be marked as Plaintiff's Exhibit 3,
20 which is not yet Bates stamped.
21
22
23

Page 136

1 (Plaintiff's Exhibit 3 was marked for
2 identification and is attached to the
3 original transcript.)
4
5    Q.   Do you recognize this document?
6    A.   Yes, ma'am.
7    Q.   What is this document?
8    A.   This is a monthly statistical
9 report, and this particular one says
10 December 2017.
11    Q.   You were warden of St. Clair in
12 December of 2017?
13    A.   Yes, ma'am.
14    Q.   Do you recall looking at this
15 statistical report?
16    A.   Probably I did.
17    Q.   Do you recall looking at any
18 statistical reports around that time
19 specifically?
20    A.   I'm sorry.
21    Q.   Do you have any specific
22 recollections of looking at statistical
23 reports when you were warden?

Page 137

1    A.   Just as a general rule, anything
2 that comes out or that's published by the
3 Department of Corrections, I was exposed to
4 it and looked at it.
5    Q.   Do you have an understanding of
6 why this statistical report was issued?
7    A.   No, ma'am.
8    Q.   Do you think that the statistical
9 report has any important information about
10 safety in it?
11    A.   I don't know.  I mean, this is
12 just a -- it's a report that is compiled,
13 talks about, you know, the statistics of the
14 Department of Corrections.
15        Now, again, how they compiled them
16 and with multiple incidents counted on
17 multiple things inside this statistics which
18 would skew the statistics, I don't know.  I
19 wasn't involved in creating this situation
20 or this report, so, you know, I can't tell
21 you whether or not any of this is accurate
22 or inaccurate.
23    Q.   Was this a public document to your

35 (Pages 134 - 137)

CONFIDENTIAL - ATTORNEY'S EYES ONLY

Page 142

1 Then there comes at time when they say,
2 well, you need squeeze in ten more beds
3 inside the dayroom, all right.
4          Now, when the said you need to
5 squeeze ten more beds inside the dayroom,
6 that kind of makes it overpopulated, okay?
7 And then we busted out a wall in the back
8 back there and put more beds in the back in
9 what used to be a closet back there, then we
10 can say that's kind of overpopulated because
11 that's more than designed capacity, okay.
12          But as opposed to St. Clair, no,
13 it wasn't overpopulated because the designed
14 capacity and the capacity of the facility is
15 pretty much what it was.  And I don't know
16 whether or not that number took into account
17 that there was 26 beds in the healthcare
18 unit as opposed to what -- I don't know.  I
19 think that statistic may be skewed for St.
20 Clair.
21    Q.   What does the word "overpopulated"
22 mean to you?
23    A.   Did I just not do a good enough

Page 143

1 job of explaining that one?
2    Q.   For the record, can you explain
3 what it would mean for a facility to be
4 overpopulated?
5    A.   Do I have to go back over that
6 same one again, because I'm going to go over
7 the same example again.
8          St. Clair was not, but Easterling
9 when we talked about it how they originally
10 single bunked, okay, then they double bunked
11 it, but that's not overpopulation, that's
12 just increasing the number of capacity.
13          But when they say, hey, can you
14 squeeze in about 20 more beds in those
15 dayrooms, that's going over the limit.  And
16 then when you're busting down a wall back
17 there in the old laundry rooms to create a
18 little more space for some more beds, that's
19 kind of overpopulating.  In my mind, that's
20 overpopulating.
21    Q.   To make sure I understand
22 correctly, overpopulated would mean that
23 there were physically too many beds than

Page 144

1 could fit in a prison.  If a prison was
2 considered overpopulated, it would be
3 because it had way too many beds in certain
4 physical spaces; is that right?
5    A.   I'll give you a good example.  All
6 right, Limestone, Limestone is an
7 institution that was designed for -- had
8 cells, and those cells were designed to have
9 double occupancy.
10          Well, somebody came up with the
11 idea we're going to put beds in the dayroom,
12 so they put 90 beds, 90 beds inside of the
13 day room.  Now, to me, that's being
14 overpopulated or whatever the word you asked
15 me was, I can't think of right now at the
16 moment, but that's being overpopulated,
17 okay?
18          But that's just not the case at
19 St. Clair, because we didn't put beds in the
20 dayroom.  We wasn't told to put beds in the
21 dayroom.
22    Q.   Do you think that overpopulation
23 has any connection to safety at a prison?

Page 145

1    A.   Well, you know, it goes to more
2 people being packed into a smaller
3 environment gives more opportunity for
4 someone to be mad at someone, so there could
5 be some issues.  So in some terms, I would
6 think yes, it could.
7          But again, when it comes down to
8 in a prison, you know, what keeps people
9 safe inside a prison is a correctional
10 officer who's being visible, roving around,
11 doing shakedowns, and also inmates helping
12 their safety by saying, hey, this trouble is
13 abrewing, you might need to look into this,
14 okay.
15    Q.   So before we put this document
16 away, I want to look at I think one more
17 thing, which is the total assaults at St.
18 Clair relative to some of the other prisons
19 here in closed security.
20          So we see that St. Clair has 41
21 total assaults, do you see that?
22    A.   All right.  You said 41?
23    Q.   Yes.  Do you see where it says

37 (Pages 142 - 145)

CONFIDENTIAL - ATTORNEY'S EYES ONLY

Page 146

1 total assaults YTD 41?
2     A.   My glasses may not be very good
3 because I ain't seen 41 on this yet.
4     Q.   Are you looking at the facility
5 operations?
6     A.   No, I was looking -- I'm sorry.
7     Q.   You might have been looking at the
8 wrong one.  I'm still looking at the
9 facility operations sheet.
10     A.   Sorry.  Where was you at?  Total
11 assaults, okay, year to date.
12     Q.   Do you have an understanding what
13 YTD would mean?
14     A.   That would be year to date.
15     Q.   So do you have any reason to
16 believe that 41 assaults at St. Clair in
17 2017 is inaccurate?
18     A.   Okay.  I guess -- I was looking
19 back here on the disciplinaries, assaults,
20 homicide and suicide page, and I couldn't
21 get a 41, but I guess this is talking about
22 that's combined for both staff and inmates.
23     Q.   Yes.  And does 41 seem accurate to

Page 147

1 you for that total number of assaults?
2     A.   Okay.  Now, you got to understand
3 that assault is if an inmate puts their
4 hands on a correctional officer, that's
5 assault.  If you just put your hands on
6 somebody, that's assault, all right?  So
7 that's probably -- I know that's probably an
8 accurate number.
9     Q.   So do you see here that St. Clair
10 has the highest number of YTD total assaults
11 out of the closed security prisons?
12     A.   Okay.
13     Q.   Do you see that?
14     A.   Okay.  How much more than the
15 other facilities?  Holman had 35, Kilby had
16 17, and Tutwiler, the women's prison, had
17 21, and Donelson had 40, so we had one more
18 than 40 and six more than Holman.
19     Q.   And for Limestone, what do you
20 see?
21     A.   Again, limestone is -- remember
22 what I said about Limestone.
23     Q.   Can you remind me?

Page 148

1     A.   Pardon me?
2     Q.   Can you remind me what you said
3 about Limestone?
4     A.   Limestone is a Level IV security
5 institution, only because that they were --
6 once housed the HIV inmates for the
7 Department of Corrections.  And they didn't
8 generally send Level V inmates to their
9 population at Limestone except for HIV
10 inmates.
11     Q.   Do you think that Level V inmates
12 caused greater number of assaults to occur
13 than Level IV inmates?
14     A.   Yes, ma'am, yes, ma'am.  Do you
15 want me to tell you one of my stories again?
16         As you work down through the
17 facility, you go through culture shock every
18 time you go from one security level to
19 another security level.
20     Q.   Now, I am going to ask you one
21 other thing.
22     A.   Okay.
23     Q.   If you turn to the slide that says

Page 149

1 disciplinaries, assaults, homicides, and
2 suicides, I think that was the slide you
3 were looking at.
4     A.   Okay.
5     Q.   This says here, if you look at the
6 inmate-on-inmate homicides column, what do
7 you see for St. Clair?
8     A.   Inmate-on-inmate homicides, zero.
9 Where are we at?
10     Q.   Do you recall any homicide --
11 inmate-on-inmate homicides at St. Clair in
12 2017?
13     A.   I mean, again, I know that during
14 the time that I was there that we had
15 homicides.  Okay.  This was -- this is a
16 December issue, okay, so this is actually
17 talking probably about one or two months
18 worth of statistics here, so we're only
19 talking about a limited number of time.
20 We're only probably talking about a
21 two-month period here.
22     Q.   So where it says year --
23     A.   It's not a physical year.  It's

CONFIDENTIAL - ATTORNEY'S EYES ONLY

Page 150

1 probably a fiscal year instead of a physical
2 year.
3     Q.   Do you know when the fiscal year
4 started at St. Clair?
5     A.   It's always going to be October.
6 These are probably for the incidents that
7 occurred in November and it was compiled for
8 December, so it's probably only talking
9 about October and November of 2017.
10     Q.   Okay.  I want to talk to you about
11 metal detectors.  Were there any medical --
12 sorry.  Were there any metal detectors at
13 St. Clair while you were the warden there?
14     A.   Yes, ma'am.
15     Q.   How many would you say were there?
16     A.   We had walkthrough metal
17 detectors, we had a metal detector that you
18 could stand up on a sidewalk and inmates
19 could pass by it and it would go off.  We
20 had handheld metal detectors, we had little
21 palm frisk metal detectors.  We had a bunch.
22     Q.   Did you consider those metal
23 detectors to be effective in detecting metal

Page 151

1 going through?
2     A.   Absolutely, to the extent that
3 they were used appropriately and -- yes.
4 Now, can an inmate or any individual defeat
5 a metal detector, absolutely.
6     Q.   How could an inmate defeat a metal
7 detector?
8     A.   Now, that's a good question, you
9 know, but it occurs all the time.
10     Q.   So would you say that metal
11 detectors made St. Clair any more safe than
12 had there been no metal detectors?
13     A.   Metal detectors in any facility
14 makes any facility -- adds to the security
15 package of that facility, absolutely.
16     Q.   Did you ever request any more
17 metal detectors to be placed at St. Clair?
18     A.   No, I don't think I did because we
19 had quite a few of them.
20     Q.   How often would a correctional
21 officer go through a metal detector?
22     A.   Just through the front entrance is
23 when the correctional officers would go

Page 152

1 through a metal detectors when they came to
2 work in the morning times or whenever they
3 came in for their shift, morning or evening,
4 sorry.
5     Q.   Would any inmate need to go
6 through a metal detector to get into H dorm?
7     A.   No, ma'am.
8     Q.   How often were inmates going
9 through metal detectors?
10     A.   Inmates, we had them on -- going
11 into the healthcare unit, going into the
12 trade school, coming in and out of the trade
13 school area, coming in and out of the
14 industry area.
15         We would set up the portable metal
16 detectors when inmates would go to lunch,
17 they'd file by that.  We'd put it in front
18 of a dormitory, and when they come out of
19 the dormitory, they'd go by that metal
20 detector.
21         There were a couple of them they
22 had were mobile, and we used them mobilely
23 and set them up here and there to get good

