# UNITED STATES DISTRICT COURT
# FOR THE NORTHERN DISTRICT OF ALABAMA
# MIDDLE DIVISION

| | |
|---|---|
| AUNDRA DEBREL BOYKINS,<br><br>    Plaintiff,<br><br>v.<br><br>JEFFERSON DUNN, *et al.*,<br><br>    Defendants. | )<br>)<br>)<br>)<br>)  Case No.:  4:19-cv-01934-ACA<br>)<br>)<br>)<br>)<br>) |

## <u>PLAINTIFF'S RE-FILED OPPOSITION TO MARC WALKER'S MOTION FOR SUMMARY JUDGMENT</u>

J.S. "Chris" Christie, Jr. (ASB-3162-H07J)
R. Terrell Blakesleay (ASB-5910-B00U)
**DENTONS SIROTE PC**
2311 Highland Avenue South
Post Office Box 55727
Birmingham, AL 35255-5727
Tel: (205) 930-5100
Fax: (205) 930-5101
chris.christie@dentons.com
terrell.blakesleay@dentons.com

Hyongsoon Kim, *pro hac vice*
**AKIN GUMP STRAUSS HAUER & FELD LLP**
4 Park Plaza, Suite 1900
Irvine, CA 92614-2585
Tel: (949) 885-4100
Fax: (949) 885-4101
kimh@akingump.com

Molly E. Whitman, *pro hac vice*
Brett M. Manisco, *pro hac vice*
Jessica Ro, *pro hac vice*
**AKIN GUMP STRAUSS HAUER & FELD LLP**
1999 Avenue of the Stars, Suite 600
Los Angeles, CA 90067-6022
Tel: (310) 229-1000
Fax: (310) 229-1001
mwhitman@akingump.com
bmanisco@akingump.com
jro@akingump.com

Jennifer S. Garrett, *pro hac vice*
Madeleine R. Freeman, *pro hac vice*
**AKIN GUMP STRAUSS HAUER & FELD LLP**
One Bryant Park
New York, NY 10036
Telephone: (212) 872-1065
Fax: (212) 872-1002
jgarrett@akingump.com

*Attorneys for Plaintiff*

Dated: June 28, 2023

**TABLE OF CONTENTS**

**PAGE**

INTRODUCTION ................................................................................................1

LEGAL STANDARD .........................................................................................2

STATEMENT OF FACTS ..................................................................................3

     I.     Response to Defendant Walker's Statement of Undisputed Facts ........3

     II.    Additional Undisputed Facts ................................................................6

     III.   Additional Disputed Facts ....................................................................9

ARGUMENT .....................................................................................................20

     I.     Summary Judgment is Inappropriate Given the Numerous
          Issues of Disputed Material Fact ........................................................20

     II.    A Reasonable Juror Could Conclude that Walker Committed a
          Constitutional Violation .....................................................................21

     III.   Walker Is Not Entitled to Qualified Immunity ...................................30

CONCLUSION ..................................................................................................34

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Adickes v. Kress & Co.*,
  398 U.S. 144, 157 (1970) ......................................................................2, 20

*Anderson v. Liberty Lobby, Inc.*,
  477 U.S. 242 (1986)........................................................................................2

*Barker v. Norman*,
  651 F.2d 1107 (5th Cir. 1981) ........................................................................32

*Carter v. Galloway*,
  352 F.3d 1346 (11th Cir. 2003) (per curiam) ...................................................21

*Celotex Corp. v. Catrett*,
  477 U.S. 317 (1986)....................................................................................2, 20

*Clark v. Alexander*,
  85 F.3d 146 (4th Cir. 1996) ...............................................................................3

*Cottone v. Jenne*,
  326 F.3d 1352 (11th Cir. 2003) .......................................................................28

*Est. of Cummings v. Davenport*,
  906 F.3d 934 (11th Cir. 2018) ...................................................................32, 33

*Farmer v. Brennan*,
  511 U.S. 825 (1994)................................................................................*passim*

*Griffin v. City of Opa-Locka*,
  261 F.3d 1295 (11th Cir. 2001) .......................................................................21

*Hale v. Tallapoosa Cty.*,
  50 F.3d 1579 (11th Cir. 1995) ..............................................................23, 24, 30

*Holloman ex rel. Holloman v. Harland*,
  370 F.3d 1252 (11th Cir. 2004) ...................................................................32, 33

*Hope v. Pelzer*,
  536 U.S. 730 (2002)........................................................................................23

*LaMarca v. Turner*,
995 F.2d 1526 (11th Cir. 1993) ...........................................................29

*Lee v. Ferraro*,
284 F.3d 1188 (11th Cir. 2002) ...........................................................33

*Lumley v. City of Dade City*,
327 F.3d 1186 (11th Cir. 2003) ...........................................................32

*Martin v. Brevard Cty. Pub. Sch.*,
543 F.3d 1261, 1265 (11th Cir. 2008) ...........................................3, 20

*O'Rourke v. Hayes*,
378 F.3d 1201 (11th Cir. 2004) .....................................................31, 32

*Perez v. Suszczynski*,
809 F.3d 1213 (11th Cir. 2016) ...........................................................31

*Q.F. v. Daniel*,
768 F. App'x 935 (11th Cir. 2019)........................................................24

*Washington v. Warden*,
847 Fed. Appx. 734 (11th Cir. 2021)...............................................33, 34

**Statutes**

Prison Rape Elimination Act ....................................................................11

**Other Authorities**

Eighth Amendment ....................................................................20, 21, 24

Fourteenth Amendment ..............................................................................1

Fed. R. Civ. P. 56(c)..................................................................................2

Fed. R. Civ. P. 702 ....................................................................................6

Fed. R. Evid. 401- 403 ..............................................................................3

Plaintiff Aundra Boykins ("Plaintiff") submits this Memorandum of Law in opposition to the Motion for Summary Judgment by Defendant Marc Walker ("Walker") [ECF 133].

## INTRODUCTION

This case seeks to hold correctional officer Walker accountable for his dereliction of duty on December 2, 2017, which allowed Cortez Whittington ("Whittington") to freely enter H Dorm while armed and stab Plaintiff repeatedly, causing injuries requiring not just a trip to the infirmary, but three days of hospitalization (hereinafter, the "Assault"). Walker moves for summary judgment primarily on the basis that he was not asleep when Whittington walked right past him. But the evidence taken in the light most favorable to Plaintiff disproves Walker's contention, or at a minimum, creates a triable issue of fact. Indeed, even if Walker's version of events were true—which Plaintiff disputes—triable issues of fact remain as to whether Walker's inattentiveness and failure to comply with and enforce St. Clair Correctional Facility's ("St. Clair") policies and procedures render him liable for violating Plaintiff's Eighth and Fourteenth Amendment rights.

