FILED
2023 Sep-30  AM 11:23
U.S. DISTRICT COURT
N.D. OF ALABAMA

# IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF ALABAMA
### MIDDLE DIVISION

| | |
|---|---|
| **AUNDRA DEBREL BOYKINS,** ] | |
| ] | |
| **Plaintiff,** ] | |
| ] | |
| **v.** ] | **Case No.: 4:19-cv-01934-ACA** |
| ] | |
| **JEFFERSON DUNN, et al.,** ] | |
| ] | |
| **Defendants.** ] | |

## MEMORANDUM OPINION

Cortez Whittington repeatedly stabbed fellow inmate Plaintiff Aundra Debrel Boykins at St. Clair Correctional Facility ("St. Clair"). Defendant Marc Walker, a correctional officer at St. Clair, was stationed nearby. After the stabbing, Mr. Walker called for backup. Ten minutes later, more guards arrived and the attack ended.

St. Clair is a Level V prison in Alabama with substantial inmate-on-inmate violence. St. Clair has multiple problems that contribute to the violence, such as chronic understaffing, noncompliance with institutional policies, inadequate locks, cameras, and metal detectors, and minimal control over inmate movement. Officials at St. Clair and within the Alabama Department of Corrections ("ADOC") have attempted to address many of the concerns; however, they are often stymied by lack of funds and uncooperative inmates and staff.

Mr. Boykins brought this action under 42 U.S.C. § 1983 against Marc Walker, Commissioner John Hamm, Warden Guy Noe, and Warden Dewayne Estes, asserting that each defendant violated his Eighth Amendment rights by failing to protect him from an unreasonable risk of harm.[1] He seeks (1) relief from Mr. Walker for monetary damages and injunctive relief in his individual and official[2] capacities; (2) monetary damages against Mr. Estes in his individual[3] capacity; and (3) injunctive relief from Mr. Hamm and Mr. Noe in their official capacities. Mr. Walker has filed a motion for summary judgment (doc. 133), and Mr. Estes, Mr. Hamm, and Mr. Noe have jointly filed a motion for summary judgment (doc. 132).

---

[1] Mr. Boykins also sued former ADOC Commissioner Jefferson Dunn in his official and individual capacities. (Doc. 65 at 4 ¶ 8). Because Mr. Dunn is no longer Commissioner of ADOC, the official capacity claim against him transferred to Commission John Hamm, the current commissioner. The individual capacity claim against Mr. Dunn was voluntarily dismissed with prejudice. (Doc. 120).

[2] It is not clear what relief Mr. Boykins is seeking from Mr. Walker in his official capacity. The complaint seeks both monetary and injunctive relief from all Defendants. (Doc. 65 at 27 ¶¶ 2, 5–6). To the extent he is seeking an injunctive relief from Mr. Walker, it would be moot for the same reasons injunction relief is moot against Mr. Hamm and Mr. Noe. To the extent he is seeking monetary damages from Mr. Walker in his official capacity, the court finds he has abandoned that claim.

[3] Although the complaint seeks injunctive relief against all defendants, Mr. Boykins asserts a claim against Mr. Estes only in his individual capacity. (Doc. 65 at 4 ¶ 9, 26 ¶ 2). Mr. Boykins has never made any arguments about the propriety of injunctive relief against Mr. Estes and the court does not construe the complaint to assert a claim for injunctive relief against Mr. Estes in his official capacity. (*See* doc. 199 at 52; doc. 216).

As an initial matter, because ADOC has transferred Mr. Boykins out of St. Clair, the court **WILL DISMISS AS MOOT** Mr. Boykins's claims for injunctive relief against Mr. Walker, Mr. Hamm, and Mr. Noe. That dismissal resolves everything except Mr. Boykins's claims for monetary relief against Mr. Walker (in his individual and official capacities) and Mr. Estes (in his individual capacity).

The court **WILL GRANT IN PART** and **WILL DENY IN PART** Mr. Walker's motion for summary judgment. The court **WILL GRANT** Mr. Walker's motion for summary judgment on the official capacity claim for monetary damages because Mr. Boykins abandoned that claim. The court **WILL DENY** Mr. Walker's motion for summary judgment on the individual capacity claim because Mr. Walker forfeited his qualified immunity defense and Mr. Boykins created a genuine dispute of material fact about the merits of the claim. The court **WILL GRANT** Mr. Estes's motion for summary judgment because he has established his entitlement to qualified immunity.

## I.    BACKGROUND

In deciding a motion for summary judgment, the court "view[s] all evidence in the light most favorable to the nonmoving party and draw[s] all justifiable inferences in that party's favor." *Thompson v. Alabama*, 65 F.4th 1288, 1297 (11th Cir. 2023) (quotation marks omitted). Where the parties have presented evidence

3

creating a dispute of fact, the court's description of the facts adopts the version most favorable to Mr. Boykins. *See id.*; *see also Cantu v. City of Dothan*, 974 F.3d 1217, 1222 (11th Cir. 2020) ("The 'facts' at the summary judgment stage are not necessarily the true, historical facts; they may not be what a jury at trial would, or will, determine to be the facts.").

1.   The Incident

Mr. Boykins and Mr. Whittington were both inmates at St. Clair. (Doc. 141-5 at 74–75; doc. 195-1 at 59–60). St. Clair is a security Level V facility. (Doc. 141-2 at 3 ¶ 4). ADOC designates each facility with a security level—ranging from I to V—that corresponds with how restrictive the environment is. (Doc. 141-2 at 3 ¶ 4). ADOC also assigns each inmate a custody level based on his behavior. (*Id.* at 3–4 ¶ 5). Two of the custody levels are relevant here: close and medium. (*Id.*). Close custody inmates have "demonstrate[d] an inability to follow institutional regulations," often because they have "prior escape attempts [or] exhibit[ed] violent behavior." (*Id.* at 3 ¶ 5). Medium custody inmates are "considered suitable for institutional programming and able to adapt to dormitory living or to double occupancy cells." (Doc. 141-2 at 4 ¶ 5). Level V facilities house close and medium custody inmates, including "the most violent and highest classified offenders in ADOC custody." (Doc. 141-9 at 13; *see* doc. 141-2 at 3–4 ¶ 4–5).

Mr. Boykins was a medium custody inmate at St. Clair and was housed in H-Dorm, one of St. Clair's five housing units. (Doc. 141-5 at 75; doc. 141-2 at 3 ¶ 4; 141-9 at 14, 141-10 at 4, 6–7, 9). H-Dorm is in a separate building from the general population housing units and connects to other parts of St. Clair through a tunnel with gates on both sides. (Doc. 195-3 at 37). Prisoners not assigned to H-Dorm were not allowed to enter (doc. 195-1 at 54; *see* doc. 141-17 at 12), and inmates in H-Dorm did not "mingle" with other inmates but would see them when entering or exiting the chow hall, receiving medication, or seeing the doctor (doc. 141-10 at 9–11).

In September 2017, Cortez Whittington was transferred from another ADOC facility to St. Clair. (*See* doc. 195-1 at 60). When he arrived at St. Clair he was classified as a medium custody inmate and was housed in P/Q-Dorm. (Doc. 141-17 at 5; doc. 195-1 at 59). P/Q-Dorm ate dinner immediately after H-Dorm; as inmates from P/Q-Dorm entered the chow hall, inmates from H-Dorm exited. (Doc. 141-17 at 9–11).

On December 2, 2017, instead of having dinner in the chow hall with the rest of P/Q-Dorm, Mr. Whittington walked from the chow hall to H-Dorm "to take advantage of the routine inmate movement during meal times." (Doc. 141-4 at 3 ¶ 7; doc. 141-17 at 9–11). He attempted to make himself "less recognizable to the on-duty Corrections Officers" by wearing a skull cap and two jackets. (Doc. 141-4 at 3

¶ 7; doc. 141-17 at 12). He also wore a towel around his neck to protect himself from stab wounds and carried a knife in his sock. (Doc. 141-17 at 12, 14). Mr. Whittington testified that because he was new to St. Clair, his disguise was enough to allow him to travel unchecked around St. Clair, even to areas he was not allowed, like H-Dorm. (*Id.* at 6). Mr. Whittington likely passed two or three guards, two gates, and two doors while making his way to H-Dorm. (Doc. 195-3 at 64). If any of the gates or doors had been locked, a correctional officer would have had to let him go through the door or gate. (*Id.*).

While Mr. Whittington was walking to H-Dorm, Mr. Boykins was watching TV in H-Dorm's TV room. (Doc. 141-10 at 20; doc. 141-17 at 16). The TV room is "[v]ery visible" from the officer cube inside H-Dorm because the room has several large glass windows. (Doc. 141-17 at 14–15; doc. 141-16 at 11). Parts of the TV room, however, would be concealed from an officer seated at the desk in the officer cube. (*See* doc. 141-10 at 21). Mr. Walker was the only guard staffed in H-Dorm. (Doc. 141-17 at 14–15). Around thirty to forty inmates were in the TV room and "at least [one] hundred" inmates were elsewhere in H-Dorm. (Doc. 141-10 at 20; doc. 141-17 at 15). Many inmates, including Mr. Boykins, were on their phones while watching TV. (Doc. 141-17 at 16). The inmates' phone use in the TV room should have been visible to Mr. Walker. (Doc. 195-1 at 11 ¶ 7; doc. 141-16 at 11; doc. 141-17 at 16). Five minutes before the incident, Mr. Boykins saw Mr. Walker asleep at

his post (Doc. 141-10 at 21, 24) but he could not see Mr. Walker from his spot in the TV room (*id.* at 21).