Page 153

1 use out of them.
2     Q.   Would it have been possible while
3 you were a warden St. Clair for an inmate to
4 go from P block to H dorm without going
5 through a metal detector?
6     A.   Probably, uh-huh.
7     Q.   Is there anything that would -- do
8 you recall whether an inmate from P block to
9 H dorm would go through a metal detector?
10     A.   Again, the portable ones,
11 sometimes we'd set them up at the door of
12 the kitchen, sometimes we'd set them up at
13 the back of the kitchen, sometimes we'd set
14 them up at the entrance of H block, which
15 was, like I said, was like a courtyard and
16 it squeezed between two buildings, so
17 everybody that came out of population G yard
18 going to either the healthcare unit or
19 anything like that would go through this
20 small area and sometimes we'd set up that
21 metal detector there.
22         And so yeah, sometimes inmates
23 would go past a metal detector but sometimes

CONFIDENTIAL - ATTORNEY'S EYES ONLY

Page 158

1    Q.  Do you recall whether you ever
2  made a recommendation for there to be more
3  searches at St. Clair?
4    A.  I don't ever recall making a
5  recommendation to increase the number of
6  searches there.  Not that I can recall.
7    Q.  Did you find the policy about the
8  number of searches that would occur to be
9  sufficient to protect inmates?
10    A.  Absolutely.
11    Q.  And do you know how frequently
12  contraband would be found during these
13  searches?
14    A.  Contraband is found in every
15  correctional facility in the State of
16  Alabama, and St. Clair wasn't an exception
17  to it.  Any time we would shake down, we
18  would find contraband.  That's the reason
19  why we do shakedowns is so that we find as
20  much as we can.  We ain't going to find it
21  all, but we find as much as we can.
22    Q.  Do you feel that searches have any
23  effect on the presence of contraband in the

Page 159

1  prison?
2    A.  It does, but it never diminishes
3  all of it.  It just can't, unfortunately.
4    Q.  During your time as warden at St.
5  Clair, do you recall whether the amount of
6  contraband that was recovered by a
7  correctional officer changed at all, either
8  went up or went down or stayed the same?
9    A.  Stayed the same, just like it did
10  all over the state.  There was contraband in
11  every facility, even in work releases.
12    Q.  What would you consider contraband
13  to be?
14    A.  The definition of contraband is
15  anything that's not given to an inmate by
16  the prison or by the warden.
17    Q.  And --
18    A.  Or sold on the canteen, sorry.
19    Q.  Do you know whether there were any
20  particular inmates that were searched more
21  frequently than others?
22    A.  If you want to say on a day-to-day
23  basis, everybody that was going to the

Page 160

1  industry to do their job, everybody that was
2  going and coming from trade school were
3  searched.  Anybody that's going into the
4  healthcare unit, they were searched, uh-huh,
5  on a daily basis, uh-huh, more so than the
6  others.
7    Q.  In terms of the dangerousness of
8  the inmates, were certain inmates considered
9  to be more dangerous than others?
10    A.  Well, you know, let's put it this
11  way: They're all Level V inmates and you
12  need to take that into consideration, just
13  as if you're in Level IV or work release,
14  that you're dealing with somebody that don't
15  want to do what you ask them to do, so you
16  don't let your guard down just because
17  you're working in a Level IV camp or a Level
18  II camp or a Level I camp, you treat them
19  the same.  And then you have just as much
20  opportunity to get assaulted anywhere you're
21  at.
22          And so when you talk about Level V
23  convicts, the dangerous individuals or super

Page 161

1  dangerous, as you would want to call, that
2  would be what we call closed out because
3  their behavior, if they had committed an
4  assault or something like that, they would
5  run the risk of being classified and closed
6  out which would place them in a single cell.
7    Q.  And so other than the individuals
8  that were placed in a single cell, was there
9  any treatment differential between the
10  inmates based on how dangerous or violent
11  St. Clair considered them to be?
12    A.  You have to understand it's not
13  St. Clair considering them that way.
14  They're classed up by the Department of
15  Corrections and sent to the facilities based
16  on their security level.
17          So everybody at St. Clair treated
18  the inmates all alike because we worked in a
19  Level V security institution.
20    Q.  How about -- were there any
21  inmates that were brought to St. Clair who
22  had committed acts of violence in prior
23  prisons?

41 (Pages 158 - 161)

CONFIDENTIAL - ATTORNEY'S EYES ONLY

Page 166

1    A.   Absolutely.  Any time an inmate is
2  injured, for whatever reason they're
3  injured, it should bother a correctional
4  officer or the warden.  That's what our job
5  is to do is to protect the inmates in the
6  facility.
7        You do what you can do, but again,
8  you have to buffer that with the
9  understanding is that convicts that choose
10  to -- to choose that behavior are going to
11  injure -- get themselves injured or are
12  going to injure one another.
13    Q.   Do you recall any period of time
14  when you were warden at St. Clair that were
15  especially violent than others?
16    A.   No.
17    Q.   Did it seem that while you were
18  warden at St. Clair the amount of violence
19  stayed the same?
20    A.   I would say it did.
21    Q.   Was there anything, looking back
22  here today, that you think you could have
23  done to limit or lessen the amount of

Page 167

1  violence at St. Clair?
2    A.   No.
3    Q.   Okay.  I want to now talk about
4  inmate movement around the prison.  Are you
5  familiar with a term "uncontrolled
6  movement"?
7    A.   With regard to what?
8    Q.   With regard to prisoners.
9    A.   Uncontrolled movement, no, I don't
10  believe I've ever heard of the term with
11  regard to prisons, uncontrolled movement.
12  We talk about controlled movement a lot but
13  not uncontrolled movement.
14    Q.   What is controlled movement?
15    A.   That's when we control when an
16  inmate goes here and there.
17    Q.   And did you feel that St. Clair
18  had any difficulties while you were warden
19  with controlling the movement of inmates?
20    A.   Not any more so than any other
21  prison in Alabama or America.
22    Q.   Can you describe to me the
23  difficulties that St. Clair did have with

Page 168

1  controlling movement of prisoners?
2    A.   No.  It's -- like I said, it's not
3  any more so than they would have at any
4  other facility in Alabama or any other
5  facility in America.  It's just a situation
6  where when inmates are going from Point A to
7  Point B, humans can get lost, humans can not
8  go here, they can go there instead.
9        Somebody could be looking this
10  way, a convict can come up to an officer and
11  get his attention and get him pointed this
12  way, convict can go that way.  There's just
13  all kinds of things that happen in life,
14  especially in a prison.
15    Q.   What did St. Clair have in place
16  while you were the warden to control the
17  movement of prisoners from Point A to Point
18  B?
19    A.   Correctional officers.
20    Q.   Other than correctional officers,
21  were there any other tools or policies or
22  measures in place to control the movement?
23    A.   That's what correctional officers

Page 169

1  do; they're responsible for looking and
2  seeing and posting and making sure inmates
3  were going in the right direction, the wrong
4  direction, check them up, do the things they
5  do on a daily basis to make it safe, and
6  that's what they did.
7    Q.   Were there any SOPs related to
8  movement of prisoners?
9    A.   I don't recall one specifically
10  about inmate movement.  I might be wrong,
11  there may be one, but I just don't recall
12  one about that specifically.
13    Q.   Do you recall making any policy
14  changes while you were the warden to any
15  type of practice that would better control
16  the movement of prisoners?
17    A.   I harped every time we had a
18  supervisors' meeting or a staff meeting, I
19  harped that we just need to maintain
20  Correction 101, which is walking around,
21  patrolling your areas, being visible and
22  doing your shakedowns like you're supposed
23  to do your shakedowns.

43 (Pages 166 - 169)

CONFIDENTIAL - ATTORNEY'S EYES ONLY

Page 170

1    And I said what's important in
2  corrections to keep the place secure and
3  safe is basic Corrections 101, roving and
4  shaking down.
5    Q.   For the record, could you identify
6  for me any policy you put in place to
7  control movement of prisoners?
8    A.   Not that I can recall, uh-uh.
9    Q.   You mentioned --
10    A.   Didn't do anything more than what
11  was already in place.
12    Q.   You mentioned staff meetings and
13  supervisor meetings.  Can you tell me more
14  about those?
15    A.   We had the -- every Wednesday I
16  had a meeting of the captains and the deputy
17  wardens in my office.  No, every morning I
18  met with the captains and the deputy wardens
19  in my office.  I believe it was Wednesday we
20  had a staff meeting where all the department
21  heads would come.
22    Then once a month, we would have a
23  supervisor meeting, security supervisor

Page 171

1  meeting.  And twice a year, we would have a
2  staff meeting where it was mandatory for
3  every correctional officer and employee that
4  worked for the institution to attend.
5    Q.   What was covered at the security
6  supervisor meeting?
7    A.   Anything that we needed to discuss
8  that was -- anything that we just needed to
9  discuss about what was going on in the
10  prison, anything that anybody would submit a
11  topic or a request for a topic.
12    We would just talk about security
13  issues, just about Corrections 101, roving,
14  making sure the correctional officers are
15  roving the cell blocks or roving their area
16  of responsibility and do the appropriate
17  shakedown, frisk search or cell searches or
18  area searches, whatever they do, the shifts
19  do their area searches, just do their part.
20    Q.   Do you recall any of these
21  supervisor security meetings where someone
22  came to you and said, Warden Estes, I think
23  we need to be doing this better or that

Page 172

1  better to make the prison more secure?
2    A.   I don't think, no, no, ma'am.
3    Q.   And do you recall any instances of
4  specifically telling anyone at those
5  meetings, the supervisor security meetings,
6  that they needed to do something different
7  than what they had already been doing to
8  make the prison more secure?
9    A.   No, ma'am.  Just hammered it home
10  every opportunity I had that our -- the
11  safety and security of the facility hinged
12  on the correctional officer doing their job,
13  roving around and doing basic Corrections
14  101, roving and searching.
15    Q.   Were there any practices in place
16  to check whether an inmate was in the right
17  place?
18    A.   We would do bed roster counts.
19  When we do bed roster counts, the inmates
20  that were out of their areas would receive
21  disciplinaries and then they would be
22  escorted back to where they were assigned.
23    Q.   What is a bed roster check?

Page 173

1    A.   Well, there is a printed roster
2  that has every name of the inmates at the
3  facility and the bed with which they sleep
4  in, and it is organized by dormitories.
5    And the officer takes that and
6  goes and physically checks the inmate's ID
7  to make sure he matches his ID and he
8  matches where the bed roster claims he's
9  supposed to be.
10    Q.   Can you tell me more about these
11  IDs that the inmates had?
12    A.   State-issued IDs just has their
13  picture on it and some other information,
14  much like a nondrivers driver's license for
15  the State of Alabama has on it, basic
16  information.
17    Q.   Were the inmates required to hold
18  these ID cards?
19    A.   They were required to have them in
20  their possession, yes, ma'am.
21    Q.   Would inmates be disciplined if
22  they didn't have them in their possession?
23    A.   They could be, yes, ma'am.