A reasonable juror could conclude that (1) based on Walker's knowledge of the unsafe conditions at St. Clair facilitating longstanding high levels of inmate-on-inmate ("IOI") violence, as well as his knowledge of the staffing shortage on the day of the Assault, Walker knew of the substantial risk of serious harm that could come

to Plaintiff if H Dorm was left unmonitored; (2) Walker was deliberately indifferent to that risk by sleeping while on his post and neglecting to check Whittington's colored wristband or otherwise identify that Whittington sought unauthorized access to H Dorm; and (3) Walker's deliberate indifference caused Boykins's injuries. Walker's motion should be denied.

## LEGAL STANDARD

Summary judgment must be denied unless the moving party demonstrates both that there "is no genuine issue as to any material fact" and that "the moving party is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(c) ("Rule 56(c)"). Pursuant to Rule 56(c), the moving party carries the burden of demonstrating that the evidence "is so one-sided that [the moving] party [should] prevail as a matter of law." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 252 (1986); *Adickes v. Kress & Co.,* 398 U.S. 144, 157 (1970) (moving party "had the burden of showing the absence of a genuine issue as to any material fact"). A defendant cannot meet this burden unless he demonstrates the absence of a genuine issue of material fact. *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986); Fed. R. Civ. P. 56(c).

Federal courts must give deference by resolving all reasonable doubts in favor of the non-movant, and considering the facts, and all reasonable inferences drawn from them in the "light most favorable to the opposing party." *Adickes*, 398 U.S. at

157; *Clark v. Alexander*, 85 F.3d 146, 150 (4th Cir. 1996) (same); *Martin v. Brevard Cty. Pub. Sch.*, 543 F.3d 1261, 1265 (11th Cir. 2008) (same).

## STATEMENT OF FACTS

### I.     Response to Defendant Walker's Statement of Undisputed Facts

Pursuant to Appendix II of this Court's Initial Order ECF 31 at 17–18, Plaintiff disputes and/or objects to the following facts in Walker's statement of undisputed facts (each identified with "<u>W ¶</u>"):

### <u>Procedural History</u>

W ¶ 1. Objection. The statement concerning why Plaintiff is incarcerated constitutes inadmissible evidence, as it is irrelevant and unduly prejudicial. Fed. R. Evid. 401- 403.

W ¶ 6. Disputed. The fact is not supported by competent evidence.

### <u>The Incident</u>

W ¶ 11. Disputed. Whittington, who was not assigned to H Dorm and prohibited from entering [*see* ECF 195-1 at 53-54; ECF 141-10 at 11, 79:11-25; ECF 195-1 at 19, 162:2-19], was able to enter H Dorm because Walker was asleep at his post [ECF 141-10 at 24, 188:14-25], allowing Whittington to "walk[] straight past" him [ECF 195-3 at 17, 221:7-12]; Walker did not check Whittington's colored wristband or search him for contraband [ECF 141-17 at 13, 221:7-14]; there were no surveillance cameras in H Dorm [ECF 195-3 at 22]; there was insufficient staffing

at St. Clair and specifically in H dorm [ECF 195-1 at 38, 192:1-18; ECF 195-3 at 30, 40:2-5; ECF 195-3 at 59, 42:10-20; ECF 195-4 at 21 (in week of Assault, 88 correctional officer positions were staffed out of 249 spots, or 35% staffing)]; the entrance door lock to H Dorm door was broken [ECF 195-3 at 107, 253:22-254:9]; and there were no metal detectors along the path Whittington likely took [*see, e.g.*, *id.* at 110, 268:8-269:8]. Whittington transferred to St. Clair in September 2017 and was not "new[ ]." *See* ECF 195-1 at 60.

W ¶ 12. Disputed. Plaintiff observed Walker sleeping immediately prior to the Assault. ECF 195-1 at 20 & 22, 163:2-3, 188:20-25.

W ¶ 13. Disputed. The COs mischaracterize the testimony. Walker testified he "could see in there," but did not testify that he was monitoring the room at the time of the Assault. ECF 141-16 at 11, 225:4-10. Someone sitting at Walker's post might not see all parts of the TV room, as Plaintiff testified he could not see Walker at his desk. ECF 141-10 at 21, 175:2-17. Walker also testified that there are "plenty" of blind spots in H Dorm, he could not monitor the entirety of H Dorm from his post, and once he heard "a commotion," he "got up from [his] desk to see what was happening." ECF 141-16 at 10, 224:3-5; ECF 195-1 at 37, 188:17-189:7.

W ¶ 17. Disputed. This fact is not supported by competent evidence. Further, Plaintiff testified that he observed Walker sleeping immediately prior to the assault. ECF 195-1 at 20, 163:2-3. This testimony is corroborated by the fact that if Walker

was awake, he should have prevented Whittington from entering H Dorm, as SOP 067 provides that "Inmates not assigned to H Building will not be allowed to visit. NO EXCEPTIONS. Colored wrist bands are to be checked before allowing inmates to enter H Dorm." ECF 195-1 at 54. Walker made no attempt to do so, and is wholly unaware of how Whittington was able to access H Dorm. ECF 195-1 at 46, 269:10-13.

W ¶ 18. Disputed, including because the characterization of events and testimony is misleading. Whittington admitted he approached Plaintiff from behind. ECF 141-17 at 16, 236:20-23. Whittington was the sole aggressor, and only Whittington—not Plaintiff—was found "guilty of fighting with a weapon." ECF 141-5 at 68-71 (finding Plaintiff not guilty "[b]ased on [Walker's] sworn testimony and the testimony of [Plaintiff] reacting in self-defense [sic] of the assault by inmate Whittington"), 78-84; ECF 195-1 at 11–12 ¶¶ 8 & 12.

W ¶ 22. Disputed. Walker did not see Whittington begin to stab Plaintiff and had to get up from his desk to identify the disturbance. ECF 141-16 at 10, 224:3-5. There is no evidence that Walker "immediately" used his radio to summon other officers. Walker's only recollection of the Assault is reflected in his Incident Report, which shows that it took at least ten minutes after Whittington began stabbing Plaintiff for backup to arrive. ECF 195-1 at 20, 221:22–222:13; ECF 141-16 at 16-

17. Further, the citation to Exhibit S of the COs' Submission does not support this alleged fact.

W ¶ 26. Disputed. Walker's statement that four correctional officers responded "within minutes" is misleading in that it suggests that a minimal and reasonable amount of time elapsed between when the assault began and when backup arrived. The evidence suggests that it took ten minutes after Whittington started stabbing Plaintiff for the additional four correctional officers to arrive at the scene. ECF 141-16 at 16-17.

W ¶ 27. Clarified. Plaintiff estimated that six or seven officers responded, but does not know how long it took officers to respond or how many officers responded to the Assault because he was fighting for his life and lost consciousness at least once due to the loss of blood from his stab wounds. ECF 141-10 at 20, 171:5-20.