When Mr. Whittington arrived at H-Dorm, he walked into the dorm without being stopped. (Doc. 141-17 at 12–13). He had a knife hidden in his sock. (*Id.* at 14). Mr. Whittington testified that Mr. Walker looked at him when he entered H-Dorm but Mr. Walker did not search him or ask him any questions. (*Id.* at 12–13). After passing Mr. Walker, Mr. Whittington received another knife from a different inmate in H-Dorm, which he tucked into his hip. (Doc. 141-17 at 13–14). He then walked over to H-Dorm's TV room, where Mr. Boykins had his back to the door, and began stabbing Mr. Boykins. (*Id.* at 14–16). Mr. Boykins was surprised by Mr. Whittington's attack and testified that he had no warning that Mr. Whittington would attack him. (Doc. 141-10 at 21).

During the attack, Mr. Boykins was "trying [his] best to wrestle [Mr. Whittington] to stop him from stabbing" him, and the wrestling led outside the "TV room to where [Mr.] Walker was." (*Id.* at 20, 25). At some point during the fight, both Mr. Whittington and Mr. Boykins saw Mr. Walker grab his radio while sitting at the officer cube. (Doc. 141-10 at 26; doc. 141-17 at 18). Mr. Walker testified that when he became aware of a "commotion" in the TV room, he "got up from [his] desk to see what was happening" and then called for backup. (Doc. 141-16 at 10). After Mr. Walker called for backup, Mr. Whittington ran from the scene

and hid his knife in an unknown location. (*Id.* at 17). The ADOC incident report for the stabbing indicates Mr. Walker "observed" the attack at approximately 4:40 PM, but backup did not arrive in H-Dorm until ten minutes later, at 4:50 PM. (*Id.*).

Once four additional correctional officers arrived, Mr. Boykins received a medical evaluation and was later transported to the hospital. (*Id.* at 16–17). After correctional officers removed Mr. Boykins and Mr. Whittington from H-Dorm, correctional staff conducted two security checks of H-Dorm and determined that "all [was] secure." (Doc. 141-9 at 6). But staff were not able to find either of Mr. Whittington's knives and assumed that he gave them to another inmate. (Doc. 195-1 at 44; doc. 141-16 at 17). Despite this assumption, the rest of the inmates in H-Dorm were not searched for knives after the stabbing. (Doc. 195-1 at 44).

Mr. Boykins's medical records indicate he was stabbed seven or eight times (doc. 147-8 at 4–15), but Mr. Boykins claims he was stabbed around thirty times and that only seven or eight were severe enough to "go all the way into [his] skin" (doc. 141-10 at 22). None of Mr. Boykins's wounds required sutures or surgical intervention, and he spent three nights in the hospital while he recovered. (Doc. 195-4 at 59; doc. 147-8 at 4–15).

About four months after Mr. Boykins returned to St. Clair, Agent Brian Casey interviewed Mr. Boykins about the attack. (Doc. 141-5 at 84). Agent Casey was an officer with ADOC's Law Enforcement Securities Division ("LESD"), which

8

investigates inmate-on inmate assaults. (Doc. 195-4 at 72). When Agent Casey met with Mr. Boykins, Agent Casey asked Mr. Boykins to sign a waiver of prosecution form; Mr. Boykins signed the form for two reasons: (1) he thought ADOC would put him in restrictive housing if he refused to sign it and (2) he feared retaliation. (Doc. 195-1 at 11–12 ¶¶ 9, 11; doc. 141-10 at 28; *see also* doc. 195-4 at 65–66). Consistent with longstanding, unwritten ADOC policy (doc. 195-5 at 69, 71), Agent Casey closed the investigation into Mr. Boykins's stabbing after Mr. Boykins signed the waiver (*id.* at 67–68). Agent Casey did not interview Mr. Whittington, in part because he was concerned that Mr. Whittington might retaliate against Mr. Boykins. (*Id.* at 66).

ADOC charged Mr. Whittington with fighting with a weapon and Mr. Boykins with fighting without a weapon. (Doc. 141-5 at 68–69, 79–80). Mr. Boykins was found not guilty; Mr. Whittington was found guilty. (*Id.*). Mr. Whittington received disciplinary sanctions, including a recommendation for reclassification; loss of canteen, telephone, and visiting privileges for sixty days; and a placement into disciplinary segregation for forty-five days. (*Id.* at 80). Mr. Whittington's custody level was later increased from medium to close custody. (Doc. 141-17 at 20; *see* doc. 141-5 at 79). In 2022, ADOC transferred Mr. Boykins to Fountain, a Level IV facility. (Doc. 141-5 at 73; 141-2 at 3).

### 2.  ADOC & St. Clair Policies

ADOC has two types of regulations: administrative regulations ("ARs") and standard operational procedures ("SOPs"). (Doc. 195-6 at 35, 47). ADOC's Commissioner issues ARs, which serve as "comprehensive guidelines by which [ADOC] standardizes administrative and operational functions." (*Id.* at 36). ARs are meant to set "the tone" and give guidance to wardens issuing SOPs. (*Id.* at 16). SOPs are "[p]olicies and procedures set forth by local orders and implemented by the Warden/Director of each institution/facility." (*Id.* at 47). Mr. Estes, St. Clair's Warden at the time of the attack, testified that he "consider[s] all SOPs to be important for the safety of the inmates." (Doc. 195-3 at 82).

One of St. Clair's SOPs makes clear that "[i]nmates not assigned to the H Building" cannot visit and states with emphasis that no exceptions will be permitted. (Doc. 195-1 at 54). To help keep inmates out of areas they are not permitted, St. Clair gives each prisoner a wristband that identifies the dorm in which they are housed. (Doc. 195-6 at 68). Since Mr. Estes became warden, St. Clair's wristband policy, which is meant to help prevent unauthorized inmate movement, has not changed. (*See* doc. 195-1 at 50–57; doc. 195-3 at 70–74). Mr. Estes testified that the wristband policy "wasn't effective whatsoever" because inmates could cut them off, sell them, and change them out with other wristbands. (Doc. 195-3 at 98). Mr. Noe, the current

warden at St. Clair, testified that the wristband policy is not enforced because of inmate tampering. (*Id.* at 36).

Although ADOC believes the policy is not effective, inmates housed in H-Dorm are issued a white wristband they must always wear. (Doc. 195-1 at 53). The gate into H-Dorm must always be locked and should only "be opened and controlled by security personnel." (Doc. 195-3 at 72). Officials assigned to H-Dorm are required to check the color of inmates' wristbands before allowing them to enter H-Dorm; if an official is unsure whether an inmate attempting to enter H-Dorm should be there, that inmate's "information must be verified before permitting" entry into H-Dorm. (Doc. 195-1 at 53–54).

Correctional officials assigned to H-Dorm are called rovers. (*Id.* at 51). An SOP requires two rovers to be on duty constantly. (Doc. 203-20 at 4). An SOP further requires rovers to patrol their areas constantly, check inmates for colored wristbands, and "conduct sufficient random personal and area shakedowns to eliminate the flow of contraband." (Doc. 195-1 at 52, 54). Rovers "are not permitted to utilize the security station/desk as an 'extended rest area'" and "must remain constantly alert." (*Id.* at 53). Rovers are not allowed to sleep "or giv[e] the appearance of sleeping on duty," with the first infraction requiring two days suspension and four infractions requiring dismissal. (Doc. 195-8 at 103). If a rover gets "sleepy, ill, or in any way

unable to perform [his] post duties," he must "notify the Shift Supervisor for an immediate relief." (Doc. 195-1 at 56).

When a conflict occurs in H-Dorm, an officer should call for back up "as soon as it becomes apparent that a problem exists." (*Id.* at 55). Then, once backup arrives, inmates should be pat-searched, handcuffed, and escorted elsewhere out of H-Dorm. (*Id.* at 55–56). Officers are permitted to use force to protect others. (Doc. 195-4 at 35).

ADOC facilities are required to undergo annual internal and external security audits. (Doc. 195-6 at 73–82). Wardens are required to use these security audits to create a corrective action plan that "address[es] deficiencies in security practices identified by the audit team." (*Id.* at 74). All supervisory staff are also required to daily "patrol all areas of the institution accessible to inmates" to "detect[] deficiencies or breaches of security" and wardens must "coordinate weekly security inspections of all institutional security devices." (Doc. 141-5 at 64–65).