44 (Pages 170 - 173)

CONFIDENTIAL - ATTORNEY'S EYES ONLY

Page 194

1 down the facility or I need to bring in
2 some -- someone from the sheriff's office or
3 anything else, any particular moments where
4 it was especially violent?
5     A.  Well, I had no authority to bring
6 anybody from the sheriff's office into the
7 institution, okay?
8     Q.  Did you have authority to bring in
9 something called the CERT team?
10     A.  I had authority to request the
11 CERT team to come in.  But let me ask you a
12 question, all right?  Would you not think --
13 consider it to be a hard day if you had to
14 call somebody's mother and say they were
15 killed inside of a penitentiary or to tell
16 them that their son was injured inside the
17 penitentiary?
18         So yeah, I had some bad days, but
19 do you think that St. Clair was anymore
20 dangerous than any other place?  No ma'am,
21 it wasn't, because I had to make those same
22 phone calls at Level IV camps and any other
23 camp I've ever worked at.

Page 195

1     Q.  Making all these calls, you're in
2 a leadership position, making all these
3 calls, do you accept this is just part of
4 the job, and the rate at which I'm making
5 these calls is just part of the job, or did
6 you ever think to yourself there's more I
7 can do here, there's got to be a way that
8 I'm making less of these calls?
9     A.  Corrections 101, making sure our
10 officers are out there roving around in the
11 cell blocks, looking and observing what's
12 going on and making sure they do their
13 searches.
14     Q.  I want to turn to the wristband
15 policy.  Is that something you were aware of
16 at St. Clair?
17     A.  In every facility, they have
18 wristbands, yes, ma'am.
19     Q.  And how did that policy work in
20 practice?
21     A.  Didn't work very good at any
22 facility.  Only inmates that wore the
23 wristbands were those individuals that

Page 196

1 wasn't violating the rules and regulations
2 and were wanting to get out of prison.
3         Other than that, if an inmate
4 needed to make a little money, he could sell
5 his wristband to somebody else, or he
6 could -- the individuals could cut their
7 wristbands off, put a little piece of
8 elastic on it out of their underwear and
9 slip them on and off any time they wanted
10 to, change them out any time they wanted to
11 go into another door, put a different color
12 band on their arm.  It wasn't effective
13 whatsoever.
14     Q.  Was that wristband policy
15 something you inherited when you came to St.
16 Clair?
17     A.  Absolutely, like it was in every
18 facility.
19     Q.  Was the wristband policy something
20 you had authority to change at all?
21     A.  It was just something that we did.
22 It was something that central office wanted
23 and so we did it.

Page 197

1     Q.  Did you have authority to change
2 it if you wanted to?
3     A.  Change it in what way, what are we
4 referring to?
5     Q.  So if you could -- for example,
6 did you have any authority to change what
7 the wristbands were made out of or require
8 that they were any more difficult to remove?
9     A.  They were plastic wristbands,
10 that's what we bought, that's what they
11 bought statewide.  There wasn't metal, there
12 wasn't anything that wasn't cutable.  Or
13 even if they were made out of metal, a
14 convict is going to figure out a way to get
15 them off their arm.
16     Q.  Did you have any authority to set
17 any disciplinary procedures in place for
18 inmates who didn't have the wristband?
19     A.  Disciplinary procedures were
20 already in place.  Admin reg already covered
21 that.
22     Q.  And you did not have authority to
23 change the admin reg about that?

CONFIDENTIAL - ATTORNEY'S EYES ONLY

Page 198

1    A.  Correct.  Yes, ma'am.
2    Q.  Okay.  I think -- how often do you
3 think that the correctional officers relied
4 on the wristbands to monitor prison
5 movement?
6    A.  Something they looked at, you
7 know, they glanced down.  If a convict come
8 out of a door that was supposed to be this
9 color or that color or go in a door, they
10 would glance at it, but were they a hundred
11 percent effective, they knew they weren't.
12 Just a tool.
13    Q.  Were there others at the prison
14 other than you who shared your view that the
15 wristband policy was not effective?
16    A.  Probably everybody did.
17    Q.  Do you recall any conversations
18 with any shift commanders or correctional
19 officer saying, I don't think this works?
20    A.  No.
21    Q.  How often, based on your
22 understanding, would a correctional officer
23 be escorting an inmate from where they were

Page 199

1 not supposed to be to where they were
2 supposed to be?
3    A.  How often did that occur?
4    Q.  On a daily basis.
5    A.  I have no idea.  It could be ten,
6 it could be 110.  I just couldn't tell you.
7 It just depends on when an officer sees
8 somebody out of place, here you go, take
9 them away.
10    Q.  And if they didn't have the
11 wristband on to say where -- if the prisoner
12 didn't have the wristband on to show where
13 they were supposed to be, was there any way
14 to deterministically find out quickly where
15 they were supposed to be?
16    A.  Yes, ma'am.
17    Q.  How was that?
18    A.  They have a radio on their side,
19 they call the shift commander's office via
20 the radio and say, I got inmate so-and-so
21 AIS number blank, blankety-blank, where is
22 his assignment?
23    Q.  And how often -- when you received

Page 200

1 reports of incidents, how often were those
2 incidents caused by an inmate who was in a
3 place they weren't supposed to be?
4    A.  I'm not going to say every one of
5 them was.  You know, probably more than 50
6 percent, though, uh-huh.
7    Q.  Did that number bother you at all
8 that maybe more than 50 percent of the
9 incidents were caused by inmates being
10 somewhere they weren't supposed to be?
11    A.  I've been in corrections 36 and a
12 half years, it's the same all over; that's
13 what they do.
14    Q.  And I think we can turn to talk a
15 little bit more about H dorm specifically.
16 And I know we have established that H dorm
17 was an open dormitory, is what you called
18 it, as opposed to individual cell block?
19    A.  Yes, ma'am.
20    Q.  And who qualified, if anyone, to
21 live in H dorm while you were working?
22    A.  H dorm was a therapeutic
23 community, meaning it was a program

Page 201

1 dormitory, meaning it was a program designed
2 to make inmates into mentors to where they
3 could mentor one another, they could put --
4 hopefully, the end game was once they were
5 released from prison, they could go out into
6 the general population and mentor those in
7 their community to hopefully not come to
8 prison in the first place.
9        And so it was a program designed
10 to make men better than what they were, give
11 them ideas on how to have people skills, how
12 to -- social skills, rather.  There was
13 probably a substance abuse component
14 involved in it.
15        There were several components, and
16 it was all designed for that purpose, to
17 build mentors, to build leaders in men.
18        But it was a program that you
19 would have to create an application to
20 attend, or sometimes inmates would show up
21 down to the H dorm and talk to the people
22 about filling out an application to apply
23 for the program.

51 (Pages 198 - 201)

CONFIDENTIAL - ATTORNEY'S EYES ONLY

Page 206

1    Q.   Was it your view while you were
2  warden that there was no more gang violence
3  at St. Clair than there was anywhere else?
4    A.   Correct.
5    Q.   Was it your view as warden at St.
6  Clair that there wasn't any more
7  inmate-on-inmate violence than at the other
8  maximum security prisons?
9    A.   I think those statistics that you
10  pointed out to me points that out.
11    Q.   And was it also your view as
12  warden that the homicide rate at St. Clair
13  wasn't any higher than it was at the other
14  maximum security prisons?
15    A.   I don't see that -- the statistics
16  you showed me didn't show any homicides at
17  any facility.
18    Q.   I'm going to show you some -- I'm
19  going to try to do this quickly, go through
20  some incidents with you.
21        I keep talking and I lose track of
22  the time.
23        Let's start with -- I think we're

Page 207

1  going to start with this one.  Okay.  I'm
2  marking Plaintiff's Exhibit 4, is that
3  right, which is a one-page document bearing
4  the Bates range CORR000611.
5        I will represent to you this is an
6  incident report dated March 5th, 2017, and
7  it is classified as an inmate-on-inmate
8  assault without serious injury.
9
10  (Plaintiff's Exhibit 4 was marked for
11  identification and is attached to the
12  original transcript.)
13
14    Q.   Do you see that?
15    A.   Yes, ma'am.
16    Q.   So I want to ask you a few things
17  about this quickly.  It says here:
18  Correctional Officer Thomas stated he didn't
19  see inmate [redacted] fighting but noticed
20  inmate [redacted] was bleeding from his mouth
21  and hand.  Do you see that?
22    A.   Uh-huh.
23    Q.   So --

Page 208

1    A.   Yes, ma'am.
2    Q.   -- if an inmate is bleeding as a
3  result of an inmate-on-inmate attack, how
4  would an inmate alert a correctional officer
5  that they were hurt?
6    A.   How would they -- well, okay, I
7  would assume that they would walk up to them
8  and say, hey, listen, I just got into a
9  fight.  Or that not being the case, the
10  officer might be patrolling around in the
11  living area and see an inmate sitting on the
12  bed with his mouth bleeding and say, hey,
13  man, what happened to you, you know, or
14  several different ways.
15        He could see this inmate in the
16  bathroom trying to wash his face, and he
17  would go in and say hey, what's going on,
18  you know.  Either the convict brings it to
19  him or he observes it and asks questions
20  about it.
21    Q.   Are you aware of any incidents
22  where it was difficult for an inmate to find
23  a correctional officer after getting into a

Page 209

1  fight?
2    A.   No.
3    Q.   Do you think there were -- that
4  there could have been any other tools in
5  place to better help prisoners get ahold of
6  correctional officers when they needed them?
7    A.   No.
8    Q.   Also it says here that you were
9  notified at 8:23 p.m., which looks like it
10  was about 19 minutes after the correctional
11  officer called in the fighting.  Do you see
12  that?
13    A.   Uh-huh.
14    Q.   Do you recall being notified of
15  this incident?
16    A.   Just reading this right here,
17  ma'am.
18    Q.   But you have no recollection of
19  this specific incident?
20    A.   No, ma'am.
21    Q.   And why do you think that is?
22    A.   I'm 63 years old.
23    Q.   Did this -- this incident did

53 (Pages 206 - 209)

CONFIDENTIAL - ATTORNEY'S EYES ONLY

1 not -- this particular incident did not make
2 a strong memory in your mind that you've
3 carried to today?
4        MR. REEVES:  Object to the form.
5     A.  I wouldn't -- no, ma'am, it did
6 not.
7     Q.  It says here at the end, it says:
8 Inmate ███████ admits to being a ███████
9 ███████, but refuses to cooperate in
10 any way.  Investigation continues and
11 further information to follow.  Inmate
12 ███████ will receive a disciplinary for
13 institutional security.  Do you see that?
14     A.  Yes, ma'am.
15     Q.  Do you have any idea of what
16 disciplinary for institutional security
17 means here?
18     A.  What disciplinary was instituted
19 here, no, ma'am, I do not.
20     Q.  Do you know what this correctional
21 officer would have meant by he received a
22 disciplinary for institutional security?
23     A.  We would have to pull that

1 disciplinary and see what he was written up
2 for.
3     Q.  Do you think that the correctional
4 officer should have indicated here what the
5 inmate was written up for?
6     A.  It's not necessary there.  I mean,
7 that's the reason why we have
8 disciplinaries.
9     Q.  And why were you notified of the
10 incident?
11     A.  I was -- apparently I was the
12 on-call security -- I was the on-call person
13 for the facility during this week.
14     Q.  How often were you an on-call
15 security official?
16     A.  I had three captains, and it was
17 once every six weeks.  I take that back.
18 Once every six weeks by myself, and then any
19 time a captain was the on-call official, I
20 had to back them up.
21     Q.  And what were your duties as the
22 on-call security official?
23     A.  After hours if something occurred,

1 an incident report had to be written for,
2 the on-call official has to be made aware
3 of.
4     Q.  Did you take any actions after you
5 were notified of this incident?
6     A.  Not in this particular one, no.
7     Q.  And was that common for you not to
8 need to take any specific action as the
9 on-call security official?
10     A.  Yes, ma'am.
11     Q.  Okay.  The next one I'm going to
12 mark as Plaintiff's Exhibit 5.  And this is
13 also a one-page document bearing the Bates
14 range CORR000613.
15        And I will represent to you this
16 is an incident report dated March 26th,
17 2017.  Do you see that?
18
19 (Plaintiff's Exhibit 5 was marked for
20 identification and is attached to the
21 original transcript.)
22
23     A.  Uh-huh.