W ¶¶ 29–31. Disputed. Plaintiff objects to the COs' citations to the reports, opinions, and testimony of the expert witnesses disclosed in this case (the "Expert Testimony" section), which do not constitute admissible evidence. Fed. R. Civ. P. 702. The COs' Expert Testimony section impermissibly sets forth numerous legal conclusions that are not based on admissible record evidence.

## II. Additional Undisputed Facts

1. In June 2016, Officer Walker was reprimanded for failing to adequately monitor H dorm, and in particular, for failing to prevent unauthorized inmates from

general population from accessing H Dorm. ECF 195-1 at 65. Specifically, an evaluation for Walker noted that he "needs to inspect inmates appearance more and rover H Dorm more frequently. ***Officer Walker should monitor population inmates and stop them from entering H dorm***." *Id.* (emphasis added).

2.      Administrative Regulation ("<u>AR</u>") 208 prohibits correctional officers for "sleeping or giving the appearance of sleeping on duty." ECF 195-8 at 103. AR 208 provides for progressive discipline whereby a fourth offense of "sleeping or giving the appearance of sleeping on duty" carries a penalty of "dismissal." *Id.*

3.      For this reason, St. Clair Standard Operating Procedure ("<u>SOP</u>") 67 provides that if correctional officers "should become sleepy, ill, or in any way unable to perform [their] post duties," they should notify their Shift Supervisor for immediate relief. ECF 195-1 at 56.

4.      Walker concedes that he has become sleepy while working in H Dorm. ECF 195-1 at 41, 216:13-16. However, rather than notify his shift supervisor, Walker's practice is that when he gets tired on his post, he simply gets up and walks around. *Id.*, 216:7-217:7.

5.      St. Clair's policies concerning officer staffing are inconsistent. SOP 031 provides that "during normal operations," ███████ is required to be present in H Dorm. ECF 141-9 at 11.

6.     Yet, SOP 032—which addresses "Staff Manning Requirements" and was signed by Estes in 2016—provides that H Dorm is to have ███████. ECF 195-6 at 55.

7.     SOP 067 ("<u>H-Unit Officer</u>"), signed by Estes in 2016, similarly states that ███████████ trained rovers will be assigned to the H Building." ECF 195-1 at 51 (emphasis added). These assigned rovers, as the "primary line of security within the institution," "must be constantly on patrol in their assigned areas and check inmates for colored wristband [sic]." *Id.* at 3. The rovers must also "conduct sufficient random personal and area shakedowns to eliminate the flow of contraband." *Id.* at 5.

8.     SOP 067 indicates that inmates assigned to H Dorm are issued a white wristband and that "[i]f in doubt of any inmate's identification, the information must be verified before permitting any inmate entrance into the H Building." ECF 195-1 at 53. This SOP instructs: "Inmates not assigned to the H Building will not be allowed to visit. NO EXCEPTIONS. Colored wrist bands are to be checked before allowing inmate [sic] to enter H Dorm." *Id.* at 54; *see also* ECF 195-3 at 36, 121:10-14.

9.     SOP 137 on "Inmate Movement Control" requires that "[t]he gates leading from H Dorm to the Industrial area will be kept locked and will be opened and controlled by security personnel only." ECF 195-3 at 72.

10.     SOP 083 explains that the "[w]ristbands are an important tool we use in our efforts to keep unauthorized inmates out of unassigned cellblocks." ECF 195-6 at 68. SOP 110 states that "Officers should check inmates for colored wristband [sic]. All inmates except those in Segregation must wear the appropriate colored wristband, based on their assigned bed assignment, at all times." ECF 195-6 at 6.

11.     Finally, SOP 110 concerning "Search and Shakedowns" also states that "[d]uring searches and shakedowns Officers should check inmates for colored wristband. All inmates except those in Segregation must wear the appropriate colored wristband, based on their assigned bed assignment, at all times." ECF 195-6 at 6.

## III.     Additional Disputed Facts

### IOI Violence at St. Clair

12.     Walker testified that St. Clair bears the reputation of being a particularly dangerous prison. ECF 195-1 at 27, 39:12-15.

13.     Between October 2011 and May 2016, eight homicides were reported at St. Clair. ECF 195-6 at 84. Two additional homicides occurred within seven months of each other, in July 2017 and February 2018. ECF 195-15 at 15, ECF 195-17 at 13-14.

14.     St. Clair recorded at least 48 IOI stabbings in 2016: five of which occurred in H Dorm, and 27 of which required a hospital visit, along with 13 other

incidents of IOI assault that required hospital visits but did not involve stabbing. *See* ECFs 174-8 at 109-156; 174-9; 174-10; 174-11; 172-12; 174-13; 174-14; 174-15; 174-16; 174-17 at 1-11. Then, between October 2016 and September 2017, ADOC reported 90 IOI assaults at St. Clair, meaning an IOI assault occurred on average every four days. ECF 195-6 at 97.

15.     IOI assaults at St. Clair continued at an even higher average rate in the months leading up to the Assault, and there were at least 10 incidents of IOI violence in December 2017, averaging one assault **every three days**. ECF 195-6 at 113 & 129; ECF 195-3 at 52. Between January 1, 2017 through December 1, 2017, St. Clair recorded at least 19 IOI assaults involving a weapon, including 18 IOI stabbings, three of which occurred in H Dorm, and 13 of which required a hospital visit, along with 27 other incidents of IOI assault that required hospital visits but did not involve stabbing. *See* ECFs 174-8 at 109-156; 174-9; 174-10; 174-11; 172-12; 174-13; 174-14; 174-15; 174-16; 174-17 at 1-11. In 2016, St. Clair recorded at least 48 IOI assaults involving a weapon. ECF 195-6 at 183-196. Through discovery, Plaintiff has been able to obtain incident reports dated after December 2, 2017 indicating at least two additional homicides since that date, as well as three additional stabbings in H Dorm. ECF 195-17 at 13, 20, 27.

16.     In 2017, numerous incidents of IOI violence went unobserved by staff, including at least four incidents in H Dorm and one homicide. *See* ECFs 174-8 at

109-156; 174-9; 174-10; 174-11; 172-12; 174-13; 174-14; 174-15; 174-16; 174-17 at 1-11.

17.     Melinda Allen, a decade-long Prison Rape Elimination Act (PREA) auditor (60 PREA audits in total, including of several maximum security prisons), who conducted a mock audit of St. Clair in April 2018, ranked St. Clair "[t]he lowest" in terms of safety measures compared to others she observed. ECF 195-6 at 171 & 173-74, 60:21-23, 117:2-5, 118:16-18. Allen found "so many problems at St. Clair" that she "contacted the Department of Justice [herself]." *Id.* at 173, 117:7-11. She described a St. Clair housing unit as "the scariest that I've ever been to." *Id.* at 172, 115:20-24. Allen observed "lack of control by staff, lack of doors working, inmates being able to move throughout the facility wherever they wanted to, moving unchallenged, being in locations where they're not supposed to." *Id.* at 175, 121:24-122:9.