### 3. St. Clair Correctional Facility

#### a. Violence at St. Clair

St. Clair has a reputation of being a "particularly dangerous" prison. (Doc. 195-1 at 27). An ADOC law enforcement member testified that "St. Clair always seemed as though it was a hot spot" for violence. (Doc. 195-5 at 63). There were ten homicides at St. Clair from October 2011 to February 2018, two of which occurred

within seven months of each other in 2017 and 2018. (Doc. 195-6 at 84; doc. 195-15 at 15; doc. 195-17 at 13–14). From January 2015 to August 2016, St. Clair had 152 incidents of assault, 99 of which involved weapons. (Doc. 195-6 at 182–211). There were at least forty-eight inmate-on-inmate stabbings at St. Clair in 2016, the year before the assault on Mr. Boykins. (*See* doc. 195-8 at 109–56; docs. 195-9, 195-10, 195-11, 195-12, 195-13, 195-14, 195-15 at 3–7). Twenty-seven of the stabbings required a hospital visit and thirteen other inmate-on-inmate assaults required a hospital visit. (*See* doc. 195-8 at 109–56; docs. 195-9, 195-10, 195-11, 195-12, 195-13, 195-14, 195-15 at 3–7). Between October 2016 and September 2017, St. Clair had ninety-nine reported victims of inmate-on-inmate assault, which was more than any other ADOC facility. (Doc. 195-6 at 20, 97).

In 2017, there were at least nineteen inmate-on-inmate assaults involving a weapon, thirteen of which required a hospital visit—Mr. Boykins's attack was one of these—along with eight other inmate-on-inmate assaults that required hospital visits. (*See* 195-15 at 11–29, 195-16; doc. 195-17 at 1–23). In the two months before the attack, St. Clair had seven inmate-on-inmate assaults resulting in serious injury and sixteen additional inmate-on-inmate assaults that did not result in serious injury. (Doc. 195-6 at 113, 129). In the month of the attack, there were seven incidents of inmate-on-inmate violence at St. Clair, most of which involved inmate-made weapons and hospitalization. (Doc. 195-17 at 15–23). And an ADOC representative

testified "there may have been some assaults that were not captured" in the December 2017 incident reports. (Doc. 195-6 at 17, 21).

### b. St. Clair's Facilities

When Mr. Boykins was stabbed, the front door in H-Dorm was broken and did not lock. (Doc. 195-3 at 107–08). The locks in St. Clair were later repaired but "the inmates . . . once again tampered with" them. (Doc. 195-6 at 19; doc. 195-3 at 85). In December 2017, more than fifty percent of St. Clair was not covered or surveilled by cameras. (Doc. 195-3 at 88). At the time of the incident, there were also no cameras surveilling H-Dorm, although some have since been added. (Doc. 195-6 at 11; doc. 203-6 at 4). Of the cameras that are in place at St. Clair today, "at least 60 to 70 percent" have been torn down, vandalized, or damaged. (Doc. 195-3 at 35; doc. 195-5 at 70; doc. 195-6 at 177).

### c. Chronic Understaffing

During the week Mr. Boykins was stabbed, 87 correctional officer positions in St. Clair were staffed out of 249 authorized positions, meaning St. Clair was staffed at 35%. (Doc. 195-4 at 21). In 2017, only thirty-five to forty-one percent of authorized correctional officer positions at St. Clair were staffed. (Doc. 203-10 at 43–95).

Two officers used to be assigned to monitor H-Dorm, but with understaffing issues at St. Clair, one officer became responsible for monitoring the entire dorm of

256 inmates. (Doc. 195-1 at 38). There are multiple blind spots in H-Dorm and there is no location in H-Dorm where a correctional officer could see every inmate. (Doc. 195-3 at 87). When asked how he was expected to keep track of 256 inmates by himself, Mr. Walker said, "[t]hat's a good question." (Doc. 195-1 at 38).

### d. Control of Inmate Movement

Failing to control inmate movement causes "incidents" to occur inside prisons. (Doc. 195-6 at 142). Inmates have been going to areas where they are not allowed for decades in St. Clair and the problem has not improved in that time. (Doc. 195-1 at 30; *see id.* at 27). In 2016 and 2017, "[a] lot of inmates would not sleep in their assigned bunks." (Doc. 195-5 at 64). Sometimes, like in Mr. Boykins's case, prisoners go to dorms where they are not allowed in order to attack other inmates, which has caused at least one homicide at St. Clair. (*Id.* at 64–65). Mr. Estes testified that "probably more than 50 percent" of incidents at St. Clair were "caused by an inmate who was in a place they weren't supposed to be." (Doc. 195-3 at 99).

### e. Contraband

Many inmates at St. Clair possess contraband, including weapons. (*See* doc. 195-8 at 2, 7, 9–10, 14, 27, 29, 34, 46, 49, 53; doc. 195-1 at 44; doc. 195-3 at 16). Inmates at St. Clair have been able to fashion knives from the chain link fence, bed rails, Coke cans, medical splints, or any other piece of metal prisoners can access. (Doc. 195-3 at 102). Because inmates can fashion contraband weapons out of so

many items, Mr. Estes said that they could do a large search and find hundreds of knives, and then a week later "there would be plenty more inside the institution." (*Id.* at 102–03). Mr. Estes also observed that inmates can evade metal detectors meant to apprehend contraband "all the time." (*Id.* at 94). Mr. Walker is unaware of any policies his superiors have taken to decrease inmate-made weapons at St. Clair. (Doc. 195-1 at 35).

Contraband cell phones are also common at St. Clair and correctional officers recover them frequently. (Doc. 195-3 at 39). Mr. Whittington testified he was able to use a cell phone every day at St. Clair. (*Id.* at 13). Cell phone use at St. Clair poses a significant safety risk because it allows inmates to coordinate getting contraband into the facility, participate in gang activity, and continue to commit other crimes. (Doc. 195-8 at 108).

## f. Inmate and Area Searches

Searches are one of the "main sources of preventing or deterring individuals from introducing contraband into" ADOC prisons. (Doc. 195-6 at 12). But searches are conducted less frequently than they should be (doc. 195-3 at 33), with searches of H-Dorm potentially occurring only once a month (doc. 195-1 at 45). Mr. Noe, the current warden at St. Clair, was unsure whether he implemented an SOP about searches but said that searches would increase with additional staffing. (Doc. 195-3 at 32–33). Mr. Estes, who was the warden at the time of the attack, testified he could

request additional officers to do larger searches for contraband to the extent he "needed to." (*Id.* at 102–03; 141-12 at 8).

### g. *External Investigations of St. Clair*

In October 2016, the United States Department of Justice Civil Rights Division initiated an investigation into the conditions of men's prisons in Alabama. (Doc. 195-1 at 71). In April 2019, DOJ issued a report, finding that "there is reasonable cause to believe, based on the totality of the conditions, practices, and incidents discovered that . . . conditions in Alabama's prisons for men . . . violate the Eighth Amendment," in part because ADOC is not protecting prisons from inmate-on-inmate violence. (*Id.* at 67–88; doc. 195-2; doc. 195-3 at 1–5).

In November 2017, one month before the attack on Mr. Boykins, ADOC entered into a settlement agreement under which the Equal Justice Initiative ("EJI") served as a monitor over a remedial plan to decrease the "known risk of harm [from] malfunctioning locks, uncontrolled movement, widespread weapons contraband, dangerous housing practices, a culture of violence, and overcrowding and understaffing" at St. Clair. (Doc. 195-4 at 78). In March 2018, the EJI issued a report after touring St. Clair and found that "[i]nmate movement within general population appears to be occurring nearly unchecked" and that "the vast majority of inmates" were not wearing wristbands in compliance with St. Clair's wristband policy. (Doc. 195-5 at 5–7). EJI also noticed "a pattern of staff non-compliance with [St. Clair's]

SOPs regarding unauthorized movement." (*Id.* at 7). The EJI monitoring team also conducted an incident review that found that "violent incidents are frequently associated with unauthorized movement" and that "staff are not documenting unauthorized movement in violent incident reports or taking disciplinary action." (*Id.*).

In April 2018, a Prison Rape Elimination Act auditor, Melinda Allen, conducted a mock audit of St. Clair and ranked St. Clair the lowest in terms of safety measures compared to other prisons she audited. (Doc. 195-6 at 173). Ms. Allen said she had "never been in a facility like that before where [she] felt like the inmates were not being protected" and that "a lot of things going on . . . were inappropriate and out of bounds." (*Id.*). Ms. Allen said she had never been to a facility "where inmates just basically go where they want to" and essentially "just reassign themselves" to different dorms. (*Id.* at 178). Ms. Allen believed that staffing issues, "lack of control by staff, lack of doors working," and lack of control over inmates' ability to move to areas where they were not allowed, all contributed to the level of inmate-on-inmate violence at St. Clair. (*Id.* at 175–76).

From October 2021 through September 2022, there were sixty-five assaults at St. Clair with ninety-three victims. (Doc. 195-7 at 22). From October 2022 until January 2023, there were thirty-five assaults at St. Clair with forty-eight victims. (*Id.*

at 39). In December 2022, a firearm was confiscated from St. Clair. (Doc. 195-8 at 49).