1     Q.  And please let me know if you want
2 to take the time to read over the whole
3 thing, but there are a few parts I wanted to
4 draw your attention to.
5        One of them is the second sentence
6 where it starts with:  At that time,
7 Sergeant England and Lieutenant Larry Baker
8 went to G dormitory and observed inmate
9 ███████ lying face down bleeding from his
10 forehead.
11        So I want to clarify here that
12 reading this, it appears that whatever
13 injury this inmate sustained was not
14 observed by any correctional officer.  Does
15 that sound right to you?
16     A.  Well, let me take an opportunity
17 to read this.
18     Q.  Sure.
19     A.  Okay.  (Witness reviews document.)
20        Okay.  Uh-huh.
21     Q.  So turning back to the second
22 sentence, Sergeant England, Lieutenant Larry
23 Baker observed the inmate lying face down

54 (Pages 210 - 213)

CONFIDENTIAL - ATTORNEY'S EYES ONLY

Page 218

1 skinned his knee or murdered, it bothers me,
2 and it bothered me then and it bothers me
3 now.
4     Q.   So just to get a yes or no, were
5 knives a problem at St. Clair while you were
6 a warden there?
7     A.   Not any more than any other
8 facility in Alabama.
9     Q.   But they were a problem, right?
10     A.   You can look at every incident
11 report for a prison in Alabama and they find
12 prison made knives or inmate made knives in
13 a facility, everywhere.
14     Q.   So did you consider them -- did
15 you consider knives to not be a problem at
16 St. Clair because you viewed the amount of
17 knives to be the same as at all other
18 prisons?
19     A.   No, ma'am.  I view knives to be
20 very problematic inside the penitentiary.  I
21 would much rather convicts hit each other
22 with fisticuffs instead of using a club or
23 weapon or a knife.

Page 219

1         But I'm not going to sit here and
2 say that St. Clair was any worse or had any
3 more knives than any other facility in the
4 State of Alabama or anywhere else does
5 because it just was not true.  Or if they
6 were condoned by any staff member in Alabama
7 for you to have -- let that convict have a
8 knife, hell, no, that didn't occur.
9     Q.   What kind of knives were recovered
10 from inmates while you were a warden at St.
11 Clair?
12     A.   I will give you the whole gamut,
13 all right?  Knives are made out of chain
14 link fence, just the chain itself.
15         The ends of the chain link fence,
16 they have called a tension rod or stretcher
17 rod.  Those rods are taken off and cut into
18 pieces and sharpened down to make weapons.
19         You've got bed rails.  They bust
20 the rails that had -- the box slides in on,
21 they bust the rails off and make weapons out
22 of those.
23         They will take a can, a Coke can,

Page 220

1 and they'll keep folding it and folding it
2 until it makes something rigid and use that
3 as a weapon.
4         Any piece of metal that you
5 possibly can think of, they'll use it as a
6 weapon.
7     Q.   Would a Coke can turned into a
8 knife, would that be picked up on a metal
9 detector in a prison?
10     A.   It's aluminum.  I think some metal
11 detectors do pick up aluminum, but I don't
12 know if it has to be -- usually it's ferrous
13 metal, so usually it's either steel or
14 something like that, so aluminum might be
15 problematic.
16     Q.   How about the chain link knives,
17 would those be picked up?
18     A.   That's metal.  That's ferrous
19 metal.
20     Q.   But it's fair to say that there
21 were other types of knives that could
22 inflict serious injury that couldn't have
23 been picked up on by a metal detector,

Page 221

1 right?
2     A.   Yes, ma'am.  I've seen inmates --
3 at one time or another, the healthcare unit
4 might issue a splint that might have a piece
5 of aluminum in it, and I've seen those taken
6 and sharpened and used as weapons.
7         Most of our brogans had a little
8 steel shank in them, and they would cut the
9 brogans open and take that piece of metal
10 out of it and use that for a -- but the
11 boots would set off the metal detectors,
12 too.
13     Q.   As the head warden at St. Clair,
14 did you ever have a moment where you thought
15 we're going to crack down on knives and
16 here's what we're going to do differently,
17 or did you find that the searches, the
18 shakedowns that were happening were
19 sufficient?
20     A.   The CERT team would come in and
21 search the entire institution, and we would
22 find hundreds of knives.  And the next week,
23 there would be plenty more inside the

56 (Pages 218 - 221)

CONFIDENTIAL - ATTORNEY'S EYES ONLY

Page 222

1 institution.
2    Q.   How many times do you recall you
3 made a request for the CERT team to come in?
4    A.   I can't -- I can't put a number on
5 it.  But, you know, we had them coming as
6 often as we needed to, as often as we felt
7 it was important to call for their presence
8 to be in the institution.
9        I wasn't fearful about calling for
10 the CERT team to come in if there was a need
11 for them to come in.
12    Q.   Looking back on your time at St.
13 Clair, are there any incidents that come to
14 mind such as, you know, wow, that was a
15 really bad assault that just sticks with --
16 that has stuck with you?  Any particular
17 incident, whether assault on another inmate
18 or an assault on a correctional officer,
19 that has stayed with you to today?
20    A.   Kind of hard to see a lieutenant
21 stabbed multiple times in the chest and
22 abdomen, yes, ma'am, I hated to see that.
23    Q.   Do you know approximately when

Page 223

1 that was?
2    A.   I can't tell you.  I think it was
3 2015.
4    Q.   And do you recall what you did, if
5 anything, after hearing about that?
6    A.   I was there.
7    Q.   You witnessed the incident?
8    A.   I didn't witness it.  He was
9 laying on the sidewalk when I -- I was the
10 on-call official and I was the calvary, and
11 here I go up there when they called and, you
12 know.
13    Q.   Do you think there was anything
14 that anyone at St. Clair could have done to
15 prevent that specific injury?
16    A.   No, ma'am.
17    Q.   And do you think that the way St.
18 Clair handled that particular attack was
19 sufficient for purposes of keeping everyone
20 at the prison safe?
21    A.   Yes, ma'am.
22    Q.   Okay.  A few more things about
23 this and we can turn to the next one.

Page 224

1    A.   I need to take a break.  I need to
2 go to the restroom.
3    Q.   Okay.  That's fine.
4        THE VIDEOGRAPHER:  We are going
5 off the record at 1:53 p.m.
6
7        (Short recess.)
8
9        THE VIDEOGRAPHER:  This begins
10 Media 4 in the deposition of Dewayne Estes.
11 We're going back on the record at 2:00 p.m.
12    Q.   (BY MS. GARRETT:)  So I believe
13 we're looking at Plaintiff's Exhibit 5 right
14 now, just two more things here.  One, it
15 says you were notified of the incident.  Do
16 you recall this particular incident?
17    A.   No, ma'am.
18    Q.   And it says here that you
19 contacted Associate Commissioner Grant
20 Culliver.
21    A.   Uh-huh.
22    Q.   Who was he?
23    A.   He was the next step above the

Page 225

1 regional coordinators.  I guess for some
2 reason or other I wasn't able to get Ms.
3 Price or Mr. Ellington.  Maybe Ms. Price was
4 on vacation or something, and I was told any
5 contact to make to Mr. Culliver.  I don't
6 remember what the situation was, I don't
7 remember that.
8    Q.   So in the last incident report we
9 looked at, it looked like you didn't have to
10 inform anyone, but here you did inform
11 someone.  Do you know why you contacted
12 someone here in this incident?
13    A.   Injury.
14    Q.   Serious injury?
15    A.   Yeah.
16    Q.   Got it.  And at the -- at the end
17 here, it says inmate ▮▮▮▮ signed a release
18 of liability and a living agreement?
19    A.   Uh-huh.
20    Q.   Do you know what the release of
21 liability refers to?
22    A.   Someone it says identified this
23 inmate -- I forget who it says identified.

CONFIDENTIAL - ATTORNEY'S EYES ONLY

Page 230

1 report, would you deduce from this report
2 that an inmate was stabbed without a
3 correctional officer observing the stabbing?
4     A.   Well, let me -- give me an
5 opportunity to read the darn thing. I'm a
6 little slow, so bear with me. (Witness
7 reviews document.)
8          Okay. Sorry. I'm slow.
9     Q.   No problem. So is it fair to say
10 that based on what's written in this report,
11 an inmate was stabbed in H dorm and no
12 correctional officer observed the actual
13 stabbing?
14     A.   By reading the report, that's what
15 I gathered from this report.
16     Q.   And it says that a rover in H dorm
17 was approached. I know we spoke a little
18 bit about this, but can you clarify for me,
19 were there ███ rovers who were assigned to H
20 dorm at one time or is it possible that CO
21 Rock was the only rover assigned to H dorm
22 that night?
23     A.   It's possible that Mr. Rock could

Page 231

1 have been the only rover there. We'd have
2 to check the duty roster to determine that.
3     Q.   Did you take any action as a
4 result of this incident being reported to
5 you?
6     A.   Did I take any action? No, I did
7 not.
8     Q.   Did you think that there needed to
9 be any changes to St. Clair as a result of
10 this incident?
11     A.   No, I did not.
12     Q.   Did you think that this incident
13 meant that the H dorm was any less safe?
14     A.   No, I did not.
15     Q.   Did this incident change your
16 opinion on the safety of H dorm?
17     A.   No, it did not.
18     Q.   We will now mark Plaintiff's
19 Exhibit 7.
20
21 (Plaintiff's Exhibit 7 was marked for
22 identification and is attached to the
23 original transcript.)