18.     Agent Casey, who was an investigator with LESD from 2016 to 2020, remarked that St. Clair "always seemed as though it was a hot spot" with respect to the amount of incidents that occurred within the facility. ECF 195-5 at 63, 133:13-14. Indeed, IOI assaults constituted a "fairly regular portion" of Casey's caseload. *Id.* at 62, 78:10-12.

19.     In 2017, the year of the Assault, St. Clair had more violent incidents than other ADOC Level V facilities. ECF 195-6 at 97; ECF 195-6 at 20, 168:20-

22. In December 2017 alone, at least 10 incidents of violence occurred at St. Clair, most of which involved a victim-inmate being assaulted with inmate-made weapons and requiring outside hospitalization. *See* ECF 195-17 at 16-23 (Incident Reports of stabbings or assaults that occurred on 12/4/2017, 12/11/2017, 12/12/2017, 12/14/2017, 12/17/2017, 12/20/2017, and 12/27/2017); ECF 195-3 at 52.

20. Yet, the 2017 ADOC-reported rate of violent incidents at St. Clair could have been under-inclusive due to the manner in which they were reported in 2017. ECF 195-6 at 21, 200:11-12.

21. Such incidents of IOI violence occurred excessively at St. Clair for years prior to the Assault. *See* ECF 195-63 at 180 (2014 letter from EJI noting that "[d]uring the last year there have been over a dozen nearly fatal stabbings and assaults at St. Clair"); ECF 195-4 at 78 (discussing settlement agreement for 2014 suit alleging ADOC "had failed to protect inmates at [St. Clair] from the known risk of harm" created by malfunctioning locks, uncontrolled movement, widespread weapons contraband, and a culture of violence, among other issues); ECF 195-6 at 183-211 (152 incidents of assault, with 99 involving weapons, between January 2015 and August 2016); *id.* at 213-24 (58 fights, with 33 involving weapons, between January 2015 and August 2016); ECF 195-6 at 23-33 (records sent to Estes in January 2018 showing 96 incidents of assault and three homicides between 2015 and 2017); ECF 195-8 at 109-156; ECF 195-9; ECF 195-10; ECF 195-11; ECF 172-12;

ECF 195-13; ECF 195-14; ECF 195-15; ECF 195-16; ECF 195-17; ECF 195-18; ECF 195-19; ECF 195-20.

22.    Walker was well aware of the high levels of inmate-on-inmate violence at St. Clair. ECF 195-1 at 28, 43:22–44:10. He testified that St. Clair is dangerous for both correctional officer and inmates, and that there have been times were he feared for his own safety. *Id.* at 28–29, 45:10-16; 47:3-6.

23.    Walker also testified that the violence plaguing St. Clair can be attributed in part to the staffing shortages, as well as the continued failure by St. Clair personnel to consistently enforce the existing SOPs that are necessary to inmate safety and the security of the facility. ECF 195-1 at 29, 34, 39 & 40, 47:12-18; 134:7–135:4; 137:7–23; 209:15-210:9.

### Failure to Control Inmate Movement at St. Clair

24.    Inmates at St. Clair are frequently "out of pocket" and able to access unauthorized parts of the prison—a condition known to contribute to inmate-on-inmate violence. ECF 195-1 at 30, 96:19–97:1.

25.    Unauthorized movement has existed at St. Clair since the 1990s and has not improved [ECF 195-1 at 30, 95:1-11], including following a 2016 homicide that occurred inside a St. Clair dorm where the investigation revealed that the inmates involved were not assigned to that dorm. ECF 195-5 at 64–65, 145:23-147:10; *see also id.* at 64 & 69, 143:16-20, 189:20-190:6; ECF 195-3 at 11, 99:14-100:17.

26.     IOI assaults resulting in serious injury at St. Clair—including prior to the Assault—often involve an inmate who was "out of pocket," *i.e.*, in an unauthorized area. *See* ECF 195-3 at 99, 199:23-200:6 (stating "probably more than 50 percent" of IOI violence at St. Clair involved unauthorized movement); ECF 195-1 at 30, 96:19-97:8; *see also* ECF 195-4 at 88 (putting Dunn and Estes on notice that "a significant number of violent incidents occurring at [St. Clair] involve unauthorized movement of inmates from or to [the P-block and Q-block].").

27.     There is evidence numerous incidents of inmate-on-inmate violence in 2017 alone in which the aggressor was in an unauthorized part of the prison at the time of the assault. *See* ECFs 174-8 at 109-156; 174-9; 174-10; 174-11; 172-12; 174-13; 174-14; 174-15; 174-16; 174-17 at 1-11.[1]

28.     Walker was well aware of the problem of inmates being "out of pocket" at St. Clair as this has been an issue the entire time Walker has worked at St. Clair. ECF 195-1 at 30, 95:1-11. This problem has not improved in any meaningful fashion. *Id.*

29.     The only documented method St. Clair employs to control unauthorized inmate movement is the use of color-coded wristbands that are supposed to identify

---

[1] These incidents represent merely a sample of incident reports produced by the CO defendants reflecting IOI violence including an "out-of-pocket" aggressor inmate.

and classify inmates by their housing units. ECF 195-1 at 30–32, 95:20-96-4; 109:14-21; 113:18-114:2; ECF 195-4 at 73, 154:22-155:6.

30.     Correctional officers and officials often do not enforce the wristband policy, in part because inmates routinely cut or remove their wristbands. ECF 195-3 at 36, 119:12-17; *id.* at 67, 122:1-5, 124:5-7; *id.* at 98, 196:6-13; ECF 195-4 at 73-74, 157:16–158:2; *see also* ECF 195-3 at 12, 110:22-111:3 (Whittington noted he would "take [his wristband] off, switch with somebody").

31.     Despite numerous policies requiring him to do so, on the day of the Assault, Walker made no attempt to inspect Whittington's wristband, verify that he was even wearing one, or otherwise prevent him from entering H Dorm while armed with at least one knife. ECF 195-1 at 46, 269:10-13 (testifying that he has "no idea" how Whittington accessed H dorm); ECF 195-3 at 17, 221:7-12 (testifying that he "walked straight past [Walker]."

### Failure to Control Contraband

32.     Walker was also aware that contraband—including inmate-made weapons like the knife Whittington used to stab Plaintiff—has long been a problem in St. Clair. ECF 195-1 at 35, 142:8-17; ECF 195-5 at 42-44; ECF 195-18 at 61-63; ECF 195-8 at 8-10, 29, 49.

33.     Walker understood that the majority of inmates at St. Clair carry contraband knives. *See* ECF 195-1 at 44, 248:3-249:10; ECF 195-1 at 12 ¶ 12; ECF 195-3 at 16, 196:10 (testifying that "everybody" at St. Clair had a knife).

34.     Walker also agreed that contraband weapons, particularly homemade knives, are "very easy for prisoners to produce or procure."  ECF 195-1 at 48, 295:7–15.