### 4.  Mr. Walker and Mr. Noe

#### a.  Mr. Walker

Mr. Walker began working for ADOC in 1996. (*See* doc. 195-1 at 36). In June 2016, Mr. Walker was reprimanded for failing to prevent unauthorized inmates from accessing H-Dorm. (*Id.* at 65). The reprimand indicated that Mr. Walker "need[ed] to inspect inmates appearance more[,] rover H Dorm more frequently[,] . . . and stop [population inmates] from entering H Dorm." (*Id.*). Mr. Walker sometimes became sleepy while working in H-Dorm (*id.* at 41), but instead of notifying his shift supervisor as the reprimand required (*see* doc. 195-1 at 56), he would "get up and walk around" (*id.* at 41).

Mr. Walker testified that "the majority of inmates at St. Clair carry contraband knives" but that because only one guard is stationed in H-Dorm and it is unsafe for a guard to be alone while performing a pat search, "pat searches are less common in H dorm." (*Id.* at 44–45). Mr. Walker also admitted that he knows St. Clair is dangerous, that it has gotten more violent in recent years, and that it is known by some as "thunder dome." (*Id.* at 27); *see Thunderdome*, Wikipedia, https://en.wikipedia.org/wiki/Thunderdome ("Thunderdome is an arena for steel-cage fights to the death in the 1985 Australian post-apocalyptic film *Mad Max*

*Beyond Thunderdome*." (emphasis omitted)). Mr. Walker believes the violence at St. Clair can be attributed in part to staffing shortages, as well as the failure by St. Clair personnel to enforce SOPs. (Doc. 195-1 at 29, 34, 39–40).

       *b. Mr. Estes*

Mr. Estes was Warden III at St. Clair from March 2015 until May 2018. (Doc. 195-3 at 79). Warden III at St. Clair "is the head of the facility and day-to-day responsibility for the operation of the facility." (*Id.*). Mr. Estes reviews all incident reports about inmate-on-inmate violence at St. Clair (*id.* at 83) and reports all Class A incidents to his supervisor (doc. 195-6 at 141). In January 2018, Mr. Estes received records of all incidents at St. Clair from 2015 to 2017, which amounted to ninety-six incidents of assault and three homicides. (*Id.* at 24–33). He also knew the DOJ was investigating Alabama prisons, but no one spoke to him about the investigation. (Doc. 195-3 at 111–12). Mr. Estes was aware that correctional officers were falling asleep during shifts. (*Id.* at 109).

Mr. Estes could unilaterally issue or modify SOPs at St. Clair if they did not contradict any ARs. (*Id.* at 82). He would sometimes assess whether the SOPs were effective but did not recall them if he believed they were "deficient or . . . needed to be changed." (*Id.*). Mr. Estes never issued an SOP governing correctional officer investigations of inmate-on-inmate violence and St. Clair still does not have such an SOP. (Doc. 195-3 at 83–84; *see* doc. 195-6 at 153–64).

After Mr. Boykins was attacked, Mr. Estes did not make any institutional changes at St. Clair because he believed "St. Clair is as safe as any other maximum security prison in the State of Alabama or any state in America" and thus changes were not necessary. (Doc. 195-3 at 111, 114). The amount of violence at St. Clair stayed the same while Mr. Estes was Warden III. (*Id.* at 96). Although Mr. Estes believed inmates at Level V institutions cause a greater number of assaults than inmates at Level IV institutions, he did not institute any additional precautionary measures at St. Clair than those in place at a Level IV institution. (*Id.* at 86, 93).

Mr. Estes implemented the following measures to combat inmate violence at St. Clair: (1) requested additional fencing for the exercise yard and G block (doc. 141-12 at 14); (2) installed additional cameras (*id.* at 15); (3) replaced "every lock on every cell door and replaced the cell doors themselves" (*id.* at 10); (4) recruited correctional officers by talking with students in criminal justice classes about careers within the Department of Corrections (*id.* at 11); and (5) requested nets to be put around the institution to keep people from throwing contraband over the fences (*id.* at 14).

## II.   DISCUSSION

There are two pending motions for summary judgment: one filed by Mr. Walker (doc. 133) and one filed by Mr. Noe, Mr. Hamm, and Mr. Estes (doc. 132). But before turning to these motions, the court must address a jurisdictional

question: whether Mr. Boykins's claims for injunctive relief have been mooted by his transfer to a different ADOC facility.

Mr. Boykins seeks injunctive relief from Mr. Walker, Mr. Hamm, and Mr. Noe in their official capacities. (Doc. 199 at 52; *see* doc. 65 at 26). While this litigation was pending, ADOC transferred Mr. Boykins from St. Clair to Fountain Correctional Center. (Doc. 141-5 at 73). As a result, the court ordered the parties to be prepared to address at the August 2023 hearing whether the claims for injunctive relief were moot. (Doc. 205).

### 1. Mootness

"Because injunctions regulate future conduct, a party has standing to seek injunctive relief only if the party alleges, and ultimately proves, a real and immediate—as opposed to a merely conjectural or hypothetical—threat of *future* injury." *Church v. City of Huntsville*, 30 F.3d 1332, 1337 (11th Cir. 1994). In other words, to have standing to seek prospective relief, a plaintiff "must show a sufficient likelihood that he will be affected by the allegedly unlawful conduct in the future." *Koziara v. City of Casselberry*, 392 F.3d 1302, 1305 (11th Cir. 2004) (quotation marks omitted). Generally, "a prisoner's transfer or release from a jail moots his individual claim for declaratory and injunctive relief." *McKinnon v. Talladega Cnty.*, 745 F.2d 1360, 1363 (11th Cir. 1984).

Mr. Boykins argues that his claims for injunctive relief are not moot because of the voluntary cessation exception to mootness. (Doc. 199 at 52). "The basis for the voluntary-cessation exception is the commonsense concern that a defendant might willingly change its behavior in the hope of avoiding a lawsuit but then, having done so, return to its old ways." *Keohane v. Fla. Dep't of Corr. Sec'y*, 952 F.3d 1257, 1267 (11th Cir. 2020) (cleaned up). A defendant's "voluntary cessation of allegedly illegal conduct does not moot a case." *Id.* at 1267. But if "the totality of [the] circumstances persuades the court that there is no reasonable expectation that the government entity will reenact the challenged policy," the case is moot. *Id.* at 1268 (cleaned up).

A court should look to three non-exhaustive, and non-dispositive, factors to guide its analysis: (1) "whether the change in conduct resulted from substantial deliberation or is merely an attempt to manipulate [its] jurisdiction"; (2) "whether the government's decision to terminate the challenged conduct was unambiguous— which, in turn, entails an inquiry into whether the government's policy shift is fairly viewed as being permanent and complete"; and (3) "whether the government has consistently maintained its commitment to the new policy." *Id.* (quotation marks omitted). But "[t]he key inquiry is whether the plaintiff has shown a reasonable expectation—or [phrased differently] a substantial likelihood—that the government

defendant will reverse course and reenact" the offending conduct. *Keohane*, 952 F.3d at 1258.

At the August 2023 hearing, Mr. Boykins argued that ADOC inmates are transferred to a different ADOC facility approximately every eighteen to twenty-four months. (Doc. 216 at 7). Mr. Boykins, however, was not able to point to an AR or SOP in the record that describes the policies around inmate transfers. (*Id.* at 7, 10).

The parties argued only about the likelihood Mr. Boykins would be transferred to a Level V facility, of which ADOC has at least five[4]: Kilby, Holman, St. Clair, Donaldson, and Limestone. But ADOC facilities are mixed, such that a facility can house inmates of different security levels, with inmates assigned to beds based on their custody classification. (*See* doc. 141-2 at 3–4 ¶ 5; doc. 216 at 42). A medium custody inmate, such as Mr. Boykins, can be housed in a Level V *or* Level IV facility. (Doc. 141-2 at 4 ¶ 5). That means that, excluding Fountain, where Mr. Boykins is currently housed, there are at least seven other ADOC facilities that house male medium custody inmates. (*See* doc. 195-7 at 22). And neither party discussed Limestone, which houses close custody inmates but could also houses

_____

[4] Although neither party included Limestone as a Level V facility, ADOC records indicate it also houses close custody inmates and is a designated Level V facility. (Doc. 195-7 at 22; doc. 141-14 at 35; *see* doc. 216). At the August 2023 hearing, Mr. Boykins's counsel represented that Fountain is a Level V facility (doc. 216 at 9–10) but ADOC records indicate it is a Level IV facility (doc. 141-2 at 3 ¶ 4).

medium custody inmates. (*See id.*; doc. 141-5 at 73–75; doc. 141-14 at 35; doc. 141-2 at 3–4 ¶ 5; doc. 216).

Counsel for ADOC represented that Kilby is used only as a transitional facility for reclassification of inmates and for patients receiving mental health treatment. (Doc. 216 at 9–10). Because Mr. Boykins fits into neither category, the court is persuaded he is unlikely to be transferred there. (*See* doc. 216 at 9–10). Holman houses only inmates that are on death row or those who are part of a service population[5] that serves the remaining inmates at Holman, and Mr. Boykins's counsel represented that it is slated to be decommissioned. (Doc. 216 at 8, 40). At the August 2023 hearing, counsel for ADOC represented that a new correctional facility is currently being built in Elmore County and its completion will trigger St. Clair's closure. (Doc. 216 at 38–39). But the timeline for the construction of the new facility, and St. Clair's closure, is unknown. (*Id.* at 39).