Page 232

1     Q.   Which is another one-page incident
2 report, now bearing the Bates range
3 CORR000631. And I will represent that this
4 is an incident report dated July 22nd, 2017;
5 is that right?
6     A.   That's what it has there, yes,
7 ma'am.
8     Q.   And this one is classified as an
9 inmate-on-inmate homicide; is that right?
10     A.   That's what it has here, yes,
11 ma'am.
12     Q.   So take the time if you need to to
13 read over this, but do you recall this
14 particular homicide?
15     A.   Yes, ma'am. I recall this -- the
16 homicide, yes, ma'am.
17     Q.   What do you recall about it?
18     A.   I was notified of it and I went to
19 the cell block with the investigator and
20 just observed the cell and the inmate in the
21 cell. Other than that, that's all I -- I&I
22 was responsible for investigating it.
23     Q.   You were responsible for

Page 233

1 investigating it?
2     A.   I&I was responsible for
3 investigating it.
4     Q.   I&I, I apologize, I thought you
5 said I. And who did I&I report to about
6 their investigation?
7     A.   Well, Mr. Mercado is the head of
8 I&I. The individual investigators fills out
9 the report and sends it to Mr. Mercado, and
10 who Mr. Mercado sends it to ain't in my
11 chain, so I don't know.
12     Q.   Did you have any involvement in
13 this particular investigation, whether --
14     A.   No, ma'am.
15     Q.   -- during -- did the result of
16 this investigation get reported to you?
17     A.   No, ma'am.
18     Q.   Did you have access to the results
19 of the investigation?
20     A.   I don't recall that I did. I
21 don't think so.
22     Q.   Was it important to you to find
23 out whether I&I had done a sufficient job

59 (Pages 230 - 233)

CONFIDENTIAL - ATTORNEY'S EYES ONLY

Page 238

1 viewed, so they do that.
2    Q.   So it's your view that cameras
3 could not have prevented this homicide?
4    A.   I'm not saying that they can't.
5 Don't have an opinion about that.
6    Q.   Okay.  Do you think that there's
7 anything that could have prevented this
8 homicide?
9    A.   I don't know what the situation
10 was.  If it was a situation where the inmate
11 was in debt or he was in fear of his life,
12 if he would have come to the correctional
13 officer and said, hey, man, I got myself
14 into a mess, I need some help, that would
15 have probably taken care of the whole
16 situation.  If inmates would just say, hey,
17 listen, I need some help.
18    Q.   Do you recall any staff meetings
19 where anyone talked about what could have
20 been done differently to prevent this
21 homicide?
22    A.   No.
23    Q.   So is it your view sitting here

Page 239

1 today that there was nothing St. Clair could
2 have done to prevent this homicide?
3    A.   I don't think I can have an
4 opinion about that.  I think that all I can
5 say is is that I can't say if we did this or
6 Y or Z that the situation would have been
7 different.
8        I know the situation would have
9 been different if either convict involved in
10 it said, hey, listen, I got this going on
11 here, we could have took care of it.
12        But to say if we did this or that
13 there would have been a different outcome,
14 it gets back down to opportunity.  If
15 someone has a deep-seeded reason to do
16 something, they're going to find an
17 opportunity to do it.
18    Q.   Did you make any policy changes at
19 St. Clair as a result of this homicide?
20    A.   No.
21    Q.   Did you believe after this
22 homicide occurred that the N 2 block was any
23 less safe than it had been prior to this

Page 240

1 incident?
2    A.   No.
3    Q.   For the incident reports that
4 mention that you were notified, do you have
5 any reason to believe that any of that would
6 be inaccurate, that -- do you have any
7 reason to believe a correctional officer
8 would say you were notified --
9    A.   If it says I was notified, I was
10 notified.
11    Q.   Okay.  We're going to mark
12 Plaintiff's Exhibit 8.
13
14 (Plaintiff's Exhibit 8 was marked for
15 identification and is attached to the
16 original transcript.)
17
18    Q.   Which is another one -- two-page
19 incident report bearing the Bates range
20 CORR000672, which is an incident report from
21 February 9th, 2018.  Do you see that?
22    A.   Yes, ma'am.
23    Q.   And do you see this is another

Page 241

1 incident report classified as an
2 inmate-on-inmate homicide?
3    A.   Yes, ma'am.
4    Q.   Do you have any recollection of
5 this homicide?
6    A.   Let me read over it.  (Witness
7 reviews document.)
8        Okay.  Uh-huh.
9    Q.   Do you have any independent
10 recollection of this homicide?
11    A.   No, I don't.
12    Q.   And does that surprise you that
13 you don't recall this homicide?
14    A.   Well, generally, I thought I
15 remembered most of them.  I just don't
16 recall this one.
17    Q.   Is there anything about this one
18 that would make it less memorable for you?
19    A.   No.
20    Q.   It says here that you were
21 notified approximately 1:10 p.m.  Do you see
22 that?
23    A.   Yes, ma'am.

61 (Pages 238 - 241)

CONFIDENTIAL - ATTORNEY'S EYES ONLY

Page 242

1    Q.   Do you have any reason to believe
2  that you were not notified at 1:10 p.m.?
3    A.   No, ma'am.
4    Q.   And this occurred at -- outside of
5  the L dorm; is that right?
6    A.   That's what it says, yes, ma'am
7  uh-huh.
8    Q.   And did you take any specific
9  actions as a result of this homicide?
10    A.   No, ma'am.
11    Q.   Do you feel like this homicide
12  made outside of the L dorm any less safe?
13    A.   No, ma'am.
14    Q.   Do you recall any staff meetings
15  where you discussed how to make certain
16  institutional changes to prevent a homicide
17  like this one?
18    A.   No, ma'am.  Now, I just want to
19  say that we continued on a daily -- every
20  staff meeting to say to continue to do
21  Correctional 101, rove, observe, supervise,
22  shakedown.  Okay?
23    Q.   Okay.  I want to turn now to the

Page 243

1  incident that's at issue here in this
2  lawsuit.
3    A.   Uh-huh.
4    Q.   Do you recall that incident?
5    A.   No, ma'am.
6    Q.   And why do you think that is?  Any
7  thoughts on why --
8    A.   No, ma'am, you know, just other
9  than time, ma'am.  I mean, I'm 60 years old,
10  I retired three years ago.  I try to forget
11  as much as I can forget, you know.  I try to
12  take care of my grandkids and play with my
13  grandkids.  That's the most important thing
14  to me right now.
15    Q.   So are you -- when I say the name
16  Aundra Boykins as the plaintiff, do you have
17  any specific memories of him?
18    A.   No, ma'am.
19    Q.   Do you have any specific memories
20  of his assailant Cortez Whittington?
21    A.   No, ma'am.
22    Q.   Okay.  I'm going to mark
23  Plaintiff's Exhibit 9.  It is a document

Page 244

1  bearing the Bates Number CORR001468.
2
3  (Plaintiff's Exhibit 9 was marked for
4  identification and is attached to the
5  original transcript.)
6
7    Q.   Do you recognize this document?
8    A.   Do I recognize it other than you
9  just giving it to me, no.
10    Q.   Do you know what this document is?
11    A.   It's a history of inmate's
12  movement, yes, ma'am.
13    Q.   Is this a document that you would
14  have reviewed in the course of your --
15    A.   No, ma'am.
16    Q.   -- duties?  Who would have been
17  responsible for maintaining this type of
18  document?
19    A.   This is printed off a computer.
20  It's printed off when a reason for it to be
21  printed off, it's printed off.
22    Q.   And do you understand that Cortez
23  Whittington, the inmate listed here, is the

Page 245

1  inmate who Mr. Boykins says in the complaint
2  stabbed him in H dorm in 2017?
3    A.   Yes, ma'am.  Yes, ma'am.
4    Q.   So I want to turn to the second
5  page.  It says here October 16th, 2017;
6  type, moved to bed; and it lists the bed as
7  P25-2A.  Do you see that?
8    A.   Where are we at?
9    Q.   So the top row on the second page.
10    A.   10/16/17?
11    Q.   Yes.
12    A.   Okay.  Got it.
13    Q.   If you flip back to the first
14  page, it says that on December 3rd, 2017, he
15  was moved to a bed D31-1A.  Do you see that?
16    A.   Uh-huh.
17    Q.   Is it, therefore, fair to assume
18  that between October 16, 2017 and December
19  3rd, 2017, he was assigned to the bed
20  P25-2A?
21    A.   Yes, ma'am, uh-huh.
22    Q.   Okay.  And I'm going to now mark
23  Plaintiff's Exhibit 10, which is a document

62 (Pages 242 - 245)

CONFIDENTIAL - ATTORNEY'S EYES ONLY

Page 250

1 door. He could have been looking in the
2 bathroom area, roving in the bathroom area,
3 somebody come in the front door. He could
4 have been in the classroom area and somebody
5 come in the front door.
6        I mean, there's any number of
7 places that he could have been where he
8 might not observe someone coming through the
9 front door.
10    Q. So there was no -- at this time,
11 December 2nd, 2017, there was no one
12 stationed to patrol or confirm who was
13 coming in and out of H dorm; is that right?
14    A. No, that's incorrect. Officer
15 Walker was assigned to the dormitory.
16    Q. Okay. But is it fair to say that
17 there was no officer stationed at the
18 entrance to H dorm responsible solely for
19 controlling movement in and out of H dorm?
20    A. I don't like your question because
21 it's a vague question and it's a misnomer.
22 That's the reason why we assign correctional
23 officers to rove particular dormitories,

Page 251

1 just as we assign them to rove P dormitory.
2        If you want to use P dormitory as
3 an example, that officer that's assigned to
4 P dormitory, he don't stand at a particular
5 place and watch the front door and every
6 convict that come in he asks them for their
7 ID to make sure they come in, because he has
8 other responsibilities to do.
9        He walks that entire dormitory to
10 make sure everybody is safe and secure and
11 that the facility is as secure it can be.
12 And in the process of doing that, if he runs
13 across somebody he's not familiar with or
14 don't see, hey, man, let me see your ID, and
15 then he checks them, and if they're from
16 another, he'll say, get out.
17    Q. So when I want to go into my
18 office building, I have to go by security
19 and I have to swipe in my ID card. If you
20 had extra correctional officers on staff,
21 would you put any of them at the entrances
22 to all of these dorms and blocks to check
23 their ID, see whether they were going in and

Page 252

1 out, who was going in and out?
2    A. I don't think that would be a
3 useful use of correctional officers. I want
4 the correctional officer to be visible, to
5 be roving around inside the cell blocks, to
6 be visible to inmates doing their job roving
7 around.
8        I want them to be checking,
9 talking, looking at people's faces, seeing
10 their eyeballs, making sure that they're
11 okay, and shaking down when they can.
12 That's what I would use correctional
13 officers for to do.
14    Q. And based on the prior exhibit we
15 looked at, is it fair to say that inmate
16 Whittington was not authorized to be in H
17 dorm at this time?
18    A. That would be -- that would be a
19 fairly good assumption, yes, ma'am. Based
20 on the information we have.
21    Q. Do you have any knowledge as to
22 how inmate Whittington was able to get into
23 H dorm even though he was not authorized to