35.     Inmates also possess contraband cell phones; according to Noe, cell phones are recovered at St. Clair on at least a weekly basis. ECF 195-3 at 39, 174:11-14. For instance, Whittington used a cell phone every day while at St. Clair (ECF 195-3 at 13, 117:11-13), even when he was in the Restrictive Housing Unit (*id.* at 18, 279:10-13).

36.     Cell phone use at St. Clair poses a significant security risk to the safety of inmates. ECF 195-8 at 108, 143:2-144:15; ECF 195-3 at 10, 58:4–59:3; ECF 195-5 at 69, 187:22–188:19.

37.     The saturation of contraband unsurprisingly drives the rate of violent incidents within St. Clair; according to Brian Casey, "[p]robably the majority" of incidents of inmate-on-inmate assaults with serious injury involved an inmate made weapon. ECF 195-5 at 64, 143:2-9.

38.     Searches serve as one of the "main sources of preventing or deterring individuals from introducing contraband into [ADOC] institutions." ECF 195-6 at 12, 79:2-6; *see also* SOP 110 (St. Clair policy requires sufficient searches).

39.     Findings from St. Clair's most recent security audit, completed in 2014, included that: (1) "[n]o cell searches are being conducted"; (2) "[s]earches of common areas are not being conducted on a regular unannounced basis"; (3) "[r]andom and routine frisk searches are not conducted on inmates in all areas of the institution"; and "[t]his issue should be a priority to rectify." ECF 195-5 at 42-44.

40.     Years after the 2014 audit findings, searches remain inconsistent and infrequent, including in H Dorm. ECF 195-1 at 45, 253:1-12; ECF 195-3 at 33, 83:6-13.

## Chronic Understaffing

41.     Between January 3, 2017 to December 26, 2017, the amount of authorized correctional officer positions at St. Clair that were "manned" ranged from only 35% to 41%, indicating a shortage of staff for the entire year. ECF 195-3 at 117-45, ECF 195-4 at 1-24.

42.     Walker was aware of the staffing shortages at St. Clair. He testified that "low staffing" makes St. Clair dangerous, and that the lack of staffing was the "biggest challenge" facing St. Clair. ECF 195-1 at 29, 47:12–18.

43.     Moreover, Walker understood that staffing shortages contribute directly to inmate-on-inmate violence at St. Clair. ECF 195-1 at 34, 136:19–137:23. As Walker testified, the staffing shortages and high levels of violence at St. Clair are "common knowledge." *Id.* at 36, 171:14-17.

## The Assault

44.     On December 2, 2017, the day of the attack, Whittington was assigned to P Dorm, and as such, was not authorized to enter H Dorm. ECF 195-1 at 54, 59–60.

45.     Whittington testified that when he entered H Dorm, he walked straight past Walker, who failed to search Whittington, check Whittington's wristband, or otherwise determine whether Whittington was permitted to enter H Dorm. ECF 141-17 at 13, 221:7-14.

46.     Whittington testified that the TV room—the area where Plaintiff was seated immediately before Whittington assaulted him—was "very visible" from the officer desk where Walker sat. ECF 141-17 at 14, 228:3-5. Plaintiff agrees that "[a]t the time of the Assault, anyone outside the TV room could see what those in the TV room were doing." ECF 195-1 at 11 ¶ 7.

47.     Whittington testified that when he entered the TV room to assault Boykins, Boykins—like many other inmates in the TV room—was on his phone.

ECF 141-17 at 16, 234:10-235:18. If this were true, anyone looking into the TV room would have been able to see him doing so. ECF 195-1 at 11 ¶ 7.

48.     There is no evidence that Walker ever secured the scene of the Assault such that a proper investigation could be conducted. To the contrary, several facts show that the scene was not secured: (1) Whittington "ran" from the scene [ECF 141-16 at 17; (2) the two knives Whittington used were never recovered [ECF 141-16 at 16 ("no crime scene or weapons located")], [ECF 195-1 at 44, 247:4–248:20]; (3) no other physical evidence was ever secured *Id.* (box for "physical evidence" left blank); (4) no other inmates present in the TV room or H Dorm were searched or even identified [*id.*, 247:4–248:20]; (5) there is no evidence the H Dorm residents were dispersed from the scene, locked down, or sent to their bunk; and (6) the only "security checks" were conducted approximately three hours after the Assault [ECF 141-9 at 6].

49.     Yet, the Duty Post Log completed by Walker following the Assault indicated that a security check had been made and that "all [was] secure," and did not mention the missing knives. ECF 141-9 at 6.

50.     Plaintiff's records reveal that he suffered "multiple stab wounds to right upper lateral arm, left lower abdomen, left flank, right upper scapular [sic], left 3rd and 4th fingers, right thigh 6 wounds, and left thigh 2 wounds." ECF 195-4 at 64. Medical records also note that Plaintiff's breathing was "compromised" and that he

was showing "decreased breath sounds on right abrasion at chest." ECF 195-4 at 60. CT and MRI results led doctors to conclude, among other things, that Plaintiff suffered a, "[p]enetrating trauma" in his chest suggesting, "pulmonary lacerations with associated hematoma[,]" a "suspected additional penetrating trauma seen along left chest"; and a "pulmonary contusion." ECF 141-8 at 11. After spending three nights in the hospital, Plaintiff was discharged on December 5, 2017. ECF 195-7 at 59.

## ARGUMENT

### I. Summary Judgment is Inappropriate Given the Numerous Issues of Disputed Material Fact

The motion must be denied unless Walker can demonstrate that there is not a single genuine dispute of material fact. *Celotex Corp.*, 477 U.S. at 323. The evidence must be viewed in the light most favorable to Plaintiff, and all reasonable inferences should be drawn in Plaintiff's favor. *Adickes*, 398 U.S. at 157; *Martin*, 543 F.3d at 1265.

Under this controlling standard, Walker's Motion must be denied. Far from being the only possible interpretation of the evidence, Walker's factual assertions are, in many cases, flatly contradicted by the weight of that evidence. Viewed in the light most favorable to Plaintiff, and drawing inferences in favor of Plaintiff's claims, there is (at a minimum) a triable issue of fact on Walker's Eighth Amendment Claim and Walker's qualified immunity defense.

**II.    A Reasonable Juror Could Conclude that Walker Committed a Constitutional Violation**

Prison officials have a constitutional duty under the Eighth Amendment "to protect prisoners from violence at the hands of other prisoners." *Farmer v. Brennan*, 511 U.S. 825, 833 (1994) (internal citations and quotation marks omitted). As the Supreme Court has explained, being violently assaulted in prison is simply "not part of the penalty that criminal offenders pay for their offenses against society." *Id.* at 834 (internal citation and quotation marks omitted). The Eighth Amendment thus imposes duties on prison officials to ensure reasonable safety of their inmates. *Id.* at 844–45. An Eighth Amendment violation gives rise to a Section 1983 civil rights action when a prison official acts with deliberate indifference to the potential or actual assault on an inmate by another. *Griffin v. City of Opa-Locka*, 261 F.3d 1295, 1303 (11th Cir. 2001).