Counsel for ADOC confirmed that nothing about Mr. Boykins's classification would prevent him from being housed at St. Clair and ADOC could not guarantee that Mr. Boykins would not be transferred back to St. Clair. (Doc. 216 at 39, 43, 46). Mr. Boykins's counsel represented that Mr. Boykins and Mr. Whittington are now

---

[5] Counsel for ADOC did not define this term or represent that Mr. Boykins would be prohibited from being part of that population and thus barred from being transferred to Holman. (*See* doc. 216 at 40).

"known enemies" and they cannot be housed together. There is no information in the record about the facility where Mr. Whittington is housed; however, an inmate movement record from March 2021 shows he was transferred from St. Clair. (Doc. 195-1 at 59–60). Mr. Boykins argues that considering all these circumstances, he has a fifty percent chance of returning to St. Clair if he is transferred. (Doc. 216 at 10). And he argues that is a sufficiently reasonable likelihood of returning to St. Clair for his claims against Mr. Hamm and Mr. Noe not to be moot.

First, the court considers whether the transfer was the result of substantial deliberation or an attempt to manipulate the court's jurisdiction. *Keohane*, 952 F.3d at 1268. Neither party was able to direct the court to an AR or SOP that governs inmate transfer, but Mr. Boykin's counsel argued that inmates are transferred among facilities roughly every eighteen to twenty-four months. (Doc. 216 at 7, 10). And although Mr. Boykins suggested there was circumstantial evidence that ADOC moved Mr. Boykins to evade jurisdiction, he offered no evidence for that assertion. (Doc. 216 at 26–27). In the light of the fact that Mr. Boykins was transferred over two years after he filed his complaint, the court is not persuaded that Mr. Boykins's transfer was an attempt to moot his claims. (Doc. 1; doc. 141-5 at 73–75). The evidence before the court suggests Mr. Boykins's transfer was a routine transfer; the product of neither substantial deliberation nor an attempt to evade jurisdiction. *See Keohane*, 952 F.3d at 1268.

Second, the court considers whether the decision to transfer Mr. Boykins from St. Clair was unambiguous, or in other words "permanent and complete." *Id.* (quotation marks omitted). Counsel for ADOC represented to the court that ADOC could not guarantee that Mr. Boykins would not be transferred back to St. Clair. (Doc. 216 at 38–39). And the court heard little evidence of how Mr. Boykins's future transfers would be evaluated. *See Doe v. Wooten*, 747 F.3d 1317, 1324–25 (11th Cir. 2014). This evidence undoubtably demonstrates a possibility that Mr. Boykins could be transferred back to St. Clair; however, Mr. Boykins's burden is to show a reasonable expectation that he will be transferred back to St. Clair. *See Keohane*, 952 F.3d at 1268.

Although Mr. Boykins's transfer to St. Clair is not foreclosed, it is not clear to the court when Mr. Boykins could even reasonably expect to be transferred—not only is there no evidence before the court on how transfer decisions are made but Mr. Boykins was at St. Clair for six years before he was transferred. (Doc. 141-5 at 73–75).

And even if the court were to assume that he would be transferred within eighteen to twenty-four months, it is not certain he will be transferred to a Level V facility (one of which is St. Clair) as his counsel suggests. (*See* doc. 216 at 7, 10). Mr. Boykins is a medium custody inmate and it is ADOC policy to house medium custody inmates in Level V and Level IV facilities. (Doc. 141-2 at 3–4 ¶ 5). In fact,

Mr. Boykins's inmate records show he has been assigned to a Level IV unit for years, including during his time at St. Clair. (Doc. 141-5 at 73–75).

Third, the court considers whether the government has consistently maintained its commitment to the new policy. *Keohane*, 952 F.3d at 1268. The court finds that factor is less applicable in the inmate transfer context, but as described above, there is minimal evidence of how ADOC decides to transfer inmates.

At the August 2023 hearing, Mr. Boykins relied heavily on two district court cases, neither of which this court finds persuasive. In *Henderson v. Thomas*, a class of HIV-positive inmates challenged an ADOC policy of segregating HIV-positive prisoners from the general population. 913 F. Supp. 2d 1267, 1276 (M.D. Ala. 2012). One of the seven plaintiffs was transferred to the other ADOC facility that houses women. *Id.* at 1286. As is relevant here, the court found that the plaintiff's claims were not moot because it was "common" to transfer inmates between those two facilities (Tutwiler and Montgomery) and ADOC had not changed the segregation policy. *Id.* The inmate in *Henderson* could only have been transferred back to Tutwiler; as described above, Mr. Boykins could be transferred to several facilities other than St. Clair.

*Braggs v. Dunn* is similarly unpersuasive. 317 F.R.D. 634 (M.D. Ala. 2016). That case also involved a class of inmates with serious mental health disorders challenging ADOC's mental health care policies and practices. *Id.* at 640.

28

Mr. Boykins's counsel argued that the *Braggs* decision noted that ADOC inmates are frequently transferred between facilities and are subject to the risk of harm at each of those facilities. (Doc. 216 at 24). *Braggs* is distinguishable for two reasons. First, the court was analyzing whether the commonality requirement was satisfied for class certification, not whether an inmate transfer satisfied the voluntary cessation exception to mootness. *Braggs*, 317 F.R.D. at 660–61. Second, the *Braggs* court was considering how frequently an entire class of inmates would be transferred to other facilities; this court's analysis, however, is narrowly focused only on whether Mr. Boykins faces a reasonable likelihood of being transferred back to St. Clair. *Id.* at 661–62.

In the alternative, Mr. Boykins argues that his claims are not moot because he is seeking relief from prison-wide polices. (*See* doc. 216 at 35–36). Mr. Boykins directs the court to *Tiedemann v. von Blanckensee*, 72 F.4th 1001 (9th Cir. 2023) for the proposition that a prison transfer does not moot a claim over an institutional-wide policy. Not only is *Tiedemann* not binding on this court, the Ninth Circuit expressly distinguished its holding from a case in which a prisoner is challenging the conditions at a specific prison to which he is unlikely to return. *Id.* at 1009.

*Tiedemann* concerned a federal inmate's challenge to a federal Bureau of Prison's ("BOP") policy of limiting inmate telephone use to 300 minutes per month. *Tiedemann*, 72 F.4th at 1004. After the inmate was transferred to a different facility,

29

the district court held his claims against his former wardens and the BOP's regional director were moot. *Id.* at 1004. The Ninth Circuit affirmed the district court's ruling that the claims against the former wardens were moot because they could not offer him relief at his new facility. *Id.* at 1008. But the Ninth Circuit reversed the district court's holding that the claims against the BOP's regional director were moot, reasoning that the telephone policy applied to the inmate at each facility and the regional director had the authority to offer him relief from that policy. *Id.* at 1008. The Ninth Circuit noted the circumstances in that case were "totally unlike prisoners whose claims challenged conditions specific to one facility from which they have been moved and to which they were unlikely to be returned." *Tiedemann*, 72 F.4th at 1009. In *Tiedemann*'s own words, it is not applicable to this case.

Considering the totality of the circumstances, the court is not persuaded Mr. Boykins has a reasonable expectation of being transferred back to St. Clair. *See Keohane*, 952 F.3d at 1268. Accordingly, the court finds that Mr. Boykins's claims against Mr. Walker, Mr. Hamm, and Mr. Noe are **MOOT** and it **WILL DISMISS THEM WITHOUT PREJUDICE**. Because the dismissal of these claims will be without prejudice, Mr. Boykins may refile his claims against Mr. Walker, Mr. Hamm, and Mr. Noe if he is ever transferred back to St. Clair. *See Wahl v. McIver*, 773 F.2d 1169, 1174 (11th Cir. 1985).

That leaves only an official and individual capacity claim for money damages against Mr. Walker and an individual capacity claim for money damages against Mr. Estes. Both have moved for summary judgment. (Docs. 132, 133). Summary judgment is appropriate if "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). "A genuine issue of material fact exists when the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Bowen v. Manheim Remarketing, Inc.*, 882 F.3d 1358, 1362 (11th Cir. 2018) (quotation marks omitted). The court will address each defendant's arguments separately.

### 2.  Mr. Walker's Motion for Summary Judgment

Mr. Boykins brings claims for monetary damages against Mr. Walker in his official and individual capacities for Mr. Walker's alleged failure to protect him or intervene when Mr. Whittington stabbed Mr. Boykins. (Doc. 65 at 5, 8–9, 23–26 ¶¶ 11, 23–26, 54–63).

### a.  *Official Capacity Claim*

Mr. Walker seeks summary judgment on Mr. Boykins's claim for monetary damages against him in his official capacity. (Doc. 142 at 19–20). Mr. Boykins does not address the propriety of his official capacity claim against Mr. Walker in his briefing. (*See* doc. 198). And at the August 2023 hearing, Mr. Boykins's counsel

stated that Mr. Boykins does not oppose the dismissal of the official capacity claims against Mr. Walker. (Doc. 216 at 5).