Page 253

1 be there?
2    A. You know, like I said, inmates
3 walk around, they have to come -- if he's
4 assigned to the G complex, what we call the
5 population G complex, he comes from that
6 sidewalk between two buildings. And usually
7 there's an officer there. He could have
8 told them he was going to the healthcare
9 unit.
10        It's 4 p.m. They're probably in
11 the process of feeding then, so he could
12 have come out of the back door of the
13 kitchen and went down the tunnel that leads
14 to H dorm. There's any number of ways he
15 could have done it.
16    Q. Were there any special security
17 risks associated with that tunnel you're
18 referring to?
19    A. No, uh-uh. You know, people like
20 to call it a tunnel. It was a walkway
21 inside of a building.
22    Q. Got it. Do you know whether the
23 locks on H dorm versus the P block were any

64 (Pages 250 - 253)

CONFIDENTIAL - ATTORNEY'S EYES ONLY

Page 254

1 different from each other at this time?
2     A.  Yes, ma'am.  It was a metal
3 building, and metal buildings had
4 notoriously bad locks.  And so the front
5 door -- the front door didn't even lock.
6     Q.  On H dorm?
7     A.  On H dorm, uh-huh.
8     Q.  At this date?
9     A.  Uh-huh.
10     Q.  And what about the P block where
11 Whittington was assigned, was he supposed to
12 be locked in at all or --
13     A.  I don't know.  Again, it looks
14 like it was associated with feeding.  I
15 don't know what point they were feeding.  I
16 don't know if this guy had secreted himself,
17 lied and got himself into the kitchen when
18 he went out to eat.  I don't know what he
19 did once he went out to go to eat or what
20 the situation was.
21         All we can really deduce is that
22 the inmate was out of pocket down in H dorm.
23     Q.  And is it your understanding that

Page 255

1 Officer Walker was responsible for the fact
2 that Whittington was in H dorm when he was
3 not authorized to be?
4     MR. REEVES:  Object to the form.
5     A.  No, ma'am.  I haven't said that at
6 all.  I don't know where you got that from.
7 I said Officer Walker was responsible for
8 roving the dormitory, right?  And that was
9 one of his duties was to rove the dormitory,
10 and if he observes somebody that's not there
11 that's not supposed to be, challenge them
12 and ask them if they're supposed to be
13 there, and find out he's not, give him a
14 disciplinary and send him back out or get
15 somebody to come down and pick him up and
16 take him to the shift commander's office and
17 write him up or do any number of different
18 things.
19         But is he responsible for him
20 being there, I'm not going to tell you he's
21 responsible for that inmate being inside
22 that dormitory.
23     Q.  Was it his duty to prevent inmates

Page 256

1 from coming into H dorm who were not
2 authorized to be there?
3     A.  It's his duty to provide security,
4 custody, and control of H dorm, which it
5 looks like that's what he did when he looks
6 up and observes the two inmates fighting,
7 one with a knife, and he calls for
8 assistance and they come down and take care
9 of the incident.  It looks like he done his
10 job.
11     Q.  So yes or no, was it Officer
12 Walker's duty to prevent Whittington from
13 entering H dorm?
14     A.  If he was aware of this inmate
15 being out of pocket and in that dormitory,
16 then, yes, ma'am, that was one of his
17 duties.
18     Q.  Do you know whether Officer Walker
19 was disciplined as a result of this
20 incident?
21     A.  For what?
22     Q.  Do you know whether he received
23 any disciplinary action for this incident?

Page 257

1     A.  What would you want me to write
2 him up for?
3     Q.  We can talk about that, but I'm
4 just wondering sitting here today, are you
5 aware whether he received any disciplinary
6 action?
7     A.  Based on this incident report, I
8 can't see that he done anything wrong.
9     Q.  Are you aware of how long Officer
10 Walker had been on duty at the time of this
11 incident?
12     A.  I am not.
13     Q.  Would it surprise you to learn
14 that Officer Walker had been on duty for
15 approximately 23 hours?
16     A.  I'm not aware of that.
17     Q.  I'm going to turn to Plaintiff's
18 Exhibit 11.
19     A.  Let me back up and say I don't
20 recall being aware of that, let's put it
21 that way.
22     Q.  Is that something you would have
23 been aware of as the warden whether --

65 (Pages 254 - 257)

CONFIDENTIAL - ATTORNEY'S EYES ONLY

Page 262

1 so there you go, not 23 hours like you said.
2     Q.   Okay.  So are you aware that the
3 plaintiff in this case has alleged that
4 Officer Walker was asleep at the time of the
5 incident?
6     A.   Kind of convenient, isn't it?
7     Q.   And are you aware of any
8 correctional officers at the time you were
9 warden falling asleep during their shift?
10     A.   Yes, ma'am.  And when they are
11 caught by their supervisor, they're
12 disciplined for it.
13     Q.   What kind of discipline would a
14 correctional officer receive for falling
15 asleep?
16     A.   It's in the admin regs the
17 progressive discipline that one could get
18 from it.  I'm not going to sit here and try
19 to recall from memory what it is, but it is
20 through dismissal.
21         If someone is caught sleeping for
22 a number of times, they can be dismissed for
23 that infraction, uh-huh.

Page 263

1     Q.   And do you know if Officer Walker
2 was disciplined at any point for sleeping on
3 the job?
4     A.   Why would someone be disciplined
5 if he wasn't asleep on the job?
6     Q.   Just if at any point if you're
7 aware that Officer Walker ever received any
8 discipline for --
9     A.   No, I'm not aware of that.
10     Q.   Okay.  The next exhibit I want to
11 show you I'm going to mark as Plaintiff's
12 Exhibit 12.
13
14 (Plaintiff's Exhibit 12 was marked for
15 identification and is attached to the
16 original transcript.)
17
18     Q.   Which is a document CORR002173.
19     MS. GARRETT:  I believe we used
20 this at the last deposition.
21     MR. REEVES:  Yes, you used this at
22 a prior deposition.  And because it's marked
23 highly confidential, attorneys' eyes only,

Page 264

1 like we did at the last deposition, we'll
2 designate this portion of the transcript
3 where we discuss this document as highly
4 confidential for attorneys' eyes only as
5 well.
6     MS. GARRETT:  Are you able to
7 state for the record the basis for making
8 that classification for this document?
9     MR. REEVES:  The reason it was
10 marked?
11     MS. GARRETT:  Yes.
12     MR. REEVES:  Yeah, it's a security
13 risk.
14     MS. GARRETT:  To discuss the
15 layout of the prison?
16     MR. REEVES:  Yes.  And to have it
17 as a visual that's not protected, yes.
18     MS. GARRETT:  I just want to
19 understand for the record.
20     Q.   (BY MS. GARRETT:)  So did you
21 receive a copy of this document?
22     A.   No, I did not.
23     Q.   Okay.  I would like you to let me

Page 265

1 know if you recognize this layout.
2     A.   This is not the way it's currently
3 set up.  And there is the dialysis building
4 that's not shown.  This unit here, this --
5 well, W trailer is still there, I apologize.
6 I don't think it's there now.
7         I'm assuming that this is the
8 dialysis building on this page here.  Okay.
9         So I guess as opposed to what it's
10 supposed to depict here, the one on the back
11 is the more accurate presentation of the
12 facility.
13     Q.   Okay.  So let's look at the one on
14 the back.  What I'd like you to walk me
15 through, Mr. Estes, is how Whittington could
16 have gotten from his bed in the P block to H
17 dorm, and recognizing that we don't know for
18 sure that that's what happened, but if you
19 could walk me through how he could have
20 gotten from the P block to H dorm.
21     A.   Okay.  Again, anything that we're
22 doing here, since we don't know how it
23 occurred, would just be purely speculation.

67 (Pages 262 - 265)

CONFIDENTIAL - ATTORNEY'S EYES ONLY

Page 266

1        But the inmate Whittingham was
2 assigned to P dormitory, which if you see in
3 these star-shaped configuration, it's the
4 one closest to the front side of the
5 facility.  This is the front side of the
6 facility, I think, yeah.
7        So he would come out this exit
8 door, hit that sidewalk and come through
9 this area that I was telling you about where
10 the two buildings are enclosed.  And this is
11 called the G yard, and it would be coming --
12 this sidewalk, I don't know if -- again, the
13 proximity in time indicates that it's close
14 to when we were feeding.  I don't know in
15 what order that the facility was being fed
16 at that time.
17        P block could come out.  If he
18 came out into -- going to the chow hall and
19 then somehow or another was able to secret
20 himself into the kitchen, or if he came out
21 of the chow hall and went down the tunnel,
22 so to speak, or this walkway that goes down
23 to H dorm, I can't tell you exactly how he

Page 267

1 did it.
2        I just know that those are the
3 routes that he would have taken would be
4 come through this walkway here and go down
5 there (indicating).
6    Q.   Would you mind just drawing on a
7 highlighter the possible routes that one
8 could take from the P block to H dorm as of
9 December 2nd, 2017?
10    A.   (Complies.)
11    Q.   Okay.  Thank you.
12    A.   That's a straight path.  There
13 could have been some other way, he could
14 have gone through some other way.  I don't
15 know, but that is one.
16    Q.   Can you think of any other way
17 sitting here today?
18    A.   Ma'am, he could have come through
19 the breezeway.  I don't know how he could
20 have done it.  He could have got himself
21 released in a healthcare unit and released
22 out the back door of the healthcare unit,
23 said he was from H dorm.

Page 268

1        He could have gone through the
2 breezeway in the front by the shift
3 commander's office and conned somebody into
4 opening up a door and going that way.
5        I don't know how he got through
6 there.  Its kind of like, it's opened up.
7 There's many areas he could have done it.
8    Q.   If he followed this path, how many
9 metal detectors do you think he would have
10 gone through?
11    A.   He wouldn't have gone through any
12 metal detectors.
13    Q.   And --
14    A.   Unless they had set up the
15 portable metal detector, which I don't know
16 if it was set up that day or if it was set
17 up behind the kitchen, if it was set up on
18 the yard, on the T, if it was here, I don't
19 know.  It could have been employed, couldn't
20 tell you.
21        But we already told you that
22 convicts can go by a metal detector and it
23 not go off.

Page 269

1    Q.   And how many cameras would have
2 picked up his movement from P to H on this
3 route?
4    A.   At the time, I don't think that --
5 other than the dayroom of P dorm, I don't
6 think there was a camera out that would have
7 picked him up.  I don't recall any cameras
8 being out there.
9    Q.   Would there have been any
10 checkpoints between P and H dorm where his
11 wristband would have been checked?
12    A.   During chow, there's people on
13 that yard.  Where he comes through the G
14 complex gate right there, there's generally
15 somebody there.  There would be somebody at
16 the T directing traffic, if it was during
17 traffic.  There would be somebody at the
18 back door of the kitchen -- somebody at the
19 front door of the chow hall, somebody at the
20 back door or the chow hall.  There could be
21 somebody down in the tunnel or the walkway.
22        Mr. Walker was down in H dorm.  I
23 mean, there could have been several people

CONFIDENTIAL - ATTORNEY'S EYES ONLY

Page 270

1 that was -- observed him.
2     Q.  Is it fair to say that you do not
3 know how Whittington got to H dorm?
4     A.  That is correct.
5     Q.  And is it fair to say that based
6 on the incident report, Officer Walker did
7 not know how he -- how Whittington got to H
8 dorm?
9         MR. REEVES:  Object to the form.
10    A.  I would have to say that that's
11 correct, because if Officer Walker had of
12 known him to be in H dorm, Mr. Walker would
13 have kicked him out.
14    Q.  Okay.  You do not recall being
15 informed of this incident specifically; is
16 that right?
17    A.  That is correct.
18    Q.  Do you recall whether you took any
19 actions as a result of this incident?
20    A.  As a matter of fact, this incident
21 occurred on a Saturday, and so like I said,
22 I wasn't made aware of it until the Monday
23 morning.