To survive a motion for summary judgment on a failure-to-protect claim, a plaintiff must produce sufficient evidence of "(1) a substantial risk of serious harm; (2) the defendants' deliberate indifference to that risk; and (3) causation." *Carter v. Galloway*, 352 F.3d 1346, 1349 (11th Cir. 2003) (per curiam).

Here, a reasonable jury viewing the evidence in the light most favorable to Plaintiff could readily conclude that (1) based on his knowledge of the broader conditions at St. Clair, Walker knew of the substantial risk of serious harm that could come to Plaintiff if H Dorm was left unmonitored; (2) Walker was deliberately

indifferent to that risk by sleeping while on his post; and (3) Walker's deliberate indifference caused Boykins's injuries. For the reasons described above and below, Plaintiff's genuine disputes of material facts concerning Walker's conduct preclude a finding of summary judgment in Walker's favor.

### A. A Reasonable Jury Could Conclude That Walker Knew of the Substantial Risk of Serious Harm that Could Come to Plaintiff.

When viewed in the light most favorable to Plaintiff, the evidence establishes that Walker was well aware of the broader conditions in St. Clair that gave rise to a substantial risk of harm to the inmates in H Dorm. Walker testified that St. Clair has a reputation for being a particularly dangerous prison. ECF 195-1 at 27, 39:12-15. He was aware that inmates at St. Clair have long been able to move freely into unauthorized parts of the facility, and that they often do so to attack other inmates. ECF 195-1 at 30, 96:19–97:8. He was aware that contraband weapons were widespread at St. Clair, and that the majority of inmates carry contraband knives or other weapons. ECF 195-1 at 44, 248:3–249:10. Walker knew that St. Clair was severely understaffed, and that this staffing shortage directly contributed to inmate-on-inmate violence. ECF 195-1 at 29 & 36, 47:12–18; 171:14-17. Walker was also on notice of the importance of preventing unauthorized inmates like Whittington from entering H Dorm, as he was reprimanded just one year prior to the Assault for failing to prevent unauthorized inmates from general population from accessing H

Dorm. ECF 195-1 at 65. Similarly, St. Clair policy clearly prohibits officers like Walker from sleeping on their posts. ECF 195-8 at 103.

In this context, it should have been obvious to Walker that sleeping on his post – or at a minimum, being so completely inattentive and otherwise failing to enforce established policies and procedures to stop Whittington from entering H Dorm in the first place—only exacerbated the risk of substantial harm to inmates. *See Hope v. Pelzer*, 536 U.S. 730, 730 (2002) ("state of mind that can be inferred from the fact that the risk of harm is obvious"); *Farmer*, 511 U.S. at 842 (same).

Controlling authority establishes that evidence of a correctional officer's knowledge of broader prison conditions are relevant to establishing a correctional officer's knowledge of the existence of a substantial risk. In *Hale v. Tallapoosa Cty.*, 50 F.3d 1579, 1583 (11th Cir. 1995), for instance, the plaintiff "produced evidence that inmate-on-inmate violence occurred regularly when the jail was overcrowded, as it was [at the time of the incident] and the two preceding years." The Court held that such evidence of broader prison conditions created genuine issues of fact regarding the defendant's knowledge of the substantial risk to inmates such that summary judgement was inappropriate. *Id.* at 1585.

Just as the defendant in *Hale* testified that "he knew that inmate-on-inmate violence was occurring on a regular basis during May 1990 and other periods of overcrowding[,]" Walker provided extensive testimony evidencing his knowledge

of the high levels of serious IOI violence at St. Clair, and the factors that contributed to such violence. ECF 195-1 at 29, 34 & 39, 47:12-18; 134:7–135:14; 137:7–23; 209:15-210:9. Such evidence of Walker's knowledge of the risk to inmates like Plaintiff precludes summary judgment.

Walker emphasizes that he "had no warning that the incident would occur prior to Whittington's surprise attack on Boykins." ECF 136 at 9. But it is well established that a claimant's "failure to give advance notice is not dispositive." *Farmer*, 511 U.S. at 848. Indeed, "an official may not escape liability merely by showing that he did not know the claimant was likely to be assaulted or that an assault would be committed by the specific prisoner who eventually committed the assault." *Hale*, 50 F.3d at 1583. Rather, evidence that Walker had "subjective knowledge of a generalized, substantial risk of serious harm from inmate violence[,]" is sufficient to allow a jury to reasonably conclude that Walker was subjectively aware of the substantial risk of harm to Plaintiff. *Id.*

### B. A Reasonable Jury Could Conclude That Walker Responded Unreasonably to the Substantial Risk of Harm to Plaintiff.

"After establishing that the official subjectively knew of a risk, the plaintiff may establish the second element – that the officials disregarded the known risk – by showing that the officials failed to respond to that risk in an objectively reasonable manner." *Q.F. v. Daniel*, 768 F. App'x 935, 944-5 (11th Cir. 2019). That is, a correctional officer may be liable under the Eighth Amendment "if he knows

that inmates face a substantial risk of serious harm and disregards that risk by failing to take reasonable measures to abate it." *Farmer*, 511 U.S. at 847.

Walker does not argue that falling asleep at his post was a reasonable response to the risk of inmate on inmate violence—it unquestionably was not. Instead, he merely argues that Plaintiff only produced evidence showing Walker was asleep "five minutes before" the Assault, but claims that "Boykins has produced no evidence that Walker was asleep or inattentive when Whittington entered the dorm or when the incident began." ECF 136 at 12. To the contrary—there is ***substantial*** evidence from which a reasonable juror could infer that Walker was asleep when Whittington entered H Dorm and started stabbing Plaintiff.

First, Plaintiff has testified that he observed Walker sleeping five minutes before the assault began. ECF 141-10 at 24, 188:20-25. Unlike Walker's self-serving testimony that he did not fall asleep, Plaintiff's testimony is corroborated by the fact that, despite multiple written policies obligating him to prevent unauthorized inmates like Whittington from entering H Dorm, Walker failed to make any attempt to do so. ECF 195-1 at 54; ECF 141-17 at 13, 221:7-14. Indeed, Whittington claims that he simply walked straight past Walker, who failed to search Whittington, check his wristband, or otherwise determine whether Whittington was permitted to enter H Dorm. *Id.* Further, the ten-minute delay between when Whittington began attacking Boykins supports the inference that Whittington was asleep when the attack began.

ECF 141-16 at 16-17. A reasonable jury could conclude that this ten-minute delay was due to the fact that Walker was asleep when Whittington began assaulting Plaintiff. This evidence supports the inference that Walker was asleep, or at a minimum, wholly inattentive such that he was indifferent to his obligations to prevent unauthorized inmates like Whittington from entering H Dorm.