The court therefore finds that Mr. Boykins has abandoned his official capacity claim for monetary damages against Mr. Walker. *See Sapuppo v. Allstate Floridian Ins. Co.*, 739 F.3d 678, 681 (11th Cir. 2014). Accordingly, the court **WILL GRANT** Mr. Walker's motion for summary judgment on the official capacity claim asserted against Mr. Walker. (Docs. 133, 142 at 19–20).

### b. Individual Capacity Claim

Mr. Boykins alleges that Mr. Walker violated his Eighth Amendment rights by failing to protect him from an unreasonable risk of harm. (Doc. 65 at 5 ¶ 11, 25–26 ¶¶ 62–63). Mr. Walker argues that summary judgment is warranted on the individual capacity claim against him because (1) Mr. Boykins cannot establish Mr. Walker committed an Eighth Amendment violation in his monitoring of H-Dorm while Mr. Boykins was attacked, and (2) even if he could, Mr. Walker would be entitled to qualified immunity. (Doc. 142 at 10–19). Mr. Boykins contends that Mr. Walker violated the Eighth Amendment by falling asleep while monitoring H-Dorm and is not entitled to qualified immunity. (Doc. 198 at 26–39).

"Qualified immunity shields a government official from liability unless he violates clearly established statutory or constitutional rights of which a reasonable person would have known." *Piazza v. Jefferson Cnty.*, 923 F.3d 947, 951 (11th Cir.

2019) (quotation marks omitted). At summary judgment, the court should draw all reasonable inferences in favor of the plaintiff when deciding if qualified immunity is appropriate. *Perez v. Suszcynski*, 809 F.3d 1213, 1221 (11th Cir. 2016).

In the Eleventh Circuit, a defendant asserting qualified immunity as a defense must first show "that he was engaged in a discretionary function when he performed the acts of which the plaintiff complains." *Epps v. Watson*, 492 F.3d 1240, 1243 (11th Cir. 2007) (quotation marks omitted). The burden then shifts to the plaintiff to show the defendant "violated a statutory or constitutional right, and . . . that the right was clearly established at the time of the challenged conduct." *Echols v. Lawton*, 913 F.3d 1313, 1319 (11th Cir. 2019) (cleaned up).

### i.  Qualified Immunity

Mr. Walker bears "the initial burden of raising the defense of qualified immunity by proving that his discretionary authority extended to his alleged actions." *Estate of Cummings v. Davenport*, 906 F.3d 934, 939 (11th Cir. 2018).

Before the court considers the substance of Mr. Walker's arguments, it must determine if he properly raised the defense in his briefing. The vast majority of Mr. Walker's argument about his qualified immunity defense relates to the clearly established prong. (*See* doc. 142 at 15–19). Only after likening this case to the Eleventh Circuit's unpublished decision in *Washington v. Warden*, 847 F. App'x 734 (11th Cir. 2021), does Mr. Walker state in a single sentence that "[i]t is

33

undisputed that Walker was acting within the scope of his discretionary authority at the time of the incident." (Doc. 142 at 18). In support, he cites only law generally describing what discretionary authority is and he cites no evidence in which Mr. Boykins concedes that Mr. Walker was acting in his discretionary authority. (Doc. 142 at 18). Indeed, whether Mr. Walker was so acting is a central dispute in this case. (*See* doc. 198 at 37).

That single sentence is not enough to satisfy Mr. Walker's initial burden. *See Christmas v. Harris Cnty.*, 51 F.4th 1348, 1354 & n.4 (11th Cir. 2022) (finding plaintiff forfeited any argument that the defendant violated clearly established law because she "dedicate[d] just two sentences to this all-important issue," and those two sentences failed to make any substantive argument). Here, Mr. Walker makes no argument, and cites no on-point authority, to demonstrate what his job-related function was or how his actions were within the scope of his authority. (Doc. 142 at 18–19). The court is otherwise left to concoct those arguments on Mr. Walker's behalf, which it cannot do. *See Fils v. City of Aventura*, 647 F.3d 1272, 1284 (11th Cir. 2011) ("[D]istrict courts cannot concoct or resurrect arguments neither made nor advanced by the parties."). Although Mr. Walker presented some, albeit minimal, arguments in his reply brief, those arguments come too late; a party cannot raise an argument for the first time in a reply brief. (Doc. 200 at 12); *Sapuppo*, 739 F.3d at 683. To allow Mr. Walker to rest on his reply after failing to adequately

address the issue in his initial brief would be to put on the plaintiff the burden of showing that the defendant was not acting in his discretionary authority. *Cf. Harbert Intern., Inc. v. James*, 157 F.3d 1271, 1281 (11th Cir. 1998) ("[T]he burden is first on the defendant to establish that the allegedly unconstitutional conduct occurred while he was acting within the scope of his discretionary authority."); *Barker v. Norman*, 651 F.2d 1107, 1124–25 (5th Cir. 1981)[6] (noting that a bald assertion is not sufficient to establish discretionary authority). Because Mr. Walker has presented the court with only a bald assertion that his actions were in his discretionary authority, the court finds he has forfeited his qualified immunity defense. *See Davenport*, 906 F.3d at 940.

Having found that Mr. Walker is not entitled to qualified immunity, the court next analyzes Mr. Boykins's claim against Mr. Walker in his individual capacity.

### ii.   Merits – Failure-to-Protect Claim

Under the Eighth Amendment, prison officials have a duty "to protect prisoners from violence at the hands of other prisoners." *Rodriguez v. Sec'y for Dep't of Corr.*, 508 F.3d 611, 616–17 (11th Cir. 2007) (quotation marks omitted). But not "every injury suffered by one inmate at the hands of another . . . translates into a

---

[6] In *Bonner v. City of Prichard*, 661 F.2d 1206, 1209 (11th Cir.1981) (en banc), the Eleventh Circuit adopted as binding precedent all decisions of the former Fifth Circuit handed down before October 1, 1981.

constitutional liability for prison officials responsible for the victim's safety." *Carter v. Galloway*, 352 F.3d 1346, 1349 (11th Cir. 2003) (quotation marks omitted). To survive a motion for summary judgment on a failure-to-protect claim, a plaintiff must create a dispute of material fact regarding whether he faced "(1) a substantial risk of serious harm"; (2) that the defendant was deliberately indifferent toward; and (3) causation. *Id.* (quotation marks omitted).

### Substantial Risk of Serious Harm

Mr. Boykins argues that he faced a substantial risk of serious harm at St. Clair because inmates consistently suffered severe injuries due to attacks by other inmates. (Doc. 198 at 28–29). Mr. Boykins does not argue there was a substantial risk of serious harm from a specific threat posed by Mr. Whittington. Therefore, Mr. Boykins's deliberate indifference claim is based only on a risk of generalized prison violence. *Marbury v. Warden*, 936 F.3d 1227, 1234 (11th Cir. 2019).

To establish deliberate indifference based on a generalized risk, the plaintiff must show "that serious inmate-on-inmate violence was the norm or something close to it." *Id.* (quotation marks omitted). Although "occasional isolated attacks by one prisoner on another may not constitute cruel and unusual punishment, confinement in a prison where violence and terror reign is actionable." *Id.* (cleaned up). When "inmate-on-inmate violence occur[s] regularly" and "the violence [is] severe enough to require medical attention and even hospitalization on occasion," there is a

question of fact as to whether a substantial risk of serious harm exists. *Hale v. Tallapoosa Cnty.*, 50 F.3d 1579, 1583 (11th Cir. 1995).

Although there is no clear threshold for what constitutes "regular" violence, *see id.*, a plaintiff can point to "specific features of a facility or its population rendering it particularly violent." *Marbury*, 936 F.3d at 1235. Those specific features include pervasive staffing and logistical issues that render prison officials unable to address near-constant violence; tensions between different subsets of a prison population; and unique risks posed by individual prisoners or groups of prisoners due to characteristics like mental illness. *Id.*

A reasonable jury could find that the generalized risk of prison violence at St. Clair posed a substantial risk of harm to Mr. Boykins. Mr. Whittington's assault on Mr. Boykins occurred in December 2017. (Doc. 141-16 at 17). Between 2016 and 2017, St. Clair was substantially more violent than any correctional facility analyzed in the cases the parties cite; over a two-year period, there were sixty-seven inmate-on-inmate assaults with a weapon. (*See* doc. 195-8 at 109–56; docs. 195-9, 195-10, 195-11, 195-12, 195-13, 195-14, 195-15, 195-16; doc. 195-17 at 1–11) (St. Clair had forty-eight inmate-on-inmate assaults with a weapon in 2016 and nineteen inmate-on-inmate assaults with a weapon in 2017); *cf. Harrison v. Culliver*, 746 F.3d 1288, 1294 n.6 (11th Cir. 2014) (thirty-three incidents involving weapons in three years was not enough to establish a constant threat of violence); *Marbury*, 936 F.3d at

1234 (fifteen stabbings in six years). From October 2016 to September 2017, twenty-nine of those assaults resulted in a serious injury. (Doc. 195-6 at 97). Between October 2016 and September 2017, St. Clair had ninety-nine reported victims of inmate-on-inmate assault, which is approximately ten percent of its inmate population. (*Id.* at 89, 97). In December 2017, the month Mr. Boykins was attacked, there were at least seven incidents of inmate-on-inmate violence. (Doc. 195-17 at 15–23). There is evidence that not all assaults were documented in incident reports. (Docs. 195-6 at 21). Most of the December 2017 incidents involved an inmate-made weapon and required hospitalization. (Doc. 195-17 at 15–23).