Page 271

1     Q.  Are you -- do you recall whether
2 you took any action specifically after this
3 incident occurred?
4     A.  In relation to what?
5     Q.  Do you recall whether you took any
6 actions as a result of this incident
7 regarding institutional changes to St.
8 Clair?
9     A.  No, ma'am.  Did not.
10    Q.  Did this incident make you feel
11 that H dorm was any less safe for prisoners?
12    A.  No, ma'am.
13    Q.  Do you recall having any staff
14 meetings to discuss how this incident could
15 have occurred?
16    A.  I don't recall any staff meetings.
17    Q.  Do you recall what happened to
18 Whittington after this incident?
19    A.  I believe that that document that
20 you showed us said -- showed he was placed
21 into restrictive housing.
22    Q.  And are you aware sitting here
23 today whether Whittington had any prior

Page 272

1 instances of inmate-on-inmate violence
2 before coming to St. Clair?
3     A.  Couldn't tell you.  Don't
4 remember.
5     Q.  Is there anything that would
6 refresh your recollection as to whether
7 he --
8     A.  Sure, if I saw the inmate's file.
9     Q.  Okay.  I will mark Plaintiff's
10 Exhibit 13, which I believe is -- actually
11 I'll come back to that one.
12        I want to turn quickly to the
13 issue of investigations of the prison.  You
14 already testified today that you were aware
15 while you were warden of a pending lawsuit
16 against the prison; is that right?
17    A.  Of a pending lawsuit against --
18    Q.  Of a lawsuit that was in effect,
19 were you aware of that at the time that you
20 were a warden?
21    A.  Are you talking about the Duke
22 lawsuit?
23    Q.  Yes, yes.

Page 273

1     A.  Yes, ma'am.
2     Q.  And you were deposed in connection
3 with that lawsuit while you were still
4 warden?
5     A.  I'm pretty sure I was.
6     Q.  Do you recall whether there was an
7 investigation by the Department of Justice
8 while you were warden of the prison?
9     A.  An investigation of --
10    Q.  Of the conditions at St. Clair?
11    A.  I don't -- I don't think that they
12 visited St. Clair.  I was looking at that
13 report that they issued, and I think -- I
14 don't recall them visiting St. Clair.
15 Donelson and Bibb, but I don't recall them
16 visiting St. Clair.
17    Q.  So you never met with any DOJ
18 attorneys or investigators?
19    A.  I don't recall.
20    Q.  Were you aware at the time that
21 the DOJ was investigating the Alabama
22 Department of Corrections?
23    A.  Yes, ma'am.

69 (Pages 270 - 273)

CONFIDENTIAL - ATTORNEY'S EYES ONLY

Page 274

1    Q.  How did you become aware of that?
2    A.  It wasn't -- it wasn't a secret to
3  anybody.  I mean, it was known.  It was in
4  the papers, it was on the news.
5    Q.  Did anyone talk to you about how
6  that investigation was going at any point
7  while you were a warden?
8    A.  No.
9    Q.  Okay.  I am going to mark
10  Plaintiff's Exhibit 13 now, which will be --
11  okay.
12
13  (Plaintiff's Exhibit 13 was marked for
14  identification and is attached to the
15  original transcript.)
16
17    Q.  Is this the document that you were
18  referring to?
19    A.  Yes, ma'am.
20    Q.  Is this a document that you
21  reviewed in preparation for your deposition?
22    A.  I reviewed it long before that, I
23  think the day it came out or something like

Page 275

1  that.
2    Q.  Okay.  There are just a few things
3  I want to ask you about here.  First, can
4  you state for the record what this document
5  is?
6    A.  I didn't write the document, but
7  the document says it's Investigation of
8  Alabama State Prisons for Men.
9    Q.  Okay.  And this is dated April
10  2nd, 2019; is that right?
11    A.  Okay, uh-huh.
12    Q.  And it says here that, on Page 3,
13  that the department opened an investigation
14  in October 2016, do you see that?
15    MR. REEVES:  Object to the form.
16    Q.  It says here that the department
17  opened a CRIPA investigation into the
18  conditions in ADOC facilities housing male
19  prisoners in October 2016.  Do you see that?
20    A.  I see that sentence right here.
21    Q.  And do you have any reason to
22  believe that that statement is not true?
23    A.  No.

Page 276

1    Q.  Do you remember when you first --
2  let me rephrase.
3    Is this CRIPA investigation by the
4  department the investigation that you were
5  aware of when you were warden of St. Clair?
6    A.  Yeah, I don't know what CRIPA
7  stands for.  But I am aware of an
8  investigation by the Department of Justice.
9    Q.  Yeah.
10    A.  Of the Department of Corrections
11  in Alabama, so --
12    Q.  Yeah.  I can represent to you on
13  the first -- on Page 1, it says CRIPA stands
14  for Civil Rights of Institutionalized
15  Persons Act.
16    A.  Okay.
17    Q.  So do you know when approximately
18  after October 2016 you learned about this
19  investigation?
20    A.  No, uh-uh.
21    Q.  Do you recall any specific staff
22  meetings where this investigation was
23  discussed?

Page 277

1    A.  I believe I recall our
2  commissioner stating that there was going to
3  be an investigation, and any time someone
4  comes to the facility, allow them in, be
5  cooperative with the investigation.  We just
6  do what we do.
7    Q.  Are you familiar with the findings
8  in this report?
9    A.  I believe I read over it.  I
10  can't -- I don't recall, you know -- tell me
11  what you're referring to.
12    Q.  So just generally first, do you
13  recall any strong reactions to this report
14  or anything that you disagreed with?
15    MR. REEVES:  Object to the form.
16    A.  Absolutely.  I believe that the
17  large majority of this information that the
18  Justice Department relied on was based on
19  inmate -- interviewing inmates and not so
20  much interviewing a correctional officer or
21  establishing fact about what the inmate
22  might have said, or if it was fact or
23  fictional or made up or if it was the

CONFIDENTIAL - ATTORNEY'S EYES ONLY

Page 302

1 about it?  Convicts are going to get in debt
2 situations.  We say, hey, listen, don't
3 borrow from each other because that runs you
4 into a bad situation.
5      Don't involve yourself in
6 homosexual relationships, hey, don't do that
7 because that runs people into bad situations
8 and people can get themselves cut up or --
9 don't do that.
10      I mean, we do that on a daily
11 basis; correctional officers do that every
12 day.  You know, gang inmates, drugs, don't
13 do drugs, it leads to nothing but violence
14 inside of an institution.  Don't try to sell
15 drugs.
16      I mean, every day, day in and day
17 out, that's what correctional officers do,
18 that's what sergeant -- that's what the
19 correctional officers do, that's what the
20 sergeants do, that's what the lieutenants
21 do, the captains do, the deputy wardens and
22 the warden every day.  They work every day
23 to make sure that the institution is as safe

Page 303

1 as it can possibly be.
2      Is it a hundred percent, hell no.
3 What in the world is a hundred percent,
4 nothing.  Okay.  Do we do a good job, hell
5 yeah, every day.  Do they get enough money
6 for it, hell no.  They need to be
7 compensated more for it.
8    Q.  Is it your view sitting here today
9 talking about the reasons for
10 inmate-on-inmate assaults that it's possible
11 that the plaintiff, Mr. Boykins, was
12 responsible for what happened to him?
13    A.  During the investigation, inmate
14 Boykins, from what I understand, says he
15 didn't want to prosecute, which effectively
16 stops the investigation.
17      We don't know what caused it.  We
18 can't make any assumptions of what caused it
19 and what we could possibly prevent in the
20 future, okay?
21      It would have been greater if the
22 individual had participated in the
23 investigation so we could have understood

Page 304

1 what happened so that maybe we could have
2 discerned something that might have been
3 useful in the moving forward to stop
4 something.  Don't know.
5    Q.  And just a few more questions.  So
6 after everything we talked about today,
7 looking back what we refreshed your
8 recollection on, can you identify for me any
9 policy, procedure or practice changes that
10 you instituted at St. Clair with regards to
11 safety measures?
12      MR. REEVES:  Object to the form.
13    A.  As a result of this incident?
14    Q.  Any incident.  Let me rephrase the
15 question.
16      During your time as warden of St.
17 Clair, did you institute any changes to
18 policies, practices or procedures to make
19 the prison safer?
20    A.  Okay.  Every day we talked about
21 Corrections 101 is the only thing that
22 corrections is about.  The only thing that
23 keeps the correctional institution secure

Page 305

1 and the inmates in it safe and the staff
2 safe is the correctional officers doing
3 their job by roving day in and day out, if
4 they're in a roving post, to rove.  If
5 they're in a roving post, shakedown, to.
6      If you're in a lockdown post like
7 a cubical, look at what you're supposed to
8 be looking at and observe.
9      I think this incident report that
10 you gave me pointed out that the security
11 officer did his job.  He observed this
12 fight, he observed this inmate being
13 assaulted, he responded, he separated, he
14 got medical attention.  The inmate that was
15 responsible for it was locked up.  I mean,
16 he got a disciplinary for it, the guy got
17 medical attention for it.
18      I think the correctional officer
19 did a damn good job.
20    Q.  So one thing -- I appreciate that.
21 I don't think it quite answers my question.
22    A.  That's fine.
23    Q.  What I'm trying to get at here is

77 (Pages 302 - 305)

CONFIDENTIAL - ATTORNEY'S EYES ONLY

Page 306

1 you came into St. Clair in March 2015; is
2 that right?
3      A.   Uh-huh.
4      Q.   And you inherited policies and
5 procedures that were in place governing St.
6 Clair; is that right?
7      A.   Right.
8      Q.   Did you look at those policies and
9 procedures and make any changes to them to
10 make the prison safer?
11          MR. REEVES:  Object to the form.
12     A.   Yeah.  Safer is a relative term.
13 I think that we -- you know, we've testified
14 to the fact that while two people involved
15 in an incident, the rest of the inmates were
16 safe.  A large majority, hundreds more
17 inmates were safe, being safe.
18          So St. Clair, I'll maintain that
19 our professional correctional staff at St.
20 Clair, and every other facility in the state
21 of Alabama, the good correctional officers,
22 work tirelessly day in and day out to make
23 the environment as safe as it can be for