Walker also relies on Whittington's testimony that he attempted to conceal his identity when he entered H Dorm as evidence that Walker was not deliberately indifferent. ECF 136 at 12. But St. Clair does not expect its correctional officers to know every inmate by their appearance; rather, the wristband policy allows an officer to recognize whether an inmate is assigned to H Dorm or not, even if the officer has never encountered that inmate before. *See* ECF 195-1 at 53. Further, Whittington's attire is irrelevant if a jury finds that Walker was indeed asleep when Whittington entered H Dorm.

Whittington also testified that he wore two jackets and a towel around his neck to protect himself during the attack. ECF 141-17 at 216:11-217:8. Given the prevalence of IOI violence at St. Clair, a reasonable jury could conclude that had Walker, a seasoned correctional officer, been attentive, Whittington's attire would have at least roused some suspicion and prompted Walker to take action. In any event, the fact that Whittington attempted to conceal his identity does not relieve Walker of his duty to prevent unauthorized inmates from entering H Dorm.

Even if Walker is to be believed, and he was in fact awake at the time Whittington entered H Dorm, there remains sufficient evidence for a reasonable jury to conclude that Walker was deliberately indifferent to the risk of harm to Plaintiff. First, there is evidence that the TV room was visible from Walker's post. ECF 141-17 at 14, 228:3-5; ECF 195-1 at 11 ¶ 7. If Whittington's testimony is to be believed that Plaintiff and many other inmates were using their cellphones in the TV room, then this suggests Walker would have seen Plaintiff using a cellphone immediately prior to the Assault. Nonetheless, although Plaintiff denies that he was using a cellphone, the evidence shows that Walker did nothing that day to enforce the St. Clair rules prohibiting cellphones. This, again, would allow a reasonable jury to conclude that Walker was wholly inattentive, or alternatively, that he consciously disregarded policy and permitted inmates to use contraband cell phones which are known to contribute to the dangerous conditions of the prison. ECF 195-18 at 108, 143:2-144:15; ECF 195-3 at 10, 58:4–59:3; ECF 195-5 at 69, 187:22–188:19.

That Walker took no action after the stabbing to secure the scene so that a proper investigation could occur is further evidence of his deliberate indifference to the risk of inmate-on-inmate violence. Despite observing Whittington repeatedly stab Plaintiff (though not the entire Assault), Walker did not ensure that the knives used in the assault were recovered. ECF 141-16 at 16–17. Walker also did not identify any witnesses to the Assault, despite the fact that the TV room was full of

inmates watching the most popular football game of the year. ECF 195-1 at 44, 247:4-248:20; ECF 141-10 at 176:3-6. Nor did Walker preserve any other physical evidence that might aid in the investigation of the Assault. ECF 141-16 at 16-17. A reasonable jury could conclude that Walker was simply indifferent to the fact that IOI violence reigns in St. Clair, and accordingly, he did not view the Assault as a crime worth investigating. But "the government and its officials are not free to let the state of nature take its course." *Farmer*, 511 U.S. at 833.

Binding authority establishes that such inattentiveness to a known substantial risk amounts to deliberate indifference. In *Cottone v. Jenne*, 326 F.3d 1352, 1359 (11th Cir. 2003), the plaintiff alleged that the two correctional officers on duty failed to monitor the inmates, and that as a result, an inmate was attacked and murdered. *Id.* The plaintiff alleged that the correctional officer defendants took consecutive breaks and were observed playing video games at their monitoring station at the time of the murder. *Id.* The Court held that, given their knowledge of the substantial risk of harm to the inmates, the correctional officers' failure to monitor the inmates was an objectively unreasonable response such that the plaintiff adequately alleged a constitutional violation. *Id.*

Here too, there is sufficient evidence that Walker was either asleep—or so inattentive that he may as well been asleep—when Whittington entered H Dorm and

attacked Plaintiff. Such evidence of Walker's deliberate indifference to the substantial risk of harm to Plaintiff precludes summary judgement.

### C. A Reasonable Jury Could Conclude that Walker's Deliberate Indifference Caused Plaintiff's Injuries

If a plaintiff establishes a causal link between the defendant's acts or omissions and the infirm condition, the defendant is 'precluded from contending that the unconstitutional condition was not at least a proximate cause of ... injuries' that arose from that condition. *LaMarca v. Turner*, 995 F.2d 1526, 1538 (11th Cir. 1993) (internal citations omitted). In *LaMarca,* the Eleventh Circuit held that a plaintiff demonstrated the "necessary causal link" where he was able to show that the prison official (1) "had the means substantially to improve" the inmate's safety, (2) "knew that the actions he undertook would be insufficient to provide [the inmate] with reasonable protection from violence," and (3) had "other means [] available to him which he nevertheless disregarded." 995 F.2d at 1539.

Here, the evidence is sufficient to permit a reasonable juror to find that Walker's deliberate indifference to Plaintiff's safety was a "necessary causal link" to the Assault. St Clair policy establishes procedures whereby correctional officers may be relieved of their duty if they are tired. In fact, SOP 067 requires that if correctional officers "should become sleepy, ill, or in any way unable to perform [their] post duties," they should notify their Shift Supervisor for immediate relief. ECF 195-1 at 56. Walker failed to do so.

If Walker acted appropriately, both by being awake and attentive and by carrying out the inmate identification policy, Whittington never would have been able to enter H Dorm to attack Plaintiff. *See* SOP 0067, 137. But letting Whittington enter H Dorm was not the only way Walker disregarded the risk to Plaintiff's safety. If Walker was awake and attentive, he could have intervened in the Assault by deploying his chemical spray, or at a minimum, more promptly calling for backup such that help may have arrived sooner, reducing the severity of Plaintiff's injuries, which ultimately required treatment at the infirmary and a three-day hospitalization. ECF 195-4 at 59. Thus, Walker's deliberate indifference to the substantial risk of harm attendant to leaving inmates completely unsupervised proximately caused Plaintiff's injuries. *See Hale*, 50 F.3d at 1585 ("[A] reasonable jury could find that the beating was caused by the excessive risk of harm which resulted from the atmosphere of deliberate indifference.")

### III.    Walker Is Not Entitled to Qualified Immunity

### A. Walker Relies on Disputed Facts to Establish Qualified Immunity

Walker's qualified immunity defense rests entirely on disputed evidence. First, Walker contends that "Boykins has produced no evidence that Walker was asleep or inattentive when Whittington entered the dorm or when the incident began." But as described above, there is substantial evidence that Walker was

asleep—or at a minimum, wholly inattentive—when Whittington entered H Dorm and attacked Plaintiff.

Second, Walker's qualified immunity defense relies on his contention that "Walker acted immediately by calling for backup." This too, is disputed. The evidence establishes that *ten minutes* elapsed between when the assault on Plaintiff began and when backup arrived—all the while Plaintiff was fighting for his life. ECF 141-16 at 16-17. Here too, a reasonable jury could conclude that Walker acted unreasonably in failing to promptly call for backup, either because he was asleep, inattentive, or simply indifferent to the fact that Plaintiff was being repeatedly stabbed.

Such disputed issues of material fact render summary judgment inappropriate. *Perez v. Suszczynski*, 809 F.3d 1213, 1221 (11th Cir. 2016) (summary judgment on qualified immunity grounds is inappropriate where "[t]he record plainly yields sharply dueling accounts of what happened") (internal citations omitted).

**B. Walker was not Engaged in a Discretionary Function**

"To be even potentially eligible for qualified immunity, the official has the burden of establishing that he was acting 'within the scope of his discretionary authority.'" *O'Rourke v. Hayes*, 378 F.3d 1201, 1205 (11th Cir. 2004) (quoting *Hartsfield v. Lemacks*, 50 F.3d 950, 953 (11th Cir. 1995)). A defendant must show, for each act in question, that he was performing a legitimate job-related function

through means that were within their power to utilize. *Id.* If he was not acting within his discretionary authority, Walker cannot invoke qualified immunity. *Lumley v. City of Dade City*, 327 F.3d 1186, 1194 (11th Cir. 2003); *see also Barker v. Norman*, 651 F.2d 1107, 1121 n.18 (5th Cir. 1981) ("[A]n official's actions may be so far removed from the ordinary course of his duties, so outside even his discretionary authority to act, that the official cannot establish his entitlement to claim immunity in the first instance").

Here, Walker asserts that "it is undisputed that [he] was acting within the scope of his discretionary authority at the time of the incident." ECF 136 at 16. Not only is this not true – Plaintiff disputes that Walker was acting within his discretionary authority by falling asleep on his post at the time of the Assault – but this sort of "'bald assertion by the defendant that the complained-of actions were ... within the scope of his discretionary authority' is insufficient." *Est. of Cummings v. Davenport*, 906 F.3d 934, 940 (11th Cir. 2018).

Rather, in determining whether an official is acting within the scope of his discretionary authority, courts consider "whether the government employee was (a) performing a legitimate job-related function (that is, pursuing a job-related goal), (b) through means that were within his power to utilize." *Holloman ex rel. Holloman v. Harland*, 370 F.3d 1252, 1265 (11th Cir. 2004). Aside from his conclusory contention that he was acting within his discretionary authority, Walker makes no

argument, and cites no case law, for the proposition that (a) sleeping on his post was a legitimate job-related functions; or (b) that it was within his power to utilize this means – sleeping – to carry out his duties. Walker has failed to meet his burden that he was acting within his discretionary authority.

To the contrary, Walker did not have discretionary authority to sleep while on duty. St. Clair policy and procedures expressly prohibit correctional officers from sleeping or giving the appearance of sleeping while on duty. ECF 195-8 at 103. Accordingly, summary judgment on the basis of qualified immunity is inappropriate. *See, e.g.*, *Holloman ex rel. Holloman*, 370 F.3d at 1282 (teacher who led class in silent prayer was ineligible for qualified immunity because she failed to establish that action fell within her discretionary powers as teacher); *Lee v. Ferraro*, 284 F.3d 1188, 1194 (11th Cir. 2002) ("If the defendant was not acting within his discretionary authority, he is ineligible for the benefit of qualified immunity.") *Est. of Cummings*, 906 F.3d at 942 (warden was not acting within his discretion to enter a do-not-resuscitate order, even though he had the authority to make other inmate medical decisions.)

Walker's reliance on *Washington v. Warden*, 847 Fed. Appx. 734 (11th Cir. 2021) is also misplaced. There, the Court declined to conclude that the correctional officer's actions in response to the risk were objectively unreasonable because *before* the stabbing began, the correctional officer ordered the inmates to stop arguing,

radioed for backup, and reported that inmates were arguing. *Id.* at 738. After the stabbing began, the correctional officer again radioed for backup. Backup arrived within *one minute*, and the fight was over in 62 seconds. *Id.*

Here, by contrast, there is evidence that Walker was unable to radio for backup before the assault began because he was asleep. ECF 141-10 at 24, 188:14-25. This is further evidenced by the fact that backup did not arrive for *ten minutes* after Whittington started stabbing Plaintiff. ECF 141-16 at 16-17.

Thus, there is evidence from which a reasonable juror could conclude that Walker was asleep when Whittington entered H Dorm and started attacking Boykins, and that Walker only awoke and called for backup once the assault was underway. This conduct is particularly unreasonable given that Walker was well aware that (1) St. Clair was severely understaffed; (2) St. Clair had excessively high rates of inmate-on-inmate violence; (3) St. Clair had problems controlling inmate movement; (4) such uncontrolled inmate movement leads to inmate-on-inmate assaults; and (5) contraband weapons were widespread and "the majority of inmates at St. Clair carried contraband knives." In this context, falling asleep as the lone officer on duty was objectively unreasonable and precludes qualified immunity.

## <u>CONCLUSION</u>

For the reasons set forth above, Walker has failed to establish that there is no disputed issue of material fact. Accordingly, his Motion should be denied.

Dated:  June 28, 2023

/s/ *Molly E. Whitman*

Molly E. Whitman (*pro hac vice*)
Brett M. Manisco (*pro hac vice*)
Jessica Ro (*pro hac vice*)
**Akin Gump Strauss Hauer & Feld LLP**
1999 Avenue of the Stars, Suite 600
Los Angeles, CA 90067-6022
Tel: (310) 229-1000
Fax: (310) 229-1001
mwhitman@akingump.com
bmanisco@akingump.com
jro@akingump.com

J.S. "Chris" Christie, Jr. (ASB-3162-H07J)
R. Terrell Blakesleay (ASB-5910-B00U)
**Dentons Sirote PC**
2311 Highland Avenue South
Post Office Box 55727
Birmingham, AL 35255-5727
Tel: (205) 930-5100
Fax: (205) 930-5101
chris.christie@dentons.com
terrell.blakesleay@dentons.com

Jennifer S. Garrett (*pro hac vice*)
Madeleine R. Freeman (*pro hac vice*)
**Akin Gump Strauss Hauer & Feld LLP**
One Bryant Park
New York, NY 10036
Telephone: (212) 872-1065
Fax: (212) 872-1002
jgarrett@akingump.com
mfreeman@akingump.com

Hyongsoon Kim (*pro hac vice*)
**Akin Gump Strauss Hauer & Feld LLP**
4 Park Plaza, Suite 1900

Irvine, CA 92614-2585
Tel: (949) 885-4100
Fax: (949) 885-4101
kimh@akingump.com


*Attorneys for Plaintiff*

## CERTIFICATE OF SERVICE

I hereby certify that on this 28th day of June, 2023, I electronically filed the

foregoing with the Clerk of the Court using the CM/ECF system.


/s/ *Molly E. Whitman*
Molly E. Whitman