Inmate-made weapons and other contraband like cellphones permeate St. Clair. (Doc. 195-1 at 44). An LESD investigator testified that "[p]robably the majority" of inmate-on-inmate assaults that result in serious injury involved a weapon. (Doc. 195-5 at 64). Mr. Walker testified that there were "many knives" in H-Dorm and he agreed that the majority of inmates at St. Clair carry contraband knives. (Doc. 195-1 at 44). Mr. Estes, St. Clair's warden at the time of the attack, testified that correctional officers could do a large search of the prison and find hundreds of knives and within a week "there would be plenty more inside the institution." (Doc. 195-3 at 102–03). Despite the known, widespread possession of contraband, pat searches were less common in H-Dorm, potentially occurring only once a month. (Doc. 195-1 at 45; *see* doc. 195-3 at 18). St. Clair used portable metal

detectors, but Mr. Estes testified that inmates were able to evade metal detectors "all the time." (*See* doc. 195-3 at 94).

Infrequent pat searches were caused, at least partially, by chronic understaffing. (*See id.* at 33). The week Mr. Boykins was attacked, St. Clair staffed only 35% of available positions; out of 249 authorized positions, only 88 correctional officer positions were filled. (Doc. 195-4 at 21). In 2017, St. Clair never staffed more than forty-one percent of authorized positions. (Doc. 203-10 at 43–95).

That chronic understaffing created inmate-to-officer ratios that made it nearly impossible for officers to perform their job duties. Although two officers were required to be assigned to H-Dorm, only one officer was responsible for monitoring the 256 inmates in H-Dorm. (Doc. 195-1 at 38). There are multiple blind spots in H-Dorm that make it impossible for one officer to see every inmate from a single location. (Doc. 195-3 at 87). At the time of the attack, there were no mirrors or cameras in H-Dorm. (Doc. 195-6 at 11; doc. 141-16 at 8). When asked how he was expected to monitor 256 inmates by himself, Mr. Walker testified "[t]hat's a good question." (Doc. 195-1 at 38).

In addition to monitoring inmates in an officer's assigned area, officers are supposed to prevent inmates prohibited from certain areas from entering those areas. (*Id.* at 30). Failure to control inmate movement results in more violence. (Doc. 195-3 at 99). But at least half the assaults in St. Clair occurred in an area the attacker was

prohibited from entering. (*Id.*). St. Clair's failure to control inmate movement has existed for decades and is widely known among St. Clair officials. (Doc. 195-1 at 27, 30; *see* doc. 195-8 at 67; doc. 195-4 at 88).

Attempting to control inmate movement, St. Clair implemented a wristband policy, since at least May 2016, to assist correctional officers in identifying the area of St. Clair an inmate is permitted. (Doc. 195-1 at 50–57; doc. 195-3 at 70–74). But inmates tampered with the wristbands or swapped them with other inmates with such frequency that the policy was not "effective whatsoever." (Doc. 195-3 at 98). Although it remained official St. Clair policy, it was rarely enforced. (*Id.* at 36).

Correctional officers were required to enforce St. Clair's polices by roving—*i.e.*, constantly patrolling their assigned areas—and ensuring that inmates were complying with the various security protocols St. Clair implemented. (Doc. 195-1 at 52, 54). St. Clair policy required that while officers were constantly patrolling their area, they would ensure inmates had the appropriate wristband and randomly search the area and inmates to confiscate contraband. (*Id.*). They were expressly prohibited from sitting at the station desk for extended periods of time and were required to remain constantly on alert. (Doc. 195-8 at 103). In practice, however, officers routinely failed to monitor their area, particularly through a failure to enforce the wristband policy. (Doc. 195-3 at 99; *see* doc. 141-17 at 12–14). Because officers sometimes worked nearly twenty-four-hour shifts, they would occasionally fall

asleep on duty. (Doc. 195-3 at 109). Mr. Walker, for example, had been previously reprimanded for failing to rove H-Dorm more frequently and failing to stop prohibited inmates from entering H-Dorm. (Doc. 195-1 at 65).

Considering the entirety of the prison environment in Mr. Boykins's favor, a reasonable jury could conclude the generalized risk of violence at St. Clair posed a substantial risk of serious harm to Mr. Boykins. Taken in the light most favorable to Mr. Boykins, violence and terror "reign[ed]" at St. Clair. *See Marbury*, 936 F.3d at 1234. The frequency and severity of violence is staggering. And in the light of that violence, St. Clair's dysfunction is shocking. St. Clair was never staffed at more than half of its capacity—just a month before the stabbing, approximately 88 correctional officers were responsible for monitoring a facility with more than 900 inmates. (Doc. 195-4 at 22; doc. 195-6 at 121). At the time of the attack, crucial SOPs implemented to run the facility were abandoned: duty stations were rarely staffed sufficiently; officers rarely roved or conducted pat down or area searches; and inmates freely moved to prohibited areas. The result was a severely understaffed correctional facility filled with weapons and other contraband within which inmates could move through with impunity. Mr. Boykins therefore carried his burden in establishing an objective risk of serious harm based on the general risk of violence at St. Clair.

*Deliberate Indifference*

An officer acts with deliberate indifference when the officer "knows of and disregards an excessive risk to inmate health or safety." *Farmer v. Brennan*, 511 U.S. 825, 837 (1994). This inquiry includes a subjective and objective component. *Caldwell v. Warden*, 748 F.3d 1090, 1099 (11th Cir. 2014). The subjective component requires that the defendant "actually . . . know[] that an inmate is facing a substantial risk of serious harm." *Rodriguez v. Sec'y for Dep't of Corr.*, 508 F.3d 611, 617 (11th Cir. 2007). A risk is known if the defendant is "aware of facts from which the inference could be drawn that a substantial risk of serious harm exists, and he . . . draw[s] th[at] inference." *Farmer*, 511 U.S. at 837. The defendant must have "disregarded that risk" and "acted with more than gross negligence." *Wade v. McDade*, 67 F.4th 1363, 1374 (11th Cir. 2023) (emphasis omitted).

The objective component considers whether "the defendant disregarded that known risk by failing to respond to it in an objectively reasonable manner." *Caldwell*, 748 F.3d at 1099 (quotation marks omitted, alterations accepted). It is not necessary that the plaintiff show he "was especially likely to be assaulted by the *specific prisoner* who eventually committed the assault," *Rodriguez*, 508 F.3d at 617 (quotation marks omitted); the inmate can "face[] an excessive risk of attack for reasons personal to him or because all prisoners in his situation face such a risk." *Farmer*, 511 U.S. at 843.

Mr. Walker argues that he did not know a substantial risk existed before Mr. Boykins's attack because he "had no warning that the incident would occur." (Doc. 142 at 11). But, as explained above, Mr. Boykins does not contend that Mr. Walker knew ahead of time that Mr. Whittington intended to attack Mr. Boykins; instead, Mr. Boykins argues that Mr. Walker knew St. Clair was so dangerous that any failure on his part to monitor inmates would put everyone under his care in substantial danger. (Doc. 198 at 27–29).

To prove that Mr. Walker knew that failure to enforce safety measures at St. Clair could result in serious harm to himself or other inmates, Mr. Boykins offers Mr. Walker's testimony that he knew (1) St. Clair was extremely dangerous; (2) that inmates at St. Clair are able to move freely into unauthorized parts of the facility and often do so to attack other inmates; (3) that contraband is common at St. Clair and most inmates carry contraband weapons; (4) that St. Clair is severely understaffed, which contributes to inmate-on-inmate violence; and (5) that it was important to keep unauthorized inmates from H-Dorm because he had been reprimanded in the past for failing to do so. (Doc. 198 at 27–28; *see* doc. 195-1 at 27, 29, 34, 39–40, 44, 65). Mr. Walker testified that he did not conduct frequent pat down searches because he was the only officer on duty, and conducting searches in that environment would expose him to physical risk. (Doc. 195-1 at 45).

A reasonable jury could find that Mr. Walker was subjectively aware of the violence and dysfunction at St. Clair and drew the inference that it posed a substantial risk of serious harm to inmates. *Farmer*, 511 U.S. at 837.

Turning to the objective prong, Mr. Walker argues that he did not fail to respond in an objectively reasonable manner because he was awake and alert at the time of the attack and he immediately called for help. (Doc. 142 at 11–12). Mr. Boykins contends that he created a genuine dispute of material fact as to whether Mr. Boykins was asleep and, if he was not asleep, whether Mr. Walker immediately called for backup. (Doc. 198 at 30–34).

Mr. Walker cites to his testimony and Mr. Whittington's testimony that Mr. Walker was awake when Mr. Whittington entered H-Dorm. (Doc. 141-17 at 12–13; doc. 141-16 at 10). But Mr. Boykins testified that (1) Mr. Walker was asleep five minutes before he was stabbed; and (2) that Mr. Walker "eventually woke up during the tussle." (Doc. 141-10 at 20, 24). Further, there is evidence (1) Mr. Walker did not search or otherwise speak to Mr. Whittington when he entered H-Dorm without permission in violation of multiple St. Clair policies (doc. 141-17 at 12–13); (2) immediately prior to the incident, many inmates were using their phones in the TV room, which was in Mr. Walker's line of sight, but he did not confiscate those phones (doc. 141-17 at 14, 16; doc. 195-1 at 11); (3) backup did not arrive for ten minutes after Mr. Whittington began stabbing Mr. Boykins (doc. 141-16 at 17); and

44

(4) Mr. Whittington's attire (a skull cap, two jackets, and a towel around his neck) could have put a seasoned correctional officer, which Mr. Walker was, on notice that he intended to attack an inmate (*see* doc. 141-17 at 12). Considering all the evidence in the light most favorable to Mr. Boykins, there is enough evidence to allow a reasonable jury to conclude that Mr. Walker was asleep when Mr. Whittington entered H-Dorm and attacked Mr. Boykins.

Mr. Boykins also argues it is undisputed that he immediately called for backup when Mr. Whittington started stabbing Mr. Boykins. (Doc. 142 at 14). The evidence before the court is (1) Mr. Walker's testimony that as soon as he became aware of a commotion, he called for backup (doc. 141-16 at 10); and (2) Mr. Whittington and Mr. Boykins's testimony that at some point during the attack they both saw Mr. Walker on his radio (doc. 141-17 at 18; doc. 141-10 at 26). First, neither Mr. Whittington nor Mr. Boykins said they immediately saw Mr. Walker on his radio, so this testimony establishes only that at some point during the attack Mr. Walker called for backup. Second, Mr. Boykins offers evidence that creates a dispute of fact about whether the call for backup was immediate. (Doc. 198 at 30–31). The duty post log from that day that indicates Mr. Whittington stabbed Mr. Boykins at 4:40 PM and backup did not arrive until 4:50 PM. (Doc. 141-16 at 17). Mr. Boykins argues the ten-minute delay creates a dispute of fact as to whether

Mr. Walker immediately called for backup because it is unlikely it would take that long for backup to arrive from elsewhere in St. Clair. (*See* doc. 198 at 30–31).

Thus, drawing all inferences in favor of Mr. Boykins, the court agrees that a reasonable jury could find that Mr. Walker did not immediately call for backup when the stabbing began. *See Cottone v. Jenne*, 326 F.3d 1352, 1359 (11th Cir. 2003), *abrogated in part on other grounds by Randall v. Scott*, 610 F.3d 701 (11th Cir. 2010) (holding that prison guards who were allegedly watching a computer game instead of monitoring the jail cell at the time of the murder exhibited deliberate indifference given the guard's knowledge of the substantial risk of harm to inmates). Therefore, because the court finds there is a genuine dispute of material fact as to whether Mr. Walker was awake and whether he immediately called for help, a reasonable jury could find that Mr. Walker did not respond reasonably to the substantial risk of serious harm that Mr. Boykins faced.

*Causation*

As the sole officer monitoring H-Dorm, a reasonable jury could find that Mr. Walker's unreasonable response to the substantial risk of harm was a necessary causal link in Mr. Whittington successfully attacking Mr. Boykins. Mr. Walker's failure to monitor H-Dorm allowed Mr. Whittington to enter H-Dorm and assault Mr. Boykins. A reasonable jury could also find that even if Mr. Walker would not have been able to stop Mr. Whittington from entering H-Dorm, immediately calling

for backup would have prevented the assault from lasting ten minutes. Accordingly, the court **WILL DENY** Mr. Walker's motion for summary judgment. (Doc. 133).

### 3.  Mr. Estes's Motion for Summary Judgment

Mr. Boykins brings an Eighth Amendment claim against Mr. Estes in his individual capacity for "failing to take reasonable measures to guarantee his safety . . . and to protect [Mr. Boykins] from violence at the hands of other inmates." (Doc. 65 at 24 ¶ 58). Mr. Estes moves for summary judgment, arguing that his actions were not unconstitutional and that he is entitled to qualified immunity. (Doc. 132; doc. 145 at 37–48).

### a.  Qualified Immunity

As described above, a defendant asserting qualified immunity as a defense must first show he was engaged in a discretionary function when he performed the acts at issue. *Epps v. Watson*, 492 F.3d 1240, 1243 (11th Cir. 2007). Mr. Boykins concedes that Mr. Estes was acting within his discretionary authority. (Doc. 199 at 52). Therefore, the burden shifts to Mr. Boykins to show Mr. Estes violated his constitutional rights and that those rights were clearly established at the time of the violation. *Epps*, 492 F.3d at 1243.

As noted above, although the court may address both questions in any order, it will first address the question of whether Mr. Estes's alleged constitutional

violation was clearly established. *See District of Columbia v. Wesby*, 583 U.S. 48, 62 n.7 (2018).

A plaintiff can show a right was clearly established in one of three ways: first, "he can show that a materially similar case" with "binding precedent tied to particularized facts" has already been decided; second, he can "show that a broader, clearly established principle should control the novel facts of a particular case"; and third, he can "show that the case fits within the exception of conduct which so obviously violates the Constitution that prior case law is unnecessary." *Waldron v. Spicher*, 954 F.3d 1297, 1304–05 (11th Cir. 2020) (quotation marks omitted, alterations accepted). Mr. Boykins relies on the first and third methods.

For the first method, Mr. Boykins cites a long list of cases for the proposition that the conditions at St. Clair posed a substantial risk of serious harm to inmates. (Doc. 199 at 53–54) (citing *Farmer v. Brennan*, 511 U.S. 825 (1994); *Lane v. Philbin*, 835 F.3d 1302 (11th Cir. 2016); *Harrison v. Culliver*, 746 F.3d 1288 (11th Cir. 2014); *Hale v. Tallapoosa Cnty.*, 50 F.3d 1579 (11th Cir. 1995); *LaMarca v. Turner*, 995 F.2d 1526 (11th Cir. 1993); *Cottone v. Jenne*, 326 F.3d 1352 (11th Cir. 2003), *abrogated in part on other grounds by Randall v. Scott*, 610 F.3d 701 (11th Cir. 2010); *Marsh v. Butler Cnty.*, 268 F.3d 1014 (11th Cir. 2001)). But he cites no caselaw demonstrating that Mr. Estes's response violated clearly established law.

48

(*See* doc. 199 at 53–54). As such, he has not met his burden of showing a violation of a clearly established right under the first method.

For the third method, Mr. Boykins argues that Mr. Estes responded unreasonably to the risk of harm at St. Clair because his "actions were so egregious that they violate a broader constitutional rule with obvious clarity." (Doc. 199 at 53). Mr. Boykins points to (1) Mr. Estes's deposition testimony that "he could not identify a single action he took" after a homicide in 2017 to improve safety at St. Clair; (2) Mr. Estes's inaction in the face of his knowledge that his policies "were not being followed, did not work, or both"; and (3) that despite Mr. Estes's knowledge of security risks in 2015, all identified issues still persist at St. Clair. (*Id.* at 54–55) (emphasis omitted). Mr. Boykins also argues that because Mr. Estes has been "a defendant in numerous prison-condition cases," he "was well informed of his constitutional duties and the types of action or inaction that would constitute deliberate indifference." (*Id.* at 54).

The court finds Mr. Boykins's arguments unpersuasive. None of the examples Mr. Boykins references are so egregious that they satisfy the high bar of violating a constitutional rule with obvious clarity. Although Mr. Estes role as a defendant in other litigation regarding St. Clair can demonstrate that he was aware of the conditions at St. Clair, Mr. Boykins has failed to demonstrate how it shows that he violated clearly established law. Accordingly, because the court finds that Mr. Estes

is entitled to qualified immunity, the court **WILL GRANT** summary judgment as to all claims against Mr. Estes.

### III.   CONCLUSION

The court **WILL DISMISS AS MOOT** Mr. Boykins's claims for injunctive relief against Mr. Walker, Mr. Hamm, and Mr. Noe. The court **WILL GRANT IN PART** and **WILL DENY IN PART** Mr. Walker's motion for summary judgment. The court **WILL GRANT** Mr. Walker's motion for summary judgment on the official capacity claim but **WILL DENY** his motion on the individual capacity claim. (Doc. 133). The court **WILL GRANT** Mr. Estes's motion for summary judgment. (Doc. 132).

The court will enter a separate partial judgment consistent with this memorandum opinion.

**DONE** and **ORDERED** this September 30, 2023.

_____
**ANNEMARIE CARNEY AXON**
UNITED STATES DISTRICT JUDGE