Page 307

1 what it is, a prison.
2          And St. Clair is as safe as any
3 other maximum security prison in the State
4 of Alabama or any state in America.
5      Q.   So is it fair to say sitting here
6 today you cannot identify any written policy
7 or procedure that you changed as head warden
8 with regards to safety of the prison?
9      A.   I do not recall having or being
10 necessary to change anything.  I don't
11 recall any policy that I had to change to
12 make it safer, because it's my contention
13 that it is safe.
14     Q.   So one other -- two other topics
15 very quickly.  One of them, is it correct
16 that your prior testimony is that there was
17 a security audit that you were involved in
18 of St. Clair before you became a warden?
19     A.   Yes, ma'am.
20     Q.   And can you tell me about that
21 security audit, how you were involved and
22 what was found?
23     A.   All 12 plus the three addendums

Page 308

1 were checked.  There is a report about it.
2 We didn't find anything more than what we
3 find at other facilities, it's the same
4 thing.
5          We address concerns or we note
6 concerns or the facility might have somewhat
7 not met the policies or NIC guidelines, we
8 make recommendations for them to correct.
9 And the institution, once they get the
10 report, they work tirelessly to correct
11 those issues that was found.
12     Q.   Do you have any reason to believe
13 that the Department of Corrections no longer
14 has custody of that security audit?
15     A.   I don't know, ma'am.
16          MS. GARRETT:  Just for the record,
17 I believe we've requested that audit, and I
18 don't think that we have it yet, so I would
19 like to make a request on the record to make
20 sure that we get a copy.
21          MR. REEVES:  This isn't the forum
22 for a request for production.  To the extent
23 we negotiated production and it was within

Page 309

1 the time range, we completed a reasonably
2 diligent search for it and it would have
3 been produced.
4          MS. GARRETT:  I believe this would
5 cover the second set of requests, but we can
6 discuss off the record.
7      Q.   (BY MS. GARRETT:)  Do you recall
8 sitting here today any changes that were
9 recommended to be made to St. Clair as a
10 result of the security audit you were
11 involved in?
12     A.   I do not recall.  I don't remember
13 any of the findings that we did, I don't
14 remember what the report says.  I did my
15 small part and I turned it in.
16          It's put together down at central
17 office, and then it's published to whomever
18 it's published to, usually the warden and
19 maybe up the chain of command.
20          I don't recall seeing it.  I might
21 have seen it when I got there.  Not sure.  I
22 don't recall it.
23          But, I mean, if it pointed out

78 (Pages 306 - 309)

CONFIDENTIAL - ATTORNEY'S EYES ONLY

Page 310

1 that the institution was doing something
2 they needed to do better, the institution
3 made efforts to correct those issues.
4        But to say that anything that we
5 found made the institution unsafe, that's
6 just not true. St. Clair, with the
7 professional correctional officers that it
8 had, was a safe environment, safe as it
9 could be. Officers were doing their job,
10 they were roving and searching and doing
11 what they could do.
12    Q.   Have you been involved in any
13 security audits of St. Clair since you were
14 a warden?
15    A.   Since I was a warden? Was I --
16    Q.   So from 2015 to the present, have
17 you been involved in any security audits of
18 St. Clair?
19    A.   Not the departmental office, no.
20    Q.   At any office, at any level were
21 you part of what is considered to be a
22 security audit under the ARs?
23    A.   We do key control to control.

Page 311

1    Q.   Have there been any findings as a
2 result of that that you made sure were
3 instituted at St. Clair?
4    A.   I don't make sure -- it's not my
5 job to make sure that anything is
6 instituted. My job is to look at the -- do
7 an audit of a particular security thing that
8 I'm looking at and then see where if the
9 institution is deficient in any manner of
10 those standards and then write it up and
11 send it forward.
12    Q.   When you say it's not your job,
13 are you referring to your current job as
14 part-time in the inspector general's office?
15    A.   The warden of the facility would
16 be responsible for making changes at a
17 particular institution.
18    Q.   When you say the facility would be
19 responsibility, who at the facility would be
20 responsible ultimately for implementing
21 changes that were recommended from a
22 security audit?
23    A.   Let me think here a second. Oh,

Page 312

1 yeah. The warden III.
2    Q.   Which leads me to I believe one of
3 my last few questions, which is -- I wasn't
4 around, I wasn't born yet, but I have heard
5 that President Truman has said, The buck
6 stops here. Are you familiar with that
7 quote?
8    A.   Yes, ma'am. Uh-huh.
9    Q.   Would you agree that the buck
10 stops with warden III at St. Clair during
11 the time that you were warden there?
12        MR. REEVES: Object to the form.
13    A.   Yeah. In relation to what?
14 That's kind of a broad thing there.
15    Q.   It's a broad question. Let me try
16 to narrow it down.
17        So would you say that when an
18 incident of violence occurs at St. Clair,
19 that the person ultimately who should be
20 held responsible is warden III?
21        MR. REEVES: Object to the form.
22    A.   Not at all.
23    Q.   If there's an incident of

Page 313

1 violence, who should be held responsible for
2 that incident occurring?
3        MR. REEVES: Object to the form.
4    A.   The inmates that create the
5 violence.
6        MS. GARRETT: Okay. I think
7 that's it.
8        MR. REEVES: No questions at this
9 time.
10        MS. GARRETT: No more questions.
11        THE VIDEOGRAPHER: We are going
12 off the record at 3:50 p.m. This concludes
13 the deposition.
14
15        (Further Deponent Saith Not)
16
17
18
19
20
21
22
23

79 (Pages 310 - 313)

# EXHIBIT A



ADOC(DOJ)-AB-0000053

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

HIGHLY CONFIDENTIAL - ATTORNEY'S EYES ONLY

# Status of Security Positions
17-Jan-17

ADOC(DOJ)-AB-0000054

ADOC(DOJ)-AB-0000055

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY



Status of Security Positions

9-Jan-17

HIGHLY CONFIDENTIAL - ATTORNEY'S EYES ONLY

## Status of Security Positions

17-Jan-17

| Cubicle OP | PT Retiree - LE | Activated Supv | Supv Manning | Supv - Assigned | Supv Authorized | Potential CO Manning | Total Assigned CO & COT | COT Assigned | COT Institution | COT Academy | Activated CO | CO Manning | CO - Assigned | CO Authorized | SF OPR |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|

ADOC(DOJ)-AB-0000056



Status of Security Positions
23-Jan-17

ADOC(DOJ)-AB-0000057

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY



HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

ADOC(DOJ)-AB-0000058

ADOC(DOJ)-AB-0000059

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

## Status of Security Positions
6-Feb-17



| | St. Clair |
|---|---|
| CO Authorized | |
| CO - Assigned | |
| CO Manning | |
| Activated CO | |
| COT Academy | |
| COT Institution | |
| COT Assigned | |
| Total Assigned CO & COT | |
| Potential CO Manning | |
| Supv Authorized | |
| Supv - Assigned | |
| Supv Manning | |
| Activated Supv | |
| PT Retiree - LE | |
| Cubicle OP | |

HIGHLY CONFIDENTIAL - ATTORNEY'S EYES ONLY

ADOC(DOJ)-AB-0000060



Status of Security Positions
13-Feb-17



Status of Security Positions
21-Feb-17

ADOC(DOJ)-AB-0000061

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

HIGHLY CONFIDENTIAL - ATTORNEY'S EYES ONLY

**Status of Security Positions**
27-Feb-17

| Cubicle OP | PT Retiree - LE | Activated Supv | Supv Manning | Supv - Assigned | Supv Authorized | Potential CO Manning | Total Assigned CO & COT | COT Assigned | COT Institution | COT Academy | Activated CO | CO Manning | CO - Assigned | CO Authorized |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|

ADOC(DOJ)-AB-0000062

Status of Security Positions
8-Mar-17

ADOC(DOJ)-AB-0000063

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

ADOC(DOJ)-AB-0000064



Status of Security Positions
13-Mar-17

ADOC((DOJ)-AB-0000065

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

**Status of Security Positions**
20-Mar-17

St. Clair

CO Authorized
CO Assigned
CO Manning
Activated CO
COT Academy
COT Institution
COT Assigned
Total Assigned CO & COT
Potential CO Manning
Supv Authorized
Supv - Assigned
Supv Manning
Activated Supv
PT Reltree - LE
Cubicle OP

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY



Status of Security Positions
27-Mar-17

ADOC(DOJ)-AB-0000066

**Status of Security Positions**

3-Apr-17

St. Clair

| | |
|---|---|
| CO - Authorized | |
| CO - Assigned | |
| CO Manning | |
| Activated CO | |
| COT Academy | |
| COT Institution | |
| COT Assigned | |
| Total Assigned CO & COT | |
| Potential CO Manning | |
| Supv Authorized | |
| Supv - Assigned | |
| Supv Manning | |
| Activated Supv | |
| PT Retiree - LE | |
| Cubicle OP | |

GHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY



Status of Security Positions
16-Apr-17

ADOC(DOJ)-AB-0000068

ADOC(DOJ)-AB-0000069

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

**Status of Security Positions**

17-Apr-17

St. Clair

| | CO Authorized | CO - Assigned | CO Manning | Activated CO | CCT Academy | CCT Institution | CCT Assigned | Total Assigned CO & CCT | Potential CO Manning | Supv Authorized | Supv - Assigned | Supv Manning | Activated Sec |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|

HIGHLY CONFIDENTIAL - ATTORNEY'S EYES ONLY

ADOC(DOJ)-AB-0000070

## Status of Security Positions

ADOC(DOJ)-AB-0000071

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

**Status of Security Positions**
1-May-17

St. Clair

| CO Authorized |
| CO - Assigned |
| CO Manning |
| Activated CO |
| COT Academy |
| COT Institution |
| COT Assigned |
| Total Assigned CO & COT |
| Potential CO Manning |
| Supv Authorized |
| Supv - Assigned |
| Supv Manning |
| Activated Supv |
| PT Retiree - LE |
| Cubicle OP |

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY



Status of Security Positions
8-May-17

ADOC(DOJ)-AB-0000072



Status of Security Positions
15-May-17

St. Clair

CO Authorized
CO - Assigned
CO Manning
Activated CO
COT Academy
COT Institution
COT Assigned
Total Assigned CO & COT
Potential CO Manning
Supv Authorized
Supv - Assigned
Supv Manning
Activated Supv
PT Retiree - LE
Cubicle OP

ADOC(DOJ)-AB-0000073

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

ADOC(DOJ)-AB-0000074

## Status of Security Positions
22-May-17





ADOC(DOJ)-AB-0000075

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

ADOC(DOJ)-AB-0000076



Status of Security Positions
6-Jun-17



**Status of Security Positions**

12-Jun-17

ADOC(DOJ)-AB-0000077

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY



ADOC(DOJ)-AB-0000078

ADOC(DOJ)-AB-0000079

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY



**Status of Security Positions**

26-Jun-17

HIGHLY CONFIDENTIAL - ATTORNEY'S EYES ONLY



Status of Security Positions
5-Jul-17

ADOC(DOJ)-AB-0000080



Status of Security Positions
10-Jul-17

ADOC(DOJ)-AB-0000081

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY